**No. 24-1020**

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

PERSONAL AUDIO, LLC,
*Plaintiff-Appellant,*

*v.*

GOOGLE LLC,
*Defendant-Appellee.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CASE NO. 1:17-cv-01751-CFC
Colm F. Connolly, Chief Judge

---

**CORRECTED NON-CONFIDENTIAL OPENING BRIEF OF APPELLANT
PERSONAL AUDIO, LLC**

---

Steven M. Hanle, *Principal Attorney*
Douglas Q. Hahn
Salil Bali
STRADLING YOCCA CARLSON &
RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660
949-725-4000

Henning Schmidt
STRADLING YOCCA CARLSON &
RAUTH LLP
500 W. 2nd Street, Suite 1900
Austin, TX 78701
512-788-5015

*Attorneys for Plaintiff-Appellant Personal Audio, LLC*

## PATENT CLAIMS AT ISSUE

(The Court's claim constructions can be found at Appx54422-54431)

**U. S. Patent 6,199,076** (Claims 3, 6, and 13 asserted)

**Claim 1:** A player for reproducing selected audio program segments comprising, in combination:

means for storing a plurality of program segments, each of said program segments having a beginning and an end,

means for receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be reproduced by said player,

means for accepting control commands from a user of said player,

means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command,

means for detecting a first command indicative of a request to skip forward, and

means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence.

**Claim 2:** A player as set forth in claim 1 further comprising means for detecting a second command indicative of a request to skip backward, and means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program.

**Claim 3**:  A player as set forth in claim 2 further comprising means responsive to the detection of two consecutive ones of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment.

**Claim 5:** A player as set forth in claim 1 including editing means for modifying said data establishing said sequence.

**Claim 6**:  A player as set forth in claim 5 wherein said editing means includes means for reordering the sequence established by said data.

**Claim 13**:  A player as set forth in claim 1 wherein said means for accepting control command from a user includes a microphone for accepting voice signals from said user and means for translating said voice signals into said control commands.

**U. S. Patent 7,509,178** (Claims 7 and 12 asserted)

**Claim 1**: An audio program player comprising:

a communications port for establishing a data communications link for downloading a plurality of separate digital compressed audio program files and a separate sequencing file from one or more server computers,

a digital memory unit coupled to said communications port for persistently storing said separate digital compressed audio program files and said separate sequencing file,

said sequencing file containing data specifying an ordered sequence of a collection of said separate digital compressed audio program files,

an audio output unit including at least one speaker or head set for reproducing said audio program files in audible form perceptible to a listener,

one or more manual controls for accepting commands from said listener, and

a processor for continuously delivering a succession of said audio program files in said collection to said audio output unit in said ordered sequence specified by said sequencing file in the absence of a program selection command from said listener, and for discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of a listener-selected one of said audio program files in said collection in response to a program selection command from said listener.

**Claim 2**: The audio program player as set forth in claim 1 further comprising a display screen for displaying a scrollable listing describing each of said separate digital compressed audio program files in said collection displayed in said ordered sequence specified by said sequencing file wherein said listener-selected audio program file is chosen by said listener by employing one or more of said manual controls to accept a program selection command from said listener to select one

of said audio program files described on said scrollable listing for immediate reproduction by said audio output unit.

**Claim 3**: The audio program player as set forth in claim 2 wherein said display screen provides a visible indication of said currently playing audio program file in the collection of programs specified by said sequencing file and described on said scrollable listing.

**Claim 4**: The audio program player as set forth in claim3 wherein said processor responds to a skip forward program selection command accepted from said listener by discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of that audio program file which follows said currently audio program file in said ordered sequence specified by said sequencing file.

**Claim 5**: The audio program player as set forth in claim 4 wherein said processor responds to a skip backward program selection command accepted from said listener at a time when said currently playing audio program file has played for at least a predetermined amount of time by discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of said currently playing audio program file.

**Claim 6**: The audio program player as set forth in claim 5 wherein said processor responds to a skip backward program selection command accepted from said listener at a time when said currently playing audio program file has not yet played for said predetermined amount of time for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment in said ordered sequence specified by said sequencing file.

<u>**Claim 7**</u>:  The audio program player as set forth in claim 6

wherein said processor responds to a skip forward program selection command when playing the last audio program file in said ordered sequence specified by said sequencing file by continuing reproduction at the beginning of the first audio program file in said sequence,

and responds to a skip backward program selection command accepted at a time when said first audio program file is playing but said first audio program file has not vet played for said predetermined amount of time by continuing reproduction at the beginning of the last audio program in said sequence

whereby the reproduction of the audio program files specified by said sequencing file can be skipped from beginning to beginning in both the forward or backward direction in a bidirectional endless loop.

**Claim 9**: The audio program player as set forth in claim 1 wherein each audio program file in said collection specified by said sequencing file is selected in accordance with program preference data or program selections accepted from said

listener to define a playback session that is personalized to the preferences of said listener.

**Claim 10**: The audio program player as set forth in claim 9 wherein at least some of said separate digital compressed audio program files downloaded from said one or more server computers are selected by or on behalf of said listener from a catalog listing of recommended audio program files available from said one or more server computers wherein the audio program files specified in said catalog listing of recommended audio program files are selected in accordance with program preference data or program selections previously accepted from said listener.

**Claim 11**: The audio program player as set forth in claim 10 wherein at least some of said separate digital compressed audio program files downloaded from said one or more server computers are specified by requests transmitted by said listener to said one or more server computers via said communication link.

**Claim 12**:  The audio program player as set forth in claim 11

    wherein said one or more manual controls include a keyboard for accepting account information from said listener that is transmitted via said communications link to said one or more server computers to establish a subscription account for said listener,

    said account information including

        a unique identification of said listener,

        a password supplied by and known to said listener, and

        credit card information for use in billing charges to said listener, and

    wherein at least some of said separate digital compressed audio program files downloaded from said one or more server computers and specified by said requests transmitted by said listener are purchased by said listener and charged to said subscription account.

## CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Personal Audio, LLC certify the following:

1.   The full name of every party represented by me is: Personal Audio, LLC

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: None.

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: None.

4.   The name of all law firms and the partners or associates that appeared for the party now represented by me in the trial Court or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are: Stradling, Yocca, Carlson & Rauth, P.C., Hardy, Parrish & Yang, LLP, Victor G. Hardy, William B. Parrish, Minghui Yang, Matthew Stephens, Jared Veliz, Ahmad Takouche, Lisa Northrop and Jason de Bretteville.

5.   The title and number of any case known to counsel to be pending in this or any other Court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal: None.

6.   Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees): None.

Dated: February 2, 2024      By: /s/ Steve Hanle
                                 Steve Hanle
                                 Attorney for Plaintiffs-Appellants
                                 Personal Audio, LLC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ................................................... v

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES........................................................... 2

STATEMENT OF THE CASE.............................................................. 3

STATEMENT OF FACTS ................................................................... 6

    I.     The Infringing Technology ................................................ 6

    II.    The Patents' Claimed Embodiment Works the Same Way ................. 9

SUMMARY OF ARGUMENT ............................................................ 13

ARGUMENT ..................................................................................... 16

    I.     STANDARD OF REVIEW ................................................. 16

        A.    JMOL ................................................................... 16

        B.    Summary Judgment .............................................. 16

    II.    THE DISTRICT COURT ERRED IN GRANTING JMOL ON INFRINGEMENT ....................................................... 17

        A.    Use Cases 1 and 2 ................................................ 17

        B.    The Court's Finding that Personal Audio Forfeited Its Arguments was Error ................................ 26

        C.    Use Case 3 ............................................................ 28

        D.    The Claim Language, Prosecution History, and Specification Confirm that Use Cases 1-3 Meet the Court's Construction of Sequencing File .................... 32

        E.    A New Trial is Not Warranted ............................... 41

    III.   THE COURT FURTHER ERRED DISMISSING PA'S DIRECT INFRINGEMENT CLAIMS ............................... 41

        A.    Manufacturer Agreements ..................................... 42

B.    Updates....................................................................................44

IV.    THE COURT ERRED BY ISSUING SUMMARY
JUDGEMENT ON PA'S 271(F) CLAIMS AND
PRECLUDING PA'S DAMAGES EXPERT FROM
TESTIFYING REGARDING THE SAME .......................................47

A.    PA Provided Substantial Evidence that US Servers
Made Foreign Installations .......................................................48

B.    There is Substantial Evidence that Updates Contained
Patented Components...............................................................56

C.    The Court Erred In Precluding The Riley Report....................64

CONCLUSION ...........................................................................................64

**CONFIDENTIAL MATIERAL OMITTED**

Confidential Material Subject to the Protective Order has been omitted from
Appellant's Non-Confidential Brief at pages 31, 50-52.  The material omitted
contains Appellee's confidential business agreements, confidential technical
information and source code obtained and or provided in discovery. The redacted
documents in the Addendum (Appx75-77, Appx80-81, Appx85-89, Appx93,
Appx96-103) were all filed under seal by the District Court.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Agrizap, Inc. v. Woodstream Corp.*,
    520 F.3d 1337 (Fed. Cir. 2008) ............................................................. 16, 24

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    629 F.3d 1311 (Fed. Cir. 2010) ....................................................................42

*Centillion Data Sys., LLC v. Qwest Communs. Int'l*,
    631 F.3d 1279 (Fed. Cir. 2011) ................................................. 44, 45, 46, 47

*Centrak, Inc. v. Sonitor Techs., Inc.*,
    915 F.3d 1360 (Fed. Cir. 2019) ...................................................... 42, 44, 45

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
    145 F.3d 1303 (Fed. Cir. 1998) ....................................................................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)......................................................................................17

*Ethicon Endo-Surgery, Inc. v. US Surgical Corp.*,
    149 F.3d 1309 (Fed. Cir. 1998) ............................................................. 16, 17

*Fisher v. Townsends, Inc.*,
    695 A.2d 53 (Del. 1997)................................................................................42

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) ...........................................................................16

*Lucent Technologies v. Gateway*,
    580 F.3d 1301 (Fed. Cir. 2009) ............................................................. 48, 49

*MobileMedia Ideas v. Apple*,
    780 F.3d 1159 (Fed. Cir. 2015) ....................................................................16

*Moleculon Research Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed. Cir. 1986) ....................................................................48

*On Demand Mach. Corp. v. Ingram Indus.*,
    442 F.3d 1331 (Fed. Cir. 2006) ....................................................................42

*Phx. Canada Oil Co. v. Texaco, Inc.*,
    842 F.2d 1466 (3d Cir. 1988) .......................................................................42

iii

*Springer v. Henry*,
    435 F.3d 268 (3d Cir. 2006) ...........................................................41

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012) ............................................ 48, 49

*Williamson v. Consol. Rail Corp.*,
    926 F.2d 1344 (3d Cir. 1991) .......................................................16

## Statutes & Other Authorities:

28 U.S.C. § 1295(a)(1) ...................................................................1

28 U.S.C. § 2107 ...........................................................................1

35 U.S.C. § 271(a) ............................................................. 2, 3, 15

35 U.S.C. § 271(f)................................................................*passim*

Fed. R. App. P. 4(a) ......................................................................1

Fed. R. Civ. P. 30(b)(6)......................................................... 19, 20, 21

Fed. R. Civ. P. 33(d) ....................................................................58

Fed. R. Civ. P. 33d ......................................................................51

Fed. R. Civ. P. 56(c)....................................................................17

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5(a), no other appeal in or from the same civil action in the lower Court was previously before this or any other appellate Court.

Pursuant to Federal Circuit Rule 47.5(b), counsel is unaware of any other pending cases that will directly affect, or will be directly affected by, the Court's decision in this appeal.

## **JURISDICTIONAL STATEMENT**

This Court has jurisdiction over this appeal pursuant to 28 U.S.C.

§ 1295(a)(1). Personal Audio timely appealed the Court's September 20, 2023,

final judgment under 28 U.S.C. § 2107 and Fed. R. App. P. 4(a) by filing its Notice

of Appeal on Sep. 28, 2023.

## **STATEMENT OF THE ISSUES**

1.      Whether there was sufficient evidence from which the jury reasonably found infringement under the District Court's construction of "sequencing file."

2.      Whether the District Court erred in granting summary judgment of non-infringement of PA's infringement claims under 35 U.S.C. §§271(a) and 271(f), including its denial of PA's motion for an adverse inference, which the Court incorporated by reference.

3.      Whether the District Court erred in precluding the testimony of expert Michele Riley based on its grant of summary judgment.

## STATEMENT OF THE CASE

Personal Audio, LLC ("PA") filed its Complaint on September 15, 2015, alleging Google infringed U.S. Patent Nos. 6,199,076 and 7,509,178. Appx357-373. The patents are directed to an audio player that downloads a playlist file that is used to control playback and to respond to commands. The accused product is an audio player called Google Play Music ("GPM") when installed on a compatible hardware device such as a smart phone or tablet.

Prior to trial, the Court granted Defendant Google's motion for summary judgment of non-infringement under 35 U.S.C. §§ 271(a) and (f), incorporating by reference its denial of PA's motion for an adverse inference. Appx61-63; Appx66-90. The Court also precluded PA's damages expert's testimony concerning foreign sales based upon the grants of summary judgment. Appx64-65.

Five days before trial, Google filed a motion for clarification of the Court's construction of the "sequencing file" claim term. Appx41027-41033. The Court had previously construed both "sequencing file" and "file of data establishing a sequence" as:

> a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands.

Appx109.

In ruling on Google's motion, the Court held that:

> A copy of a file is not the file but rather is a new and distinct file (*i.e.*, a second file). Thus, the use of ***only*** data from a copy of a first file constitutes the use of only a second file and does not constitute the use of the first file.
>
> I do not think further claim construction is necessary at this time. **If a party presents to the jury an infringement or noninfringement theory inconsistent with my claim construction, I will let the jury know and will make sure the opposing party is not prejudiced by that presentation.**

Appx41071-41072.

With this ruling, PA put on its infringement case and, after the presentation of PA's infringement case, in part through its expert Dr. Almeroth, Google sought a "curative" jury instruction on the term "sequencing file," including the following:

> … I instruct you that the "sequencing file" limitation is not met when files are downloaded and stored in the LISTITEMS table and then certain data stored in that table is copied into another QUEUEITEMS or QUEUE table…

Appx41108-41109. Google argued that "[t]his curative instruction is required due to Dr. Almeroth's testimony that contradicted the Court's construction." *Id.*

On June 14, 2023, the Court denied Google's proposed instruction, stating:

> THE COURT: You know, I think the instructions are what they are. …I think the evidence is what it is, but I'm not going to put in the jury instruction what really should be either achieved on cross-examination or in closing argument. That's what I'm going to do. I'm not going to give a written instruction on sequencing file.

Appx47887 at 1054:8-23. Given this, the Court allowed its original sequencing file construction to go to the jury without the "corrective" instruction argued for by Google. The jury returned a verdict that four of the five asserted claims were both valid and infringed, and awarded PA damages in the amount of $15.1 million. Appx41184-41192.

Following post-trial briefing, the Court reversed course and issued a Memorandum Opinion (Appx25-54) and Order (Appx24) granting judgment as a matter of law—finding that the use of the playlist files downloaded and stored by Google Play Music did not meet its "sequencing file" construction because a second file was also used in controlling playback. A final judgment was entered on September 5, 2023. Appx22-23.

PA now appeals.

## STATEMENT OF FACTS

### I.    The Infringing Technology

The evidence at trial supported the jury's verdict that GPM met the

sequencing file limitations. GPM allows a user to download one or more playlists

into the player. As can be seen in GPM's user interface, each playlist contains a

sequence of songs that can be played:



Appx20878. The name in the GPM code of the playlist file that is downloaded and

stored is "listitems." Appx46922 at 198:11-15; Appx47244 at 466:18-23;

Appx47268-47269 at 490:2-491:14. Listitems is stored locally in the player's

database. Appx47244 at 466:18-23. Google's witnesses conceded that the

downloaded playlists stored as listitems are files. Appx47463-47464 at 685:25-

686:2 (Mayer-Patel); Appx47364 at 586:19-20 (Razumeiko); *see* Appx22149-22150; Appx38044. Listitems can contain multiple playlists, each being accessed using its "listid." Appx47269 at 491:5-14. The contents of listitems are described in Appx54162 and include eleven separate data element fields including "musicid, listid, listitemid, and position."

One control feature is called "continuous playback," which automatically plays the next song in a playlist upon the completion of the prior song without the need of further commands. *See* claim 1 of '178 patent, Appx47273 at 495:9-22. The patents also claim two types of skip commands. One type causes the player skip to the next song in the playlist to begin continuous playback. *See e.g.*, claim 4 of the '178 patent. Appx47207-47208 at 429:13-430:10. The second, a "go" command, allows a user to skip to a particular song in a playlist using a visual display to start continuous playback. *See* claim 1of the '178 patent, Appx47189-47190 at 11:10-412:12.

GPM *directly* accesses the downloaded playlist file to control playback of the ordered sequence and respond to control commands in at least the following instances:

> Use Case 1:  GPM's "play playlist" control command will access listitems and continuously play through each song in a selected playlist starting with the first song. Appx47056 at 332:12-14; Appx47460-47461 at 682:14-683:10; Appx47360 at 582:13-16.

Use Case 2:  GPM's "go" command accesses listitems and begins continuous playback from a user-selected song in the playlist. Appx47056 at 332:9-12; Appx47360-47361 at 582:17-583:5.

Use Case 3:  After any song loaded in the queue is identified for playback, the "find playable song" function in the code accesses listitems again to check to see if the song is playable before it is fetched. Appx47287 at 509:20-512:18. If it fails the test, the song will not be played.

(Appx20630-20651; Appx38019.) The following diagram depicts how GPM uses the downloaded playlist to control playback for these three instances:



Step 1: Playlist files are created on Google's server. Appx47197-47199 at 419:15-421:10.

Step 2: The playlist files are downloaded from the server and stored in the database as "listitems." Appx47271-47272 at 493:24-94:10; Appx47242 at 464:19-23.

Step 3: In response to a "play" or "go" control command, the player *directly accesses* listitems to obtain the sequence that will be played and loads the musicids of the sequence into the queue. Appx47349 at 571:20-25; Appx47360-47361 at 582:13-583:5 and Appx47364  at 586:12-16

8

(Razumeiko); Appx47460-47461 at 682:14-683:10 (Mayer-Patel). Appx47056 at 332:9-14; Appx47270 at 492:3-14. The "queue" is also semi-permanently stored in the queueitems table. Appx47353 at 575:2-12.

Step 4: The player then reads the data loaded into the queue from the downloaded sequencing file to identify the next song to fetch from storage to play. Appx47350 at 572:12-17.

Step 5: Before each identified song of the sequence in the queue is fetched from storage, the player accesses listitems again and retrieves the song's "listitemsid" to test if it is "playable." Appx47287-47290 at 509:20-512:18; *see also* Appx47361-47362 at 583:12-584:1. The primary reason why a song may not be playable is that it is not stored locally. Appx47288 at 510:5-11. Only if a song is playable, is it fetched and played. This process is repeated until each song in the playlist is played.

## II.    The Patents' Claimed Embodiment Works the Same Way

The heart of the Court's JMOL was its belief that *only* the "queue" is being used to control playback, notwithstanding the undisputed testimony from several witnesses that the downloaded playlist is directly accessed to determine the order of songs that will be played back by the command. The Court reasoned that the access of the downloaded playlist file by the control commands to load the queue with the sequence that will be played back is not a use of the file to control playback of the ordered sequence. The jury disagreed by finding infringement under the Court's claim construction.

Moreover, as described in the written description and file history, the downloaded sequencing file in the specification controls playback in essentially the same way as GPM's playlist. The claimed downloaded sequencing file specifies a

sequence to be played that is loaded into other data structures that are then scanned to locate the next song to be played during playback. Thus, the District Court's interpretation of his own construction is inconsistent with the intrinsic record.

As described by the Magistrate Judge in Appx130-185, the specification teaches that the ***received*** sequencing file is used to control playback in the ordered sequence by loading its sequence into another data structure:

> the embodiment described in the specification teaches that ***a sequencing file with a recommended sequence (Table 307)*** is created on the host server and downloaded to the player-and that ***another sequencing file*** containing the final sequence (Sequencing File 351) is created on the player, ***using the data of the received sequencing file to control playback***.

Appx152-157; Appx170.

Importantly, the reexam file history that the district Court relied on in construing the "sequencing file" term identifies the "sequencing file *with a recommended sequence* (Table 307)" as the claimed sequencing file—not the selections file 351 containing the final sequence created from the downloaded file 307. The '178 *Inter Partes* Rexam Response (Appx8203-8209 at 5) relied upon for the Court's construction and states that the claimed "sequencing file" is disclosed at '178 patent Col. 8:48-53, which provides:

> The data downloaded includes *a recommended program sequence file which* provisionally identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data *by the download compilation processing*.

(Appx232 at 8:48-53.)  Thus, the downloaded Recommended Schedule File 307 that contains the "recommended program sequence" is the claimed received sequencing file that is used to control playback. *See infra* at Argument, §II.D for a complete discussion of the file history in this regard.

The Court's JMOL decision is inconsistent with the statements in the file history that the claimed sequencing file ("recommended program sequence file" 307) is used to control playback of the ordered sequence by providing a sequence that is loaded into other data structures scanned by the controls (selections file 351).



**PATENT EMBODIMENT**

The Reexam Identifies the File 307 as the claimed sequencing

| Host Creates Schedule File 307 from Request File 301.  1 | Downloads and Stores Schedule File 307 on the player  2 | Player uses Schedule File 307 to compile Selections File 351  3 | In response to a command, player scans File 351 to identify song to be fetched  4 | File 351 data is copied into CurrentPlay. CurrentPlay specifies the next song to be played.  5 |

The operation of the claimed embodiment comprises:

Step 1:  The host creates the claimed sequencing file containing the "recommended program sequence file" (*i.e.*, Recommended Schedule File 307) from Requested file 301. Appx237 at 18:36–42; 18:31–35.

Step 2:  The player downloads the claimed sequencing file ("Recommended Schedule Table 307") to the player. Appx237 at Col. 18:31-34; Appx242 at Col.27:13-18.

11

Step 3:  The player uses downloaded sequencing file 307's sequencing data to "compile" selections file 351. Appx234 at Col. 12:9-17. The user is given an opportunity to review file 351 and edit the sequence before playback. 8:54-62 Appx232.

Step 4:  In response to control commands, the player scans selections file 351 to locate the next song in the sequence. Appx234 at 12:13-45; Appx245 at 34:28-31; Appx246 at 35: 27-43.

Step 5:  After scanning selections file 351, its data is copied into data structure Current Play. Appx226 at Fig. 5. The value in Current Play "specifies" next song played next and can be used to depart from the order of the downloaded file. Appx245 at 34:19-34.

Importantly, downloaded Recommended Schedule File 307 is merely used to "compile" another file on the player called selections file 351. Appx234 at 12:9-40. The player then only directly references selections file 351, not the downloaded and claimed sequencing file "Schedule File 307, to identify the individual songs to be fetched and played in response to commands during playback. Appx234 at 12:17-45; Appx170; Appx245 at 34:14-19 and 28-31; Appx246 at 35:27-43. Thus, based on the intrinsic record, the Court's "used…to control playback of each song in the ordered sequence" construction may be met by a received file that specifies the sequence of playback that is loaded into other control structures during execution of the commands. *See infra* at Argument, §II.D.

## <u>SUMMARY OF ARGUMENT</u>

The District Court issued judgment as a matter of law in favor of Google, claiming there was no evidence that the playlist files downloaded by Google Play Music are "sequencing files" under the Court's construction. Appx42. The Court found that no jury could reasonably find that the downloaded playlist files were used to control playback, even though the undisputed evidence showed that the downloaded playlist files are *directly* accessed in response to control commands to control the sequence of songs that would be played back in response to those commands. The Court's decision apparently rested on the fact that, after the downloaded playlist file is accessed by the control commands, its sequencing data is loaded into another data structure called "the queue" for further processing during execution of the control command. Appx38-42. In the Court's view, only the queue—not the downloaded playlist—was used to control playback of each song in the ordered sequence, even though the playlist file was directly accessed to execute control commands.

The Court's unduly narrow view ignores the fact that GPM directly accesses the downloaded playlist file in listitems in response to control commands to determine the sequence that each song will be played back in by the command. Nothing in the plain language of the Court's construction or the file history excludes this means of controlling playback from the scope of the claims.

Moreover, since the downloaded playlist file determines the order of the queue, it controls the order that the queue is played back in—thus it is used to control playback of the ordered sequence. Under the Court's narrow logic, one could not reasonably find that a steering wheel controls the steering of a car because it only turns the wheels and only the wheels actually turn the car. Or one could not reasonably find that a CD is used to control playback of songs because its data (and sequence) is copied into memory and only the memory is played back. This defies the common understanding and use of the term "control." Indeed, the district Court appeared to concede this point before trial when it clarified that its construction did not prevent the use of a second file—in addition to the downloaded file—in controlling playback. Appx86. The Court's restrictive view of "controlling playback" is also inconsistent with how computers work. The "use" of any stored file necessarily includes reading its data. A computer reads data by copying its data into another data structure location (*e.g.*, RAM) for processing. Rather than demonstrating non-infringement, the creation and use of the queue from the downloaded playlist is part of *how* the downloaded playlist file controls playback. Thus, as permitted by the Court's construction, clarified at the start of trial, both the downloaded playlist and the queue are used to control playback of each song in the ordered sequence.

The Court's restrictive view of "controlling playback" after trial is also inconsistent with the specification of the patents, prosecution history, and its own prior orders. The written description expressly contemplates the use of multiple data structures to control playback.

The Court also erred in granting summary judgement of PA's 271(f) claims because the circumstantial, expert and other evidence of distribution of patented components by US servers to foreign devices raised fact issues for trial.

Finally, the Court erred in granting summary judgement of PA's 271(a) claims by failing to consider whether Google acted in concert with Android manufacturers to make the claimed invention and whether its updates made it a final assembler of the claimed invention.

# ARGUMENT

## I.    STANDARD OF REVIEW

### A.    JMOL

This Court reviews decisions on motions for JMOL under the law of the regional circuit. *MobileMedia Ideas v. Apple*, 780 F.3d 1159, 1164 (Fed. Cir. 2015). The Third Circuit reviews district Court JMOL decisions *de novo*, viewing the record in the light most favorable to the verdict winner. "***Only*** if the record is 'critically deficient of the minimum quantum of evidence' on which a jury could reasonably base its verdict does the Third Circuit affirm a grant of JMOL." *Id.*

A Court must give the verdict winner "the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court "may not weigh the evidence, determine the credibility of witnesses, or substitute [its] version of the facts for the jury's version." *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1342 (Fed. Cir. 2008) (*quoting Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

### B.    Summary Judgment

The Federal Circuit reviews a grant of summary judgment *de novo. Ethicon Endo-Surgery, Inc. v. US Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). Summary judgment is appropriate only when there is no genuine issue as to any

material fact. *Id.*, citing Fed. R. Civ. P. 56(c). "In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). Thus, at the summary judgment stage, the non-movant's version of any disputed issue of fact is presumed correct. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## II.  THE DISTRICT COURT ERRED IN GRANTING JMOL ON INFRINGEMENT

### A.   Use Cases 1 and 2

The District Court erred in granting JMOL as there is substantial evidence that would allow a reasonable juror to conclude that the downloaded playlist files meet the "sequencing file" construction. The Court's opinion at 13 makes much of the fact that Plaintiff's expert testified that the queue is used for user control:

> Dr. Almeroth, however, testified that one file-the LISTITEMS Table-is received by the player and stored, and that a different file-the Queue-is "used for the user control."

Appx38. The fact that the queue is "used for user control," however, does not negate the evidence that the downloaded and stored playlist file in listitems is *also* used to control playback. Both structures play an indispensable role in controlling playback of the ordered sequence.

In this regard, Almeroth explicitly identified "listitems" as the sequencing file and asserted that it complies with the Court's construction. Appx47268-47269 at 490:24-491:4, 492:19-20. He further testified that the "operation" of having the downloaded playlist file that "moved across the network into the database and is then loaded into the queue" (*i.e.*, use of listitems) meets this Court's sequencing file construction requiring the "***received***" file be stored and used to control playback. Appx47271-47273 at 494:12-15 and 493:24-494:2.

Almeroth further elaborated that accessing the downloaded playlist file "*inside of the database*" [*i.e.*, listitems] (Appx47242 at 464:2-23) performs the "next step" of being "used for user control":

> And so one of the ways of ***accessing a playlist* once it's stored inside of the database** is to use the identifier. That's the name for how you can access that particular playlist. And so at least this portion of the claim, ***does the next step***. It's sent over a network, and then it's stored, and then we'll eventually get to the third piece, which is where ***that sequencing file*** [*i.e.*, the "accessed" downloaded and stored playlist in the database, listitems] is used for user control…

Appx47242-47243 at 464:24-465:6. Thus, his testimony established that the downloaded file stored as listitems is accessed (*i.e.*, used) for user control, thereby pointing to the same file as meeting all three parts of the construction of sequencing file.

Almeroth also testified that the downloaded playlist file is referenced to determine what will be played next by the commands. Appx47201 at 423:4-10 (go

18

command); Appx47204 at 426:23-25 (play playlist)**.** He further testified that the

player scans the "*received* sequencing file" for skip commands. Appx47290 at

512:14-18.

Almeroth further testified that the "collection of information" from the

accessed downloaded playlist file is imported into every data structure used by the

controls. Appx47271-47272 at 493:2-494:10. The Court's opinion makes much of

the fact that Almeroth testified that the queue is used for control. However, the fact

that the queue is used for control speaks directly to whether the access of listitems

to load the queue was for the purpose of controlling playback.

Google's own witnesses admit <u>how</u> the downloaded playlist file is used:

1. to respond to control commands, and
2. to control playback of each song in the ordered sequence.

Both, Google's own Rule 30(b)(6) technical witness and its infringement expert,

testified that downloaded listitems is directly accessed during execution of the "go"

and "play" control commands (use cases 1-2) and thereby is directly "used" to

respond to control commands:

> Q. [W]hen you ***hit that "Go" command***, does Google Play Music ***<u>use</u>*** the
> list items table to seed the queue?
> A. It will take music IDs from list items and populate them in the queue.
>
> Q. Okay. So it will go to the list items table and ***<u>use</u>*** that populate the queue?
> A. Yes.

19

Appx47360-47361 at 582:13-583:5 (Razumeiko); *see also* Appx47059 at 335:8-11;

Appx47352 at 574:13-575:6; Appx47364 at 586:12-16.

> Q.    Okay. So I want to know about what the code says. It goes – ***when you press "play***," it goes to that list items table to seed the queue, correct? A. Yes.

Appx47460-47461 at 682:14-683:10 (Mayer-Patel); *see also* Appx47056 at 332:9-

14; Appx47360 at 582:13-16; Appx47364 at 586:12-16. Thus, Google has

admitted that GPM's control algorithms ***directly use*** the downloaded playlist file to

obtain its sequencing information to respond to the "Play" and "Go" control

commands (Use Cases 1 and 2). Requirement 1 above is met.

The next question is whether that admitted "use" of the downloaded file is

used to control playback of each song in the ordered sequence. Again, Google's

own Rule 30(b)6 witness and Director of Engineering Evans admitted that the

access of the sequence of the *downloaded* playlist discussed above controls the

order of playback:

> Q [I]is it fair to say that the sequence of a ***downloaded*** playlist is ***used to control*** the ***order*** of the songs that are used for playback?

> THE WITNESS: The order of the playlist would be the order of the queue when it is created, and, thus, the order that the queue is played back in.

> Q So is that a yes or a no?

> THE WITNESS: I believe it's **yes**.

Appx47060 at 336:9-20 (Evans); *see also* Appx47058-47059 at 334:5-14, 335:8-11.). Google's other Rule 30(b)6 witness, Dr. Razumeiko, further testifies in this regard:

> Q. Do you disagree with Mr. Evans' statement played on his video that the sequence of songs *in the playlist* determines an order of playback unless the user shuffles?
>
> A. That is correct statement. I agree with him.

(Appx47364 at 586:6-9; *see also* Appx47058-47059 at 334:5-14, 335:8-11). Since the retrieved sequence from the downloaded playlist is "***used to control*** the ***order*** of the songs" played back, the jury could reasonably conclude that the downloaded playlist was used to "control playback of each song in the ***ordered*** sequence." The above holds true even though the queue is *also* used in the process of controlling playback. The jury could reasonably have determined that both the downloaded playlist file and the queue are used to control playback, consistent with the Court's clarification of its construction before trial.

The District Court improperly dismisses these party admissions as to the ultimate issue, characterizing them as establishing "*__only__* that a ***copy*** of the LISTITEMS play list moved into the Queue controls playback." Appx40. The Court's comment is particularly perplexing as neither party's witnesses testified that a "copy" of listitems is in the queue. The unequivocal trial testimony of Google's witnesses is that only the musicids of a playlist is imported from listitems

into the queue, excluding most of the data fields that comprise listitems playlist (*e.g.*, listid, position, listitemid etc.). Appx47350 at 572:8-11; Appx47437 at 659:1-19. The cited testimony establishes that certain data elements of listitems is used to seed the queue, but **not** that the queue includes a copy of the listitems playlist. Moreover, the evidence is not that data from the downloaded playlist in listitems is copied into the queue before a control command is issued. Rather, the testimony establishes that the downloaded playlist file is directly accessed and thereby "used" in response to a Play or Go command to control what is played.

To the extent that the district Court understood the reference to the downloaded "playlist" in the Evans and Razumeiko testimony above to be referring to a playlist in the queue, it was incorrect. Appx38-42. The Evans testimony above, code comments and other witnesses use separate terms to distinguish between the downloaded "playlist" (*i.e.*, listitems) and the "queue." *See e.g.*, Appx47051 at 327:13-24 (Evans) ("The playlist isn't playing; the queue is playing. They're different."); Appx47440 at 662:7-16 (Mayer-Patel) ("And list items is the table where we store our playlist, but queue items is the table that we use to control playback. And so these are two different files."); Appx53853 at Appx54119 at 1059-62 and 1073; 570:18-24; Appx47060 at 336:15-16. The term "playlist" refers to the downloaded playlist listitems while the term "queue" refers to the queue populated with data from the playlist. *Id.* Importantly, the witnesses

22

do not testify that *only* the "order of the queue" is used for playback, as contended by the Court. Nor is there any reference here to a "copy," as suggested by the Court. Rather, Evans and Razumeiko *explicitly* admitted that "the sequence of a *downloaded playlist*" itself—not just the "order of the queue"—is "used to control" or "determine" the "order" of the songs that will be played back by the command. Appx47060 at 336:9-20; Appx47364 at 586:6-9; *see also* Appx47058-47059 at 334:5-14; 335:8-11.

Evans provided the reasoning for this admission. Since the downloaded playlist's sequence determines the "order the queue when its created," it "thus" also controls the "order that the queue is played back in":

> The order of the playlist would be the order of the queue when it is created, and, thus, the order that the queue is played back in.

Appx47060 at 336:9-20. And since the downloaded *playlist* controls the "order that the queue is played back in," its use is to control playback of each song in its ordered sequence, as Evans *explicitly* admitted by answering "yes" to the question as posed. *Id*.; *see also* Appx47059 at 335:8-11. The evidence was sufficient for the jurors to infer from the testimony above that *both* the downloaded playlist and the queue are files that are used to control playback of each song in the ordered sequence.

As the verdict winner, all reasonable inferences from the evidence must be made in favor of PA. It matters not whether the judge disagrees with a party's

admissions or believes they are susceptible to a different interpretation. The Court

"may not weigh the evidence…or substitute [its] version of the facts for the jury's

version." *Agrizap*, 520 F.3d at 1342. As long as the evidence could reasonably be

understood in the manner set forth above, the verdict must stand.

Google's source code comments further confirm the jury's determination

that the downloaded playlist (not merely the queue) is used to control playback of

the ordered sequence:

> "This field should be updated when a *playlist is played.*" Appx54062 at 907-
> 08.

> "replaces playlist with a new list, and *starts playing* it." Appx54107 at 784.

> "*Already playing the same playlist* at the same position, bail out early
> instead of restarting the song…." Appx54034 at 2292-3.

*See also* Appx47366 at 588:8-591:3. A juror could reasonably conclude from these

technical comments that since "playlists" are "played," they are used to control

"playback" of each song of the ordered sequence. The queue is just part of the

implementation of "playing playlists."

Almeroth and Quackenbush also gave equivalence testimony that the

"received sequencing file" was "scanned" to execute the skip command that the

Court failed to address. Appx47290 at 512:14-18; Appx47721-47722 at 888:12-

889:6.

24

The district Court's opinion further rejected the above substantial evidence from Google's own witnesses because "at most, this testimony shows that the LISTITEMS Table *takes part* in initiating playback of the *first song* in a playlist." Appx40. However, Google's witnesses' testimony on its face contradicts the Court and explicitly states that the sequence of the "downloaded playlist is used to control the ***order*** of the songs that are used for playback" and "determines" the "***order*** of playback." Appx47060 at 336:9-20 (Evans); Appx47364 at 586:6-9; *see also* Appx47058-47059 at 334:5-14; 335:8-11. Since the downloaded playlist controls the ***"order"*** of songs that will be played back in response to the command, the jury was reasonable to conclude that it is being used to control playback of "each song in the ***ordered*** sequence," and not just "playback of the first song," as contended by the Court. Furthermore, the source code comments that a "playlist" is "played" supports the jury's verdict that the playlist is used to control playback of "each song in the ordered sequence" of that playlist.[1] The district Court appears to

---

[1] The Court also argues that the source code comment that GPM "'replaces the current playlist with a new list and starts playing it at the specified position in the list' means that a different sequencing file-*i.e.*, *a copy*-is being used during playback." Appx40. The cited comment has nothing to do with characterizing the data in the queue as a "new list" or "copy" from that of listitems. No witness testified to such an interpretation. Nor does any witness contend that the queue is a "copy" of the playlist. The comment describes the operation of the "go command." When a "go command" is issued, the player will stop playing the playlist that is currently playing and will continue playback at the selected position of the "new list" selected by the go command. The term "list" refers to the data structure of an

have preferred its own view of the evidence to that of both Google's own witnesses, source code comments, and the jury. This was clear error.

Indeed, the Court's statement above concedes that listitems "takes *part* in initiating playback.*"* Appx40. By the Court's own words, this meets its construction. Appx40820-41026 at 130-31 ("I think Personal Audio is right ... I don't believe it's the case that the use of the file precludes the use of another file to execute the control function. All I said was that the file had to be used to control it, but that doesn't mean it can't be used with something else. But it must be used as *part of the control*.").

Since the control commands access both listitems and the queue to control playback in the ordered sequence, it was reasonable for the jury to find that both are being used to control playback of each song in the ordered sequence. Without accessing the downloaded playlist, the queue would have no sequence and the player could not control playback of the ordered sequence.

**B.    The Court's Finding that Personal Audio Forfeited Its Arguments was Error**

The Court found that "Personal Audio has forfeited whatever arguments it purported to make about "Cases 1 through 4" because apparently the Court felt that

---

individual playlist and is distinguished from the queue. Appx54119 at 1059-62 and 1073 ("Add songs to the **queue** from the **list…**"). Thus, the word "new list" refers to a new *playlist* selected as part of an issued go command—not the queue.

PA did not adequately describe its "use case" terminology. Appx42. This was clear error. First, the evidence regarding the direct access of the listitems table in response to a Play or Go command that comprises Use Cases 1-3 was set forth in full in PA's opposition to Google's motion for JMOL. Appx46555-46584 at 1-4. Thus, the Court was provided a complete description of PA's evidence comprising the Use Cases 1-3 and the Court in fact considered and responded to it, regardless of whether the District Court understood the terminology.

Second, PA's Opposition to Google's JMOL motion correctly cited the Court's order "D.I. 720." Appx46563. D.I. 720 is an order denying Google's Daubert challenge based upon Almeroth's opinion allegedly not complying with the Court's construction of sequencing file—the very same issue of the JMOL and here. Appx38017-38020. In denying the motion, the Court stated:

> it appears that Plaintiff points to at least certain instances of GPM's operation that it contends comport with this interpretation of the Court's construction. (D.I. 598 at 1-2, 4 *(cases 1, 2 and 3)*; Tr. at 186-90, 198)…it is not appropriate for the Court to do what Defendant wants it to do—to make a finding of non-infringement (*i.e.*, a finding that "PA cannot rely solely on *Cases 1, 2 and/or 3* to demonstrate infringement").

Appx38019 (adopted by district Court Appx38224-38225). PA further provided a cite in its JMOL response to "D.I. 598 pp. 1-2 and 4" which describes where in its opposition to Google's original sequencing file Daubert motion PA described Use Cases 1-4. Appx46555-46584. Thus, PA adequately described its use cases in its

papers. It would be an abuse of discretion to find that these arguments were waived when (a) the substance of the arguments and evidence was addressed in detail, and (b) PA cited the Court's own prior rulings and the parties briefing that led to that ruling to remind the Court of its prior rulings using the "use case" terminology.

In its Daubert, Google made the same arguments concerning the queue that it made in its JMOL. Appx20471-20476 at 2-3. PA presented in its opposition the same arguments concerning Use Cases 1-3 (Appx20633-20634) and much of same witness testimony and other evidence discussed above (Appx20635-20638), and the Court found that PA could proceed with its infringement theory in view of the Court's construction. Accordingly, the Court's JMOL ruling is substantively inconsistent with its own prior rulings and confirms that the above evidence is substantial evidence supporting the jury's verdict.

### C.    Use Case 3

The trial evidence supports a finding the GPM infringes under Use Case 3. Use case 3 meets even the Court's narrow view of what it means to control playback. GPM repeatedly and continually references the original downloaded listitems file *each time* a song in the queue is selected for playback to control whether the song will be played. PA's expert Almeroth testified that, when the player locates the next song in the queue for playback, it retrieves the song's "listitemid" to check if the song is "playable" before it is fetched for playback:

4733. Right. This is the "find playable song" that I mentioned. So kind of in the middle where the function name is "find playable song." And the part I want to point to is 4764. That's where I just described *this scanning through the [received] file*. So there's a "while true," so it keeps going, and there's a check at about 4769. If the audio ID and *list item ID* equals null [sic], then it says in the comment, "It's an invalid play position or an invalid song in the queue. Exit out."

Appx47290 at 512:2-10; Appx47027-47028 at 303:13-304:23. List item ID is a

variable in the listitems file. Appx54162 at 1834 and 1859. If the audio file does

not pass this test based upon audioid and the retrieved *list item id*, then the song is

not played. Appx47290 at 512:2-10; Appx47027-47028 at 303:13-304:23. Thus,

listitems is directly and *continually* used to control playback of "each song in the

sequence" as each song is played. This Use Case was also approved by the district

Court as complying with the construction in its order denying Google's Daubert

motion regarding the sequencing file limitations. Appx38019 (adopted by Court

Appx38224-38225) (finding that Use Case 3 meets the Court's construction).

The Court's JMOL ruling dismisses this substantial evidence because "there

is no evidence from which to conclude, that this code function (or the LISTITEMS

Table) otherwise 'respond[s] to control commands' as required by the construction

of 'sequencing file.'" Appx41. The Court was incorrect, as Dr. Almeroth testified

that the "find playable song" function" is part of the code that executes both the

skip command and the continuous playback function of a play control command.

Almeroth's testimony about the use of "list item id" was part of the explanation of

how GPM meets the "scanning forward in the *received* sequencing file for the

appropriate loctype" step in the corresponding structure algorithm for the ***skip***

command. Appx47290 at 512:2-18; Appx54422-54431. Since this step is part of

the control algorithm of the skip command (*id.* at 7), the "find playable song"

function occurs in response to a control command. *See also* Appx47361 at 583:12-

20 ("when a user clicks 'next,' does Google Play Music look for the next *playable*

*song*? A. Yes."); Appx47286-47290 at 508:2-10; 509:2-11; 510:12-511:2; 512:2-

18. Almeroth explained that both the skip command and the continuous playback

function call the "get next play position" function (also called "next" function)

when they need to determine the next "playable" song in the sequence to play.

Appx47286 at 508:2-10 (skip and continuous play); Appx47287 at 509:2-6;

Appx47279-47280 at 501:6-502:23 (continuous playback). As part of determining

the next song to fetch, the player determines if the next file in the sequence is

"playable." Appx47287-47288 at 509:2-510:15. The "list item id" is retrieved and

used as part of the determination of whether it is "playable." Appx47290 at 512:2-

10; Appx47027-47028 at 303:13-304:23. Thus, there was substantial evidence that

the playable song function uses the listitems file in response to control commands

and during continuous playback.

    The district Court further found that "no witness testified at trial about what

a 'list items id' is or where it is "contained." Appx41. But the testimony

concerning retrieving the "list item id" was made in context of Almeroth's testimony that the "*received* sequencing file" (*i.e.*, listitems) was "scanned" during execution of a skip command and the jury could reasonably conclude that listitemsid is from the received sequencing file, listitems. Appx42790 at 512:2-18. Thus, the jury had substantial evidence from which to find that a "listitemid" is from "listitems," as the name *also* correctly indicates <u>on its face</u>. Further supporting such a finding, Google's witnesses confirmed that the listitemsid is not found in the queue. Appx47350 at 572:8-11 (Razumeiko); Appx47437 at 659:1-19 (Mayer-Patel). Finally, the source code explicitly identifies "list item id" as being

███   and, therefore, part of "Listitems":



Appx54162 at 1834 and 1859. Almeroth specifically published to the jury page Appx54162 (admitted into evidence Appx53853-54318) while describing the code that defined the "items" found in list items. (Appx47241-47244 at 463:23-465:6, 466:1-14; Appx47269 at 491:2-8 ("I showed the source code for the list items table").

Accordingly, there was substantial evidence supporting the jury verdict based on all three use cases that the downloaded sequencing file was used to control playback of each song in the sequence and to respond to commands.

**D.    The Claim Language, Prosecution History, and Specification Confirm that Use Cases 1-3 Meet the Court's Construction of Sequencing File**

In issuing JMOL, the Court's opinion suggests that it considered its claim construction language "used…to control playback of each song in the ordered sequence" to require something more than directly accessing the sequencing file in response to a control command to specify the order that each song will be played back in. Appx25-54 at 15. The Court thus interpreted the language of its construction to require that the received file be repeatedly accessed in its original storage location as each song is played, so as to exclude from the claim scope downloaded files whose data is loaded into an additional data structure for processing during execution (Use Cases 1 and 2).

Nothing in the language of the Court's construction or prosecution history mandates that the downloaded sequencing file must be referenced continually and repeatedly as playback of each song is commenced. Nor is there anything that excludes the use of multiple files to control playback. To the contrary, the very example given in the prosecution history of the claimed downloaded sequencing file that was used to control playback of the ordered sequence *merely* provided a

sequence for playback that is loaded in other control data structures, which are in turn then scanned by the controls. Indeed, the file history and "the specification teaches that a sequencing file with a recommended sequence (Table 307) is...downloaded to the player-and that another sequencing file containing the final sequence (Sequencing File 351) is created on the player, using the data of the received sequencing file to control playback)." Appx130-185 at 41 and 23-28.

Moreover, the district Court's view of its construction is simply contrary to how computers work. To use data from a permanently stored file as claimed, the data is copied into data structures for processing. Appx28984-28986 at ¶¶169-173. Thus, one skilled in the art would understand that the claim requires accessing the received file and loading its sequencing data into other data structures for processing during execution of control commands. The jury could reasonably apply that understanding of "used…to control playback of each song in the ordered sequence." Again, there are no words in the construction requiring repeated use of the received file or otherwise limiting "used … to control…the ordered sequence" in the specific manner or timing suggested by the Court.

The explicit language of the asserted claims does not contain the "used…to control playback" limitation. Nevertheless, the Court imputed this requirement because it found that the patentee had so defined it during *inter partes* reexam of the '178 patent occurring nearly 14 years after the issuance of the patent. In D.I.

447 at 2-4, the Court found that the patentee provided a lexicographic definition
for the sequencing file term from the following language from p. 5 of PA's *Inter
Partes* Reexam Response (Appx8203-8209 at 5):

> As discussed below, the term "sequencing file" of independent claim
> 1 and the term "playback session sequencing file" of independent
> claim 14, when interpreted in light of the [#] 178 patent specification
> and file history, should be interpreted to mean "a file that is received
> by the player and used by the processor to both control playback of
> each song in the ordered sequence and respond to control commands."
> The claimed sequencing file is received by the player and used by the
> processor to both control playback of each song in the ordered
> sequence and respond to control commands. [12:16-19; 34:17-23] ….
> The downloaded, locally-stored sequencing file *thus specifies an
> ordered sequence of audio files to play* (*e.g.*, in case the listener wants
> to just listen such as while driving).

Appx107-129 at 2-4. The language above from the excerpts relied upon by the
Court describes the file that is "used…to control playback" as merely one that
"thus specifies an ordered sequence to play" without describing any other
requirements, such as <u>repeated</u> reference to the file each time a song is played.

A few lines later on the very same page (5) of the reexam response that the
Court relies on, the response identifies the example of the claimed "sequencing
file" that is received and used to control playback as being disclosed at Appx232 at
Col. 8:48-53**.**

> The ***sequencing file*** "provisionally identifies the order in which
> downloaded program segments are to be played," **[8:48-53]** and is a
> file that is downloaded and used to control the playback session and
> navigation within the playback session. (bracket in original).

Appx8203-8209 at 5. The above referenced Col. "8:48-53" of the '178 Patent

provides:

> The data downloaded includes **[1]** *a recommended program sequence file* which **[2]** *provisionally* identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data **[3]** *by the download compilation processing* mechanism seen at 151 at the server.

Appx232 at Col. 8:48-53.

The "recommended program sequence file" of the above description refers

to the downloaded Recommended Schedule File 307 as the example of the claimed

sequencing file embodying the "used to control playback" limitation. Indeed,

Recommended Schedule File 307 is the only file described as containing "**the**

recommended program sequence…for the next playback session" and is the *only*

file that has "recommended" in its name:

> "a Schedule Table 307 which contains the *recommended sequence* of program segments for the next playback session," Appx237 at 17:62-64.

> "thereby producing the *recommended Schedule Table 307* which is transferred to the subscriber, along with program segments, during the *download transfer*."

Appx237 at 18:32-33.

File 307 is called the "recommended" schedule file because the server sends a

schedule "provisionally" chosen by the server and thus recommended to the user.

The user then gets a chance to edit the sequence before playback and choose which

recommendations to finally include in selections file 351. Therefore, selections file 351 represents the final choices by the subscriber and not the recommendation of the server. Appx155-156, Appx170; Appx226 at Fig. 5 Step 211; Appx232 at 8:54-62.

The specification further states that it is the downloaded Schedule File 307 that provides the "complete program sequence," not selections file 351, to the subscriber.

> The Schedule 307 *downloaded* to the player, and the associated programming, announcement and advertising segments sufficient to provide a complete program sequence with adequate advertising to meet the preference of the subscriber.

Appx207 at 27:15-19.

Selections File 351 is not the "sequencing file" or "file establishing a sequence" that was the subject of the lexicographic statements in the reexam file history. Unlike file 307, Selections File 351 is not downloaded to the player (Appx130-185 at 24-25) or disclosed as being part of the download "compilation" process mechanism (Appx237 at Col. 17:1-18:21), and it is never referred to as the "recommended" file or providing the recommended sequence, as indicated in Appx232 at Col. 8:48-53.

The Magistrate Judge thus expressly found that the language "recommended program sequence file which provisionally identifies the order" of playback found in Col. 8:48-53 is a reference to recommended schedule file 307:

36

> To that end, the patents refer to what must be Table 307-*i.e.*, a file with a recommended sequence of program segments-as being downloaded to the player. 17 For example the specification explains … that "*[t]he data downloaded includes a recommended program sequence file which provisionally identifies the order…*" (*Id.*, col. 8:39-41 (emphasis added))

Appx153. The Magistrate Judge again further relies upon the same language of col. 8:39-4 (Appx155) to conclude "Taken together, these portions of the specification show that it is *Table 307*, with its recommended sequence of programs, that is downloaded"—thus indicating Col. 8:39-41 is about file 307. (Appx156.)

The district Court never reversed the Magistrate's findings on the specification in this regard, but rather adopted a claim construction based on lexicography despite the specification. It only <u>now</u> interprets the construction in a way that is inconsistent with the very Reexam Response that gave rise to the lexicography.

The identification of the downloaded "recommended program sequence file" 307 as the claimed sequencing file is fundamentally inconsistent with the Court's JMOL decision because the described operation of file 307 fully embraces Use Cases 1 and 2, both of which seed the queue with the ordered sequence in response to a control command. This can be seen by comparing steps 2-4 of GPM's operation to steps 2-4 of the embodiment described in the specification and Reexam Response:

37





*See supra* at Statement of Facts, §§I and II for citations for each step of these diagrams.

Just as GPM's control algorithms at step 3 references the downloaded listitems to seed the queue, the downloaded recommended Schedule File 307 is used to seed/compile another data structure called selections file 351 with its downloaded sequence:

> the sequence of program segments to be presented to the user is formed into a ***schedule file (seen at 307*** in FIG. 4) consisting of a sequence of program segment identification numbers ***which are used to compile*** a sequencing file, called the selections file, illustrated at

38

> ***351 in FIG. 5***, which contains more detailed information about the sequence of events which occur during playback. ***The player obtains information from the selections file*** which ***identifies the individual program segments to be fetched from mass storage and played***…The playback operation itself continues from the designated playback point in the selections file (seen at 351 in FIG. 5) which follows a program sequence initially created by the host server [File 307] and downloaded with the program segments themselves, and then (optionally) modified by the addition, deletion and re-sequencing of segment identifiers.…

Appx234 at 12:9-40. Just as GPM then scans the queue after playing the first song in the sequence, selection file 351 is scanned to locate the next song in the sequence during playback and for control commands. Appx245 at34:28-31 ("the player executes a skip to the next Subject, which is accomplished by Scanning the selection file 351 until the next subject Selection Record seen at 360 is located"); Appx246 at 35:27-43; Appx234 at 12:13-45. Schedule File 307 is never described as being directly scanned by the controls beyond seeding selection file 351. Thus, the claimed downloaded sequencing file (recommended schedule file 307) is used to control playback of each song in the ordered sequence by merely specifying a sequence for playback that is loaded into other data structures that are then scanned by the controls. *See* Appx130-185 at 23-28, 41 for further analysis of the specification.

Importantly, the above highlighted language further clarifies that the player references selection file 351—not downloaded schedule file 307—"to identif[y] the individual program segments to be *fetched* from mass storage and *played*,"

thereby refuting any notion that the claim language "to control playback of *each song* in the ordered sequence" mandates that the player repeatedly reference the downloaded sequencing file as "each song" of the sequence is played back, as the trial Court now interprets its construction.

Recommended Schedule File 307—that was the subject of the lexicography relied upon for the Court's claim construction—was described as being used to control playback and respond to commands, despite the fact that it is only referenced to "compile" selections file 351. Thus, the direct use of the downloaded playlist file during execution of a control command by GPM to seed the queue and thus determine the order of what is played by the command also meets the "used … to control each song in the ordered sequence" limitation. Furthermore, this description of the claimed sequencing file in the Reexam Response also repudiates any prosecution disclaimer or estoppel that would exclude the use of multiple data structures to control playback in the manner described above.

The specification further repudiates the Court's narrow view of used "to control." Request File 301 is explicitly disclosed as controlling "skipping":

> ***To control Subject and topic skipping***… the selections file seen generally at **301** in FIG. 4 preferably takes the form of a ***sequence of records***….

Appx236 at 31:55-65. File 301 is never downloaded or scanned by the player. Rather, it merely provides a sequence to create schedule table 307 on the server and schedule table 307 is then transferred to the player:

40

The programs, advertising and announcement segments which are added to the ***Request Table 301 to form the Schedule Table 307*** Appx238 at 18:36–42.) . . . thereby producing the recommended ***Schedule Table 307 which is transferred to the subscriber*** … during the download transfer. *Id.* at 18:31–35.)

As stated above, downloaded schedule file 307 is then used to compile selections file 351 which in turn is scanned by the controls. Thus, file 301 is said "to control" skipping by merely providing a sequence that is eventually loaded into other data structures that are scanned by the controls, even though the file itself is never directly scanned by the controls or even downloaded.

Accordingly, the claim language, specification and file history all confirm that Use Cases 1-3 meet the sequencing file limitation. The jury verdict must be reinstated.

### E.     A New Trial is Not Warranted

A new trial is inappropriate here because substantial evidence including party admissions by Google as to the ultimate issue support the verdict, therefore, "a miscarriage of justice" would not result if the verdict were to stand," as required for a new trial. *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006).

## III.   THE COURT FURTHER ERRED DISMISSING PA'S DIRECT INFRINGEMENT CLAIMS

The Court's erred by granting summary judgment regarding PA's direct infringement claims with respect to manufacturer agreements and updates. Appx66-90 at 16; Appx61-63.

## A.    Manufacturer Agreements

Google acted in concert with its Android manufacturers to make infringing devices and, therefore, is jointly liable for direct infringement. *On Demand Mach. Corp. v. Ingram Indus*., 442 F.3d 1331, 1437-38 (Fed. Cir. 2006) (With respect to *system* claims, "when infringement results from the participation and combined action(s) of more than one person or entity, they are all joint infringers and jointly liable.")  The actions of Android manufacturers are attributable to Google through the contractual relationship established by their MADA agreement. *Centrak, Inc. v. Sonitor Techs., Inc*., 915 F.3d 1360, 1372 (Fed. Cir. 2019) ("The district Court found this evidence insufficient to create a material issue of fact, but we disagree….An "integration agreement" could constitute circumstantial evidence that Sonitor hired a contractor to build at least part of an infringing *system*)(system claims); *see Akamai Techs., Inc. v. Limelight Networks, Inc.*, 629 F.3d 1311, 1320 (Fed. Cir. 2010) ("[J]oint infringement [is]  when …. One party is contractually obligated to the other to perform the steps"). If the "contractee's control or direction dominates the manner or means of the work performed, … the independent contractor becomes an agent capable of rendering the principal vicariously liable for the acts of the independent contractor." *Fisher v. Townsends, Inc.,* 695 A.2d 53, 61 (Del. 1997); *Phx. Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir. 1988).

This case is unusual in the complete dominion and control Google exercised over the Android manufacturers to specifically include each and every claimed feature in the Android devices. Google directly provided the GPM software that embodies all of the claimed software features. Google's MADA mandates that GPM will "preload all Google Applications" including GPM on all devices in a territory. Appx35828-35845 at §3.3.

Google contractually controls the type of hardware devices that GPM is installed on by requiring that the hardware be an approved "Android Compatible Device." *Id.* at §2.7. Prior approval is mandated for each device model. *Id.* at §4.3; 2.7(b). Thus, Google controls the specific models that receive a GPM installation and limits approval to those devices that meet Android's system requirements including having the claimed hardware features. Appx35828-35845 at §4.3; Appx20889-20914 at ¶¶158, 160-225. MADA requires the entire suite of software, including GPM (Appx35828-35845 at § 1.1(m)), chosen *solely* by Google to be installed. (*Id.* at §§ 1.1(m); 23.13; 3.4, 2.4, 3.3, 3.4.). Thus, Google controls and specifies all of the infringing features (software and hardware) when requiring manufacturers to place GPM on approved devices.

Google also controls the timing of distribution to such time that the device is "approved by Google" (*Id.* at §§1.1(j, l); 2.7(a).)  Google also receives a direct monetary benefit from installation. (Appx29248-29396 at ¶¶20-30, 154-58.)  At a

43

minimum, the above facts create a triable issue of fact. *Centrak,* 915 F.3d 1360 (reversing because an "integration agreement" could constitute circumstantial evidence that Sonitor hired a contractor to build at least part of an infringing system.")

### B.    Updates

There is also substantial evidence that Google makes infringing devices by using its installers to directly place new versions of GPM on devices through wireless updates. Google's MADA agreement provides that it "may auto-update Google Applications…at Google's discretion" and that the company may not prevent such updates. (Appx35828-35845 at §4.5). Multiple whole versions of GPM were distributed over the infringement period. Appx36954- 36982 at ¶39.

Google's witnesses further testified that Google determines the time and manner of these installations through "push updates."  Appx36145 at 299:15-21. A push update is when the host chooses to "push" (*i.e.*, force) an update to a device rather than a "pull" where a user would request it.

The Court's summary judgement decision relied upon the device's manual settings that can prevent automatic updates to find that the customer controlled the updates and was therefore the only assembler, *citing Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1288 (Fed. Cir. 2011). Appx66-90 at 18-19. The Court erred because it failed to consider whether Google's own acts "put into

service" the systems that made the infringing device and therefore whether it installed the software to complete the infringing device to be a final assembler. *Centillion*, 631 F.3d at 1284-85; *Centrak,* 915 F.3d at 1371-73 ("The district Court misunderstands CenTrak's argument. CenTrak's infringement theory is comparing *Sonitor* not to the software maker Qwest, but to *Qwest's customers*, who completed the claimed system by installing Qwest's software onto their own hardware"); Appx37791-37794. One can be found to have installed the software by merely initiating the process that caused the installation despite lacking control over the devices. *Centillion*, 631 F.3d at 1283, 1285.

In *Centillion*, the customers were the sole party that requested installation of the software. There was no evidence that Quest had sent any instructions to its installers to install the infringing software. Nor did it require its customers to install the software.

In contrast, Google chooses the time, manner, and content of its "push" updates, and thus sends the electronic instruction that actually activates the installer to make the infringing device. Therefore, like the customers in Centillion, Google's acts "put into service" the system that combined all of the elements that made the infringing devices.

End users do not "make the decision" to send the updates that make the device. The end user settings on updates do not request, activate, or initiate the

installers to install software, but merely allow the updates sent by Google to do so. It does not matter what the settings are on the device, if Google does not choose to send an update instruction, there will be no installation.

The fact that the user could potentially have taken actions to block those updates—when they did not—does not mean that the user is the sole party that installed the software, as suggested by the Court's decision. The update settings play no more role in installing software than standard features such as an on/off button or airplane mode or security feature that can also be used to prevent an update.

The Court misconceived the *Centillion* standard by solely focusing on who has control over the overall device rather than who initiated the specific acts that put into service the system that made the infringing device (*i.e.*, the installation instruction). *Id.* at 1283 ("an end user can 'put a system into service' even though it does not control back-end components"). It was undisputed that Quest had physical control over its backend systems. All computers including the backend server in *Centillion* have controls or settings like those mentioned above that could potentially disable the device from being able to accept on-demand requests. Nevertheless, despite this control, it was the user's "on-demand requests" that was found to put the system into service. *Id*. at 1285 ("If the user did not make the request, then the back-end processing would not be put into service"). Likewise,

Google's instructions to install updates put into service the installers that made the infringing device. The installation was made by Google irrespective of whether the customers had physical control over the device or the ability to stop updates.

Furthermore, unlike *Centillion,* where Quest did "not require customers to load the software" (*id.* at 1283), Google's end-user and manufacturer agreements mandate their setting to "allow updates automatically." (Appx36954-36982 at ¶ 40; Appx36846; Appx35828-35845 at §4.5). Thus, Google forces its customers (including manufacturers) to automatically allow Google's installation of updates and they are not free to decide to not install the software. Once that setting is activated, the user gives no more input with respect to a given installation and Google's sending of an update is the final act that controls the assembly of the infringing device. The Court's decision should be reversed.

## IV.  THE COURT ERRED BY ISSUING SUMMARY JUDGEMENT ON PA'S 271(F) CLAIMS AND PRECLUDING PA'S DAMAGES EXPERT FROM TESTIFYING REGARDING THE SAME.

PA appeals the Court's findings and reasoning is set forth in Appx66-90[2]; Appx61-63 and in Appx91-106; Appx57-58, and its Daubert of Michele Riley based on the same arguments below. Appx64-65; Appx59-60.

---

[2] PA also appeals the portion of the Court's denial of its Motion for Adverse Inference, which the Court incorporated by reference into its 271(f) decision. Appx57-58 and Appx91-106.

### A.    PA Provided Substantial Evidence that US Servers Made Foreign Installations

35 U.S.C. Section 271(f) requires, among other things, that patented components must be supplied from the United States to a foreign jurisdiction. The Court issued summary judgment with respect to PA's 271(f) infringement claims, because the Court believed PA's evidence as to whether US GPM servers update foreign devices to be "[l]ittle [m]ore than [s]peculation[]." Appx86. The Court erred by rejecting substantial circumstantial evidence in the record of such distribution.

PA needs only to show at least one act of infringement to defeat summary judgment. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012) (The extent of infringement is a damages question under the reasonable approximation standard.)

The law is well settled that one does not need direct evidence identifying a particularized instance of direct infringement, but rather, circumstantial evidence to reasonably infer that such act likely occurred is sufficient. *Toshiba*, 681 F.3d at 1365; *Lucent Technologies v. Gateway*, 580 F.3d 1301, 1318 (Fed. Cir. 2009); *Moleculon Research Corp. v. CBS,* Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986).

In *Toshiba,* the patent pertained to a method of recording video to DVD. The accused products had both infringing "disc-at-once" mode and non-infringing "multiscan" mode. *Toshiba*, 681 F.3d at 1364-65. Despite the fact that there was no

48

"direct evidence" that any customer used the infringing mode, the Federal Circuit

reversed, stating that "direct infringement can be proven by circumstantial

evidence." *Id.* The Court relied upon the fact the product included instructions for

the infringing mode and expert evidence "regarding why someone would … use

the disc-at-once mode" to find a fact dispute.

In *Lucent*, the patent pertained to a method of displaying data using

information fields that was only infringed when used by the defendant's customers.

Despite the lack of any direct evidence that Microsoft's customers performed the

method within the United States, the Federal Circuit upheld the jury's verdict

relying upon "extensive sales of the product and instruction," stating:

> Nevertheless, circumstantial evidence was just adequate to permit a
> jury to find that *at least one other person within the United States*
> during the relevant time period….Lucent's expert testified that *"[i]t's
> hard to imagine that we're the only two people in the world that ever
> used it*…the jury in the present case could have reasonably concluded
> that, sometime during the relevant period from 2003 to 2006, *more
> likely than not* one person somewhere in the United States had
> performed the claimed method using the Microsoft products*.

*Lucent*, 580 F.3d at 1318.

As in *Lucent*, where circumstantial evidence showed it was  "more likely

than not [that] one person somewhere in the United States had performed the

claimed method," here, the established circumstantial evidence of the record is

such that it is much more likely than not that at least ***one*** GPM distribution to a

foreign country came from a US server.

CONFIDENTIAL MATERIAL OMITTED

PA established that Google instructed and contractually required its customers to accept installation of GPM. *See* infra at section III.B ("Updates.") PA also established that there were well over ███████ installations in 2015 alone in countries that did not contain a local GPM server (hereinafter, Non-Local Installations). *See* total of entries of Appx31381-31386 minus the entries for countries with servers on the map below (US, BE, FI, HK, SG, TW, and IE). Mexico and Canada had ██████ in 2015 alone. *See* Appx31383 (MX total ███████; Appx31386 (CA total ████████).

Google's interrogatory responses establish that each and every of those ██ ████ Non-Local Installations were ***necessarily*** made by one of thirteen GPM servers in the world, six of which resided in the United States:

CONFIDENTIAL MATERIAL OMITTED



**Data center locations**

We own and operate data centers around the world to keep our products running 24 hours a day, 7 days a week. Find out more about our data center locations, our community outreach efforts in those communities, and job opportunities in our locations around the world.

View our data centers in a larger map

| Americas | | Asia | Europe |
|---|---|---|---|
| Berkeley County, South Carolina | Mayes County, Oklahoma | Hong Kong | Hamina, Finland |
| Council Bluffs, Iowa | Lenoir, North Carolina | Singapore | St Ghislain, Belgium |
| Douglas County, Georgia | The Dalles, Oregon | Taiwan | |
| Quilicura, Chile | | | |

GOOG-PA-00026558

Google ☰ Privacy & Terms

Appx20308; *see also* Appx20259-20261 at 20303 (Google's Fed.R.Civ.P. 33d response incorporating the above image); Appx29248-29396 at ¶¶54-55.

Furthermore, PA established that Google's U.S servers have the capability to distribute GPM to devices outside the country and Google admitted that such distributions *have indeed occurred*. Appx35902 at 56:9-2. Google witnesses never affirmatively testify that *none* of the ██████ Non-local distributions came from the United States or that there was a technical reason why that would be the case.

CONFIDENTIAL MATERIAL OMITTED

In view of the fact that the Non-local distributions *necessarily* must come from one of the thirteen identified GPM servers, the question of infringement reduces to whether it is more likely than not that at least one of the ████ Non-Local Distributions came from the United States or that it was more likely that *each and every* one of the ████ Non-Local Distributions came from foreign servers?

All reasonable inferences from the evidence are made in favor of the non-movant. A fact finder could reasonably conclude that it is more likely than not that at least one US server distributed GPM to a foreign device given the extraordinary high volume of Non-Local distributions without a local server, Google's instruction to accept updates, and the lack of any technical reason why foreign servers would be preferred *exclusively* over US servers. This is particularly true for the ████ Non-Local distributions in North American which are in close proximity to US servers and literally on separate continents from the nearest foreign server. Indeed, it seems implausible to think that among millions of Non-local distributions in North America that every single one of them occurred from foreign servers.

As explained in its adverse inference opinion at Appx91-106 (incorporated by reference at Appx66-90 at 21-22) the Court dismissed this reasonable evidence

because Razumeiko testified that Google's servers allow users in other countries to

download GPM "[a]s an exception" set forth below:

> Q. Do the servers in the United States allow users in countries that are not
> the United States to download the Google Play Music app? . . .
> THE WITNESS: So user is not in the United States?
>
> Q. That's right.
> A As an exception, if a global network outage, user could be related to
> United States server.
>
> Q. What is a global network outage?
> A Let's say if you're in Europe and Europe does not have connectivity to
> European Google data center.

Appx35902 at 56:9-25. The district Court reasoned that since PA does not

contradict the above testimony or otherwise demonstrates that outages occurs,

Google is entitled to summary judgement. Appx66-90 at 21-22.

PA does not need to contradict the above testimony for there to be a triable

issue of fact. The above statement can be entirely true _and_ Google's U.S. servers

still made some or all of the Non-local distributions during the infringement

period. Neither the above testimony nor any other evidence states that _none_ of the

Non-local distributions came from the United States. Nor does the above statement

or any other evidence say the above described "outages" are even rare or unlikely

to occur. Rather, than foreclosing the possibility of US distribution, the above

testimony confirms that US servers do in fact distribute GPM to foreign devices.

Given that the life of the patents covered GPM from launch until October 2016, it

was more likely than not that at least one of these outages discussed by Razumeiko

occurred within the infringement period, alone creating an issue of fact.

Still further, Razumeiko broadly defines "outage" as when the device does

not have "connectivity" to a local data center. Appx35902 at 56:9-25 ("Let's say if

you're in Europe and Europe does not have connectivity to European Google data

center."). Here, it is undisputed that the identified Non-local Distributions do not

have connectivity with a local GPM data server within their own country and could

be reasonably understood as falling within the category of what is described as an

"outage." No Google witness contradicts such an understanding.

Similarly, the above testimony does not state that outages are the *only*

exception that US servers handle foreign distribution. It is silent as to whether

there are other occasions. The Court may not infer that outages are the only

exception in favor of Google when all reasonable inferences should be made for

PA and Google chose not to submit testimony to clearly establish such a fact if it

was true.

In addition, the above statement suggests that European data centers handle

the regional traffic for Europe, rather than being confined to only handling the

traffic within the nation that contains the data center. Appx20308 (only three data

centers in Europe). One could reasonably infer that the US servers likewise handle

North American regional traffic in the same way and therefore distributes to

Mexico and Canada.

Furthermore, Google's briefing states:

"*as a general matter*, devices outside the United States do not receive
installations or updates from servers inside the United States."

(Appx36993).

"that updates to devices outside of the United States would only be provided
by Google servers inside the United States *in rare circumstances.*"

(Appx20429).

One can reasonably infer from the above admissions that at least on occasion

Google's US servers do make distributions to foreign devices—thereby creating a

fact issue. In any event, qualified statements such as "as a general matter" and "in

rare circumstances" hardly foreclose the issue for summary judgment.

Importantly, Google's witnesses never affirmatively state that none of the

identified Non-Local Distributions were performed by servers in the United States

or that "outages" did not occur during the infringement period. Nor is there any

testimony that outages are even "rare," only lawyer characterization in a brief.

They also do not state affirmatively that foreign servers handle Non-local

distributions including those in Mexico and Canada or that foreign servers work

any different than US servers in handling distributions to outside their country. In

short, Google's witness never proffer any evidence contradicting, much less

disproving, the reasonable inference that at least *one* of the Non-Local

Distributions came from the United States established by PA's circumstantial

evidence.

All reasonable inferences must be made in favor of the non-movant during

summary judgment. The information as to which servers perform GPM

distributions is in the sole control of Google, and Google could write programs to

collect such information if not already done. Despite this, Google chose not to

affirmatively adduce where the distributions in fact came from or affirmatively

collect the information necessary to make that determination. One could

reasonably infer from this failure to investigate or adduce such information that

Google knew that its US servers had distributed GPM or that it is more than likely

than not to be the case. Accordingly, the Court erred in issuing summary judgment.

### B. There is Substantial Evidence that Updates Contained Patented Components

The Court also granted summary judgment with respect to PA's 271(f)

claims because "PA has not proffered any evidence regarding the contents of any

update" to demonstrate that patented components of GPM were distributed during

the infringement period. Appx87. The Court reasoned that some updates may only

be incremental (*i.e.*, that is changing a small portion of the functionality) and

therefore may not be directed to patented features. Appx87-89.

PA, however, submitted substantial evidence that Google's GPM updates contained patented components of the invention. Almeroth opined that when Google updates to *new versions* of GPM, it downloads a whole new code base:

> *When Google updates a device to a new version*, it is downloading a new version of the software including a *new code base*. Thus, the device is provided with a *whole new application. This new application is a substantial component of the invention* (and includes infringing features) and Google's installers/updaters assemble this component into the claimed invention when it is placed on compatible hardware.

Appx28908-28909 at ¶¶11-12. He further testified that there were multiple updates to these new versions made during the infringement period. Appx36954-36982 at ¶39.

Accordingly, it matters not whether the new versions may only have incrementally changed the functionality of unpatented features of GPM. Since in the specific case of updates to new *versions* of GPM, the updates download a "whole new application" with a "new code base," the download necessarily will include the existing patented features as well as the newly changed ones—thereby supplying substantial components of the patented invention.

Dr. Almeroth further explained that "Dr. Mayer-Patel does not dispute this point, only stating that any minor changes cannot 'make' an infringing combination." Appx28908 at ¶12. But minor or not, Dr. Mayer-Patel ignores that each "installation" of an update *includes new infringing code*, regardless of whether the old code also infringed. *Id.* To support his report's opinion that

updates include "installations" containing patented components Dr. Almeroth cites to Razumeiko's testimony that updates are recorded as installation events in the spreadsheet Daily Device Installs. Appx36260 at 366:4–7.

As pointed out at the hearing, (Appx37763-7815 at Appx37797), these Daily Device Installs spreadsheets (Appx31341-31379) were produced pursuant to Fed. R. Civ. P. 33(d) for Interrogatory No. 5, which requested Google: "Identify…the number of installations of the *Patented Technology* on any device for the six years prior to the filing date of this lawsuit." Appx35772-35774. Since these updates/installations of Daily Device installs were of "patented technologies," one can reasonably infer that patented components were supplied during the infringement period with the updates.

The Court dismissed this unambiguous expert opinion and Google's admission in its interrogatories as to the ultimate issue because the Court asserted that Almeroth's testimony "was not meant to convey that a 'whole new application' of GPM is supplied as part of any update," (Appx-90) seizing on the sentence italicized below out of context:

> If you apply an update to a *base installed version*, you're creating a new instance of that application, just like if you were to <u>uninstall it and install</u> a monolithic single version that included all of the changes. *So whether or not you're doing an incremental update that only applies to part of the functionality, the result is you have a new application installed and operating.*"

Appx30714-20726 at 113:16-25; Appx28908 at ¶11.

First, there is no affirmative testimony from Google's technical or expert witnesses saying that Almeroth is not correct that version updates do not download the whole code base. Nor do they affirmatively testify that no patented components were downloaded during the infringement period. Indeed, Google itself in its interrogatory responses admits that its update installations during the infringement period contained patented technologies. Appx35772- 35774.

Second, Almeroth's testimony relied upon by the Court does not indicate that the whole application code base is not supplied in "any update," as suggested by the Court. Rather, it affirms the exact opposite. The testimony relied upon by the Court is addressed to the specific case of an "update to base installed version." Dr. Almeroth's answer in italics merely reflects the fact that it does not matter if a new version update may only incrementally change "part of the functionality" because the whole code base including the existing unchanged code concerning the patented features is still downloaded. Thus, this statement affirms the notion that version updates download the whole application—not contradicts it, as suggested by the Court.

Indeed, the testimony *immediately* above the Court's cited testimony makes clear that it was concerning *version* updates that download the *entire code* of the application and not just code pertaining to the incremental change in functionality written over an existing code. There, Almeroth explicitly describes these version

updates as "if you were to <u>uninstall it and install</u>" the "monolithic" application, which would be replacing all of the code of the application—not just the code of the incremental change of a given update." *See also* Appx28906-28909 at 112:15-113:2; 114:14-115:20.

This is further demonstrated by the fact that the testimony relied upon by the Court was explaining par. 11 of his report, which unambiguously states that it pertains to a base version update that *downloads* a "new code base" for a "whole application" that includes the "components of the invention." Appx28908 at ¶¶11-12; Appx30720 at 113:16-25.

The Court's confusion as to Almeroth's testimony is found in the fact that incremental updates to functionality can happen in two different situations and the Court fails to distinguish between the two. An update is incremental when it only changes a small part of the *functionality*. The fact that the code is incrementally different in functionality does not define the method that the code is physically changed on the device (whole new application vs writing over the system image of a base version with just the changes). Almeroth discusses two situations where incremental updates can occur: (1) during a version update (*i.e.*, a new version) or (2) regular non version update. In the case of an update to the version, the whole application is replaced, not just the code related to any incremental difference between versions. Appx28908 at ¶¶11-12; Appx30720 at 113:16-25. So even if the

new version is only incrementally different in functionality, the whole application

is downloaded not just the code that was incrementally different. *Id.* Thus, version

updates will necessarily download the patented components.

Almeroth acknowledges that GPM has the ability to write over portions of

existing code without providing a whole new code base for *some* incremental

updates. In a regular or non-version update, incremental updates may be written

over the system image of the base version rather than replacing the base version:

> Google has the ability to do incremental updates, that if there's
> additional -- if there's changes to the code, you can apply those
> incrementally instead of downloading an entire fresh version of the
> application. *But, again, I think that's caveated with and at least some
> instances that would be the case versus instances where you would
> either reinstall update to a new base version.* Appx30719 at 112:15-
> 25.

> * * *

> So at least based on this description, it seems similar to kind of this
> incremental updating process where you have a base version and then
> incremental updates beyond that and that you can roll back
> incremental updates. *But my recollection is that there are some
> instances where the updates are for the entire application.*
> Appx30718 at 111:18-112:3.

As shown above italics, however, Almeroth repeatedly contrasts the instances

where only the changes are downloaded, from the instances involving updates to a

"new base version" that "reinstall" or download the "entire application." Thus, the

Court is entirely mistaken that Almeroth is not saying that the whole application is

downloaded in the specific case of base version updates.

61

The Court also rejected Dr. Almeroth's testimony as being unsupported with respect to the issue that patented components were downloaded. In his Reply Report, Almeroth explicitly cites to Daily Device Installs and the <u>Razumeiko testimony that updates are counted as "installations."</u> Appx28908 at ¶12 (*citing* Appx31341-31379; Appx36260 at 366:4–7.)  This alone supports his opinion as Google admits these installations on Daily Device Installs are of PA's patented technology.

Furthermore, Almeroth also gives the specific technical reason that *version* updates download the whole code base. Almeroth is a source code expert and his testimony is evidence as to its operation. He personally reviewed the source code including all 27 versions of the code during the infringement period (Appx28960-28961 at ¶121, n.12). As such, he would have knowledge of the downloading process and whether these code versions were duplicates of the same code with spot changes or whether they were replacements of the whole code base. He would also know if the accused functionality was changed between versions.

His report specifically states his opinion is "based on my understanding of the Accused Software" (Appx28906 at ¶8) and repeated in his deposition that his opinion is based upon knowledge of how GPM's downloading process works (Appx30721 at 114:14-20). When questioned about the differences he found in the

code between versions, he responded that the differences were not substantial

enough to change his opinion of infringement:

> [M]y analysis based on the different versions produced by Google that
> the *differences* in functionality were insubstantial as it related to *the
> accused functionality* and the operation of that functionality as
> reflected in the source code. So there were *differences*, but not
> differences that made a difference with respect to what I've relied on
> for infringement. And I think that's confirmed through Dr. Mayer-
> Patel's opinions where he doesn't draw operational distinctions that
> lead to noninfringement for different reasons across the range of
> accused versions.

Appx30724 at 117:1-13. Almeroth above, however, specifically stated that there

were "differences in functionality" between the versions with respect to the

"accused functionality."

Importantly, this testimony supports both of his opinions that the Court says

are unsupported. First, it demonstrates that Almeroth reviewed the code for

differences between versions and, therefore, he did the requisite analysis to

determine whether version updates replaced the whole code base or just small

portions of it—supporting his opinion in par. 11 of his Reply report. Appx28908 at

¶11.

Second, he testified above that there were "differences" in "accused

functionality" which necessarily mean differences in the code itself for patented

features. Since the versions differed in code with respect to the "accused

functionality," then necessarily Google's version updates downloaded code

modules for the accused functionality (*i.e.*, "patented components") even if they were just incremental updates written over the system image. This provides further technical bases supporting his opinions in Reply Report 8-9 and 11 (Appx28908-28911) that patented components were distributed during the infringement period. Almeroth still further provided the technical reason supporting his opinion in par. 11 of his Reply report that the application file "cannot be subdivided" and that "whole package is installed." Appx28908 at ¶11; Appx36954-36982 at ¶¶39-41.

Accordingly, the Court erred granting summary judgement.

### C.    The Court Erred In Precluding The Riley Report

Finally, PA appeals the Court's decision on precluding Michele Riley from testifying regarding damages pursuant to 271(f) based on the Court's 271(f) ruling. Appx64-65; Appx59-60. Here, the Court ruled that PA's damages expert, Michele Riley, was precluded from testifying concerning foreign sales based upon the grant of summary judgment. To the extent that this Court reverses the grant of summary judgment against PA's 271(f) damages claim, that same finding against Michele Riley should likewise be reversed.

### CONCLUSION

Personal Audio respectfully submits that the Court reverse the District Court's grant of JMOL, summary judgment, and precluding the testimony of Michele Riley.

Respectfully Submitted,

/s/ Steven M. Hanle
Steven M. Hanle
Douglas Q. Hahn
Salil Bali
STRADLING YOCCA CARLSON
    & RAUTH LLP
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660
949-725-4000

Henning Schmidt
STRADLING YOCCA CARLSON
    & RAUTH LLP
500 W. 2nd Street, Suite 1900
Austin, TX 78701
512-788-5015

*Attorneys for Plaintiff-Appellant*
*Personal Audio, LLC*

# **ADDENDUM**

# **TABLE OF CONTENTS**

**Pages**

Final Judgement of The Honorable Colm F. Connolly
  filed September 20, 2023 ...................................................................Appx22

Order of The Honorable Colm F. Connolly
Re:  Granting Defendant's Renewed Motion for Judgment
as a Matter of Law or New Trial
  filed September 5, 2023 .....................................................................Appx24

Memorandum Opinion of The Honorable Colm F. Connolly
Re:  Granting Defendant's Renewed Motion for Judgment
as a Matter of Law or New Trial
  filed September 5, 2023 .....................................................................Appx25

Order of The Honorable Colm F. Connolly
Re:  Granting in Part and Denying in Part Defendant's
Motion for Clarification
  filed June 11, 2023...............................................................................Appx55

Order of The Honorable Colm F. Connolly
Re:  Adopting The Magistrate Judge's Order and Overruling Defendant's
Objections at 718 and Plaintiff's Objections at 719
  filed February 28, 2022 .....................................................................Appx59

Order of The Honorable Colm F. Connolly
Re:  Adopting The Magistrate Judge's Report and Recommendation
Re:  Defendant's Motion for Summary Judgment of Noninfringement
as to Third-Party Products
  filed February 28, 2022 .....................................................................Appx61

Oral Order of The Magistrate Judge
Re:  Granting in Part and Denying in Part Defendant's Motion to Exclude
Opinions of Damages Expert M. Riley
  filed January 7, 2022...........................................................................Appx64

[SEALED] Report and Recommendation of The Magistrate Judge
Re:  Defendant's Motion for Summary Judgment
  filed January 7, 2022...........................................................................Appx66

[SEALED] Memorandum Order of The Magistrate Judge
Re:  Denying Plaintiff's Motion for Adverse Inference
  filed November 4, 2021 .......................................................................Appx91

Memorandum Opinion of The Honorable Colm F. Connolly
Re:  Claim Construction
        filed January 6, 2020...........................................................................Appx107

(First) Report and Recommendation of The Magistrate Judge
Re:  Claim Construction
        filed January 16, 2019........................................................................Appx130

United States Patent No. 6199076
        dated March 6, 2001 ...........................................................................Appx186

United States Patent No. 7509178
        dated March 24, 2009 .........................................................................Appx220

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,      )
                         )
         Plaintiff,    )
                         )
       v.        )   C.A. No. 17-1751 (CFC)
                         )
GOOGLE LLC,        )
                         )
         Defendant.   )

## **FINAL JUDGMENT**

This action came before the Court for a trial by jury beginning on June 12, 2023, the Honorable Colm F. Connolly, United States District Judge, presiding. At trial, Plaintiff Personal Audio, LLC ("Personal Audio") alleged that Defendant Google LLC ("Google") infringed claims 3, 6, and 13 of U.S. Patent No. 6,199,076 ("the '076 patent") and claims 7 and 12 of U.S. Patent No. 7,509,178 ("the '178 patent").

Prior to trial, the Court granted Defendant Google's motion for summary judgment of non-infringement of 35 U.S.C. §§ 271(a), 271(c), and 271(f) with respect to the accused third-party products (D.I. 754).

In the phased trial, the jury rendered a verdict in Personal Audio's favor on direct infringement and validity on June 16, 2023 (D.I. 857) and rendered a verdict in Personal Audio's favor on indirect infringement and willfulness on June 20, 2023 (D.I. 859). The jury awarded Personal Audio $15.1 million based on infringement

by third-party products. (D.I. 859). Personal Audio did not seek damages for direct infringement by Google.

Following post-trial briefing, on September 5, 2023, the Court issued a Memorandum Opinion (D.I. 884) and Order (D.I. 885) granting judgment as a matter of law ("JMOL") that Google did not infringe any of the asserted claims and setting aside the jury's verdict and award.  The Court's opinion did not address damages or willfulness because the Court found that those issues were moot.

Therefore, pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the Court's rulings on summary judgment, the jury's verdict, and the Court's ruling on JMOL, as referenced herein:

IT IS HEREBY ORDERED AND ADJUDGED that Google has not infringed the asserted patent claims (claims 3, 6, and 13 of the '076 patent, and claims 7 and 12 of the '178 patent), and judgment is accordingly entered in favor of Google and against Personal Audio.


Dated:   9. 20 ·23

_____
Chief Judge


_____
(By) Deputy Clerk


2
**Appx23**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,

                    Plaintiff,

           v.                              Civil Action No. 17-1751-CFC

GOOGLE LLC,

                    Defendant.

## <u>ORDER</u>

At Wilmington on this Fifth day of September in 2023:

For the reasons set forth in the Memorandum Opinion issued this day, IT IS

HEREBY ORDERED that Defendant's Renewed Motion For Judgment As A

Matter Of Law Or New Trial (D.I. 863) is GRANTED.

It is FURTHER ORDERED that the parties shall file no later than

September 19, 2023 a proposed judgment for the Court to enter.

_____
CHIEF JUDGE

**Appx24**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PERSONAL AUDIO, LLC,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Civil Action No. 17-1751-CFC |

Brian E. Farnan, Michael J. Farnan, Rosemary J. Piergiovanni, FARNAN LLP,
Wilmington, Delaware; Steven M. Hanle, Jason de Bretteville, Douglas Q. Hahn,
Salil Bali, Lisa Northrup, Ahmad Takouche, Henning Schmidt, STRADLING
YOCCA CARLSON & RAUTH, P.C., Newport Beach, California

    *Counsel for Plaintiff*

Jack B. Blumenfeld, Brian P. Egan, Cameron P. Clark, MORRIS, NICHOLS,
ARSHT & TUNNELL LLP, Wilmington, Delaware; Melissa J. Baily, David A.
Perlson, Antonio R. Sistos, Jeff Nardinelli, QUINN EMANUEL URQUHART &
SULLIVAN, LLP, San Francisco, California; Patrick Stafford, QUINN
EMANUEL URQUHART & SULLIVAN, LLP, Washington, District of
Columbia; Owen F. Roberts, QUINN EMANUEL URQUHART & SULLIVAN,
LLP, New York New York; Olga Slobodyanyuk, QUINN EMANUEL
URQUHART & SULLIVAN, LLP, Redwood Shores, California; Lance Yang,
QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California

    *Counsel for Defendant*

**MEMORANDUM OPINION**

September 5, 2023
Wilmington, Delaware

_Colm F. Connolly_

COLM F. CONNOLLY
CHIEF JUDGE

Plaintiff Personal Audio, LLC (Personal Audio) sued Defendant Google LLC (Google) for infringement of claims 3, 6, and 13 of U.S. Patent No. 6,199,076 (the #076 patent) and claims 7 and 12 of U.S. Patent No. 7,509,178 (the #178 patent). The asserted patents cover an audio program player that automatically plays a predetermined schedule of audio program segments—songs, for example— from a program library. The claimed player also allows listeners to use commands (e.g., "skip") to alter the sequence and content of the audio program segments. Personal Audio alleges that Google's "Google Play Music" (GPM) software, which was installed on Google devices (e.g., Google's Pixel C tablet) and third-party devices (e.g., unlicensed third-party cell phones with GPM installed), infringes the asserted patents.

After a six-day trial, the jury found Google liable for direct and induced infringement of claims 3 and 6 of the #076 patent and claims 7 and 12 of the #178 patent. It also found that Google willfully infringed or willfully induced users of unlicensed Android phones with GPM installed to infringe those claims and that all the asserted claims are not invalid. The jury awarded Personal Audio $15.1 million in damages.

**Appx26**

Pending before me is Google's Renewed Motion For Judgment As A Matter Of Law Or New Trial (D.I. 863).

# I.    MOTION FOR JUDGMENT AS A MATTER OF LAW (JMOL)

## A.    Legal Standard

"If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "The grant or denial of a JMOL motion is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1133 (Fed. Cir. 2004).

A party that does not have the burden of proof is entitled to a judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

## B.    Analysis

### 1.    Direct Infringement

Google argues that Personal Audio "did not adduce substantial evidence that the accused products satisfied the [asserted claims'] 'sequencing file' limitations or

2

**Appx27**

the [asserted claims'] means-plus-function elements [that were] construed to require 'LocType' algorithms." D.I. 863 at 2.

         **a.**    **"Sequencing File" Terms**

         **1)**    **Relevant Pretrial Proceedings**

The claim term "sequencing file" appears in each of the #178 patent's asserted claims, and the term "file of data establishing a sequence" appears in each of #076 patent's asserted claims. The parties referred to these terms as the "sequencing file" terms, and I construed "sequencing file" to mean "a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands." D.I. 447 at 2.

Before trial, Google filed a "Motion in Limine #2 – Preclude Argument That More Than One File Can Meet The 'Sequencing File' Limitation." D.I. 799-33 at 2. Google stated in the motion that Personal Audio "intend[ed] to offer [trial] testimony and argument that the asserted claims can be met when one sequencing file is downloaded and stored but another file is used to control playback." D.I. 799-33 at 4.

When the parties presented oral argument on the motion in limine during the pretrial conference, I asked Personal Audio's counsel: "At the end of the day, are you going to acknowledge in front of the jury or rather are you going to assert [in

front of the jury] that there was a sequencing file, a single one that performed all

three functions?" D.I. 823 at 128:10–13. Personal Audio's counsel responded:

"We are going to do that for sure." D.I. 823 at 128:14. I took Personal Audio's

representation at face value and said to Google's counsel:

> So, Google, here's the thing. If they are going to hold
> themselves to [my claim construction of "sequencing
> file"] -- they've got to prove that there's at least one
> sequencing file that executed all three functions at some
> point. [And] they said -- they just said that's what they
> are going to prove.

D.I. 823 at 129:1–5.

Google, however, did not take Personal Audio's representation at face value.

In response to my comments, Google's counsel said:

> Your Honor, but the way that they're going to do it
> -- this is the problem. This is why we have to keep
> coming back to this -- they say that, but the way they
> intend to do it is to go against exactly what they argued at
> claim construction. *They are going to say that the file
> that was received and stored is used because you extract
> the information from it and put it into another file that
> controls playback.*
>
> That is their theory under equivalence. They said
> it in their own opposition. They say in their own
> opposition, Page 3 -- the issue of whether the claims as
> so defined exclude the use of multiple sequencing files
> was not at issue.
>
> *They want to say that they extract -- the way
> Personal Audio gets around what was clearly decided
> and intended to be decided through claim construction is
> they say, look, the downloaded and stored file is used for*

4

**Appx29**

> *everything because the information is extracted from it,*
> *put into different data structures, and those data*
> *structures control playback.*
>
> So originally, the received file was used because
> the sequence was taken from the received file. That's
> how they are saying that they are going to argue their
> case. But if you look . . .
>
> -- that's exactly what they were arguing at claim
> construction. They were arguing against our claim
> construction because they wanted to argue exactly that.
> [Personal Audio] wanted to argue that the sequence from
> that received sequencing file to be used to respond to
> control playback can be copied into another file that is
> used to control playback. *So their use of the original file*
> *is: Well, we used it. We used it to* <u>*take the information*</u>
> <u>*and copy it into other files that then control playback*</u>.
> But that was rejected at claim construction. That was the
> whole argument at claim construction.

D.I. 823 at 129:6–30:16 (emphasis added).

As it turned out, Google's prediction about how Personal Audio would

attempt to prove at trial the existence of a "sequencing file" in GPM was spot-on.

But based on what I understood Personal Audio to say at the pretrial conference, I

denied the motion in limine:

> . . . . I didn't say, when I articulated the basis for my
> claim construction hearing, and having gone back and
> looked at the lexicography in question, *I don't believe it's*
> *the case that the use of the file precludes the use of*
> *another file to execute the control function.*
>
> *All I said was that the file had to be used to control*
> *it, but that doesn't mean it can't be used with something*
> *else. But it must be used as part of the control.*

<div align="center">5</div>

<div align="center">**Appx30**</div>

So I'm going to deny the motion in limine.

D.I. 823 at 130:20–31:4 (emphasis added).

Five days before trial began, Google filed a motion for "clarification" of the "sequencing file" construction. D.I. 834. Google stated that it understood my comments from the pretrial conference to mean that the "sequencing file" construction "requires the processor to use the received sequencing file when controlling playback of each song and when responding to control commands, even though the processor may also use 'something else' in addition to the received sequencing file when controlling playback of each song." D.I. 834 at 3. But Google remained concerned that Personal Audio was going to argue that "infringement occurs (either literally or by equivalents) when one file is received and stored, *some information from that file is* _copied into a second file_, and *only* that second file is used to control playback of each song and respond to control commands." D.I. 834 at 3 (some emphasis added). Google therefore "requeste[d] clarification that the Court's claim construction of 'sequencing file' precludes infringement where (i) one 'sequencing file' is received and stored, (ii) *some information from that 'sequencing file' is copied into a second file*, and (iii) the processor uses *only that second file to control playback* of a song or respond to control commands." D.I. 834 at 4 (some emphasis added). It also proposed a clarifying construction to be presented to the jury. D.I. 834 at 5.

6

Personal Audio filed an answering brief in which it argued that "[a]s long as the file is used to control playback of each song and to respond to commands, it meets [the] limitation regardless of the timing of that use by the processor to control playback." D.I. 839 at 3. Personal Audio insisted that my construction does not prevent "the access to and/or extraction of data from the downloaded sequencing file to control playback [a]s a use of the downloaded file for" controlling playback. D.I. 839 at 6. But it also stated: "It is beyond reasonable dispute that accessing and extracting information from the downloaded sequencing file to load other *control* structures is <u>using</u> the downloaded sequencing file as part of the control." D.I. 839 at 6 (emphasis in the original; internal quotation marks and citation omitted).

After reading the parties' briefs, I did not change my construction of "sequencing file." But I was concerned by Personal Audio's statement that "accessing and extracting information from the downloaded sequencing file to load other control structures is using the downloaded sequencing file as part of the control" because that statement suggested that Personal Audio would attempt to argue during trial that copying the sequencing file and using only that copy to control playback would not violate my claim construction. I therefore issued an order that stated in pertinent part:

> . . . [M]y claim construction of the "sequencing file" limitation requires that *<u>the</u>* file is (1) received by the

7

**Appx32**

> player, (2) stored, *and* (3) used by the processor to
> control playback of each song in the ordered sequence
> and respond to control commands.  A theory of
> infringement based on a showing that *only a second file*
> is used to control playback of each song in the ordered
> sequence and respond to control commands is not
> consistent with my claim construction.
>
> A copy of a file is not the file by rather is a new
> and distinct file (i.e., a second file).  Thus, the use of only
> data from a copy of a first file constitutes the use of only
> a second file and does not constitute the use of the first
> file.

D.I. 843 at 1 (emphasis in the original).  It was therefore crystal clear by the time

trial began that in order to prove direct infringement of the "sequencing file"

limitation, Personal Audio had to establish that an individual file was (1) received

by the player, (2), stored, *and* (3) used by the processor to control playback of each

song in the ordered sequence and respond to control commands.  Evidence that

only a copy of the received and stored file (or a part of that file) was used to

control playback would not satisfy the "sequencing file" limitation.

### 2)    Relevant Trial Proceedings

At trial, Personal Audio primarily elicited evidence about the "sequencing

file" terms through its infringement and invalidity expert, Dr. Kevin Almeroth.  Dr.

Almeroth testified that "the" sequencing file is initially *stored* in one data

structure: the LISTITEMS Table.  In his words:

> [T]here's a server that's providing what's called JSON
> data, Java Script Object Notation.  That was part of the

8

**Appx33**

> code that I showed for downloading the sequencing file.
> And then it was stored -- the sequencing file was stored
> into the list items table. I showed the source code for the
> list items table.
>
> . . . . [T]hat list items table contains all of the lists,
> all of the songs that are in lists, and then their positions
> within that respective list.

Tr. of June 12–20, 2023 jury trial at 490:24–91:8. Dr. Almeroth also testified that

the sequencing file is *accessed* through the "list ID":

> And the way that the sequencing file is accessed in
> that list items table is through the list ID. So you see the
> list ID come across from the JSON object at the server.
> And it's in the list items table. And so that's the name by
> which the list -- the sequencing file would be accessed.

Tr. 491:9–14. He further testified that the data stored in the LISTITEMS Table are

*moved* into another data structure, the QUEUE_ITEMS TABLE, at which point

they become the "sequencing file":

> . . . . [T]hose three items that are part of the
> playlist, *are then moved* into the queue items table. And
> so now you have the same songs in -- . . . those would be
> the three songs that were part of the list 2481.
>
> Now, the name for this data structure is the queue
> items table. And so that's how the sequencing file is
> referenced when you have the queue items table.
>
> The position now becomes specific to the
> particular music ID and its location in the queue items
> table. *So that's, now, the sequencing file.*

9

**Appx34**

Tr. 492:3–14 (emphasis added).  And finally, Dr. Almeroth testified about how the

data in the QUEUE_ITEMS TABLE are "*loaded into*" a third data structure, the

Queue, which becomes the "sequencing file":

> Okay.  Then the final step is the queue items table.  That
> information is loaded into the queue.  And so *now the
> queue becomes the sequencing file*.  The queue is now the
> name of that collection of data.  *And it's the queue that's
> used for the user control.*

Tr. 493:10–14 (emphasis added).

In describing these steps, Dr. Almeroth testified that he was "[t]racing the

collection of data through the system as -- and then that is the sequencing file as it

moves through the system."  Tr. 493:6–8.  He summarized his opinion as follows:

> So the sequencing file starts in the JSON, as a JSON
> object, comes across the network, is stored in the
> database in the list items table and then into the queue
> items table, then is stored in the queue.  And so I believe
> Google's position is that that's not the same sequencing
> file because it changes location or different formats.  I
> won't try and say exactly what they're going to say, but
> *what I will say is applying the construction for the term
> "file," and for sequencing file, <u>the fact that it moves
> across the network</u> into the database and then is loaded
> into the queue, does not mean that there is not
> infringement.*

Tr. 493:24–94:10 (emphasis added).

In its cross-examination of Dr. Almeroth, Google elected not to confront him

directly about his testimony that the data he identified as the "sequencing file"

*move* from the LISTITEMS Table to the QUEUE_ITEMS TABLE and eventually

10

**Appx35**

to the Queue.  Google also chose not to confront Dr. Almeroth on cross about the

Court's construction of "sequencing file" or the fact that the use of only a copy of

the file received and stored by the processor (or a part of that file) to control

playback would not satisfy that claim construction.  In the middle of the cross,

however, Google elicited the following testimony:

> Q.  You talked a bit about the list items table earlier?
>
> A.  Yes, ma'am, I did.
>
> Q.  Every entry in the table in the list items table has three fields of data, correct?
>
> A.  Yes, ma'am.
>
> Q.  And those three fields are "Playlist ID, Music ID, and Position," correct?
>
> A.  Yes, ma'am.
>
> Q:  *Now, when the queue items table is loaded, nothing about the list items table changes, does it?*
>
> A.  *That's correct.*
>
> Q.  *And when the queue is loaded, nothing about the queue items table changes, correct*?
>
> A.  *That's correct.*
>
> Q.  And list items is in a different memory location from queue items, correct?
>
> A.  It is.

11

**Appx36**

Q.  And queue items is in a different memory location
from queue, correct?

A.  It is.

Tr. 535:21–36:15 (emphasis added).[1]

The next day, Google timely moved for judgment as a matter of law of

noninfringement under Rule 50(a).  *See* D.I. 848; Tr. 1070:24–72:24.  I denied the

motion without prejudice to renew, saying "We're going to see what the jury says,

and then we'll deal with all this after trial."  Tr. 1072:20–74:19.

The next day, during closing arguments, Personal Audio's counsel made the

following statement to the jury:

> Google's [s]econd argument [for why the jury
> should return a verdict of no direct infringement] is that
> we don't have a sequencing file because we have a bunch
> of different files.  And they showed you some slides in
> their opening that said -- that tried to distinguish between
> this data structure over here on the left, which is a JSON
> object that is downloaded; a list items table that is over
> here on the right, which is what it goes to when it's on
> the player.  There is the list items table.
>
> And then it goes to the queue items table with the
> same collection of data flowing through and then from

---

[1] The logically unavoidable conclusion from this testimony is that the data that Dr.
Almeroth says are "loaded" into the QUEUE_ITEMS_Table and eventually into
the Queue are copied from data received and stored in the LISTITEMS Table.  It is
understandable, however, that the jury would have overlooked this subtle (though
substantively effective) line of questioning, especially since it comprised less than
one page of the 35 pages of Dr. Almeroth's cross-examination and was not
highlighted by an introductory transition statement or other means during the cross
or mentioned by Google in closing argument.

12

**Appx37**

the queue items table to the queue.  So it's all the same collection of data that -- and this is according to the Court's claim construction -- that same collection of data that flows through the Google Play Music application.

*And it leaves behind the same data in the previous data structure, but it's the same collection of data that moves through*, and it's received by the player and stored by the processor to both control playback of songs and to respond to control commands like skip forward and skip back.

Tr. 1124:13–25:7 (emphasis added).

### 3)   Google is Entitled to JMOL

Dr. Almeroth's testimony, viewed in the light most favorable to Personal Audio, does not provide a sufficient evidentiary basis for a rational juror to find that Google's GPM has a "sequencing file."  Again, I construed "sequencing file" to mean "*a file* that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands."  D.I. 447 at 2 (emphasis added).  That means that a single file must be received, stored, and used to both control playback and respond to commands.  Dr. Almeroth, however, testified that one file—the LISTITEMS Table—is received by the player and stored, and that a *different* file—the Queue—is "used for the user control."  *See* Tr. 490:24–91:8; 493:10–14.

Although Dr. Almeroth testified during his direct examination that the data in the LISTITEMS Table that he identifies as the sequencing file are *moved* into

13

**Appx38**

the QUEUE_ITEMS Table and then the Queue, he admitted on cross that "nothing

about the list items table changes" when the data are loaded into the

QUEUE_ITEMS Table and the Queue.  Tr. 536:4–6.  To use Personal Audio's

counsel's words, "the same collection of data that moves" into the

QUEUE_ITEMS Table and the Queue is "le[ft] behind" in the LISTITEMS Table.

Tr. 1125:2–7.  In other words, Dr. Almeroth's testimony necessarily means that the

data in the LISTITEMS Table are *copied*, and *the copied data* are then moved into

the QUEUE_ITEMS Table and the Queue.  As made clear before trial, however,

that infringement theory does not satisfy the "sequencing file" claim construction.

Accordingly, Google is entitled to JMOL of noninfringement.  *See Laitram Corp.*

*v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("[T]he failure to meet a

single limitation is sufficient to negate infringement of the claim.").

Personal Audio argues in its posttrial briefing that "<u>undisputed</u> evidence

presented at trial [showed] that LISTITEMS is <u>also used</u> [with the Queue] to

control playback, and is thus a 'sequencing file' under the Court's construction."

D.I. 868 at 1–2 (emphasis in the original).  In support of this argument, Personal

Audio points to the testimony of "GPM engineer Razumeiko and Google's

infringement expert [Dr. Mayer-Patel] . . . that each time playback is initiated (with

a 'play' or 'go' command), the GPM processor directly references and therefore

<u>uses the playlist in LISTITEMS</u> to seed the queue <u>and</u> to commence playback."

14

**Appx39**

D.I. 868 at 2 (citations omitted; emphasis in the original).  But at most, this testimony shows that the LISTITEMS Table takes part in initiating playback of the first song in a playlist; and, as discussed above, the received and stored "sequencing file" must "control playback of *each song* in the ordered sequence *and* respond to control commands."  D.I. 447 at 2 (emphasis added).

Personal Audio next argues that "the playlist in LISTITEMS is used to control the order that the songs used for playback."  D.I. 868 at 2 (emphasis in the original; internal quotation marks omitted).  But the testimony it cites in support of this assertion establishes only that a copy of the LISTITEMS playlist moved into the Queue controls playback.  *See* Tr. 336:15–17 (John Evans, a Google engineering director, testifying by deposition that "[t]he order of the playlist would be the order of the queue when it is created, and thus, the order that the queue is played back in"); Tr. 586:6–9 (Mr. Razumeiko agreeing with Mr. Evans).  The source code comments that Personal Audio says "further confirm that the *playlist* is used to control playback," D.I. 868 at 2 n.1 (emphasis in the original), also prove otherwise.  The comments state that GPM "*replaces* the current playlist with a *new list* and starts playing it at the specified position in the list."  Tr. 588:20–22 (Mr. Razumeiko reading GPM source code) (emphasis added).  *Replacing* the current playlist means that *a different* sequencing file—i.e., a copy—is being used during playback.

15

**Appx40**

Personal Audio also argues in its briefing that the LISTITEMS Table "controls playback of each song in the ordered sequence" because GPM "continually references" a code function called "listitemsid" that Personal Audio says is "contained in [the] LISTITEMS [Table]" "to confirm that *each song in the ordered sequence* is playable." D.I. 868 at 3 (emphasis in original). But the record evidence cited by Personal Audio, *see* D.I. 868 at 3, does not support this assertion. Indeed, no witness testified at trial about what a "listitemsid" is or where it is "contained." And in any event, even if a "listitemsid" code function were contained in the LISTITEMS Table (or within a file within that Table) and controlled the playback of each song in an ordered sequence, Personal Audio does not contend, and there is no evidence from which to conclude, that this code function (or the LISTITEMS Table) otherwise "respond[s] to control commands" as required by the construction of "sequencing file."

Finally, Personal Audio argues in its posttrial brief that the evidence it discusses in its brief "supports Cases 1–3 that the Court already found, if proven, would meet the sequencing file construction" and that "Google's [JMOL] motion ignores Cases 1, 2, and 3 and attacks [Dr.] Almeroth's explanation of *how* the data from the LISTITEMS Table is used to populate the queue in support of Use Case 4." D.I. 868 at 4–5 (emphasis in the original). To be blunt, although I think Personal Audio is making here a claim construction argument, I really have no idea

16

**Appx41**

what it is talking about. Personal Audio does not define the "Cases" it has in mind, let alone discuss how they are relevant to the issue at hand. It cites in support of this argument a Memorandum Order (D.I. 720 at 3) issued by the Magistrate Judge earlier in this action that refers to "cases 1, 2, and 3" in a parenthetical to a citation to a reply brief (D.I. 630 at 3) Google filed in support of a *Daubert* motion to exclude Personal Audio's infringement expert's testimony about "sequencing file." "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Accordingly, Personal Audio has forfeited whatever arguments it purported to make about "Cases" 1 through 4.

In sum, viewing all the record evidence in the light most favorable to Personal Audio and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find direct infringement of the asserted claims' "sequencing file" limitation. Accordingly, I will grant Google's JMOL motion with respect to direct infringement.

### b.   "LocType" Terms

Each of the asserted claims has a means-plus-function limitation that requires a sequencing file with "LocTypes." *See* D.I. 863-1. Google argues that Personal Audio did not adduce sufficient evidence for the jury to find that the accused products had the structural equivalent of a LocType.

17

**Appx42**

A claim limitation that recites a function to be performed rather than a definite structure is subject to the requirements of 35 U.S.C. § 112, ¶ 6 (1994). *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1266 (Fed. Cir. 1999). Such a limitation "must be construed 'to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.'" *Id.* at 1266–67 (citing 35 U.S.C. § 112, ¶ 6; *see also B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)). "Literal infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Id.* If the relevant structure in the accused device is not identical to the corresponding structure in the patent's written description, then the test for § 112, ¶ 6 equivalence is whether the two structures "perform the identical function, in substantially the same way, with substantially the same result." *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000). Because "[f]unctional identity *and* either structural identity or equivalence *are both necessary*," *Odetics*, 185 F.3d at 1267 (some emphasis added), a court is required "to give independent meaning to both the 'function' and 'way' prongs of the equivalency test." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 312 F. App'x 326, 332 n.3 (Fed. Cir. 2009).

1)    **"Means for Continuously Reproducing/Delivering" Terms**

I construed the corresponding structure for the asserted claims' "means for continuously reproducing/delivering" terms to include an algorithm that performs the following steps:

1. beginning playback with the program segment identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;
2. when the currently playing program concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;
3. repeating step (2) until a rewind Selection_Record (LocType: R) in the sequencing file is reached, which resets the CurrentPlay variable to the location value contained in the rewind Selection Record which is set to "1" to begin the playing sequence again with the first Selection_Record in the sequencing file.

D.I. 863-1 at 3–4.  Dr. Almeroth described these three steps as follows:

So the first one is the beginning playback with the program segment identified by the program ID contained in the selection record specified by the CurrentPlay variable.

So you're beginning playback of one song.  That's kind of step one.  The second step is when the currently playing program concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the program ID contained in the next selection record in the sequencing file.

19

**Appx44**

So, in other words, increment the counter to look at the next record to see what the next song in the playlist is. Okay?

And then the third step is you keep going to the next song in the playlist until you hit a rewind selection record LocType of "R" in the sequencing file. And what that does is it resets the CurrentPlay variable to the location value contained in the rewind selection record, which is one. So it goes back to the beginning of the playlist. And that's what the steps of the structure for this limitation require.

Tr. 497:1–21.

Dr. Almeroth also testified that the differences between these steps and GPM's source code, like using a mechanism besides a LocType "R," were not substantial structural differences:

.... So these kinds of structures allow for structural equivalents. So for example, if the name of the variable is not "program ID" or "CurrentPlay," that's not a particularly big difference.

If the way that you implement the check that your end of the list is not with a LocType "R" but some other mechanism, that wouldn't be a significant difference.

Tr. 497:24–98:5; *see also* Tr. 499:12–19 ("So let me summarize. So the requirement here is that the differences between the accused product and the patent are insubstantial. And so the way that you can test for -- that it's not a substantial difference is if it's interchangeable, you can use one versus the other in that

20

**Appx45**

scenario, or that you're performing the same function in essentially the same way, substantially similar, to get to the same result.") (Almeroth).

Personal Audio argues that in addition to the above testimony, Dr. "Almeroth provided detailed step-by-step testimony that the 'way' GPM implements continuous playback—as a whole—performs the recited function in substantially the same way as the structure in the Court's construction, and that they achieve substantially the same result of continuous playback in a loop." D.I. 868 at 10.  There is record evidence that supports this contention.  Dr. Almeroth testified, for example, about GPM's "set next track function": the steps that GPM processes "to figure out what the next song is that should be played."  Tr. 501:3–18.  That function includes "a check at 5797 that checks whether or not you're at the end of the playlist.  And so the way that it checks is to say, is the current player position greater than or equal to the length of the playlist."  Tr. 502:4–7.  Dr. Almeroth expounded:

> Okay.  So in nonmathematical terms, it says, am I on the last song or not?  And if I'm on the last song, what it sets it to is back to the first song.  And that happens -- you see case at 5799.  That's "repeat current."  That would get executed if you're just repeating one song.  And then at 5811, that's the case for "repeat none."  So no repeat, you would stop.
>
> And the case that we care about is at 5817 where you "repeat all," and then you return the target position.  And the target position was calculated -- sorry to jump around -- but at 5795, target position equals the play

21

**Appx46**

position essentially divided by the length. And so that
sets the target position to one. It checks when you're at
the end. *If you're at the end, it sets it back to one. . . .*

The context here is we're talking about if you
continue to play songs and you have to find the next one,
it keeps playing the next song, always checking to see if
you're at the end of the list. *And if you are, you circle
back to the first song.*

Q. And after reviewing all of the code in the operation of
the app, did you conclude, based on your analysis, that
the Google Play Music performs at algorithm [sic] as
construed by the Court in the same -- as required by the
claim element?

A. I determined that it meets it under the same or
equivalent structure as defined in the construction.

Tr. 502:8–03:14 (emphasis added).

Dr. Almeroth also testified about Google's litigation position that GPM's

structure is not structurally equivalent because it "does not use LocTypes":

Q. And so do you agree with -- with Google's argument
that they don't meet this limitation because they don't
use LocTypes?

A. No. I disagree.

Q. And why is that?

A. Well, for two reasons. One, the idea it has to match
with [a figure in the patents' written descriptions that
described an embodiment] is not correct. That's not the
test. It's whether it meets the limitation under the Court's
construction. And I showed what that algorithm was. It
includes a LocType, but I don't believe Google's analysis
accounts for structural equivalence. They don't have to

22

**Appx47**

be the same variable names, and the technique can be substantially similar and still meet the limitation.

So even though Google Play Music checks that you're at the end of the list based on the number of list items and circles back based on that, I believe that structure is insubstantially different from the requirements of the claim construction.

Tr. 504:11–05:3.

Viewing the above evidence in the light most favorable to Personal Audio and giving it the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury could reasonably find direct infringement of the LocType limitation in the "means for continuously reproducing/delivering" terms.

          **2)**    **"Means for Responding to a Skip Command" Terms**

Claims 3 and 6 of the # 076 patent and claim 7 of the #178 patent include a "means for responding to a skip command" limitation, which I construed to require an algorithm that performs the following steps:

1. Scanning forward in the received sequencing file to locate the next Selection_Record of the appropriate LocType;
2. Resetting the CurrentPlay variable to the record number of that Selection_Record; and
3. Fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.

A LocType is a single byte character and an identifier that indicates a characteristic of a selection record.

23

**Appx48**

D.I. 873-1 at 2, 5.  Dr. Almeroth described those steps in the following manner:

> It says, "Scanning forward in the received sequencing file
> to locate the next Selection_Record of the appropriate
> LocType."  Then you reset "the CurrentPlay variable to
> the record number of the Selection_Record," the next one
> that was identified.  And then you fetch and play the
> program segment identified by the program ID.
>
> So as you can probably anticipate, the dispute is
> whether or not there is an appropriate LocType in Step 1,
> or the structural equivalence of the entire algorithm.

Tr. 506:18–07:2; *see also* Tr. 507:18–20 ("As I said, the real dispute is whether or

not there is a LocType that's required under structural equivalence.") (Almeroth).

Google argues that Personal Audio has not adduced sufficient evidence to

support the jury's verdict because the "Music IDs" used in GPM are not

structurally equivalent to LocTypes.  D.I. 863 at 17.  Personal Audio responds that

it adduced, through Dr. Almeroth, "step-by-step evidence as to the 'way' GPM's

code operates as a whole to perform the recited function in substantially the same

way as the claimed structure and achieves the same or substantially the same result

of locating the next song and playing it."  D.I. 868 at 7 (emphasis in the original).

It points, for instance, to the following testimony from Dr. Almeroth:

> . . . . [T]he code that that calls will actually look at the
> next song in the sequence and determine if it's playable.
> And if it's not, it will find the next song after that that's
> playable.

24

**Appx49**

> So, for example, why would a song in a playlist
> not be playable? And the answer is a couple of reasons.
> So one is that you're in airplane mode and this particular
> song hasn't been downloaded. So it uses the music ID
> and then tries to find where that song is stored. And so if
> the music ID is not playable, then it will move to the next
> item in the list.
>
> So it actually scans forward in that sequencing file
> to find the next song that's playable, and it uses the
> music ID to determine if that next song is playable or not.
>
> * * * *
>
> So this ties into that first step. Scanning forward
> in the sequencing file to locate the next selection record
> of the appropriate LocType.
>
> In the code, what it does is it uses the music ID
> and its equivalent to the LocType to determine whether
> or not that song is appropriate, whether or not it's
> playable. So in that instance, the music ID is the
> LocType.

Tr. 510:1–11:3. Dr. Almeroth also testified about why a music ID is structurally

equivalent to a LocType despite not being a single byte character:

> Now, at the bottom, it says, "The LocType is a
> single byte character," and in the examples, it's not a
> single byte. A byte is eight bits. That only gets you
> numbers between about zero and 256. So in Google Play
> Music, it's not one byte; it's multiple bites. Well, that's a
> structural equivalence.
>
> The key to the invention is not having a single byte
> or two bytes. The novelty of the invention is really the
> program player with the advanced functionality. That's
> why there are structural equivalents, so that these minor
> differences in how this algorithm is implemented doesn't
> take a system outside of the scope of the claims.

25

**Appx50**

> So that's why I think in this instance, using the
> music ID is a structural equivalence to what this claim
> requires.

Tr. 511:6–20; *see also* Tr. 512:2–18.  Dr. Almeroth further responded to Google's

argument that a music ID is not structurally equivalent to a LocType:

> Q. . . . .  Okay.  So what -- does Google agree with your
> opinion that Claim 4 is performed by Google Play
> Music?
>
> A.  No, they don't.
>
> Q.  And what is your understanding of what they dispute?
>
> A.  It's a very similar reason as previously.  They say that
> there has to be absolutely be a LocType just like exactly
> the algorithm requires.  I don't believe they're allowing
> for structural equivalence, so that's why I disagree with
> that conclusion.
>
> Q.  Okay.  And you talked earlier about whether
> particular LocTypes that are in the written description of
> the patent, like an "R" or an "S" or a "T," are required in
> the Court's claim construction.  What was your opinion?
>
> A.  That they were not.  And for this limitation, there's
> no identification of a specific LocType, and so music ID
> would fit just fine.
>
> Q.  So what would be the -- according to the source code
> you reviewed, what would be the appropriate LocType or
> its equivalent in the code?
>
> A.  The next playable music ID.

> Q. So after hearing Google's argument and considering it
> and analyzing the source code and analyzing the app, is it
> your opinion still that Google Play Music on an accused
> device meets all the limitations and performs the
> algorithm of Claim 4 of the [#]178 patent?
>
> A. Yes, that's correct.

Tr. 513:7–14:7; *see also* Tr. 517:2–9 ("I believe Google's non-infringement

positions are consistent with respect to either not having a LocType or having a

LocType that does something different. And so the same analysis and conclusions

and the discussion of my responses to their non-infringement opinions would apply

to all of the other limitations that have been construed with the LocType term or

the sequencing file in the term or the construction.") (Almeroth).

Viewing this evidence in the light most favorable to Personal Audio and

giving it the advantage of every fair and reasonable inference, there is sufficient

evidence from which a jury could reasonably find infringement of the LocType

limitation in the "means for responding to a skip command" terms.

\* \* \* \*

To sum up: I find that Personal Audio has not adduced sufficient evidence to

support the jury's direct infringement verdict with respect to the "sequencing file"

limitations. Personal Audio has, however, adduced sufficient evidence to support

the jury's direct infringement verdict with respect to the "LocType" limitations.

The "sequencing file" limitation is present in each of the asserted claims. Personal

27

**Appx52**

Audio therefore has not adduced sufficient evidence to support the jury's direct

infringement verdict, and accordingly, I find that Google is entitled to JMOL of no

direct infringement.

### 2.   Induced Infringement, Willfulness, and Damages

Google also asks for JMOL of no induced infringement, no willfulness, and

a lower damages award.  D.I. 863 at 18, 21, 22.  Because I will grant Google's

motion for JMOL of no direct infringement, I need not address these arguments.

"[T]here can be no inducement or contributory infringement without an underlying

act of direct infringement."  *In re Bill of Lading Transmission & Processing Sys.*

*Pat. Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012) (citation omitted).  Direct

infringement is also "necessary, but not sufficient, for a finding of willfulness."

*Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021).  And

with no direct infringement, Personal Audio is not entitled to compensatory or

enhanced damages.  *See* 35 U.S.C. § 284 ("Upon finding for the claimant the court

shall award the claimant damages adequate to compensate for the infringement

. . . .  [T]he court may increase the damages by up to three times the amount found

or assessed.").

## II.   CONDITIONAL MOTION FOR A NEW TRIAL

Under Rule 50(c)(1), "[i]f the court grants a renewed motion for judgment as

a matter of law, it must also conditionally rule on any motion for a new trial by

28

**Appx53**

determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). In this case, were the Federal Circuit to vacate the judgment of no direct infringement, I believe a new trial would be warranted because, as explained above, Personal Audio effectively ignored the Court's claim construction of "sequencing file" and because the jury's verdicts with respect to direct infringement of the asserted claims of the #076 and #178 patents are contrary to the evidence.

## III.  CONCLUSION

For the reasons discussed above, I will enter a judgment of no infringement of the asserted patents as a matter of law. I will also conditionally grant Google's motion for a new trial under Federal Rule of Civil Procedure 50(c)(1).

The Court will issue an Order consistent with this Opinion.

**Appx54**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,

                 Plaintiff,

     v.

GOOGLE LLC,

             Defendant.

Civil Action No. 17-1751-CFC

---

## **ORDER**

Google has filed a motion for clarification and amendment of my construction of the "sequencing file" limitation. D.I. 834. Personal Audio opposes the motion. D.I. 839.

Google is correct that my claim construction of the "sequencing file" limitation requires that *the* file is (1) received by the player, (2) stored, *and* (3) used by the processor to control playback of each song in the ordered sequence and respond to control commands. A theory of infringement based on a showing that *only a second file* is used to control playback of each song in the ordered sequence and respond to control commands is not consistent with my claim construction.

A copy of a file is not the file but rather is a new and distinct file (i.e., a second file). Thus, the use of only data from a copy of a first file constitutes the use of only a second file and does not constitute the use of the first file.

**Appx55**

I do not think further claim construction is necessary at this time. If a party
presents to the jury an infringement or noninfringement theory inconsistent with
my claim construction, I will let the jury know and will make sure the opposing
party is not prejudiced by that presentation.

* * * *

NOW THEREFORE, at Wilmington on this Eleventh day of June in 2023, it
is **HEREBY ORDERED** that Google's motion for clarification (D.I. 834) is
**GRANTED IN PART AND DENIED IN PART.**

_____
CHIEF JUDGE

2

**Appx56**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,                    )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )  Civ. No. 17-1751-CFC/CJB
                                        )
GOOGLE LLC,                             )
                                        )
            Defendant.                  )
                                        )

## ORDER

Pending before me are Personal Audio's objections (D.I. 719) and Google's

objections (D.I. 718) to the Magistrate Judge's Order issued on January 7, 2022

(D.I. 707).   The Order granted in part and denied in part Google's *Daubert* motion

to exclude certain opinions of Personal Audio's damages expert (D.I. 567).   I

review the Magistrate Judge's non-dispositive Order to determine whether it is

"clearly erroneous or is contrary to law."   Fed. R. Civ. P. 72(a).   The Order is

neither.   Having reviewed the parties' briefing submitted to the Magistrate Judge,

Ms. Riley's expert report, the parties' objections, and their responses to the

objections, I agree with the Magistrate Judge's Order in all respects.

NOW THEREFORE, on this 28th day of February in 2022, IT IS HEREBY

ORDERED that:

1. Plaintiff's Objections to the Magistrate Judge's Report and
   Recommendation (D.I. 719) are OVERRULED;

2. Defendant's Objections to the Magistrate Judge's Report and
   Recommendation (D.I. 718) are OVERRULED;

3. The Magistrate Judge's Order (D.I. 707) is ADOPTED;

4. Defendant's *Daubert* Motion to Exclude the Opinions of Damages
   Expert Michele Riley (D.I. 567) is GRANTED IN PART AND DENIED
   IN PART.

_____
                CHIEF JUDGE

2

**Appx60**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,                    )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )  Civ. No. 17-1751-CFC/CJB
                                        )
GOOGLE LLC,                             )
                                        )
                    Defendant.          )

## **<u>ORDER</u>**

Pending before me are Personal Audio's objections (D.I. 716) and Google's
objections (D.I. 717) to the Magistrate Judge's Report and Recommendation issued
on January 7, 2022 (D.I. 706).   The Magistrate Judge recommended in his Report
and Recommendation that I grant in part and deny in part Google's motion for
summary judgment of noninfringement with respect to accused third-party
products (D.I. 552).   I have reviewed the Report and Recommendation, the
objections, and the responses to the objections.

The Magistrate Judge had the authority to make his findings and
recommendation under 28 U.S.C. § 636(b)(1)(B).   I review his findings and
recommendations de novo.   § 636(b)(1); see also Fed. R. Civ. P. 72(b)(3); *Brown
v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

I agree with the Magistrate Judge's thorough analysis and conclusions and

will therefore adopt the Report and Recommendation and overrule both parties' objections.

I make the following observations with respect to Google's objections to assist the parties as they prepare for trial.   First, Google did not contest that Personal Audio proffered sufficient proof of infringement with respect to the Blu-Products Life XL device.   That fact alone required me to overrule Google's objections.   Second, as noted in the Magistrate Judge's Report, Personal Audio will be required at trial to establish by a preponderance of the evidence that the 1.8 billion installations of GPM "had to have been on devices that . . . contained the other claimed hardware components."   D.I. 706 at 11.   I am inclined to make this requirement explicit in a jury instruction and in a question on the verdict sheet. Third, it appears that there may be authenticity and related issues about the "Current Device Installs" spreadsheet that could result in jury speculation and confusion, and unfair prejudice to Google.   I am inclined to try the case in phases to avoid those pitfalls.   *See Enzo Life Scis., Inc. v. Digene Corp.,* No. CIV.A. 02-212-JJF, 2003 WL 21402512, at *5 (D. Del. June 10, 2003) ("Bifurcation is an important discretionary tool that district courts can use to ensure that the cases are resolved in a just manner by juries that understand the complex issues before them.").

2

**Appx62**

NOW THEREFORE, on this 28th day of February in 2022, IT IS HEREBY

ORDERED that:

1. Plaintiff's Objections to the Magistrate Judge's Report and
   Recommendation (D.I. 716) are OVERRULED;

2. Defendant's Objections to the Magistrate Judge's Report and
   Recommendation (D.I. 717) are OVERRULED;

3. The Report and Recommendation (D.I. 706) is ADOPTED;

4. Defendant's Motion for Summary Judgment of Non-Infringement as to
   Accused Third-Party Products (D.I. 552) is GRANTED IN PART AND
   DENIED IN PART; and

5. Summary judgment of noninfringement under 15 U.S.C. §§ 271(a),
   271(c), and 271(f) with respect to the accused third-party products is
   GRANTED.

_____
                     CHIEF JUDGE

3

Appx63

*Personal Audio LLC v. Google LLC*, 1:17-cv-01751-CFC

| 01/07/2022 | 707 | ORAL ORDER: The Court, having reviewed Defendant's Daubert motion to exclude the opinions of Plaintiff's damages expert Michele Riley regarding the royalty base and rate ("Motion"), (D.I. 567 ), and the briefing related thereto, (D.I. 568; D.I. 603; D.I. 633), and having considered the relevant legal standards, see 360 Heros, Inc. v. GoPro, Inc., --- F. Supp. 3d ---, 2021 WL 5050879, at *1-2 (D. Del. Nov. 1, 2021), hereby ORDERS that the Motion be GRANTED-IN-PART and DENIED-IN-PART as follows: (1) With regard to Defendant's challenge to Ms. Riley's opinions regarding the royalty base, (D.I. 568 at 2-6), Defendant first argues that the royalty base is not tied to the accused products, because it considers sales of products that were not included on the list of 1,933 "exemplary" third-party products referenced in Plaintiff's infringement contentions, (D.I. 571, ex. A). But as the Court noted in its recent Report and Recommendation regarding a related summary judgment motion, (D.I. 706 at 10), it now understands Plaintiff's theory to be that these exemplary devices are simply representative of thousands of models of phones/tablets that directly infringed the patents-in-suit, (D.I. 603 at 1; see also D.I. 290 at para. 6; D.I. 605, ex. GG at 5-6). As a result, it does not find Ms. Riley's reference to "other" devices (i.e., devices not included in the list of 1,933) to be problematic and ORDERS that this portion of the Motion be DENIED.; (2) As to Defendant's other argument that Ms. Riley's "ROW" royalty base is premised on an erroneous assumption, this portion of the Motion is GRANTED, as it relates to Plaintiff's Section 271(f) claims as to third-party devices, which the Court has recently recommended should be dismissed (on similar grounds) via a grant of summary judgment, (D.I. 706 at 19-24).; (3) With regard to Defendant's challenge to Ms. Riley's opinions regarding the royalty rate, (D.I. 568 at 6-15), Defendant first argues that the upper bound of Ms. Riley's reference range (expressed in a cents per unit metric) is unreliable. Its core argument here (the only argument pressed both in its opening and reply brief) is that this upper bound is derived from a license between Plaintiff and another company, wherein the license (for a lump sum) included rights not only to the patents-in-suit, but also to an unrelated patent; Defendant faults Ms. Riley for allocating none of the license payment to that unrelated patent (thereby jacking up the cents per unit rate for the license). (Id. at 7-9; D.I. 633 at 4) The Court agrees that Ms. Rileys methodology here was unreliable, and GRANTS this portion of the Motion, as Ms. Riley either needed to credibly explain why no value was allocated to this unrelated patent or why some value should be allocated to it, and she did neither. (D.I. 633 at 4 (citing ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 871 (Fed. Cir. 2010))); (4) Next, as to Defendant's challenge to Ms. Riley's reliance on certain cents-per-device |

"offers" that Plaintiff made to settle two other lawsuits, this portion of the Motion is GRANTED. While offers for proposed licenses may have some value in determining a reasonable royalty in certain situations, WhitServe, LLC v. Comput. Packages, Inc., 694 F.3d 10, 29-30 (Fed. Cir. 2012), the offers here are irrelevant, especially in light of the fact that: (a) the offers were rejected; (b) the parties to those two cases settled on different terms that are known to the parties; and (c) earlier in this case, Plaintiff successfully blocked discovery into its licensing negotiations like these. (D.I. 568 at 10-12; D.I. 633 at 4); cf. MLC Intell. Prop., LLC v. Micron Tech., Inc., Case No. 14-cv-03657-SI, 2019 WL 2716512, at *13-14 (N.D. Cal. June 28, 2019); MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd., Civil Action No. 14-804-RGA, 2017 WL 6268072, at *4 (D. Del. Dec. 7, 2017).; (5) With regard to Defendant's objection to Ms. Riley's reliance on overall profit margins, the Court DENIES this portion of the Motion. In light of Plaintiff's argument that GPM adds important value as a key part of Defendant's product ecosystem, the Court cannot say it was improper for Ms. Riley to utilize Defendant's profit margin to adjust the appropriate royalty rate in the manner she did; possible holes in that approach could be explored on cross-examination. (Plaintiff's Hearing Presentation at Slides 13-16); cf. Transcenic Inc. v. Google Inc., Civil Action No. 11-582-LPS (D.I. 591 at 111-12) (D. Del. Feb. 19, 2015).; and (6) Lastly, as to Defendant's challenge to Ms. Riley's reliance on Mr. Heiblim's opinions, the Motion is GRANTED. With regard to the challenged paragraphs of Ms. Riley's report, (D.I. 571, ex. J at paras. 168-73), Ms. Riley does not sufficiently explain how the cited portions of Mr. Heiblim's opinions relate to the claim limitations in the asserted patents; in the absence of that connection, Ms. Riley's analysis does not "fit" the facts of the case. (D.I. 568 at 15).Ordered by Judge Christopher J. Burke on 1/7/2022. (mlc) (Entered: 01/07/2022)

**Appx65**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

PERSONAL AUDIO, LLC,                      )
                                          )
            Plaintiff,                    )
                                          )
    v.                                    )        Civil Action No. 17-1751-CFC-CJB
                                          )
GOOGLE LLC,                               )        **REDACTED - PUBLIC VERSION**
                                          )
            Defendant.                    )

<u>**REPORT AND RECOMMENDATION**</u>

Presently pending in this patent infringement case is Defendant Google LLC's

("Defendant" or "Google") Motion for Summary Judgment of Non-Infringement as to Accused

Third-Party Products Pursuant to 35 U.S.C. §§ 271(a), 271(b), 271(c) and 271(f) (the "Motion").

(D.I. 552)  Plaintiff Personal Audio, LLC ("Plaintiff" or "Personal Audio") opposes the Motion.

For the reasons that follow, the Court recommends that Google's Motion be GRANTED-IN-

PART and DENIED-IN-PART.

**I.      BACKGROUND**

**A.      Factual Background**

On September 15, 2015, Personal Audio filed this action against Google in the United

States District Court for the Eastern District of Texas, alleging infringement of United States

Patent Nos. 6,199,076 and 7,509,178 ("the asserted patents") due to Google's distribution of

Google Play Music ("GPM").  (D.I. 1; D.I. 38 at ¶¶ 2-3, 53-55, 73-74, 81-82)  In December

2017, the case was transferred to this District.  (D.I. 103)  The case has been referred to the Court

to hear and resolve all pretrial matters, up to and including the resolution of case-dispositive

motions.  (Docket Items, December 13, 2017 and September 10, 2018)

The asserted patents are related and share a common specification.  (*See* D.I. 147, ex. A (hereinafter, the "'076 patent"); *id.*, ex. B (hereinafter, the "'178 patent"); D.I. 38 at ¶ 30; D.I. 159 at 1 n.1)  The '076 patent is entitled "Audio Program Player Including a Dynamic Program Selection Controller"; it was issued on March 6, 2001 from U.S. Appl. No. 08/724,813, which was filed on October 2, 1996.  ('076 patent)  The '178 patent, entitled "Audio Program Distribution and Playback System," is a divisional of the application that led to the '076 patent, and was issued on March 24, 2009.  ('178 patent)  These patents are directed to an audio program player that automatically plays a predetermined schedule of audio program segments (e.g., songs) from a program library.  (D.I. 38 at ¶¶ 31, 33; '076 patent, col. 2:6-8)  The claimed player further allows a listener to dynamically alter the sequence and content of the audio program segments presented.  (D.I. 38 at ¶¶ 31, 33; '076 patent, cols. 1:7-9, 1:64-2:3, 2:44-47, 2:55-58)  The asserted patents expired in October 2016.  (D.I. 595 at 4 at ¶ 11)

Personal Audio asserts that Google infringes at least claims 2-3, 5-6 and 13-15 of the '076 patent and claims 5-8, 10-12, 14-21, 28 and 29 of the '178 patent.  (D.I. 605, ex. C1 at ¶ 1)  Claim 14 of the '178 patent, which is very lengthy, is representative for purposes of this Motion; it is reproduced below:

> **14.** An audio program player for automatically playing a collection of audio program files selected by a listener, said player comprising, in combination:
> a memory unit for storing:
> (a) a plurality of audio program files,
> (b) program description data including displayable text describing each of said audio program files, and
> (c) at least one separately stored playback session sequencing file which specifies an ordered sequence of a collection of said plurality of audio program files,
> a communications port for downloading at least some of said audio program files and said playback session sequencing file from said one or more server computers, at least some of said audio program files downloaded from said one or more server computers being

2

selected by said listener from a library of audio program files available from said one or more server computers, and said audio program files in said collection specified by said playback session sequencing file being selected by or on behalf of said listener to produce a personalized playback session,

one or more controls for accepting input commands from said listener,

a display screen for presenting a visual menu listing to said listener containing displayable text describing some or all of the audio program files in said collection specified by said sequencing file,

an audio playback unit for automatically and continuously reproducing said audio program files in said collection in the ordered sequence specified by said playback session sequencing file in the absence of a control command from said listener, and

a processor for executing one or more utility programs to perform control functions in response to said input commands from a user, said functions including:

(a) in response to a first one of said input commands designating a selected audio program file described on said visual menu listing for causing said audio playback unit to discontinue the reproduction of the currently playing audio program file in said ordered sequence and to instead continue the reproduction at the beginning of said selected audio program file,

(b) in response to a second one of said control commands for discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of that audio program file which follows said currently playing audio program file in said ordered sequence specified by said playback session sequencing file,

(c) in response to a third one of said control commands accepted from said listener at a time when said currently playing audio program file has played for at least a predetermined amount of time by discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of said currently playing audio program file, and

(d) in response to said third one of said control commands accepted from said listener at a time when said currently playing audio program file has not yet played for said predetermined amount of time for discontinuing the reproduction of the currently playing program file and instead continuing the reproduction at the beginning of that audio program file which precedes the currently playing program segment in said ordered sequence specified by said playback session sequencing file.

('178 patent, col. 48:1-67)

Any additional facts relevant to this Report and Recommendation will be discussed in Section III below.

### B.  Procedural History

Google filed the instant Motion on June 29, 2021, (D.I. 552), and briefing was completed on August 31, 2021, (D.I. 628).  The Court heard argument on certain summary judgment and *Daubert* motions on September 22, 2021, including the instant Motion.  (D.I. 687 (hereinafter, "Tr."))  A trial date will be set following the disposition of summary judgment motions.  (D.I. 228; D.I. 449)

## II.  LEGAL STANDARD

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).  If the moving party meets this burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*."  *Id.* at 587 (emphasis in original) (internal quotation marks and citation omitted).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."

4

*Matsushita*, 475 U.S. at 586. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

The patentee bears the burden of proving infringement by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). "Summary judgment of noninfringement is . . . appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002).

**III.    DISCUSSION**

5

Before initiating this action against Google, Personal Audio sued a number of manufacturers of devices utilizing the Android operating system; it has entered into several settlement and license agreements as a result of this prior litigation. (D.I. 571, ex. J at ¶¶ 50, 71-73) Personal Audio's theory of infringement for some of those manufacturers (such as Acer Inc./Acer America Corp. and ASUSTek Computer Inc./ASUS Computer International) was that the devices they manufactured and sold included audio program players that utilized GPM. (*Id.*, ex. Z at ¶¶ 64-66, 82-84)

Personal Audio then initiated this action against Google. Personal Audio accuses one Google product, the Pixel C Tablet, of infringing the asserted patents. (*Id.*, ex. A at 1)[1] Additionally, Personal Audio accuses Google of infringement with respect to other devices manufactured by third parties (the "accused third-party products"), which Personal Audio asserts: (1) were installed with GPM during the infringement period and (2) include the claimed hardware features. (D.I. 594 at 3-4; Tr. at 68-69; D.I. 595 at 1 at ¶ 1; D.I. 605, ex. C1 at ¶ 123; D.I. 605, ex. G at ¶ 48) In its supplemental final infringement contentions, Personal Audio attached a spreadsheet listing 1,933 such accused third-party products, which it describes as a "representative sample of the universe" of infringing devices. (D.I. 571, ex. A at 7; *see also id.*, ex. B at ¶ 156)

With its Motion, Google presents three arguments. First, Google argues that Personal Audio has not sufficiently shown that the 1,933 accused third-party products directly infringed, because it puts forward no evidence that these products: (1) included GPM; (2) were made, sold, or used during the infringement period (a period ending in October 2016); and (3) were made, sold, or used in the United States. Without any such evidence, Google asserts that it cannot be

---

[1]    This Google product is not at issue in the instant Motion. (Tr. at 8)

6

liable for infringement under any of Sections 271(a), (b), (c) or (f) with respect to these devices. (D.I. 553 at 1-2; Tr. at 8)  Second, Google addresses Personal Audio's theories that Google is a direct infringer under Section 271(a) with respect to the accused third-party products, arguing that these theories fail as a matter of law and are unsupported by sufficient evidence.  (D.I. 553 at 7-10; Tr. at 9)  Third, Google takes up Personal Audio's theories that Google is a direct infringer under Section 271(f) with respect to the accused third-party products, asserting that these theories too fail as a matter of law and are unsupported by sufficient evidence.  (D.I. 553 at 11-12; Tr. at 9-10)

The Court will address each of these three arguments in turn.  In considering Google's first argument (i.e., that Personal Audio has not proved that the 1,933 accused third-party products directly infringe), the Court will focus on Section 271(b) (as did Personal Audio in its briefing).  (D.I. 594 at 1-5)  The Court will then address Google's other arguments concerning Sections 271(a) and 271(f).[2]

### A.    Induced Infringement Under Section 271(b)

Section 271(b) of the Patent Act provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  In order to prevail on a claim of induced infringement, the patentee must establish "first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal quotation marks and citation omitted).  Personal

---

[2]    As for Section 271(c), although Google's opening brief mentions this section as well, (D.I. 553 at 2), Personal Audio's briefing did not reference it (nor the concept of contributory infringement) at all, (*see* D.I. 594; D.I. 595 at 9).  So far as the Court can tell, then, Personal Audio is no longer pressing a claim of contributory infringement in relation to the accused third-party products.

7

Audio argues that the asserted patents are directly infringed when GPM is installed by device manufacturers and/or end-users on compatible devices with the claimed hardware features, and that Google induces that infringement by providing instructions on how to load or install GPM on such devices. (*See, e.g.*, D.I. 605, ex. C1 at ¶¶ 279-80, 1204; *id.*, ex. GG at 1-2)

It is the direct infringement element of Section 271(b) that is at issue here. A patent is directly infringed when an entity "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent[.]" 35 U.S.C. § 271(a). Google argues that summary judgment of non-infringement under Section 271(b) must be granted with respect to the accused third-party products because Personal Audio has not proffered evidence establishing "direct infringement by each third-party product accused in this case." (D.I. 553 at 1-3, 6-7; D.I. 628 at 1)

In response, Personal Audio first asserts that: (1) it is only required to show one instance of direct infringement to make out an induced infringement claim; (2) it has done so with respect to the Blu Products Life XL product (the "Blu product"); and (3) denial of Google's entire summary judgment is therefore appropriate. (D.I. 594 at 2; *see also* Tr. at 67, 69-71; Personal Audio's Slide Presentation for Google's Motion No. 1 at Slide 7) The Court will first explain why it agrees with Personal Audio that its induced infringement claim—at least as the claim relates to the Blu product—cannot be dismissed.

The caselaw is clear that to prove induced infringement, a patentee need only demonstrate that "at least one person directly infringed an asserted claim during the relevant time period." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012); *cf. Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332-33, 1335 (Fed. Cir. 2016) (explaining that, in a case where the plaintiff proved that third parties infringed the

8

asserted patents directed to circuits by presenting evidence that the plaintiff had purchased at least three products containing infringing chips in the United States, this was sufficient to allow the jury to find that the defendant had induced its customers to infringe as a class); *Largan Precision Co. v. Genius Elec. Optical Co.*, 646 F. App'x 946, 947-49 (Fed. Cir. 2016) (affirming a judgment of no induced infringement with respect to patents directed to camera lenses, where the plaintiff failed to offer evidence of direct infringement by third-party Apple, as it proffered "no evidence [] that a *single* Apple product sold in the United States contained an accused [defendant] lens") (emphasis added). And on that front, Personal Audio's infringement expert, Dr. Kevin C. Almeroth, physically inspected one of the 1,933 products: the Blu product. (D.I. 553 at 4 n.2; D.I. 594 at 2; D.I. 595 at 2 at ¶ 2) Although Google initially contested that Personal Audio had met its burden of establishing a genuine dispute of material fact with respect to whether the Blu product directly infringes the asserted patents, (D.I. 553 at 7; D.I. 628 at 1 n.1; Tr. at 11-12), by the end of oral argument, Google ultimately appeared to concede the point, (Tr. at 57). And indeed, Personal Audio's showing as to that product was sufficient, in that: (1) Dr. Almeroth opines that the Blu product includes GPM and contains every limitation of the asserted claims, (*see* D.I. 605, ex. C1 at ¶¶ 158, 160); (2) the public specification sheet for the Blu product indicates that its launch was announced in January 2016, (*id.*, ex. C2 at 3,676); and (3) a Personal Audio employee purchased the Blu product in Texas, (*id.* at ¶ 65).

But beyond the Blu product, Google's Motion seeks summary judgment on the induced infringement claim to the extent that the claim implicates the direct infringement of the other 1,932 third-party products referenced above. *Cf. Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334-35 (Fed. Cir. 2009) (finding that the patentee's circumstantial evidence was sufficient to show at least one act of direct infringement in the United States during the relevant

9

period, so as to support its indirect infringement claims, but noting that the evidence was otherwise insufficient to allow the conclusion that broader infringement had occurred or to support the scope of the jury's damages award); Robert A. Matthews, Jr., 2 *Annotated Patent Digest* § 10:37 (Dec. 2021 Update) ("To prove liability for inducing infringement a patentee need only show one act of direct infringement.  But to prove the amount of damages, the patentee must limit it[s] damages claim to the number of actual instances of direct infringement it can prove the accused infringer's inducing activity caused.").  As to this issue, as an initial matter, the Court has come to the conclusion that Google is mischaracterizing Personal Audio's induced infringement theory.  After having heard from the parties at oral argument and having reviewed the record, the Court does not understand Personal Audio to be attempting to demonstrate additional instances of induced infringement (and, more specifically, attempting to satisfy the direct infringement sub-component of such an allegation) by focusing on particularized aspects of these 1,932 other products.  Instead, Personal Audio's argument is that these additional 1,932 devices are simply representative of thousands of models of phones/tablets that directly infringed—and that, in total, there were over 1.8 billion installations of GPM during the infringement period on such phones/tablets (as is reflected in Google's own documents). (D.I. 594 at 2-3; Tr. at 65-68, 79-80; Personal Audio's Slide Presentation for Google's Motion No. 1 at Slides 3-4)[3]  Put another way, Personal Audio does not intend to prove the direct infringement element of its induced infringement claim by listing out each of these other 1,932

---

[3]    Personal Audio contends that the 1,933 specifically-identified third party devices are representative of the models of devices listed in two spreadsheets:  (1) a spreadsheet entitled ███████████████ that lists a ███████████ (D.I. 605, ex. W); and (2) a spreadsheet listing all ███████████████████, (*id.*, ex. V).  (*See* Personal Audio's Slide Presentation for Google's Motion No. 1 at Slide 3; Tr. at 78-79, 86; D.I. 605, ex. GG at 6; *id.*, ex. HH at 47-48)

CONFIDENTIAL MATERIAL OMITTED

devices and then demonstrating on a *device-by-device basis* that, during the relevant time period, each such device contained GPM and had the various required hardware characteristics.  Rather, Personal Audio intends to:  (1) prove that there were over 1.8 billion installations of GPM in the relevant time period; and (2) then show, in large part via circumstantial evidence, that those 1.8 billion installations (or at least those that were U.S.-based) *had to have been* on devices that also contained the other claimed hardware components.  (D.I. 594 at 2-5; Tr. at 59, 65-69, 77, 79-80)

This seems to the Court like it could be a viable way of proving up the direct infringement element of Personal Audio's induced infringement claim—as that claim relates to third-party products other than the Blu product.  It is well-settled, for example, that the direct infringement requirement of a patentee's induced infringement claim can be proven by circumstantial evidence of direct infringement by unnamed parties.  *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1336 (Fed. Cir. 2012); *Toshiba Corp.*, 681 F.3d at 1364; *see also, e.g.*, *Semiconductor Energy Lab. Co. v. Chi Mei Optoelecs. Corp.*, 531 F. Supp. 2d 1084, 1112 (N.D. Cal. 2007) (explaining that circumstantial evidence can show third-party direct infringement when direct infringers are identified by a class).  And relatedly here, it would seem that so long as Personal Audio can show a material dispute of fact with respect to whether certain (not-specifically-named) devices linked to the U.S.-based portion of the 1.8 billion installations all directly infringe the asserted claims of the patents-in-suit, then that portion of Personal Audio's Section 271(b) claim as to third party products should also survive summary judgment.[4]  And Personal Audio has demonstrated that there is a genuine issue of material fact on this score.

---

[4]     Google argues to the contrary that the ███████████ spreadsheets "do not show that ███████████ on any *particular* ██████ at all[.]"  (D.I. 628 at 3 (emphasis added))  But again, the Court is not convinced that Personal Audio is absolutely required to

CONFIDENTIAL MATERIAL OMITTED

First, when it comes to demonstrating the 1.8 billion installations of GPM, Personal Audio points to two █████████████ spreadsheets as reflecting that number.  (D.I. 594 at 3 (citing D.I. 605, ex. T & EE); *see also* Tr. at 86, 120; Personal Audio's Slide Presentation for Google's Motion No. 1 at Slide 14; D.I. 605, ex. G at ¶ 48)  One of these spreadsheets reflects devices in █████████, (D.I. 605, ex. T), while the other reflects █████ devices, (D.I. 605, ex. EE).  (D.I. 605, ex. G at ¶ 48)  Google has represented that these spreadsheets contain "the █████████ that you could imagine to capture █████████████. . . . [I]t [i]s literally all of the █████████████████."  (D.I. 353 at 37-38; *see also* Tr. at 92; D.I. 323 at 2)

Second, when it comes to demonstrating that the devices on which GPM was installed in the U.S. contain the other claimed hardware elements, Personal Audio points to the following evidence, (D.I. 594 at 3-5; Personal Audio's Slide Presentation for Google's Motion No. 1 at Slides 3-14):

- Evidence demonstrating that:  (1) the ███████████████ listed on the ████████████ spreadsheets include factory ███████ of GPM, (*see* D.I. 353 at 37-38), and (2) such devices must have Android and an account in order to receive

---

present evidence demonstrating that the limitations of the asserted claims are satisfied on a specific-product-by-specific product basis (so long as Personal Audio can otherwise show, via circumstantial evidence, that each of the instances of direct infringement that it points to for damages purposes is in fact an instance where GPM was downloaded to a device that met the claims' limitations).  *Cf. Semiconductor Energy Lab. Co.*, 531 F. Supp. 2d at 1112-13 ("SEL alleges that CMO sells its products to customers who then import infringing end-products into the United States.  SEL need not identify every specific act of direct infringement (i.e., each individual importation) by each of CMO's numerous customers in order to prove its claim for inducement. The circumstantial evidence that SEL has identified is sufficient to create a material issue of fact for trial."); *Nalco Co. v. Turner Designs, Inc.*, 73 F. Supp. 3d 1096, 1107 (N.D. Cal. 2014) ("The question then becomes:  Must Nalco produce additional direct evidence of infringement, and engage in multiple fact-specific inquiries, beyond the four examples it already provided, to find infringement by unnamed end users?  No.  The Federal Circuit has upheld claims of infringement based on circumstantial evidence of direct infringement by unidentified parties.").

12

an installation of GPM, (D.I. 605, ex. C1 at ¶¶ 154-55, 167, 170; *see also id.*, ex. JJ at 153, 173);

- The system requirements for Android require each of the claimed hardware features to be present on the device. (D.I. 605, ex. C1 at ¶¶ 158, 160-225) Personal Audio's expert further opines that the hardware features had to be present on the devices since the devices received installations of GPM. (*Id.* at ¶¶ 155, 173, 183, 193, 201; *see also id.*, ex. E at ¶¶ 14-16; *id.*, ex. JJ at 324-28);

- At least 99% of the publicly available specification sheets for the 1,933 exemplary third-party products demonstrated that those representative devices contained the required hardware features. (*Id.*, ex. C1 at ¶¶ 156-57)

This circumstantial evidence is sufficient for a jury to find the underlying direct infringement necessary with respect to the accused third-party products. For the above reasons, the Court therefore recommends that Google's Motion for summary judgment of non-infringement with respect to the accused third-party products pursuant to Section 271(b) be denied.[5]

## B.    Direct Infringement Under Section 271(a)

Google next moves for summary judgment of non-infringement with respect to Personal Audio's theories that Google is a direct infringer under Section 271(a) with respect to the accused third-party products. (D.I. 553 at 7-10) As noted above, a patent is directly infringed when an entity "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent[.]" 35 U.S.C. § 271(a). Here, Personal

---

[5]    In the instant Motion, Google does not contest the other elements of Personal Audio's Section 271(b) claim, so the Court need not address those here.

13

Audio argues that Google "makes" the accused third-party products. (D.I. 594 at 6-8; Tr. at 107, 109, 112; D.I. 605, ex. C1 at ¶ 1194)[6]

Generally, to "make" a patented device under § 271(a), a single entity must "combine all of the claim elements[.]" *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011); *see also, e.g., Acceleration Bay LLC v. Take-Two Interactive Software, Inc.*, Civil Action No. 16-455-RGA, 2020 WL 1333131, at *4 (D. Del. Mar. 23, 2020). Pursuant to the United States Court of Appeals for the Federal Circuit's decision in *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011), if a customer (rather than a defendant company) performs the final step to assemble a claimed system by installing certain software, then the defendant company has not infringed, because it is the customer who directly infringes by completing the system. 631 F.3d at 1288; *see also Acceleration Bay LLC*, 2020 WL 1333131, at *4. The asserted claims here are device claims directed to players that include hardware and software components. (*See, e.g.*, '178 patent, col. 48:1-67; Tr. at 114-15; D.I. 605, ex. C1 at ¶¶ 81, 83) It is not disputed that Google itself does not manufacture the hardware components of the accused third-party players, nor put those hardware components together. (D.I. 553 at 7; D.I. 595 at 5-6 at ¶ 21; D.I. 628 at 4; Tr. at 109, 115) So what are Personal Audio's theories with regard to "making," and can they withstand summary judgment?

---

[6]    In its opening brief, Google had also argued that Personal Audio cannot establish Google's direct infringement via "use" of the accused third-party products. (D.I. 553 at 10) However, Personal Audio did not respond to that argument in its briefing, and therefore does not appear to be pressing a theory that Google directly infringes by "using" those products. (*See* D.I. 628 at 5 n.4; Tr. at 46; *see also* D.I. 595 at 7 at ¶ 30 (Personal Audio stating that Google's "use" of the patented invention on accused third-party products is disputed, but then only pointing generally to the Amended Complaint in support))

14

CONFIDENTIAL MATERIAL OMITTED

In its answering brief, Personal Audio first asserted a theory of divided direct infringement.[7]  Specifically, Personal Audio asserted that Google is a part of a joint enterprise (along with the manufacturers of the accused third-party products) to make such devices; Personal Audio said that this is so because Google requires the manufacturers to ██████████ ██████████  and to allow Google to ██████████████████████  to them[.]"  (D.I. 594 at 6; *see also* D.I. 595 at 5-6 at ¶ 21)  Personal Audio cited to *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) in support of this "joint enterprise" theory.  (D.I. 594 at 6)  In that case, the Federal Circuit concluded that with respect to a method claim, two or more actors can form a joint enterprise and all be charged with the acts of the other, rendering each entity liable "for the steps [of the claimed method] performed by the other as if each is a single actor[,]" so long as the plaintiff demonstrates proof of four elements.  *Akamai Techs.*, 797 F.3d at 1023.

But this theory of Personal Audio's fails as a matter of law.  (D.I. 628 at 5; Tr. at 47, 49)[8] The law of joint infringement set out in *Akamai* applies to method claims; it is irrelevant here, where the only asserted claims are to devices.  *See, e.g.*, *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016) ("Our cases have applied joint infringement to method claims and not system claims."); *Midwest Athletics & Sports Alliance LLC v. Ricoh USA, Inc.*, Case No. 2:19-cv-00514-JDW, 2021 WL 3722329, at *8 (E.D. Pa. Aug. 23, 2021); *United Servs. Auto. Assoc. v.*

---

[7]      This is also known as joint infringement.  *See, e.g.*, *Sapphire Crossing LLC v. Robinhood Mkts., Inc.*, Civil Action No. 18-1717-MN-CJB (Consolidated), Civil Action No. 20-726-MN-CJB, 2021 WL 149023, at *4 (D. Del. Jan. 15, 2021).

[8]      Indeed, by the time of oral argument on the Motion, Personal Audio seemed to have abandoned this theory.  (*See* Tr. at 111-12 (Personal Audio's counsel stating "This is not a case of divided infringement."); Personal Audio's Slide Presentation for Google's Motion No. 1 at Slides 15-22)

CONFIDENTIAL MATERIAL OMITTED

*Wells Fargo Bank, N.A.*, Case No. 2:18-CV-00366-JRG-RSP, 2019 WL 6896676, at *1-2 (E.D. Tex. Dec. 18, 2019).

Beyond its irrelevant joint enterprise theory, Personal Audio also contends that Google "makes" the accused third-party products by "requir[ing] its customers to passively and automatically ███████████████████████████████████████████████████ ██████ at a time and manner determined ████████." (D.I. 594 at 7-8 (emphasis in original); *see also* Tr. at 111-12; Personal Audio's Slide Presentation for Google's Motion No. 1 at Slide 15 ("Google Makes Infringing Devices by Pushing GPM Updates")) In other words, Personal Audio asserts that while third parties manufacture the various hardware components of the accused third-party products, Google acts as the "final assembler" (and thus, the "maker") of these products by "pushing" updates of GPM to the products. (Tr. at 110-14)[9] For the first time during oral argument, Personal Audio pointed to *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360 (Fed. Cir. 2019) as being the key case that supports this theory of direct infringement. (*Id.* at 107-17)

In *Centrak*, the Federal Circuit explained that a "final assembler" of a claimed system can be liable for making the system, even if it did not make all of the component parts of the system. The asserted claims in that case recited systems for locating and identifying portable devices using ultrasonic base stations. *Centrak*, 915 F.3d at 1362-63. The defendant's accused systems included three pieces of hardware sold by the defendant (RF gateways, ultrasonic location transmitters and portable locator tags); however, it was undisputed that the defendant did not provide certain other claimed elements of the systems, such as the backbone network or server

---

[9]     It is undisputed that with respect to the accused third-party products that come already installed with GPM, it is the manufacturers and/or end-users that perform the installation in the first instance (not Google itself). (D.I. 571, ex. B at ¶ 280; Tr. at 50, 140-41)

16

hardware. *Id.* at 1363, 1371. The defendant also provided software for installation of the system on a customer's server hardware. *Id.* at 1363. The plaintiff's direct infringement theory was that the defendant "made" the accused system when it installed and configured the systems, thus acting as the "final assembler[.]" *Id.* at 1364, 1371-72. The district court granted summary judgment of non-infringement, agreeing with the defendant that there was no triable issue of fact regarding infringement because the defendant did not make each of the claimed components of the accused system. *Id.* at 1364, 1371. The Federal Circuit reversed. *Id.* at 1373-74. In doing so, the Federal Circuit concluded that "a final assembler can be liable for making an infringing combination—assuming the evidence supports such a finding—even if it does not make each individual component element" by "add[ing] the final limitations to complete a claimed combination[.]" *Id.* at 1371-72. And the *Centrak* Court found that the plaintiff had put forward sufficient evidence to create a triable issue of fact regarding whether the defendant was the final assembler of the accused system—based on evidence that the defendant's personnel completed at least a portion of the final system configuration and software setup necessary to make the accused system work. *Id.* at 1372-73.

The Court does not find the facts here to be analogous to those at play in *Centrak.* Instead, here the undisputed evidence demonstrates that it is the *end users* of the accused third-party products who choose whether to receive all updates and/or particular updates pushed by Google. In asserting otherwise, Personal Audio points to Google Play Terms of Service dated October 12, 2020 (the "Terms of Service").[10] (D.I. 594 at 7 (citing D.I. 605, ex. BBB)) But with respect to updates, the Terms of Service provide that:

---

[10]    It is worth noting that these Terms of Service are dated more than four years after expiration of the asserted patents. But for the sake of argument here, the Court will assume that they (or similar terms) were in effect during the alleged period of infringement.

17

> **Updates.** Google Play, related support libraries, or Content may
> need to be updated, for example, for bug fixes, enhanced functions,
> missing plug-ins and new versions (collectively, "**Updates**").
> Such Updates may be necessary in order for you to use Google
> Play or to access, download, or use Content.  By agreeing to these
> Terms and using Google Play, you agree to receive such Updates
> automatically.  You may be able to manage Updates to certain
> Content via Settings in Google Play.  If it is determined, however,
> that the Update will fix a critical security vulnerability related to
> the Content, the Update may be completed irrespective of your
> Update settings in Google Play or your Device.

(D.I. 605, ex. BBB at 1)  Pursuant to the Terms of Service, then, the user agrees to receive

updates and can manage updates to certain content by adjusting his or her settings (with the

user's choice in that regard being overridden only if the update "will fix a critical security

vulnerability").  (*Id.*; *see also* D.I. 628 at 6; Tr. at 52)[11]  And Personal Audio's other evidence on

this point similarly underscores that it is *the user's choice* whether to update GPM on the user's

device.  (D.I. 605, ex. JJ at 299 (Google's 30(b)(6) witness is asked "When Google pushes an

update of the [GPM] application, do updates happen automatically?" and responds "[i]t depends

on the user settings" which include "[n]ever update, update only on WiFi, always update") (cited

in Personal Audio's Slide Presentation for Google's Motion No. 1 at Slide 19); *id.* at 412-13

(same) (cited in Personal Audio's Slide Presentation for Google's Motion No. 1 at Slide 20))

Thus, to the extent that an end user chooses to allow updates to GPM (i.e., a program already

installed on the end user's device) *it is that end user* who acts as the "final assembler" and

arguably "makes" the infringing device.  (D.I. 553 at 9; Tr. at 52-53, 142-43)

In this regard, here it is *Centillion*, and not *Centrak*, that is on point.  In *Centillion,* the

Federal Circuit concluded that the defendant did not "make" the accused system under Section

---

[11]     Personal Audio has not proffered any evidence that Google automatically pushed
a "critical security" update to GPM (as opposed to other Google Play Content) to any accused
third-party product during the relevant time period.  (*See* D.I. 594 at 7-8; D.I. 628 at 6)

271(a) as a matter of law, where it was the defendant's customers who made the "decision . . . whether to install and operate" certain software in a way that "completes the [infringing] system"; after the customers made that decision, it was thus those customers who were said to have completed the accused system once the software was installed. *Centillion*, 631 F.3d at 1287-88; *id*. at 1288 (noting, in the section of the opinion relating to liability for "making" under Section 271(a), that the defendant's customers were "free to choose whether to install the software" and that the defendant did not "make" the accused system because it did not combine all of the claim elements since "[t]he customer, not [defendant], completes the system by providing the 'personal computer data processing means' and installing the client software"). Because the undisputed evidence here shows that the end users make the decision as to whether to receive GPM updates, Google does not "make" the accused third-party products and cannot be liable under Section 271(a) regarding third-party products as a matter of law.[12]

## C.    Direct Infringement under Section 271(f)

Finally, the Court turns to Google's argument that summary judgment of non-infringement under Section 271(f) is appropriate. Section 271(f) allows patentees to bring a claim for infringement based upon an alleged infringer supplying components of a patented invention from the United States. 35 U.S.C. § 271(f). Section 271(f) "contains two provisions that 'work in tandem' by addressing 'different scenarios.'" *WesternGeco LLC v. ION*

---

[12]    *See, e.g.*, *Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069, 1078 (Fed. Cir. 2021) (rejecting the plaintiff's theory that "the defendants are liable for 'making' the claimed hardware components, even though they are in fact made by third parties, because their accused software runs on them" since it was the customer, not the defendant, who completed the system by providing the hardware components and installing the client software); *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1364-65, 1368 (Fed. Cir. 2021) ("The evidence shows that Dropbox provides its customers with software for download but no corresponding hardware. . . . Because Dropbox does not provide its customers with any hardware in conjunction with its accused software, Dropbox does not make . . . the complete invention.").

19

CONFIDENTIAL MATERIAL OMITTED

*Geophysical Corp.*, 138 S. Ct. 2129, 2134 (2018) (quoting *Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 742 (2017)).  Specifically, Section 271(f)(1) "addresses the act of exporting a substantial portion of an invention's components[,]" *id.*; *see also* 35 U.S.C. § 271(f)(1), and Section 271(f)(2) "addresses the act of exporting components that are specially adapted for an invention[,]" *WesternGeco*, 138 S. Ct. at 2135; *see also* 35 U.S.C. § 271(f)(2).  With respect to both sections of 271(f), Personal Audio asserts that Google's update of GPM constitutes a substantial portion of the components of the claimed invention, and that when Google servers located in the United States place GPM on a device located in a foreign jurisdiction via updates, Google commits an act of infringement under Section 271(f).  (*See* D.I. 595 at 7 at ¶ 31; D.I. 605, ex. C1 at ¶ 1218; D.I. 605, ex. E at ¶ 9)[13]

Google puts forward two reasons why summary judgment should be granted on the Section 271(f) allegations.[14]  First, Google argues that Personal Audio's Section 271(f) claim

---

[13]     Dr. Almeroth's report suggests that Personal Audio's Section 271(f) theory includes both Google sending *updates* to GPM to a device in a foreign jurisdiction and Google *installing* GPM on such devices.  (*See, e.g.*, D.I. 605, ex. C1 at ¶ 1218)  With respect to installations, however, Google noted in its opening brief that the undisputed evidence demonstrates that—to the extent that Google provides GPM software to manufacturers of devices—Google does so by uploading ████████████████████, and manufacturers can then choose to ████████████████████.  (D.I. 553 at 11 (citing D.I. 571, ex. S at 18))  In light of this evidence, Google asserts that Personal Audio cannot establish Section 271(f) infringement with respect to *installations*, because Personal Audio cannot show that Google supplies copies of GPM that are actually installed on devices in foreign jurisdictions.  (*Id.*)  Personal Audio did not respond to this particular argument.  Moreover, its briefing and oral argument concerning Section 271(f) focused solely on updates.  (D.I. 594 at 9-11)  Thus, the Court assumes that Personal Audio is not pressing a Section 271(f) theory based on installations.

[14]     In addition to these two arguments, in its opening brief, Google makes another argument specific to Section 271(f)(1).  It asserts that Section 271(f)(1) is inapplicable because it requires that multiple components of an invention be supplied, *see Life Techs. Corp.*, 137 S. Ct. at 743, and because Personal Audio "concedes[] that the GPM application is a *single* component" of the claimed invention, (D.I. 553 at 11 (citing D.I. 571, ex. I at 125-126) (emphasis in original)).  This particular argument is not well-taken.  (D.I. 594 at 9)  It is true that

20

CONFIDENTIAL MATERIAL OMITTED

requires evidence demonstrating that some portion of ████████ that occur on devices in ████████████████████████████████—and that there is no such evidence in the record.  (D.I. 553 at 12; D.I. 628 at 6-7; Tr. at 53, 143-44)  Second, Google argues that even assuming that Personal Audio could establish that a device in a ██████ ████████ received a GPM update from Google's ████████████ during the relevant time period, Personal Audio has not sufficiently established that any such update included one or more components of the patented invention, as required by Section 271(f).  (D.I. 553 at 12; D.I. 628 at 7-8; Tr. at 53-54, 144-45)  The Court agrees with Google on both counts.

With respect to Google's first reason, in its November 4, 2021 Memorandum Order denying Personal Audio's Motion for Adverse Inference (the "November 4, 2021 MO"), the Court previously concluded that Personal Audio's theory (i.e., that Google's ████████████ ███████ updated GPM on devices ████████████) is supported by "[l]ittle [m]ore than [s]peculation[.]"  (D.I. 688 at 10-13)[15]  The same conclusion applies here,[16] and the Court

_____

in the snippet of his deposition testimony that Google relies on, Dr. Almeroth suggested that GPM constituted the relevant component for purposes of Section 271(f).  (D.I. 571, ex. I at 125-26)  But Personal Audio points to a portion of Dr. Almeroth's report that defines the accused software as constituting, in addition to GPM, Google Play and associated software and Google's computer systems.  (D.I. 605, ex. C1 at ¶ 123; *id.*, ex. GG at 1)  Personal Audio therefore does contend that Google supplies multiple components.

[15]    With that Motion for Adverse Inference, Personal Audio had argued that Google intentionally and continuously destroyed evidence relevant to the issue of whether Google's ████████████ sent updates of GPM to devices ████████████████████.  (*See* D.I. 688 at 5)  In light of that purported spoliation, Personal Audio requested that the District Court issue a jury instruction stating that jurors should presume that all installations and updates of GPM originated from Google's servers located in the United States (or, alternatively, that six out of every 13 installations and updates of GPM originated from Google's United States servers).  (*Id.* at 6; *see also* Personal Audio's Slide Presentation for Google's Motion No. 1 at Slide 33)

[16]    In its opposition to the instant Motion, Personal Audio points to the same data center location maps and spreadsheets that it did in connection with its Motion for Adverse Inference.  (D.I. 594 at 10-11; D.I. 688 at 12)  Personal Audio also cites to deposition testimony purportedly constituting admissions "that Google's ████████ have delivered

incorporates by reference that discussion.[17]  With Personal Audio having failed to proffer

sufficient evidence to support its theory that a ███████ device received a GPM update

from ███████ during the relevant time period, the Court recommends that summary

judgment of non-infringement as to the accused third-party products be granted pursuant to

Section 271(f).[18]

     With respect to Google's second reason, Google asserted in its opening brief that

"because [Personal Audio] has not proffered any evidence regarding the contents of any update,

[Personal Audio] cannot establish that one or more components 'of the invention' is provided

from the United States, as required by Section 271(f)."  (D.I. 553 at 12 (emphasis omitted))

Google explains that this is important here, where GPM includes additional functionalities that

are not being accused of infringement, such as the radio functionality.  (Tr. at 53; *see also* D.I.

571, ex. I at 121)  In response, Personal Audio made two assertions:  that "[1] when an update

for a new version of Google Play is completed, the ████████████████████ is

███████████ to devices ███████."  (D.I. 595 at 13 at ¶ 27 (citing D.I. 605, ex. JJ
at 56, 354, 361))  But the cited deposition testimony does not admit any such thing.  The first
excerpt conveys that unless there is a global network outage, Google servers in ████████
are *not* responsible for ███████ of GPM on devices ████████
(D.I. 605, ex. JJ at 56)  The next two excerpts state that the majority of distributions of GPM
███████.  (*Id.* at 354, 361)

     [17]     Personal Audio has filed objections to the November 4, 2021 MO that are pending
before the District Court.  (D.I. 697)

     [18]     *Cf. Pulse Elecs., Inc. v. U.D. Elec. Corp.*, 530 F. Supp. 3d 988, 1024-25 (S.D.
Cal. 2021) (granting summary judgment of non-infringement where the plaintiff's infringement
position with respect to certain samples being sent to the United States relied on mere
speculation about "'possibilit[ies]'" and not actual evidence); *Pilot Energy Sols., L.L.C. v. Oxy
USA, Inc.*, Cause No.: AU-16-CA-00687-SS, 2018 WL 3014421, at *3 (W.D. Tex. Apr. 6, 2018)
(granting summary judgment of non-infringement where the only evidence submitted by the
plaintiff with respect to infringement was a factual affidavit in which the declarant engaged in
speculation, and concluding that the affidavit was insufficient to create a genuine issue of
material fact because "unsubstantiated assertions, improbable inferences, and unsupported
speculation are not competent summary judgment evidence").

installed[; and [2] that] 27 new versions were distributed during the infringement period."  (D.I.
594 at 10; *see also* Personal Audio's Slide Presentation for Google's Motion No. 1 at Slide 25)
Yet for the following reasons, these two assertions are insufficient to create a genuine issue of
material fact:

- Personal Audio's first assertion comes from a paragraph of Dr.
  Almeroth's reply report in which he makes that contention
  (without citing to anything in support).  (D.I. 605, ex. E at ¶
  11)  However, when Dr. Almeroth was questioned about this
  paragraph during his deposition, he explained that his
  statement therein was *not* meant to convey that a "████████
  ████████" of GPM is supplied as part of any update.  (D.I.
  628 at 7)  Instead, Dr. Almeroth testified that:  (1) "Google has
  the ability to do ████████, that if . . . there's changes
  to the code, you can ████████ instead of
  downloading an ████████ of the application[;]" and
  (2) with respect to the portion of his report stating that "[w]hen
  Google updates a device to a new version, it is ████████
  ████████ including a ████████" and
  thus "the device is provided with a ████████[,]"
  this means that "whether or not you're doing an ████████
  ████████ that only applies to ████████, the result is
  you have a new application installed and operating."  (D.I. 571,
  ex. I at 112-13; *see also id.* at 114-15 (explaining his view that
  even if "all of the updates [are] ████████" that still means
  that "a new application" has been created))  Personal Audio
  retorts that Dr. Almeroth "clearly testified that there are
  instances where the whole application is ████████ for a
  particular update[,]" (Personal Audio's Slide Presentation for
  Google's Motion No. 1 at Slide 26; *see also* Tr. at 134-35),
  pointing to Dr. Almeroth's testimony that:  (1) "my
  recollection is that there are some instances where the updates
  are for the ████████, potentially major ████████
  ████.  But, again, I'm trying to do this from memory, and
  there's quite a few different depo cites that I'd have to go back
  and look at to get the details[;]" and (2) the proposition that
  Google does ████████ is "caveated with . . . versus
  instances where you would either ████████
  ████████[,]" (D.I. 571, ex. I at 112).  This is not "clear[]"
  testimony at all in support of the assertion that updates
  constitute an ████████ of GPM.  And even if it
  were, it would be premised not on actual evidence, but on
  nothing more than Dr. Almeroth's say so.  In the end, Personal

23

> Audio has failed to proffer "any evidence that any update included ███ related to the accused functionality." (D.I. 628 at 8; Tr. at 54, 144-45)

- Personal's Audio's second assertion comes from a Declaration of Dr. Almeroth that is the subject of a pending motion to strike, (D.I. 639), and it simply says "[t]here are at least 27 versions between 3.0 (September 2014) and 6.14 (September 2016) that were distributed during the infringement period." (D.I. 608 at ¶ 39)  There is no further information regarding the content of these distributions, such as whether these versions were ████████████ or updates to the ████████. (*See* Tr. at 145)

The Court therefore agrees with Google that summary judgment of non-infringement under Section 271(f) as to third-party products is appropriate for this reason as well.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Google's Motion be GRANTED-IN-PART and DENIED-IN-PART.  Specifically, the Court recommends that summary judgment of non-infringement with respect to the accused third-party products be granted pursuant to Section 271(a), 271(c) and 271(f).  The Court recommends that summary judgment of non-infringement with respect to the accused third-party products be denied pursuant to Section 271(b).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

24

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **January 12, 2022** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated: January 7, 2022

*Christopher J. Burke*

Christopher J. Burke

UNITED STATES MAGISTRATE JUDGE

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,     )
     )
     Plaintiff,     )
     )
     v.     )     Civil Action No. 17-1751-CFC-CJB
     )
GOOGLE LLC,     )     **REDACTED - PUBLIC VERSION**
     )
     Defendant.     )

## MEMORANDUM ORDER

Presently pending in this patent infringement case is Plaintiff Personal Audio, LLC's ("Plaintiff" or "Personal Audio") "Motion for Adverse Inference" (the "Motion"). (D.I. 543) Defendant Google LLC ("Defendant" or "Google") opposes the motion. For the reasons that follow, the Court hereby ORDERS that Personal Audio's Motion is DENIED.[1]

## I.   BACKGROUND

On September 15, 2015, Personal Audio filed this action against Google in the United States District Court for the Eastern District of Texas, alleging infringement of United States Patent Nos. 6,199,076 and 7,509,178 due to Google's distribution of Google Play Music ("GPM"). (D.I. 1; D.I. 38 at ¶¶ 2-3, 53-55, 73-74, 81-82) In December 2017, the case was transferred to this District. (D.I. 103) This case has been referred to the Court to hear and

---

[1] In circumstances where case-dispositive sanctions are not imposed, courts treat motions for adverse inferences as non-dispositive. *See, e.g.*, *Khatabi v. Bonura*, 10 Civ. 1168 (ER), 2017 WL 10621191, at *2-3 (S.D.N.Y. Apr. 21, 2017) (explaining that if a Magistrate Judge denies a motion for sanctions and therefore does not impose any terminating, case-dispositive sanctions, the ruling is treated as non-dispositive); *Apple Inc v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 988-89 (N.D. Cal. 2012) (reviewing a Magistrate Judge's adverse inference order for clear error where the order did not constitute a dispositive ruling).

resolve all pretrial matters, up to and including the resolution of case-dispositive motions. (Docket Items, December 13, 2017 and September 10, 2018)

One of Personal Audio's infringement theories is that Google's supply or update of GPM constitutes a substantial portion of the components of the claimed invention, and that when Google servers located in the United States place GPM on a device located in a foreign jurisdiction through installation or through updates, Google commits an act of infringement under 35 U.S.C. § 271(f) ("Section 271(f)").  (*See, e.g.*, D.I. 605, ex. C1 at ¶ 1218; *see also* D.I. 544 at 3)  In connection with this theory, during the discovery phase of the case, Personal Audio served discovery requests on Google seeking the number and origin of installations of GPM. (D.I. 545, ex. 4 at 10-14; *id.*, ex. 5 at 15-18)  These discovery requests include Interrogatory Nos. 27, 28 and 29:

> Interrogatory No. 27 ("Rogg 27"):
>
> For each version of Google Play and [GPM] (for example, v5.8 codenamed "rush") that was publicly released in the Relevant Time Period, identify the location of the server or servers making each such version available for download.
>
> Interrogatory No. 28 ("Rogg 28"):
>
> For each server identified in response to Interrogatory No. 24, list the number of unique downloads from devices in the U.S., and the number of unique downloads from devices outside of the U.S.
>
> Interrogatory No. 29 ("Rogg 29"):
>
> For each version of Google Play and [GPM] (for example, v5.8 codenamed "rush") that was publicly released in the Relevant Time Period, explain in detail the delivery method for Google Play and [GPM]: (a) to devices located in the U.S.; and (b) to devices located outside of the U.S.; including, for each category, the location of the server or servers from which each such version is downloaded by user devices.

(*Id.*, ex. 5 at 15-16)

2

CONFIDENTIAL MATERIAL OMITTED

Google did not substantively respond to Roggs 27 and 28.  (*Id.*)  In response to Rogg 29, Google identified certain documents which contain multiple maps; these maps identify the location of 13 Google data centers (i.e., servers) ("data center location maps") that are capable of installing or updating GPM on a user's device.  (*Id.*, ex. 5 at 18; *id.*, ex. 6)  Six of these data centers are located in the United States.  (*Id.*, ex. 6)  Google has produced spreadsheets identifying the number of ████████ that have occurred in the ████████ and in various ████████; two examples of such ████████ are ████ and ████.  (*Id.*, ex. 7)  Canada and Mexico do not contain Google servers capable of distributing GPM, (*id.*, ex. 6), and so the Google servers that are responsible for installing or updating GPM on devices in Canada or Mexico must be located in some other country.  However, Google has not produced records that directly link particular ████████ to the particular Google server that is responsible for the ████████  (*See* D.I. 544 at 5)

On December 17, 2018, Personal Audio moved to compel complete responses to Roggs 27 and 28.  (D.I. 307 at 1-2)  On December 20, 2018, Google responded that it had conducted a reasonable search for responsive information, but was unable to find data directly responsive to these discovery requests.  (D.I. 309 at 1)  Specifically, with respect to Rogg 27, Google explained that it had not found data regarding "the location of the server or servers making each ████████ available for ████████" but that it had produced information regarding the location of data centers capable of making GPM available for download during the relevant time period (i.e., the data center location maps).  (*Id.* (internal quotation marks omitted))  And with respect to Rogg 28, Google noted that while it could not find the information requested therein, it had made available a corporate witness, Mr. Igor Razumeiko, to testify regarding the "general operation of Google's servers vis-a-vis user's devices (including regarding the relative location

3

of those servers and devices)." (*Id.* at 1-2 (citing D.I. 310, ex. 6 at 56)) That deposition took place on December 5, 2018; a second deposition of Mr. Razumeiko occurred on July 23, 2019. (D.I. 545, ex. 8 at 1; *id.*, ex. 9 at 1)

On January 4, 2019, the Court denied as moot Personal Audio's motion to compel with respect to Roggs 27 and 28 in light of Google's "representation that after reasonable searches, it has either not found responsive records or, to the extent it has, it has produced such materials." (Docket Item, January 4, 2019)

Personal Audio filed the instant Motion on June 29, 2021. (D.I. 543) Briefing on the Motion was completed by August 31, 2021. (D.I. 625) The Court heard argument on certain summary judgment and *Daubert* motions on September 22, 2021, during which the parties discussed issues relevant to the instant Motion. (D.I. 687 (hereinafter, "Tr.")) A trial date will be set following the disposition of summary judgment motions. (D.I. 228; D.I. 449)

## II.    STANDARD OF REVIEW

Spoliation refers to situations where a party has altered, destroyed, or intentionally withheld evidence "relevant to an issue in a case." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73, 79 (3d Cir. 2012) (citation omitted).[2] Spoliation occurs where: (1) "the evidence was in the party's control; [(2)] the evidence is relevant to the claims or defenses in the case; [(3)] there has been actual suppression or withholding of evidence; and [(4)] the duty to preserve the evidence was reasonably foreseeable to the party." *Id.* at 73. "[A] finding of bad faith is pivotal to a spoliation determination. . . . [w]ithholding [evidence] requires intent." *Id.* at 79 ("As a result, we must be convinced that . . . [the non-movant] intended to actually withhold the [evidence]

---

[2]    The determination of whether a party has spoliated evidence in a patent infringement action is governed by regional circuit law. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1345 (Fed. Cir. 2011).

4

from [the movant] before we can conclude that sanctionable spoliation occurred.").[3]  The party

asserting spoliation has the burden of proof.  *See, e.g.*, *Brown v. Certain Underwriters at Lloyds,*

*London*, CIVIL ACTION NO. 16-cv-02737, 2017 WL 2536419, at *4 (E.D. Pa. June 12, 2017);

*Harrell v. Pathmark*, Civil Action No. 14-5260, 2015 WL 803076, at *3 (E.D. Pa. Feb. 26,

2015).

## III.    DISCUSSION

With its Motion, Personal Audio asserts that Google "intentionally and continuously"

destroyed evidence (in the form of server logs and content delivery records) relevant to this

case—and that, as a result, the Court "should impose severe sanctions for Google's outrageous

litigation misconduct."  (D.I. 544 at 1)  The crux of Personal Audio's Motion is that despite

Google's representations that it did not have responsive information to PA's discovery requests

described above, "[i]t was later discovered . . . that Google, in fact, possessed but then deleted

the [responsive] information that would normally be kept in server logs and content delivery

records, despite this being the subject of multiple requests and a motion to compel."  (*Id.* at 6;

*see also id.* at 10 ("Google was in possession of its server logs and content delivery records

during the pendency of this litigation and chose to allow that information to be destroyed rather

than turned over to Personal Audio."); D.I. 625 at 1; Tr. at 132)  In light of this alleged

---

[3]      If a court finds that spoliation has occurred, it then must determine an appropriate sanction for the suppression or withholding of evidence.  This analysis considers:  "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future."  *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).  Possible sanctions for spoliation include "dismissal of a claim or granting judgment in favor of a prejudiced party;[] suppression of evidence;[] an adverse inference . . .;[] fines;[] and attorneys' fees and costs."  *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (citations omitted).

CONFIDENTIAL MATERIAL OMITTED

spoliation, Personal Audio asserts that the Court (or, as applicable, the District Judge) should: (1) presume that the withheld evidence was unfavorable to Google; (2) instruct the jury that it must presume that the evidence was unfavorable to Google; and (3) instruct the jury that it should presume that all installations and updates of GPM originated from Google's servers located in the United States (or, alternatively, that six out of every 13 installations and updates of GPM originated from Google's United States servers).  (D.I. 544 at 22; D.I. 625 at 3)[4]

Personal Audio's accusation here is about as serious as it gets—that its opponent committed very significant wrongdoing by intentionally destroying relevant evidence.  What evidence does Personal Audio cite to in support of this weighty allegation?

Here, Personal Audio points to portions of four pages of deposition testimony; these pages consist of one snippet of deposition testimony from the December 5, 2018 deposition of Mr. Razumeiko, and another snippet of deposition testimony from Mr. Razumeiko's follow-up July 23, 2019 deposition.  (D.I. 544 at 6 (citing D.I. 545, ex. 8 at 265-66; *id.*, ex. 9 at 393-94))  In the first snippet of deposition testimony, Mr. Razumeiko discussed certain communications with Google servers that are logged:

> Q  Are communications with Google servers logged? . . .
>
> THE WITNESS:  Some ████████████████████ ████████

---

[4]      In calculating damages pursuant to Section 271(f), Personal Audio's damages expert Michele M. Riley noted that in the absence of the "exact number of GPM distributions to devices outside of the United States that were performed by a server located within the United States[,]" based on the data center location maps produced by Google, "it is reasonable to assume that 6 out of every 13 [] activations of GPM outside of the United States originate from within the United States."  (D.I. 571, ex. J at ¶ 55)  Based on this assumption, she calculated that the total reasonable royalty damages for Section 271(f) infringement would be ████████. (*Id.* at ¶ 192)  Alternatively, Ms. Riley opined that due to Google's alleged spoliation, "Personal Audio may be entitled to claim all worldwide sales[,]" (*id.* at ¶ 62), with the total damages under this scenario amounting to ████████, (*id.* at ¶ 193).  Google has moved to exclude Ms. Riley's opinions on this basis as unreliable.  (D.I. 568 at 4-6)

6

CONFIDENTIAL MATERIAL OMITTED

[] Q  Are Google Play Music communications with Google servers logged?

A  Say it again, please.

Q  Are Google Play Music communications with Google servers logged?

A  Google Play Music application with Google Play Music service?

Q  When you ███ the application and—outside the 24-hour window and there is a communication with the server, is that logged?

A  It would perform ████, which is ██████████ ███.

Q  And that's ████ after how many days?

A  Some ██████; some █████.

(D.I. 545, ex. 8 at 265-66 (objections omitted))  And in the second snippet of deposition

testimony, Mr. Razumeiko responded to questioning regarding content delivery records:

Q  Does the content delivery system keep records? . . .

THE WITNESS:  To my knowledge, it does. . . .

Q  Do these records include ████████ for Google Play Music? . . .

THE WITNESS:  No.

[] Q  What metrics are stored there? . . .

THE WITNESS:  It keeps a list of ██████████████ ████████.

[] Q  When it receives a █████, does it erase the █████? . . .

THE WITNESS:  No.

[] Q  How long are these ███ stored for? . . .

7

CONFIDENTIAL MATERIAL OMITTED

THE WITNESS:  To my knowledge, ███.

(*Id.*, ex. 9 at 393-94 (objections omitted))

Personal Audio's Motion is fatally flawed for at least three reasons.  The Court addresses these reasons below, in turn.

> ### A.      Personal Audio Has Failed to Meet its Burden to Demonstrate that Google Destroyed Relevant Evidence.

First, the Motion is premised on the notion that these server logs and content delivery records (that Google ████████) contained *relevant, responsive information* regarding the number of ████████ and ████ on devices outside of the United States that were performed by servers located within the United States.  (D.I. 544 at 6, 8-9)  But nothing in Personal Audio's briefing suggests that this is actually the case.

The above-referenced excerpts from Mr. Razumeiko's depositions, upon which Personal Audio hinges its Motion, certainly do not do so.  Those excerpts provide absolutely no indication that the records at issue would convey the ████ *of the server that* ██████████ *GPM on a device*.  (*See* D.I. 611 at 1, 9-11)

With respect to the server logs, for example, Mr. Razumeiko's first snippet of deposition testimony establishes only that when GPM is ████████ (not ██████ or ████), the server ████████ of that in "██████████" or "████."  (D.I. 545, ex. 8 at 266; *see also* D.I. 613 at ¶ 2)  But Personal Audio does not explain how this evidence shows that the ██████ of ██████████ includes information about the ██████████ of the server at the time that ████ is ██████ and/or ████ on a device.  (*See* D.I. 611 at 6)  As for the content delivery records, Mr. Razumeiko's second snippet of deposition testimony indicates that these records do not "include ██████ metrics for" GPM, but instead store "a list of ██████████ ██████████████████████" (D.I. 545, ex. 9 at 393-94; *see also* D.I.

8

CONFIDENTIAL MATERIAL OMITTED

612, ex. A at 412; D.I. 613 at ¶ 3)  The ████████ may include ███, if ███ is present
on the ███.  (D.I. 612, ex. A at 395)  Nothing in Mr. Razumeiko's deposition testimony
suggests, however, that the content delivery records store information regarding whether ███
████████ on devices ███ of the ████████ were performed by ███ in
the ████████.  Indeed, Mr. Razumeiko has submitted a declaration in which he affirmatively
states that the "████████ does not contain any information about (a) the geographical
location of a device; or (b) the identity or location of any server from which the device received
an installation of or an update to a package."  (D.I. 613 at ¶ 3)[5]

Google pointed out this lack of evidence in its answering brief.  In its reply brief,
Personal Audio retorted that it does not have to provide "strict" proof that Google in fact
maintained the type of U.S. ████████ data that it was seeking, in order for Google to be
sanctioned.  (D.I. 625 at 6)[6]  But *some* proof is certainly required.  Again, the crux of the Motion

---

[5]    Google did produce spreadsheets that contained relevant data (i.e., the number of
████████ on which ███ was reported to be ████████) that was generated from Google's content
delivery system.  (D.I. 545, ex. 9 at 407-08; D.I. 611 at 7, 10)  The information was then sorted
on a geographic basis with reference to a ████████.  (D.I. 611 at 10 n.6 (citing D.I.
612, ex. A at 375))

[6]    Personal Audio argues that this is so since it had no opportunity to inspect the
deleted server logs and content delivery records at issue.  (D.I. 625 at 6)  In support of this
argument, Personal Audio cites to *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102 (E.D. Pa.
2005) and *United States v. Bunty*, 617 F. Supp. 2d 359 (E.D. Pa. 2008) for the proposition that
when a party did not have an opportunity to examine the evidence at issue, "courts do not require
strict proof of the deleted content[.]"  (D.I. 625 at 6)  These cases do not support Personal
Audio's position.  In *Paramount Pictures Corp.*, the defendant had wiped his computer's hard
drive clean of all data shortly after being notified that he was being sued for infringing the
defendant's motion picture copyrights.  234 F.R.D. at 107.  In the portion of the opinion upon
which Plaintiff relies, the district court was discussing the test for mandating a particular
sanction "*upon a finding* of improper destruction or loss of evidence;" there the district court was
noting that when considering the degree of prejudice suffered by the party that did not destroy
the evidence, the court should take into account whether that party had an opportunity to
examine the evidence before it was destroyed.  *Id.* at 111-12 (emphasis added).  *Bunty* stands for
this same proposition—i.e., that in assessing the proper sanction to impose *after* a party is able to
demonstrate that relevant evidence has been subject to spoliation, the district court should

is that Google deleted evidence that would have revealed the number of ████████████ and

████████ on devices ████████ of the ████████████, which were performed by a server ████████████

the ████████████.  (D.I. 544 at 6-7)  If that is so, and if Personal Audio has the burden of proof to

show that Google spoliated relevant evidence, then Personal Audio has to put forward *some*

evidentiary basis establishing that relevant evidence once existed (and that Google spoliated it).

Personal Audio simply has not done that.

Personal Audio has thus failed to meet its burden of establishing that Google destroyed

relevant evidence.  For this reason alone, a finding of spoliation (and imposition of sanctions) is

not warranted.  *See, e.g.*, *Makeen v. Comcast of Colorado X, LLC*, Civil Action No. 09-cv-

02595-WYD-MEH, 2011 WL 93728, at *3 (D. Colo. Jan. 11, 2011) (denying a motion for

sanctions with respect to the alleged destruction of server logs where "the relevance of the logs is

at best, minimal"); *Convolve, Inc. v. Compaq Comput. Corp.*, 223 F.R.D. 162, 176 (S.D.N.Y.

2004) (denying motion for sanctions for failure to preserve e-mails, where the movant "has

established only that [relevant individuals] communicated by e-mail and telephone . . . from time

to time" but "has made no effort to determine the substance of those communications in anything

but the most general terms") (internal quotation marks and citation omitted).

    **B.**    **Personal Audio is Seeking Sanctions Relating to a Theory (i.e., that Google's U.S.-based Servers Installed/Updated GPM on Devices in non-U.S. Countries) that is Otherwise Supported by Little More than Speculation.**

Second, despite Personal Audio's guess that "a significant portion of" worldwide

installations/updates of GPM must have been "activated from the United States[,]" (D.I. 544 at

---

consider, when assessing prejudice, the extent to which the movant had a meaningful opportunity to
examine the evidence before it was destroyed.  617 F. Supp. 2d at 370.  However, a
determination of proper sanctions only comes into play if the court determines that spoliation has
*actually occurred*; here, the Court makes no such finding.

11), the undisputed evidence demonstrates that: (1) Google servers in the ███████ interact with devices ████████████ ; and (2) unless there is a global network outage, Google servers in the █████████ are *not* responsible for ████████████████ on devices outside of the United States, (D.I. 611 at 3-4; Tr. at 55-56). To that end, during his December 5, 2018 deposition, Mr. Razumeiko testified as follows:

> Q  Okay.  If I bought a new Android phone without Google Play Music preinstalled in the United States with WiFi connectivity, would I be accessing Google's servers to download Google Play Music? . . .
>
> THE WITNESS:  If you don't have it installed —you don't have it preinstalled—
>
> [] Q  That's correct?
>
> A  —and you got Android phone—
>
> Q  That's correct.
>
> A  —you may be able to download it from Google Play Store.
>
> Q  And where are the servers for the Google Play Store located? . . .
>
> A  For ████████ ?
>
> [] Q  That's correct.
>
> A  In ████████ .
>
> Q  Do the servers in ████████ allow users in countries that are ████████████ to download the Google Play Music app? . . .
>
> THE WITNESS:  So user is not in the United States?
>
> [] Q  That's right.
>
> A  As an exception, if a global network outage, user could be ████████████ .

11

> Q  What is a global network outage?
>
> A  Let's say if you're in Europe and Europe does not have
> connectivity to European Google data center.

(D.I. 612, ex. A at 55-56 (objections omitted); *see also id.* at 301-02 (Mr. Razumeiko testifying

that the servers that are "capable of delivering ████████████ to users ████████████

████████████████████████████

     Personal Audio does not point to any evidence to the contrary.  And it acknowledges that

it has not demonstrated that a global network outage occurred during the relevant time period.

(Tr. at 130)  Instead, Personal Audio simply speculates that a "significant portion" of GPM

installations and updates outside of the United States must have been activated from servers

inside the United States because:  (1) the data center location maps show that there are seven

countries in the world with servers that can distribute GPM, but (2) Google's spreadsheets

indicate that there are devices with ████ in over ████████, which means that (3) "the vast

majority of distributions [of GPM are] in countries [that] don't have a data center and are

receiving it from some[where] outside their borders" and thus (4) since countries like Canada,

for example, have no Google data center locations, "it's reasonable to assume that Canada

received some of [its] 60 million GPM distributions [from] the data centers that are closest to

them [i.e., in the United States]."  (Tr. at 123-25; *see also id.* at 126 (Personal Audio's counsel

arguing that it is reasonable to infer that Mexico's distributions of GPM came from the United

States since that is where the "closest" data centers are located); *id.* at 128-29, 130-31 ("[J]ust in

server design, you don't have servers in Asia handling . . . North American requests.  It's

obviously the US ones."); D.I. 544 at 11; D.I. 605, ex. U)  The problem is that Personal Audio's

position here is not based on any evidence in the record.  Instead, as Google argues, it is "just

rank speculation"—and indeed, it conflicts with Mr. Razumeiko's testimony that ████████████

CONFIDENTIAL MATERIAL OMITTED



servers allow ██████████████████████████████████████████

global network outage.  (Tr. at 143 (Google's counsel noting that Personal Audio's assumption

that ██████ must ██████ in devices ██████████ is "inconsistent with the

testimony" from Mr. Razumeiko and "not how Google set up the system"))[7]

In the absence of anything more than speculation, Personal Audio cannot rely on this

Motion in an attempt to fill in gaps in proof for its Section 271(f) claim.  *See, e.g., Am. Power,*

*LLC v. Speedco, Inc.*, No. 1:15-CV-2091, 2017 WL 4084060, at *13 (M.D. Pa. Jan. 17, 2017)

("Finally, as these factual pillars of its spoliation claim have failed, American Power has been

left with nothing, beyond speculation, to support its view that videos which do not depict the

actual service performed on the truck might have contradicted in some material way what the

video showing the actual work performed on the truck disclosed[.]  More than speculation is

needed to support this claim.").

> **C.** **Personal Audio Unduly Delayed in Seeking Out Facts Relating to the Server Logs and Content Delivery Records at Issue, or in Pressing its Spoliation Claim.**

Finally, even if it was possible that the server logs and content delivery records at issue

might have contained relevant information, Personal Audio's inaction with respect to these

records *for years* would support denial of its Motion.  Personal Audio learned about the server

logs and content delivery records at the time of Mr. Razumeiko's depositions (cited above),

which took place in December 2018 and July 2019.  And yet it is undisputed that Personal Audio

---

[7]    During oral argument, Google's counsel explained that there are "very many
reasons why the ██████ are dedicated to ██████ and ██████████ are dedicated to
██████████ and to ██████ [.]"  (Tr. at 144)  Google's counsel further pointed out that
Personal Audio does not cite to any testimony from a technical expert to back up its speculation
that servers in the United States must necessarily service foreign countries that are
geographically close to the United States but that do not have Google servers located in them.
(*Id.*)

never met and conferred with Google regarding these documents after Mr. Razumeiko's depositions, and never asked Google for clarification as to what information these documents stored.  (D.I. 611 at 14-15; D.I. 625 at 11)  Nor did Personal Audio ask additional questions of Mr. Razumeiko regarding the global network outage exception, or follow up with Google to seek additional information regarding such an outage—including whether such an outage had actually occurred during the relevant time period here.  (D.I. 611 at 4-5; Tr. at 56)  Instead, it just filed the instant Motion a couple of years later.

Personal Audio attempts to blame an October 19, 2018 stipulation for its inaction.  (D.I. 625 at 11)  This stipulation extended the fact discovery deadline to December 14, 2018, but also provided that "[e]ach party further agrees that it will not serve additional requests for production or [Rule] 30(b)(6) deposition notices on the other party."  (D.I. 280)  Personal Audio contends that this stipulation prevented it from "serv[ing] further interrogatories or RFPs or demand[ing] further production from Google."  (D.I. 625 at 11)

Personal Audio's argument is belied by the history of this case.  For example, on January 3, 2019 (following entry of the above-referenced stipulation and the close of fact discovery), Personal Audio filed a motion to compel (the "January 3, 2019 motion to compel"), *inter alia*, a further Rule 30(b)(6) deposition.  (D.I. 320 at 5)  Personal Audio's request was premised on the fact that on December 14, 2018,[8] Google had supplemented its discovery responses, including responses relating to the absence of certain limitations in its GPM software—and that Google had done so after Mr. Razumeiko's December 5, 2018 deposition, such that Personal Audio could not have questioned Mr. Razumeiko fully with respect to that issue.  (*Id.*)  The Court

---

[8]    This is the same date that Google identified the data center location maps as relevant to Rogg 29.  (D.I. 545, ex. 5 at 18-19)

14

granted the January 3, 2019 motion to compel and permitted a second deposition of Mr.

Razumeiko. (D.I. 354 at 5-6) Additionally, on January 22, 2019, Personal Audio filed a motion

to compel the deposition of Google employee Peter Nguyen; Personal Audio asserted that it had

only first learned about Mr. Nguyen during Mr. Razumeiko's December 5, 2018 deposition (the

"January 22, 2019 motion to compel"). (D.I. 335) The Court granted the January 22, 2019

motion to compel as well, finding that Personal Audio had established good cause for seeking

this deposition beyond the fact discovery deadline. (Docket Item, Feb. 6, 2019)[9] In

circumstances like this, where Personal Audio could have sought relief relating to the content of

the server logs and content delivery records years ago—but did not—a finding of spoliation is

not warranted. *Cf. Ferrone v. Onorato*, Civil Action No. 05-303, 2007 WL 2973684, at *10

(W.D. Pa. Oct. 9, 2007) ("Even assuming the Plaintiff had evidence of alleged spoliation, it was

incumbent upon him to seek redress through an appropriate discovery motion. His complaints

come too late, and the court cannot now resolve such a serious accusation through its

consideration of papers submitted in opposition to summary judgment and with no response by

---

[9]       On April 23, 2019, Personal Audio moved to compel additional testimony regarding, *inter alia*, "the location of Google's servers used to distribute GPM internationally[,]" arguing that Mr. Razumeiko was unprepared on this topic and that Google produced the data center location maps on December 14, 2018, after Mr. Razumeiko's first deposition (the "April 23, 2019 motion to compel"). (D.I. 390 at 3) Google responded that Personal Audio's complaints were untimely since its earlier motions to compel could have raised these issues, but failed to do so. (D.I. 392 at 3-4) Google also asserted that Mr. Razumeiko was sufficiently prepared and that Personal Audio "has identified no question that it wants to ask about the maps, which simply show the locations of the servers that Razumeiko already testified about[.]" (*Id.* at 4) The Court agreed with Google as to these portions of the April 23, 2019 motion to compel (although it granted other requests that Personal Audio had made in the motion relating to Mr. Razumeiko's supplemental deposition). (D.I. 404) However, the Court's adjudication of the January 3, 2019 and January 22, 2019 motions to compel demonstrate that if Personal Audio had actually made a showing of good cause with respect to these portions of its April 23, 2019 motion to compel, the Court would have granted the requested relief, even though that motion was filed well after the close of fact discovery.

15

the Defendants."); *see also Alchem Inc. v. Cage*, Case No. 2:20-cv-03142-JDW, 2021 WL 4902331, at *6 & n.2 (E.D. Pa. Oct. 21, 2021) (same).

## IV.   CONCLUSION

For the reasons set out above, the Court hereby ORDERS that Personal Audio's Motion is DENIED.[10]

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order.  Any such redacted version shall be submitted no later than **November 9, 2021** for review by the Court.  It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Order.


Dated:  November 4, 2021

*Christopher J. Burke*

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[10]      Personal Audio further requested its reasonable attorney's fees and that this case be deemed exceptional under 35 U.S.C. § 285.  (D.I. 544 at 22)  In light of the Court's ruling, that request is DENIED.

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,

             Plaintiff,

       v.

GOOGLE, INC.,

             Defendant.

Civil Action No. 17-1751-CFC-CJB

---

Brian Farnan, Michael Farnan, FARNAN LLP, Wilmington, Delaware; Douglas Hahn, Salil Bali, STRADLING YOCCA CARLSON & RAUTH, P.C., Newport Beach, California; Henning Schmidt, Minghui Yang, R. Floyd Walker, Victor Hardy, William Parrish, HARDY, PARISH, YANG, LLP, Austin, Texas

     *Counsel for Plaintiff*

Brian Egan, Jack Blumenfeld, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Antonia Sistos, David Perlson, Melissa Baily, QUINN EMANUAL, URQUHART & SULLIVAN, LLP, San Francisco, California

     *Counsel for Defendant*

**<u>MEMORANDUM OPINION</u>**

January 6, 2020
Wilmington, Delaware

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Plaintiff Personal Audio, LLC (PA) has sued Google, Inc. for infringement

of two patents: U.S. Patent Nos. 6,199,076 BI (the #076 patent) and 7,509,178 B2

(the #178 patent). D.I. 38. Claim construction was referred to the Magistrate

Judge, who held a *Markman* hearing and issued three Reports and

Recommendations (Reports) recommending that I adopt constructions for ten

disputed terms. D.I. 331; D.I. 372; D.I. 406. The parties have filed objections to

five of the Magistrate Judge's recommended constructions. D.I. 350; D.I. 380; D.I.

409. I review de novo the Magistrate Judge's conclusions. *See St. Clair*

*Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co.*, 691 F. Supp. 2d

538, 541–42 (D. Del. 2010) ("Objections to the magistrate judge's conclusions

with regard to the legal issue of claim construction are reviewed *de novo*."); Fed.

R. Civ. P. 72(b)(3).

## I.    DISCUSSION

### A.    January 16, 2019 Report and Recommendation

In his first Report, dated January 16, 2019, the Magistrate Judge

recommended constructions for three of the disputed claim terms. D.I. 331.

Google objects to the January Report's constructions of the "sequencing file" and

"means responsive" terms.

### 1.    Sequencing file

| |
|---|
| **Term:** sequencing file (#178 patent, claims 1–13); file of data establishing a sequence (#076 patent, all asserted claims); playback session sequencing file (#178 patent, claims 14–21, 28, 29). |
| **PA's Proposed Construction:** a file of data that identifies the order in which audio program segments chosen by or for a user are to be played |
| **Google's Proposed Construction:** a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands |
| **Report's Construction:** a file of data that identifies the order in which audio program segments chosen by or for a user are to be played |
| **The Court's Construction:** a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands |

Like the Magistrate Judge, I reject Google's argument that the claim language imposes the three use limitations for the term "sequencing file" in Google's proposed construction. It is true that the claim language literally requires that a single sequencing file be downloaded and stored, but the claim language does not literally require that the same sequencing file be used by the processor. Rather, the literal language states only that the processor "continuously deliver[ ] a succession of said audio program files . . . in *said ordered sequence* specified by the said sequencing file." #178 patent at claim 1 (46:9–13). Thus, the claim language *by itself* allows for, but does not require, a single sequencing file to be used by the processor.

I disagree, however, with the Magistrate Judge's conclusion that Google's proposed construction of the term is not set forth clearly and unequivocally in the

prosecution history.  In my view, the following excerpt from the prosecution

constitutes a clear and unequivocal definition of the term "sequencing file":

### G. Proper Interpretation of "Sequencing File" In Light of Specification and Prosecution History

In light of the specification and file history excerpts quoted above, the claim *term* "sequencing file" (which appears in all [#]178 patent claims and was not a term of art in 1996) is readily understandable to one of skill in the art as a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands. [12:16-19; 12:27-28; 34:17-19] It is used to determine, for instance, what song is to be played next if the user wishes to skip forward or back or select a specific song.  It is not simply a playlist, but rather a file of data that the player references when the player is deciding what audio segment to play in response to the presence or absence of a control command.

D.I. 160, Ex. 11 at 8 (emphasis added) (second set of brackets in original).  This

definition is consistent with another clear and unequivocal instance of

lexicography in the prosecution history:

As discussed below, *the term* "sequencing file" of independent claim 1 and *the term* "playback session sequencing file" of independent claim 14, when interpreted in light of the [#]178 patent specification and file history, should be interpreted to mean "a file that is received by the player and used by the processor to both control playback of each song in the ordered sequence and respond to control commands." The claimed sequencing file is received by the player and used by the processor to both control playback of each song in the ordered sequence and respond to control commands. [12:16-19; 34:17-23]. . . . The downloaded, locally-stored sequencing

3

**Appx110**

> file thus specifies an ordered sequence of audio files to
> play (e.g., in case the listener wants to just listen such as
> while driving) . . . .

D.I. 160, Ex. 11 at 5 (emphasis added) (second set of brackets in original).

The Magistrate Judge found that "[t]hese statements may well not have been intended to define a 'sequencing file' generally" because "one could also reasonably interpret [them] in line with PA's explanation" that the statements "could be reasonably seen as being 'directed to the combination of explicit limitations directed to the sequencing file found in the claims.'" D.I. 331 at 31 (quoting D.I. 176 at 6). I disagree with this finding because (1) the statements expressly define "the term" sequencing file, not the claimed sequencing file; and (2) as the Magistrate Judge also found earlier in his Report (and correctly in my view), the claim language does *not* include the combination of the explicit limitations set forth in the statements from the prosecution, *see* D.I. 331 at 21–22 (noting that the claims "do not explicitly require that the sequence may be found only on that sequencing file at the time the sequence is used" but "simply require that the sequence itself is *originally found* on the sequencing file referenced in the claims" (emphasis in original)).

"Applicants can define (lexicography), explain, or disavow claim scope during prosecution." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342–43 (Fed. Cir. 2015). "To act as a lexicographer, a patentee must 'clearly set forth a

definition of the disputed claim term' and 'clearly express an intent to redefine the term.'" *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). Here, the above-quoted excerpts from the prosecution history clearly set forth the definition of "sequencing file" proposed by Google and therefore I will adopt that definition and reject the Magistrate Judge's recommendation with respect to that term.

### 2.     "means responsive" terms

The "means responsive" terms are three terms found in three claims of the #076 patent. The first term is a means responsive to a user's "skip command" and the second two terms are a means responsive to a user's single and double "back commands." The parties agree that these limitations are means-plus-function limitations governed by 35 U.S.C. § 112(6), and they agree on the functions corresponding to those limitations. D.I. 331 at 34. They dispute, however, how to construe the structure corresponding to those functions. *See id.* at 35–39.

### a.     Skip Command in Claim 1 of the #076 Patent

| |
|---|
| **Term:** means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence (#076 patent, claim 1) |
| **PA's Proposed Construction of Step 1 of the Corresponding Structure:** <br><br> scanning forward **in the sequence established by the sequencing file** to locate the next Selection_Record of the appropriate LocType; |

5

| |
|---|
| or, alternatively,<br><br>scanning forward **in a sequencing file** to locate the next Selection_Record of the appropriate LocType |
| **Google's Proposed Construction of Step 1 of the Corresponding Structure:** scanning forward **in the received sequencing file** to locate the next Selection_Record of the appropriate LocType |
| **Report's Construction of Step 1 of the Corresponding Structure:** scanning forward **in the sequence established by the sequencing file** to locate the next Selection_Record of the appropriate LocType |
| **The Court's Construction of Step 1 of the Corresponding Structure:** scanning forward **in the received sequencing file** to locate the next Selection_Record of the appropriate LocType |

For the structure corresponding to the skip command term, the parties

dispute whether, as Google argues, the player must scan the *received* sequencing

file when responding to a user's skip command or whether, as PA proposes, it can

scan either of (1) any sequencing file or (2) the sequence established by a single

sequencing file (as PA proposes).  D.I. 331 at 39–40.  I disagree with the

Magistrate Judge's conclusion that the player must only scan the sequence

established by a sequencing file.  As explained above, during the prosecution of the

#076 patent, the patentee's clear and unequivocal lexicography established that the

player must use the same sequencing file that it downloaded (i.e., received) when

responding to user commands.  "Statements made during the prosecution relating

to structures disclosed in the specification are certainly relevant to determining the

meaning of the means-plus-function limitations of the claims at issue."  *Alpex*

*Comput. Corp. v. Nintendo Co.*, 102 F.3d 1214, 1220 (Fed. Cir. 1996); *see also*

6

**Appx113**

*Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 942 (Fed. Cir. 2013)

("[P]ositions taken before the PTO may bar an inconsistent position on claim

construction under § 112, ¶ 6."). Here, the patentee limited the structure that

corresponds to the function of responding to a user's skip command with the

following statement in the prosecution history:

> [T]he claim term "sequencing file" . . . is readily
> understandable to one of skill in the art as a file that is
> received by the player, stored, and used by the processor
> to both control playback of each song in the ordered
> sequence and *respond to control commands*. It is used to
> determine, for instance, what song is to be played next *if
> the user wishes to skip forward* or back or select a specific
> song.

D.I. 160, Ex. 11 at 8 (emphasis added) (citations omitted). Accordingly, I will

adopt Google's proposed construction of the means responsive to a user's skip

command and reject the Magistrate Judge's recommendation with respect to that

term.[1]

---

[1] The Magistrate Judge based his recommendation in part on his conclusion that an
embodiment described in the written description of the patent "teaches that a
sequencing file with a recommended sequence (Table 307) is created on the host
server and downloaded to the player—and that another sequencing file containing
the final sequence (Se[lections] File 351) is created on the player, using the data of
the received sequencing file to control playback." D.I. 331 at 41. In my view, the
language used to describe Table 307 and Selections File 351 in the written
description lacks clarity and consistency. I do not think the written description
shows unambiguously that Table 307 is a sequencing file or that Selection File 351
is created on the player.

7

### b.    Single Skip Back Command and Double Skip Back Command in Claims 2 and 3 of the #076 Patent

| |
|---|
| **Terms:** (1) means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program (#076 patent, claim 2); and (2) means responsive to the detection of two consecutive ones of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment (#076 patent, claim 3) |
| **PA's Proposed Construction of Step 1 of the Corresponding Structure:** if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the programming segment |
| **Google's Proposed Construction of Step 1 of the Corresponding Structure:** if the currently playing program segment has played for a predetermined amount of time **after the start time recorded in a usage log file**, resetting the playback position to the beginning of the programming segment |
| **Report's Construction of Step 1 of the Corresponding Structure:** if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the programming segment |
| **The Court's Construction of Step 1 of the Corresponding Structure:** if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the programming segment |

For the structure corresponding to the back command terms, the parties dispute whether the predetermined amount of time must be measured using a "start time recorded in a usage log file" as Google proposes. D.I. 331 at 37. I agree with the Magistrate Judge and will adopt his recommendation that the structure be construed as not requiring the player to measure the predetermined time using a start time recorded in a usage log file.

8

In its objections, Google argues that "the specification only describes one structure that could perform [the] function: The system responds to BACK commands by resetting the playback point to the desired point in the sequence and ***recording the start time***." D.I. 350 at 10.  But the written description never states that the player records the start time to determine if the predetermined amount of time has passed, as Google's proposed construction would require.  To constitute corresponding structure, "the intrinsic evidence [must] clearly link[] or associate[] that structure to the function recited in the claim." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir. 2015).  Yet nothing in the specification links "recording the start time" to determining whether the predetermined amount of time has passed.

Google reasonably argues that "determining ***which*** 'skip back' command should be implemented requires some means of measuring time so as to distinguish a 'double skip back' from two 'single skip backs.'" D.I. 350 at 10 (emphasis in original).  As the Magistrate Judge noted, "[i]t seems problematic that the specification does not appear to recite structure for measuring whether the segment is within the predetermined amount of time when a back command is received." D.I. 331 at 52.  But, as the Magistrate Judge, also noted, that issue goes to indefiniteness and can be raised by Google at the summary judgment phase of the case.

9

## B.    March 13, 2019 Report and Recommendation

On March 13, 2019, the Magistrate Judge issued his second report, recommending constructions for three more of the disputed claim terms.  D.I. 372. PA objects to the March Report's construction of the "means for continuously reproducing" term.

### 1.    "means for continuously reproducing . . ." in Claim 1 of the #076 Patent

| |
|---|
| **Term:**  means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command (#076 patent, claim 1) |
| **PA's Proposed Construction:**<br><br>Function: continuously reproducing said program segments in the order established by said sequence in the absence of a control command<br><br>Steps 2 and 3 of the Structure:<br><br>(2) when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;<br><br>(3) repeating step (2) until a command is issued **or that the sequence is completed** |
| **Google's Proposed Construction:**<br><br>Function: continuously reproducing said program segments in the order established by said sequence in the absence of a control command<br><br>Steps 2 and 3 of the Structure:<br><br>(2) when the currently playing program segment concludes, |

10

**(a) if the concluded segment is a topic or subject announcement,** incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the received sequencing file, and

**(b) if the conclude segment is a program segment, (i) scanning forward in the received sequencing file to locate the next Selection_Record containing the appropriate LocType; (ii) resetting the CurrentPlay variable to the record number of that Selection_Record; and (iii) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record (LocType: R);**

(3) repeating step (2) until a rewind Selection_Record **(LocType: R)** in the **received** sequencing file is reached, which resets the CurrentPlay variable to the location value contained in the rewind Selection_Record which is set to "1" to begin the playing sequence again with the first Selection_Record in the received sequencing file

**Report's Construction:**

Function: continuously reproducing said program segments in the order established by said sequence in the absence of a control command

Steps 2 and 3 of the Structure:

(2) when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;

(3) repeating step (2) until a rewind Selection_Record (LocType: R) in the sequencing file is reached, which resets the CurrentPlay variable to the location value contained in the rewind Selection_Record which is set to "1" to begin the playing sequence again with the first Selection_Record in the received sequencing file

**The Court's Construction:**

Function: continuously reproducing said program segments in the order established by said sequence in the absence of a control command

11

Steps 2 and 3 of the Structure:

(2) when the currently playing program segment concludes, incrementing the CurrentPlay variable by one and fetching and playing the program segment identified by the ProgramID contained in the next Selection_Record in the sequencing file;

(3) repeating step (2) until a rewind Selection_Record (LocType: R) in the sequencing file is reached, which resets the CurrentPlay variable to the location value contained in the rewind Selection_Record which is set to "1" to begin the playing sequence again with the first Selection_Record in the received sequencing file

The parties agree that "means for continuously reproducing" is a means-plus-function limitation, governed by 35 U.S.C. § 112(6), D.I. 372 at 2, and they agree on the limitation's function: "continuously reproducing said program segments in the order established by said sequence in the absence of a control command," *see id.* at 3. The parties dispute two issues: "whether the corresponding algorithmic structure requires (1) the sequence to be repeated in an endless loop; and (2) scanning for the next record of appropriate LocType." *Id.* at 5 (citations omitted). PA objects to the Magistrate Judge's recommendations with respect to both issues.

I will adopt the Magistrate Judge's recommendation that the structure be construed to include an endless loop. The portion of the #076 patent's written description that the parties agree sets out the term's structure describes an algorithm that, in the absence of a user command, runs through the sequence and then starts the sequence again. #076 patent at Figure 3, 12:16–13:11, 34:28–35:44.

12

**Appx119**

That "arrangement creates in effect, an endless loop, allowing the user to skip

forward in circular fashion through the entire program selection to locate desired

programming, regardless of where the CurrentPlay register is set." *Id.* at

35:44–48.

In its objections, PA argues that although one may configure the sequencing

file to play programs in an endless loop, Figure 7 of the patent "explicitly discloses

sequencing files that do not do so." D.I. 380 at 3. But I agree with the Magistrate

Judge that Figure 7 does not "shed[ ] light on the appropriate corresponding

structure for this term." D.I. 372 at 9 n.2. Figure 7 displays only a portion of a

selections file—a portion that does not include the end of the file, where the

variable for the endless loop would appear.[2] Figure 7 shows only that portion of

the selection file that corresponds to displaying an image of text, and the Figure's

depiction of the file ends at the point where the algorithm turns the image off.

#076 patent at Figure 7, 44:59–64. Also, Figure 7 displays the selections file's

interaction with just a single audio file. *Id.* at Figure 7. It thus does not reveal how

the player continuously reproduces playback of the sequence because it does not

show how the player transitions from one audio file to the next audio file.

PA also argues in its objections that the Magistrate Judge "clearly and

---

[2] I also note that Figure 7 was not part of PA's proposed structure for this term.
D.I. 372 at 3.

indisputably err[ed] by completely failing . . . to identify the explicitly recited function." D.I. 380 at 1. The parties, however, had agreed on the construed function for this term. D.I. 372 at 3. Thus, the Magistrate Judge did not need to decide that issue and PA cannot now raise an issue that was not before the Magistrate Judge.

PA also argues that, under the doctrine of claim differentiation, claim 4 shows the distinction between continuously reproducing and looping because claim 4 expressly claims an endless loop and claim 1 does not. D.I. 380 at 6. But I agree with the Magistrate Judge's conclusion that "PA's claim differentiation argument . . . is not dispositive on the question of whether the corresponding structure for the continuously reproducing term requires an endless loop," D.I. 372 at 9 (internal quotation marks omitted), because "the judicially developed guide to claim interpretation known as 'claim differentiation' cannot override [35 U.S.C. § 112(6)]," *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991).

As to the second issue—whether the algorithm requires scanning for the next record of appropriate LocType—"the parties dispute: (1) whether the LocType R structure is required to perform the recited function . . .; and (2) whether scanning the file to locate the next record using LocType is required for advancing to the record representing the next program segment in the sequencing file in the course of continuously reproducing." D.I. 372 at 9 (internal quotation marks omitted).

I agree with the Magistrate Judge that the R LocType should be included in the corresponding structure. A portion of the written description that the parties agree contains corresponding structure states: "The end of the selections file 351 is marked with an R Selection_Record . . . . When the player encounters this record, it resets the CurrentPlay register to 1, and the playing sequence begins again." #076 patent at 35:40–44.

I also agree with the Magistrate Judge's recommendation that the structure does not require LocType scanning. Nothing in the written description shows that LocType scanning is the necessary structure for the function of continuously reproducing the program segments in the absence of a user command. The portions of the patent that Google points to in support of its construction link scanning the LocType to responding to a specific user command, *see id.* at 32:24–50, 34:32–44, not continuing the playback *in the absence* of a command.

### C.    June 7, 2019 Report and Recommendation

On June 7, 2019, the Magistrate Judge issued his third report, recommending constructions for four of the disputed terms. D.I. 406. Google objects to the June Report's constructions of "editing means for modifying said data sequence" in claims 5 and 6 of the #076 patent and "means for translating said voice signals into said control commands" in claim 13 of the #076 patent. D.I. 409. The parties agree on the function for both terms. Google, however, argues that both terms are

indefinite because the specification lacks sufficient structure.

    **1.**     **"editing means for modifying said data sequence" in Claims
5 and 6 of the #076 Patent**

| |
|---|
| **Term:** editing means for modifying said data sequence (claims 5 and 6 of the #076 patent) |
| **PA's Proposed Construction:**<br><br>Function: modifying said data establishing said sequence<br><br>Structure:<br><br>a player client programmed to:<br><br>1. Add a program segment; and/or<br>2. Delete a program segment; and/or<br>3. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence;<br><br>or, alternatively,<br><br>a player client programmed to:<br><br>1. Access selections file 351; and<br>2. Alter identifiers of program segments within the selections file, including the following operations:<br>    a. Add a program segment; and/or<br>    b. Delete a program segment; and/or<br>    c. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence |
| **Google's Proposed Construction:**<br><br>Function: modifying said data establishing said sequence<br><br>Structure: no disclosure of corresponding structure in the patent specification. |
| **Report's Construction:**<br><br>Function: modifying said data establishing said sequence |

Structure: a player client programmed to:

1. Access selections file 351; and
2. Alter identifiers of program segments within the selections file, including the following operations:
    a. Add a program segment; and/or
    b. Delete a program segment; and/or
    c. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence

**The Court's Construction:**

Function: modifying said data establishing said sequence

Structure: a player client programmed to:

1. Access selections file 351; and
2. Alter identifiers of program segments within the selections file, including the following operations:
    a. Add a program segment; and/or
    b. Delete a program segment; and/or
    c. Assign a new or different order to a given program segment; and update the order for the program segments in the serialized sequence

"[A] challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003). Here, I agree with the Magistrate Judge's conclusion that Google has not met its burden to show by clear and convincing evidence that the "editing means" limitation is indefinite for failing to disclose sufficient structure. I

17

**Appx124**

will thus adopt the Magistrate Judge's recommendation that I construe the structure according to PA's alternative construction.

Because the "editing means" term is a computer-implemented means-plus-function limitation, the specification must disclose an algorithm or procedure for performing the claimed-function. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008). In its objections, Google argues that the Magistrate Judge's construction "merely restates the function 'modifying' as adding, deleting, and/or reordering" and thus does not provide an algorithm for performing the modifying function. D.I. 409 at 7. I find, however, that the written description does provide, in the form of words, a procedure for performing the function. *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1386 (Fed. Cir. 2011) ("A description of the function in words may disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure under § 112, ¶ 6." (internal quotation marks and citation omitted)). Specifically, the written description states that the user can "[u]tiliz[e] the programming data and a utility program previously supplied by the server," #076 patent at 8:49–50, to add, delete, and re-sequence segment identifiers found in selection file 351, *id.* at 12:21−26. The procedure disclosed is thus: (1) accessing selections file 351 and (2) modifying the identifiers linked to each segment in the

18

file by adding, deleting, or reordering them. That disclosed procedure is sufficient

structure for the editing means term.

### 2. "means for translating said voice signals . . ." in Claim 13 of the #076 Patent

| **Term:** means for translating said voice signals into said voice control commands |
|---|
| **PA's Proposed Construction:**<br>Function: translating said voice signals into said control commands<br>Structure: a microphone and voice recognition software (i.e., a voice command system) |
| **Google's Proposed Construction:**<br>Function: translating said voice signals into said control commands<br>Structure: no disclosure of corresponding structure in the patent specification |
| **Report's Construction:**<br>Function: translating said voice signals into said control commands<br>Structure: a microphone and voice recognition software (i.e., a voice command system) |
| **The Court's Construction:**<br>Function: translating said voice signals into said control commands<br>Structure: a microphone and voice recognition software (i.e., a voice command system) |

I agree with the Magistrate Judge's conclusion that "Google has not

demonstrated by clear and convincing evidence that the 'means for translating said

voice signals into said voice control commands' limitation is indefinite for failing

to disclos[e] sufficient structure." D.I. 406 at 24. I will thus adopt the Magistrate

Judge's recommendation that the corresponding structure be construed as: "a

microphone and voice recognition software (i.e., a voice command system)."

In its objections, Google argues that the specification does not disclose an

algorithm corresponding to the claimed function. D.I. 409 at 2. But I agree with

19

the Magistrate Judge's finding that the patent discloses an algorithm that is linked

to the function at issue, and "PA has pointed to evidence sufficiently demonstrating

that such structure was known at the time of the invention." D.I. 406 at 24.

First, the written description discloses a voice command system as the

algorithm for performing the function. The written description explains that a user

can use its voice to choose a program segment by "[u]sing a hands free voice

command system." #076 patent at 16:50–56. The written description also states

that the "player **103** further includes a sound card **110** which receives audio input

from a microphone input device **111** for accepting voice dictations and commands

from a user." *Id.* at 4:41–44.

Second, although the above structure does not provide an algorithm

regarding how the player translates voice signals into control commands, the

Federal Circuit has "been generous in finding something to be a corresponding

structure when the [written description] contained a generic reference to structure

that would be known to those in the art and that structure was clearly associated

with performance of the claimed function." *Med. Instrumentation & Diagnostics

Corp. v. Elekta AB*, 344 F.3d 1205, 1213–14 (Fed. Cir. 2003). PA has provided

sufficient evidence to "make it reasonable to conclude that a 'voice command

system' was indeed a known structure in the art at the time of the invention." D.I.

406 at 23. PA's evidence shows that voice command systems were in use at the

time of the patent "with commercial options available." *Id.* at 23. Because the patent linked known systems to the translating function, a person of ordinary skill in the art would have known what kinds of programs to use. *See Elekta*, 344 F.3d at 1214 ("[H]ere there would be no need for a disclosure of the specific program code if software were linked to the converting function and one skilled in the art would know the kind of program to use.").

Google argues that the Magistrate Judge erred "in directing [his] inquiry to whether the software referred to in the specification was well known in the art at the time to perform the function, rather than focusing on whether the specification discloses an algorithm." D.I. 409 at 6. I agree that Google's assertion finds support in certain Federal Circuit decisions. *See, e.g., Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337 (Fed. Cir. 2008) ("It is not enough for the patentee simply to state or later argue that persons of ordinary skill in the art would know what structures to use to accomplish the claimed function. . . . The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing that structure."); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340–41 (Fed. Cir. 2008) ("Simply reciting 'software' without providing some detail about the means to accomplish the function is not enough."). But given the language from *Elekta* cited above, and the clear and convincing evidence

21

standard for indefiniteness, I find that the written description contains sufficient structure and will adopt PA's construction for the term.

## II.     CONCLUSION

For the foregoing reasons, I will sustain-in-part and overrule-in-part Google's objections to the Magistrate Judge's Report and Recommendations and I will overrule PA's objections to the Magistrate Judge's Report and Recommendations.  I will sustain Google's objections regarding the construction of the term "sequencing file" and will construe the term as: "a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands."  I will also sustain Google's objections regarding the construction of the term "means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence" and will construe the first step for the structure corresponding to that term as: "scanning forward in the received sequencing file to locate the next Selection_Record of the appropriate LocType."  I will overrule all other objections and will adopt the Magistrate Judge's recommended constructions for the remaining disputed terms.

The Court will enter an order consistent with this Memorandum Opinion.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PERSONAL AUDIO, LLC,                    )
                                        )
      Plaintiff,                      )
                                        )
      v.                              )     Civil Action No. 17-1751-CFC-CJB
                                        )
GOOGLE LLC,                             )
                                        )
      Defendant.                      )

## REPORT AND RECOMMENDATION

In this action filed by Plaintiff Personal Audio, LLC ("PA" or "Plaintiff") against Google

LLC ("Google" or "Defendant"), PA alleges infringement of United States Patent Nos.

6,199,076 (the "'076 patent") and 7,509,178 (the "'178 patent" and collectively with the '076

patent, "the asserted patents"). Presently before the Court is the matter of claim construction.

The Court recommends that the District Court adopt the constructions as set forth below.

## I.    BACKGROUND

### A.    The Asserted Patents

The asserted patents are related and share a common specification. (*See* D.I. 147, ex. A

(hereinafter, the "'076 patent"); *id.*, ex. B (hereinafter, the "'178 patent"); D.I. 38 at ¶ 30; D.I. 159

at 1 n.1)[1] The '076 patent is entitled "Audio Program Player Including a Dynamic Program

Selection Controller" and was issued on March 6, 2001 from U.S. Appl. No. 08/724,813, which

was filed on October 2, 1996. ('076 patent) The '178 patent, entitled "Audio Program

---

[1]    In light of this, the Court will typically only cite to one of the two patents when
citing to portions of the patents' common specification.

Distribution and Playback System," is a divisional of the application that led to the '076 patent, and was issued on March 24, 2009.  ('178 patent)

The asserted patents are directed to an audio program player that automatically plays a predetermined schedule of audio program segments (e.g., songs) from a program library.  (D.I. 38 at ¶¶ 31, 33; '076 patent, col. 2:6-8; D.I. 159 at 1)  The claimed player further allows a listener to dynamically alter the sequence and content of the audio program segments presented.  (D.I. 38 at ¶¶ 31, 33; '076 patent, cols. 1:7-9, 1:64-2:3, 2:44-47, 2:55-58)  The Abstract of the patents explains that "a host system organizes and transmits program segments to client subscriber locations" (i.e., to players).  ('076 patent, Abstract)  The audio program player may be implemented by a conventional laptop or desktop computer equipped with, *inter alia*:  (1) a sound card connected to a speaker; and (2) a modem connected to the Internet that downloads the program information from the remote server and uploads program selections and preferences as well as usage data.  (*Id.*, cols. 4:32-5:45)

B.    **Procedural History**

On September 15, 2015, PA filed this action against Google in the United States District Court for the Eastern District of Texas ("Eastern District of Texas"), alleging infringement of the asserted patents.  (D.I. 1 at ¶¶ 1-4)  Prior to filing the instant lawsuit, PA had asserted the '076 patent and '178 patent in six other litigations in the Eastern District of Texas.  (D.I. 128 at ¶ 7)  In one of these litigations, *Personal Audio, LLC v. Apple, Inc.*, Civil Action No. 9:09CV111 (the "*Apple* litigation"), the Eastern District of Texas Court issued multiple orders in which it construed certain terms of the asserted patents, (D.I. 160 (hereinafter, "Sano Decl."), exs. 1-3), and further discussed the meaning of claim terms in connection with opinions relating to the

2

defendant's motion for summary judgment of indefiniteness and motions for judgment as a

matter of law, (*id.*, ex. 16; D.I. 147 (hereinafter, "Almeroth Decl."), ex. C).

In conjunction with the *Apple* litigation, an *ex parte* reexamination proceeding was

instituted by the United States Patent and Trademark Office ("PTO") with respect to certain

claims of the '076 patent, and an *inter partes* reexamination proceeding was instituted by the

PTO with respect to the '178 patent. (*See* D.I. 147, ex. Z at 3-4) The reexamination examiners

ultimately confirmed the relevant claims of the '076 patent, and the reexamination proceeding for

the '178 patent was eventually terminated as a result of the conclusion of the *Apple* litigation.

(*Id.*)

Shortly after PA initiated this action in the Eastern District of Texas, the case was stayed,

at Google's request, pending *inter partes* review ("IPR") proceedings (the "IPR proceedings")

involving certain claims of both asserted patents, which had been instituted by the Patent Trial

and Appeal Board ("PTAB") of the PTO. (*See* D.I. 234 at 4) Those proceedings concluded by

September 2016. (Almeroth Decl., exs. G, H) With respect to the '076 patent, the PTAB found

that: (1) claims 1 and 4 were unpatentable; and (2) Google had not proven that claims 2, 3, 14

and 15 were unpatentable. (*Id.*, ex. G at 57; D.I. 23 at 1) As for the '178 patent, the PTAB found

that: (1) claims 1-4, 9 and 13 were unpatentable; and (2) Google had not proven that claims 5-8,

14-17, 28 and 29 were unpatentable. (Almeroth Decl., ex. H at 44; D.I. 23 at 1) The parties filed

cross-appeals with respect to those decisions to the United States Court of Appeals for the

Federal Circuit, and the Federal Circuit ultimately affirmed the PTAB's conclusions in all

respects. *Google LLC v. Personal Audio, LLC*, 743 F. App'x 978 (Fed. Cir. 2018).

3

In January 2017, the Eastern District of Texas Court lifted the stay, (D.I. 31), but the case was thereafter transferred to this District in December 2017, (D.I. 103). Upon transfer here, the case was assigned to the Vacant Judgeship docket on December 13, 2017, and was referred to the Court "for handling through case-dispositive motions[,]" including "deciding non-dispositive matters and making recommendations as to the resolution of dispositive matters." (Docket Item, December 13, 2017) The case has since been re-assigned to District Judge Colm F. Connolly, with the substance of the referral to the Court remaining the same. (Docket Item, September 10, 2018)

The parties completed initial briefing on claim construction on July 18, 2018. (D.I. 146; D.I. 159; D.I. 176; D.I. 186) The Court held a *Markman* hearing on August 1, 2018. (D.I. 250 (hereinafter, "Tr.")) Following the hearing, on August 7, 2018, Google submitted a supplemental letter brief to address caselaw newly disclosed by PA during the *Markman* hearing. (D.I. 202)

## II.    STANDARD OF REVIEW

### A.    General Claim Construction Principles

It is well-understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). Claim construction is a generally a question of law, although subsidiary fact finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015).

4

The Court should typically assign claim terms their "ordinary and customary meaning[,]" which is "the meaning that the term[s] would have to a person of ordinary skill in the art ['POSITA'] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations omitted). However, when determining the ordinary meaning of claim terms, the Court should not extract and isolate those terms from the context of the patent; rather it should endeavor to reflect their "meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321; *see also Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016).

In proceeding with claim construction, the Court should look first and foremost to the language of the claims themselves, because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks and citations omitted). For example, the context in which a term is used in a claim may be "highly instructive." *Id.* at 1314. In addition, "[o]ther claims of the patent in question, both asserted and unasserted, can . . . be valuable" in discerning the meaning of a particular claim term. *Id.* This is "[b]ecause claim terms are normally used consistently throughout the patent, [and so] the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Moreover, "[d]ifferences among claims can also be a useful guide[,]" as when "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

5

**Appx134**

In addition to the words of the claims, the Court should look to other intrinsic evidence. For example, the Court should analyze the patent specification, which "may reveal a special definition given to a claim term . . . that differs from the meaning [that term] would otherwise possess" or may reveal an intentional disclaimer of claim scope. *Id.* at 1316. Even if the specification does not contain such revelations, it "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotation marks and citation omitted). That said, however, the specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). And a court should also consider the patent's prosecution history, if it is in evidence, because it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution[.]" *Phillips*, 415 F.3d at 1317.

Extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises[,]" can also "shed useful light on the relevant art[.]" *Id.* (internal quotation marks and citations omitted). Overall, while extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal quotation marks and citations omitted); *accord Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995).

In utilizing these resources during claim construction, courts should keep in mind that "[t]he construction that stays true to the claim language and most naturally aligns with the

6

patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

**B.     Principles for Construction of Means-Plus-Function Limitations**

35 U.S.C. § 112, ¶ 6 ("Section 112, paragraph 6")[2] provided as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The "means-plus-function" technique of claim drafting is a "convenience" that allows a patentee to express a claim limitation in functional terms "without requiring the patentee to recite in the claims all possible structures" that could perform that function. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003). In exchange for getting the benefit of this drafting convenience, however, patentees must disclose, in the written description of the patent, a corresponding structure for performing the claimed function. *Noah Sys, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012); *see also Elekta*, 344 F.3d at 1211 ("[T]he price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof.") (citation omitted). A patentee satisfies this requirement "only if the specification or prosecution history *clearly links or*

---

[2]     The Court here refers to the version of Section 112 as it existed prior to the passage of the Leahy-Smith America Invents Act ("AIA"). Although the structure of Section 112 changed after the AIA's passage, those changes are applicable only to any patent application filed on or after September 16, 2012. *See Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1183 n.1 (Fed. Cir. 2014). Because the applications at issue here were filed before that date, the Court refers to the pre-AIA version of Section 112.

*associates* that structure to the function recited in the claim." *In re Aoyama*, 656 F.3d 1293, 1297 (Fed. Cir. 2011) (emphasis added) (quoting *Elekta*, 344 F.3d at 1210); *see also Elekta*, 344 F.3d at 1220 ("The public should not be required to guess as to the structure for which the patentee enjoys the right to exclude. The public instead is entitled to know precisely what kind of structure the patentee has selected for the claimed functions, when claims are written according to section 112, paragraph 6."). "If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have failed to particularly point out and distinctly claim the invention as required by . . . section 112, [paragraph 2], which renders the claim invalid for indefiniteness." *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (internal quotation marks and citation omitted).[3]

Construing a means-plus-function limitation is a two-step process. The first step is determining the claimed function of the limitation. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015); *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). The second step is identifying the corresponding structure disclosed in the specification and equivalents thereof. *Williamson*, 792 F.3d at 1351; *Medtronic, Inc.*, 248 F.3d at 1311.

When a patentee claims a computer-implemented invention and invokes means-plus-function limitations, the United States Court of Appeals for the Federal Circuit has "consistently required that the structure disclosed in the specification be more than simply a general purpose

---

[3]     Section 112, paragraph 2 provided that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2.

computer or microprocessor." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). This requirement seeks to avoid "pure functional claiming[,]" *id.*, and mandates that the patent must disclose sufficient algorithmic structure[4] or some other description explaining how the computer performs the claimed function, *see id.* at 1332-37; *Blackboard, Inc*, 574 F.3d at 1383-85; *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (explaining that a patentee is permitted "to express that algorithm in any understandable terms including as a mathematical formula, in prose, [] or as a flow chart, or in any other manner that provides sufficient structure") (internal citation omitted). The Federal Circuit has identified a "narrow exception" to this requirement; no algorithm need be disclosed "when the function 'can be achieved by any general purpose computer without special programming.'" *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364-65 (Fed. Cir. 2012) (quoting *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011)). For example, "a general-purpose computer is sufficient structure if the function of a term such as 'means for processing' requires no more than merely 'processing,' which any general-purpose computer may do without special programming." *Id.* at 1365. The Federal Circuit has emphasized that "[i]t is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed." *Id*; *see also Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 841 F.3d 1334, 1342 (Fed. Cir. 2016).

---

[4]    An algorithm is "'a step-by-step procedure for accomplishing a given result[.]'" *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 841 F.3d 1334, 1342 (Fed. Cir. 2016) (citation omitted).

9

## III.   DISCUSSION

The parties currently have disputes regarding ten terms or sets of terms (hereinafter,

"terms").[5]  This Report and Recommendation addresses the first three terms, in the order in

which the parties addressed them at the *Markman* hearing.  The other seven terms will be

addressed in a forthcoming Report and Recommendation(s).

### A.   "file"

The claim term "file" appears in all asserted claims of the patents-in-suit.  The use of the

disputed term in claim 1 of the '178 patent is representative.  Accordingly, this claim is

reproduced below, with the disputed term highlighted:

> 1.  An audio program player comprising:
> a communications port for establishing a data communications link
> for downloading a plurality of separate digital compressed audio
> program *files* and a separate sequencing *file* from one or more
> server computers,
> a digital memory unit coupled to said communications port for
> persistently storing said separate digital compressed audio program
> *files* and said separate sequencing *file*, said sequencing *file*
> containing data specifying an ordered sequence of a collection of
> said separate digital compressed audio program *files*,
> an audio output unit including at least one speaker or headset for
> reproducing said audio program *files* in audible form perceptible to
> a listener,
> one or more manual controls for accepting commands from said
> listener, and
> a processor for continuously delivering a succession of said audio
> program *files* in said collection to said audio output unit in said
> ordered sequence specified by said sequencing *file* in the absence
> of a program selection command from said listener, and for
> discontinuing the reproduction of the currently playing audio

---

[5]    The parties originally submitted an additional set of terms for claim construction:
"player"/"audio program player"/"programmed digital computer[,]" which are found in all
asserted claims of the patents-in-suit.  (*See, e.g.*, D.I. 159 at 2; D.I. 176 at 14)  During the
*Markman* hearing, however, the parties agreed that these terms may be given their plain and
ordinary meaning, and the Court therefore will not further construe them.  (Tr. at 174-75)

program *file* and instead continuing the reproduction at the beginning of a listener-selected one of said audio program *files* in said collection in response to a program selection command from said listener.

('178 patent, cols. 45:60-46:18 (emphasis added))

The parties' competing proposed constructions for "file" are set out in the chart below:

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| file | any collection of data that is stored and manipulated as a unit<br><br>or, alternatively:<br><br>a collection of data that is stored and manipulated as a unit by a file management or database system | a collection of data that is stored and manipulated as a named unit by a file-management system |

(D.I. 146, Appendix A at Ref. 1; D.I. 176 at 14)  As reflected in these proposals, the parties have two disputes with respect to the term "file": (1) whether the term refers to a collection of data that must be stored and manipulated *by a file-management system* (Google's position) or may alternatively simply be stored and manipulated by either a file-management system *or* a database system (PA's position); and (2) whether, as Google suggests, the "file" must be *named*.  (*See* D.I. 159 at 9; Tr. at 11-12)  Google argues that while it is undisputed that "file" and "data" must mean two different things, (D.I. 186 at 13; *see also, e.g.*, '076 patent, 46:18 (claim 1 reciting "means for receiving and storing *a file of data*") (emphasis added)), PA's "broad construction" improperly conflates "file" and "data[,]" (D.I. 159 at 10-11).  During the *Markman* hearing, Google's counsel explained that with respect to this term, "the key issue that is really going to drive the construction is to make sure that a file is construed as something different from data." (Tr. at 11)  And in Google's view, the only way to do that is to require that a "file" be a *named*

11

collection of data stored and manipulated as a unit by a *file-management system*. (*Id.* at 11-13

("[A] file is distinguished by the fact that it is also named and stored in a file-management

system whereas data that is not a file cannot be stored in a file-management system."); *see id.* at

20)

The Court will first assess Google's proposed "file-management system" limitation. As

to that limitation, the Court is not persuaded that, in the context of these patents, a "file" must be

limited to something (i.e., data) stored and manipulated only by a file-management system. This

is so for four reasons.

First, despite Google's argument to the contrary, the Court does not understand PA's

alternative proposed construction for "file" (i.e, "a collection of data that is stored and

manipulated as a unit by a file management or database system") to mean the same thing as

"data" and to thus improperly conflate "file" and "data." PA does not simply propose to

construe "file" to mean "data." Instead, its proposal adds additional parameters: (1) there must

be a *collection* of data; (2) such collection must be stored and manipulated *as a unit*; and (3) such

storing and manipulation is by a *file-management system or a database system*. (*See id.* at 23-24

(PA's counsel explaining that its proposal amounts to more than just "unstructured" data, instead

encompassing a block of data that is stored and manipulated by a database system (or file-

management system)))

Second, it is undisputed that the patents nowhere use the term "file-management system"

in describing the invention. (*See* D.I. 146 at 3; Tr. at 14) And thus, as PA puts it, Google

"ignores that the patents teach storing and accessing files and the data within files without ever

12

teaching that a file-management system is necessary." (D.I. 146 at 4)[6]  Moreover, while the

patents do not include the phraseology "file-management system," they do refer to "database[s]"

that "store[]" "file[s]." (*See, e.g.*, '076 patent, cols. 5:66-6:2, 6:34-44; D.I. 146 at 4)

Third, the patents refer to database tables as files, which (as PA asserts) indicates that the

construction for "file" should encompass data structures that are stored and manipulated by

database systems. (D.I. 146 at 3-4; D.I. 176 at 14; Tr. at 7-8, 25)  For instance, in discussing the

preferred embodiment, the patents refer to a particular table (Table 301) that is stored in a

database as a "file":

> The [program] selections made by and uploaded from the
> [individual] subscriber take the form of a *file* (sequence) of 32 bit
> integers, each integer (ProgramID) designating a particular
> program segment. This *file of integers* is placed in a *relational
> database Requested Table seen at 301* in Fig. **4** . . . . The Program
> Segment records in the Programs Table **303** are relationally linked
> using the ProgramID key to other tables including[] the Requested
> Table **301** discussed above.

---

[6]      During oral argument, Google's counsel argued that while the patents did not
expressly use the term "file-management system," there are "examples of file-management
systems" therein. (Tr. at 14)  To that end, counsel asserted that the patents refer to the notion of
a file transfer protocol ("FTP") as the means for downloading files to the player, and that such a
protocol deals only with files, not just any collection of data. (*Id.* at 13-14; *see, e.g.*, '076 patent,
col. 5:47-51 ("The host server **101** provides a FTP server interface . . . which provides file
transfer protocol services to the player **103**[.]"))  Google did not make this point in its briefing,
(*see* D.I. 159; D.I. 186), though Google's expert did briefly mention it in his declaration, (*see*
D.I. 162 at ¶ 18 (explaining that the POSITA would not understand "file" in the context of
"receiving and storing" to mean any unit of data, especially given the patents' numerous
references to the FTP server as being the tool that downloads files to the player)).  However, it is
not entirely clear from Google's limited arguments on this point whether a FTP actually *is* a
"file-management system," or instead simply constitutes instructions for transferring files. (*See,
e.g., id.* at 7 n.1 (Google's expert stating that FTP is "a fast, application-level protocol widely
used for copying files to and from remote computer systems on a network using TCP/IP, such as
the Internet"); Tr. at 14 (Google's counsel responding that "[y]es[,]" FTP is the file-management
system but then adding "[w]ell, it's a system that deals only with files"))  And so the Court is not
convinced that it should limit the construction of "file" to requiring a file-management system on
the basis of these references to "FTP" in the patents' specifications.

('178 patent, col. 17:15-61 (emphasis added))[7]  And earlier, the patents explain that at step 219,

"the selections made by the user at **217** as well as the contents of the usage log recorded at **215**

are uploaded to the server as a requested *file (seen at 301* in Fig. **4**)."  (*Id.*, col. 9:50-52

(emphasis added))  Additionally, the patents describe another database table ("Table 307") as a

"file" which is formed from segments added to Table 301:

> The Program_Segment records in the Programs Table **303** are
> *relationally linked* using the ProgramID key to *other tables*
> including . . . *Schedule Table 307* which contains the
> recommended sequence of program segments for the next playback
> session[.]

(*Id.*, col. 17:58-64 (emphasis added))

> The programs, advertising and announcement segments which are
> added to the Request Table **301** to form the *Schedule Table 307* are
> determined by a matching procedure **342** which may be better
> understood by first considering the content of the data structures
> which provide data utilized to make those selections.

(*Id.*, col. 18:37-42 (emphasis added))

> As described in more detail later in connection with FIGS. **4** and **5**,
> the sequence of program segments to be presented to the user is
> formed into a *schedule file (seen at 307 in Fig. 4*) consisting of a
> sequence of program segment identification numbers which are
> used to compile a sequencing file, called the selections file,
> illustrated at **351** in FIG. **5**, which contains more detailed
> information about the sequence of events which occur during
> playback.

---

[7]     Google responds that these references are irrelevant to the construction of the
claimed "files" because "the server-side 'database' of 32-bit integers relied on by PA has nothing
to do with the 'files' that are received and stored by the player." (D.I. 186 at 13; *see also* D.I.
159 at 11)  At a minimum, however, the above-referenced portions of the specification provide
support for the idea that—at least as a general matter—a "file" is something that can be stored in
a database system.

14

(*Id.*, col. 12:9-16 (emphasis added))  In the Court's view, the patents' references to these structures as both database tables and files supports PA's argument that a file should be construed to mean data stored and manipulated as a unit by a file-management system *or* a database system.[8]  (*See* Tr. at 25)[9]

Fourth and finally, the extrinsic evidence further supports that a "file" is not *always* something that is stored and manipulated by a file-management system.  (D.I. 146 at 4)  For example, in support of its argument, Google cites to a dictionary that defines "file" in a way mirroring Google's construction ("any collection of data that is stored and manipulated as a named unit by a file-management system").  (D.I. 147 at ¶ 39 & ex. M (citing *Academic Press Dictionary of Science & Technology* 826 (1st ed. 1992)))  However, that same dictionary provides another definition for "file" that makes no mention of a "file-management system." (*Id.*)  This alternative definition simply describes a "file" as "a collection of items with certain common aspects, organized for a specific purpose and stored or processed as a unit[.]"  (*Id.*)

---

[8]    Google's position that server-side database structures have nothing to do with the "files" received and stored by the player seems to overlook the fact that the specification not only refers to Table 301 and Table 307 as both files and database tables, but also discloses that Table 307 is downloaded *by the player*.  (*See, e.g.*, '076 patent, col. 18:29-31)  Indeed, when pressed about PA's reliance on Table 307 in support of its proposed construction during the *Markman* hearing, Google seemed to have a different answer as to why Table 307 is not helpful to PA—there explaining that even if a file can "go into" a database system, it *also* must be "capable of being stored and managed by a file-management system."  (Tr. at 19-20)

[9]    Google asserts that certain arguments that PA made during reexamination proceedings support Google's position that a "file" must be received and stored by a file-management system (and not simply by a database system).  (D.I. 159 at 10 (citing D.I. 160, ex. 11 at 8 & *id.*, ex. 9 at 3); Tr. at 16; Google's Markman Presentation, Slide 16)  This stretches the prosecution history too far.  As PA retorts, in these portions of the prosecution history, PA was distinguishing the prior art on other bases; Google has not pointed to anywhere in the prosecution history where the patentee stated that a file could not be stored and manipulated by a database system.  (Tr. at 9-10; PA's Markman Presentation, Slides 8-11)

15

**Appx144**

Similarly, other dictionaries from the relevant time period do not require that a file be something that is only stored in and manipulated by a "file-management system." For example, one such dictionary defines "file" as "'a block of information stored on disk, tape, or similar media. A file may contain a program, a document, or a collection of data (such as a mailing list).'" (*Id.* at ¶ 38 & ex. J (quoting *Barron's Dictionary of Computer and Internet Terms* (5th ed. 1996))) Another dictionary defines "file" to mean:

> A complete, named collection of information, such as a program, a set of data used by a program, or a user-created document. A file is the basic unit of storage that enables a computer to distinguish one set of information from another. A file is the "glue" that binds a conglomeration of instructions, numbers, words, or images into a coherent unit that a user can retrieve, change, delete, save or send to an output device.

(*Id.* at ¶ 38 & ex. K (quoting *Microsoft Press Computer Dictionary* (3d ed. 1997)))[10] These dictionary definitions also help to underscore that a "file" is not something that must always be associated with a file-management system. (D.I. 146 at 4; Tr. at 7)

With regard to the parties' second dispute (that is, whether a file must constitute data that is a "named" unit), the Court will adopt that portion of Google's construction. In its opening brief, Google argued that the patent specification "confirms that 'files' must be identified by name, distinct from unnamed collections of data[,]" and it cited to numerous examples of the patents: (1) describing files as being requested, downloaded, or stored using a filename; and (2) making reference to named files. (D.I. 159 at 10; *see also* Tr. at 13-14) In its briefing, PA did not address this dispute at all. During the *Markman* hearing, PA only raised the issue in response

---

[10]    PA's expert points to a few more dictionary definitions for "file" that purportedly do not include reference to a "file-management system," (D.I. 147 at ¶ 38), but the attached portions of the dictionaries do not appear to include the pages that define "file[,]" (*id.*, exs. I, L).

16

**Appx145**

to questioning from the Court. (*See, e.g.*, Tr. at 10)  This all suggests that PA's opposition on this point is not especially strong.

PA ultimately explained that its hesitation with respect to the "named" limitation is that it is not sure what the scope of "named" is—for instance, does a file with an identifier amount to a "named" file? (*Id.* at 10-11, 23-24)  Because this issue was not well-argued in the briefs, Google's response to PA's question (about what it means for a file to be "named") is unclear. In light of all of this, the Court will recommend adoption of the "named" portion of Google's construction, and to the extent that there are disputes down the line with respect to what "named" means, the parties may address those during the summary judgment stage of the case. (*See id.* at 10 (PA's counsel acknowledging that the "named" issue is one "probably [best] taken up on summary judgment"))

For all of the above reasons, the Court recommends that the term "file" be construed as "a collection of data that is stored and manipulated as a named unit by a file-management or database system."

**B.    "sequencing file" terms**

The terms "sequencing file" and "playback session sequencing file" appear in independent claims 1 and 14 of the '178 patent, respectively, while the term "file of data establishing a sequence" is part of the means-plus-function element "a means for receiving and storing a file establishing a sequence" of the independent claims of the '076 patent (collectively, the "sequencing file limitations" or the "sequencing file terms"). (*See, e.g.*, D.I. 146 at 4-5)  The use of the disputed term in claim 1 of the '178 patent is representative.  Accordingly, this claim is reproduced again below for ease of reference, with the disputed term highlighted:

    **1.** An audio program player comprising:

<div align="center">17</div>

a communications port for establishing a data communications link
for downloading a plurality of separate digital compressed audio
program files and a separate *sequencing file* from one or more
server computers,
a digital memory unit coupled to said communications port for
persistently storing said separate digital compressed audio program
files and said separate *sequencing file*, said *sequencing file*
containing data specifying an ordered sequence of a collection of
said separate digital compressed audio program files,
an audio output unit including at least one speaker or headset for
reproducing said audio program files in audible form perceptible to
a listener,
one or more manual controls for accepting commands from said
listener, and
a processor for continuously delivering a succession of said audio
program files in said collection to said audio output unit in said
ordered sequence specified by said *sequencing file* in the absence
of a program selection command from said listener, and for
discontinuing the reproduction of the currently playing audio
program file and instead continuing the reproduction at the
beginning of a listener-selected one of said audio program files in
said collection in response to a program selection command from
said listener.

('178 patent, cols. 45:60-46:18 (emphasis added))

The parties' competing proposed constructions for the "sequencing file" limitations are

set out in the chart below:

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "sequencing file" <br><br> "file of data establishing a sequence" <br><br> "playback session sequencing file" | a file of data that identifies the order in which audio program segments chosen by or for a user are to be played | A file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands |

(D.I. 146, Appendix A at Ref. 2)  The parties' primary dispute with respect to the sequencing file

terms is whether the construction should include the following three limitations set out in

Google's proposal (hereinafter, the "use limitations"); these use limitations would require that a

18

**Appx147**

sequencing file must always be: (1) received by the player; (2) stored by the player; and (3) used

by the processor to both control playback of each song in the ordered sequence and respond to

control commands. (D.I. 146 at 5; D.I. 159 at 4) Google, on the one hand, argues that its

construction is mandated by the claim language and the prosecution history. (D.I. 159 at 4-9;

D.I. 186 at 1-7; Tr. at 67-69) PA, on the other hand, asserts that it is improper to import these

use limitations into a construction for the sequencing file terms; it argues that to the extent that

the use limitations are required by the claims, that is because the *surrounding claim language*

makes this so—not because these limitations are *bound up in the definition of the sequencing file*

*terms themselves*. (D.I. 146 at 5; Tr. at 32)

      In assessing the respective arguments, it is helpful to first have an understanding of the

bigger picture. In other words, why are the parties fighting about this? With its proposed

construction, Google's position is that each reference to "sequencing file" in the claims "refers to

the *same* 'sequencing file'"—meaning one single sequencing file is received by the player and

stored by the player, and it is that file and *that file only* that is used to control playback of each

song in the ordered sequence, and used to respond to control commands. (D.I. 186 at 1

(emphasis in original); *see also* D.I. 159 at 4-5; Tr. at 74-75) For its part, PA acknowledges that

every claim requires "one sequencing file to be received, to be stored, and its sequence be

referenced for use to control playback and to respond to commands[.]" (Tr. at 47; *see also id.* at

49) Beyond that, however, PA asserts that the claims do *not* require that the received sequencing

file and *only* that sequencing file be scanned and used in certain algorithmic steps (which steps

will be discussed in detail in connection with the next set of terms addressed herein, the "means

responsive" limitations). (*Id.* at 47; D.I. 146 at 2-3, 8-9) Instead, according to PA, the patents

allow for the *sequence* from that received sequencing file to be used to respond to control

playback—for example, after it has been copied onto another file. (Tr. at 46-48)[11]

The Court ultimately concludes that PA's proposed construction for the sequencing file

limitations is the correct one. To explain why this is so, the Court will address, in turn, the claim

language, the patent specification and the prosecution history.

### 1.    Claim Language

PA argues that the sequencing file limitations should be construed based on what such a

file actually *is* (a file of data that identifies the order in which audio program segments chosen by

or for a user are to be played), instead of construing the term based on how a sequencing file may

be *used*. (Tr. at 32) To that end, PA points out that the use limitations in Google's construction

are found explicitly in the surrounding claim language, where applicable. (D.I. 146 at 5; Tr. at

32)[12] Claim 1 of the '178 patent, for example, recites a sequencing file that is: (1) received by

the player (i.e., the player has a communications port for "downloading" the sequencing file); (2)

stored at the player; and (3) used to control playback (i.e., the player has a processor for

delivering audio program files "in said ordered sequence" specified by "said sequencing file"

and for "continuing the reproduction at the beginning of a listener-selected one of said audio

program files"). (*See* PA's Markman Presentation, Slide 36) In PA's view, the use limitations

included in Google's proposal should not be included in the construction for the sequencing file

---

[11]    During the *Markman* hearing, PA explained that the "real battle" with respect to these terms relates to the "means responsive" terms that will be taken up next, (Tr. at 46), and the parties' dispute will be clearer in the discussion of that term set.

[12]    The Court notes that in the *Apple* litigation, the Eastern District of Texas Court used a similar rationale in construing the "sequencing file" terms in a manner similar to that proposed here by PA. (D.I. 147, ex. D at 20-21)

20

limitations, because the claims recite them expressly where they are required, and because the

patents make certain other references to sequencing files that are not limited in the manner

suggested by Google's construction. (D.I. 146 at 5-6; Tr. at 32-33, 44-46)

Google, for its part, asserts that the claim language demonstrates that the same

sequencing file received by the player must be stored by the player, used to control playback of

each song in the ordered sequence and used to respond to control commands. (D.I. 186 at 1)  In

support, Google points out that the claims "recit[e] 'sequencing file' the first time the term

appears in the claims, and then recit[e] '*said* [] sequencing file' in every other instance.

Accordingly, each 'sequencing file' in the claims refers to the *same* 'sequencing file.'" (*Id.*

(certain emphasis in original); *see also* D.I. 159 at 5 ("The references to 'said sequencing file' [in

the claims] indicate that it is the same file that is subject to each aspect of the claim."))

When one looks carefully at the claim language, however, it becomes clear that the

claims do more than simply make repeated references to "said sequencing file."  For instance, as

to the player recited in claim 1 of the '178 patent, certain steps require a processor for delivering

audio program files "*in said ordered sequence* specified by said sequencing file in the absence of

a program selection command from said listener[.]" ('178 patent, col. 46:11-13 (emphasis

added))  Similarly, the player claimed in claim 14 of the '178 patent includes an "audio playback

unit for automatically and continuously reproducing said audio program files in said collection *in

the ordered sequence* specified by said playback session sequencing file[.]" (*Id.*, col. 48:28-32

(emphasis added))  And claim 1 of the '076 patent claims a player with a "means for receiving

and storing *a file of data establishing a sequence*" and "means for continuously reproducing said

program segments *in the order established by said sequence* in the absence of a control

command[.]" ('076 patent, col. 46:18-19, 24-26 (emphasis added))  These references to the use

21

**Appx150**

of a "sequence" from the sequencing file do not explicitly require that the sequence may be found only on that sequencing file at the time the sequence is used. They simply require that the sequence itself is *originally found* on the sequencing file referenced in the claims.

With the claim language both: (1) otherwise including use limitations like the ones that Google seeks to include in the construction for the "sequencing file" limitations; and (2) seeming to require that, for some of the steps, "[a]ll you have to use is *the sequence* specified by that [received] sequencing file[,]" (Tr. at 49 (emphasis added); *see also id.* at 103-04), that language thus appears to more closely support PA's proposal.

### 2.    Patent Specification

PA also heavily relies on the specification in support of its proposed construction. It cites to portions of the specification that purportedly demonstrate that in one embodiment, the player downloads a sequencing file (Table 307) and then uses the sequence from Table 307 to create a separate sequencing file ("Selections File 351") that was itself *not* received by the player from the host server. Instead, PA explains, Selections File 351 was *compiled directly on the player* from another sequencing file (i.e., Table 307).[13] (D.I. 146 at 2-3, 5-6; D.I. 176 at 1-3; Tr. at 33-34) PA argues that Selections File 351 is thus an example of a sequencing file that is not received by the player, but is nevertheless used by the player to influence playback; this shows, according to PA, that Google's construction (which requires that a "sequencing file" must always

---

[13]    PA further explains that its position here (that Selections File 351 is not downloaded to the player, and instead is created on the player) must be correct, because were both sequencing files (Table 307 and Selections File 351) downloaded by the player, this would lead to an unnecessary redundancy. In other words, "[i]f final Selections File 351 was downloaded . . . there would be no reason to also redundantly download a separate Recommended Schedule Table 307." (D.I. 176 at 3; *see also* Tr. at 88 (PA emphasizing that it "doesn't make any sense at all" for the specification to be describing both sequencing files 307 and 351 as being downloaded to the player))

22

have been downloaded by the player) is incorrect. (D.I. 176 at 1 (PA contending that because

this embodiment makes reference to a sequencing file that is not downloaded onto the player, it

helps explain why "the naked term 'sequencing file' by itself does not have the[] limitations

[suggested by Google]"); *see also* Tr. at 34)

For its part, Google agrees with PA that Table 307 and Selections File 351 are not both

downloaded. (D.I. 186 at 3)[14] But what Google argued in its briefing was that: (1) Table 307 is

not a "file" at all, but instead a "relational database[;]" and (2) Table 307 "resides on the server

(Fig. 4) and *is not downloaded*, stored, or used on the player." (*Id.* at 2 (emphasis added))

Instead, Google's position was that "Selections File 351 *is plainly downloaded*; Table 307 *is*

*not*." (*Id.* at 3 (emphasis added))[15] Google's position is wrong, for the reasons set out below.

First, the specification clearly refers to the structure that is Table 307 as, *inter alia*, a

file.[16] At differing points, the specification names that structure as both a "schedule file" and a

"Schedule Table[.]" (*See, e.g.*, '076 patent, cols. 12:5; 17:59)

---

[14]      Both parties' experts also agree at least on this point.  PA's expert, Kevin C.
Almeroth, Ph.D., explains that if Selections File 351 was compiled on the server and downloaded
to the player, "there would be no reason to also download recommended Schedule File 307, for
which the only disclosed purpose is to provide an initial recommended sequence for compiled
Selections File 351." (D.I. 177 at ¶ 21)  Google's expert, Ketan Mayer-Patel, Ph.D., similarly
points out that "[a] person of ordinary skill in the art would understand that there is no need to
download both Table 307 and Selections File 351." (D.I. 188 at ¶ 8)

[15]      By the time of the *Markman* hearing, Google seemed to back away from the
absolute position that Table 307 is not downloaded, contending instead that "[w]hether 307 is
also downloaded is more of an open question" and that "the specification suffers from some lack
of specificity" in that regard.  (Tr. at 84)

[16]      This point was also touched on above with respect to the "file" term.

Second, contrary to Google's position, the specification makes it very clear that Table

307 is indeed downloaded to (i.e., received by) the player.  To that end, the specification

explicitly states that "the recommended Schedule Table **307** [] is *transferred to the subscriber,*

*along with program segments, during the download transfer*." (*Id.*, col. 18:29-31 (emphasis

added); *see also id.*, col. 21:61-62 (referring to the "*output* Schedule Table **307**") (emphasis

added); *id.*, col. 27:15 (referring to the "Schedule **307** downloaded to the player"); PA's

Markman Presentation, Slide 17)  The specification also makes more implicit references to the

fact that Table 307 is received by the player.  To that end, the patents refer to what must be Table

307—i.e., a file with a *recommended* sequence of program segments—as being downloaded to

the player.[17]  For example, the specification explains that:  (1) "the *recommended order* and the

identification of the program files making up an individual playback session *are stored in a*

*session schedule file* (to be described in detail in connection with FIG. **5**)[;]" and (2) the "player

**103** *downloads the session schedule file*[.]" (*See id.*, col. 7:1-11 (emphasis added))  In the next

column, the specification indicates that "[t]he data *downloaded* includes a *recommended*

*program sequence file* which provisionally identifies the order in which downloaded program

segments are to be played[.]" (*Id.*, col. 8:39-41 (emphasis added))[18]  Meanwhile, the

---

[17]    It is clear from the specification that Schedule File/Table 307 "contains the
*recommended* sequence of program segments for the next playback session[.]" ('076 patent, col.
17:59-61 (emphasis added); *see also id.*, col. 18:29 (explaining that the host server adds various
program segments tailored to the subscriber's known preferences to "produc[e] the
*recommended* Schedule Table **307**") (emphasis added); D.I. 186 at 2 (Google acknowledging
that Schedule File/Table 307 "contains 'the recommended sequence of program segments for the
next playback session'"); Tr. at 35 (PA's counsel pointing out that Table 307 contains the
*recommended* sequence))

[18]    PA notes that the specification describes in detail what is being downloaded, and
in each case it refers to only a single sequencing file being downloaded that is either explicitly

24

**Appx153**

specification never states that Selections File 351 is downloaded to the player from the server.

(*See* D.I. 176 at 2; Tr. at 35)

Third, the specification describes Selections File 351 as being *compiled from* Table 307

and it strongly suggests that this compilation happens *on the player*. The specification states:

> As described in more detail later in connection with FIGS. **4** and **5**,
> the sequence of program segments to be presented to the user is
> formed into a schedule file (seen at **307** in FIG. **4**) consisting of a
> sequence of program segment identification numbers which are
> used to compile a sequencing file, called the selections file,
> illustrated at **351** in FIG. **5**, which contains more detailed
> information about the sequence of events which occur during
> playback.

('076 patent, col. 12:3-10)  While it is true that this excerpt does not expressly say that the

compiling of Selections File 351 file takes place on the player, (*see* D.I. 159 at 5), the Court

agrees with PA that all signs point to that being the case.

For one thing, as explained above, everyone agrees that it would not make sense for two

sequencing files (both Table 307 and Selections File 351) to be downloaded to the player.

Additionally, as PA points out, Figure 4 seems to "describe[] all the different data structures that

are stored on the host server and created on the host server" and, while it discloses Table 307, it

does not disclose Selections File 351.  (Tr. at 34-35; *see also* D.I. 176 at 2)

Moreover, the specification notes that Selections File 351 is compiled from Table 307, as

described above, and then further explains that Selections File 351 "follows" a sequence that is

created by the host server and downloaded to the player (i.e., Table 307):

> The playback operation itself continues from the designated
> playback point in the selections file (seen at **351** in FIG. **5**) which

---

identified as Table 307, or described as containing a *recommended* sequence.  (Tr. at 35; PA's
Markman Presentation, Slides 22-23)  That seems correct.

> *follows a program sequence initially created by the host server and*
> *downloaded with the program segments themselves, and then*
> *(optionally) modified by the addition, deletion and re-sequencing*
> *of segment identifiers as discussed earlier in connection with step*
> ***211** in FIG. **2**.*

('076 patent, col. 12:21-27 (emphasis added); *see also* PA's Markman Presentation, Slide 30; Tr.

at 37-38)  The earlier discussion referenced in this passage (i.e., the discussion of step 211 of

Figure 2) explains that:

> The data downloaded [to the player] includes a *recommended*
> *program sequence file* which provisionally identifies the order in
> which downloaded program segments are to be played, with the
> initial selection and sequence being established based on user
> preference data by the download compilation processing
> mechanism seen at **151** at the server.
>
> Before a playback session begins, *as indicated at **211***, the
> subscriber has the opportunity to *review and alter* the provisional
> program selections and sequence established as a default by the
> downloaded information from the server.  Utilizing the
> programming data and a utility program previously supplied by the
> server, the subscriber may alter the selection and sequence of
> program materials to be played . . . .
>
> At the request of the user, the sequence of programming defined by
> the program sequence file (the selections file illustrated at **351** in
> FIG. **5**) is then reproduced for the listener.

('076 patent, col. 8:39-57 (emphasis added))  Figure 2 of the patent, which depicts a flow chart of

the "information distribution functions" of the invention, (*see id.*, col. 4:1-3), in turn depicts

certain of these steps:

26

**Appx155**



Fig. 2

Taken together, these portions of the specification show that it is Table 307, with its *recommended* sequence of programs, that is downloaded at step 207 of Figure 2. Following that download, the subscriber may then *edit* (on the player) that *downloaded program sequence* (step 211 of Figure 2). What results from such editing is the final sequence of programming defined in Selections File 351, which is ultimately "reproduced for the listener." (*Id.*, col. 8:54-57; *see also id.*, col. 12:21-27; D.I. 176 at 3 (PA noting that "Selections File 351 contains a final sequence that is disclosed as being edited after Schedule Table 307 is downloaded. *See* Step 211 of Fig. 2[.]"))

In sum, the Court agrees with PA that the specification discloses: (1) a "sequencing file" with a recommended sequence that is created on the host server and downloaded by the player; and (2) another "sequencing file" containing the final sequence that is compiled from the first

27

sequencing file, after optional modification by the subscriber, on the player. This, in turn, supports PA's proposal, which: (1) does not require a sequencing file to be something that in all cases has been received by the player; and (2) does not limit the claims to requiring that the same received sequencing file—and that file *only*—must be used to "control both playback of each song in the ordered sequence and respond to control commands."

### 3. Prosecution History

Google contends that the prosecution history supports its construction. (D.I. 159 at 6; Tr. at 68-69) To that end, the Federal Circuit has explained that "[t]he prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). Google's argument is premised on the following portions of the prosecution history, (D.I. 159 at 6-7):

> • During the reexamination proceeding for the '178 patent, the patent owner explained with respect to "sequencing file":
>
> **G. Proper Interpretation of "Sequencing File" in Light of Specification and Prosecution History**
>
> In light of the specification and file history excerpts quoted above, the claim term "sequencing file" (which appears in all '178 patent claims and was not a term of art in 1996) is readily understandable to one of skill in the art as *a file that is received by the player, stored, and used by the processor to both control playback of each song in the ordered sequence and respond to control commands.* [12:16-19; 12:27-28; 34:17-19] It is used to determine, for instance, what song is to be played next if the user wishes to skip forward or back or select a specific song. It is not simply a playlist, but rather a file of data that the player references when the player is deciding what audio segment to play in response to the presence or absence of a control command. (D.I. 160, ex. 11 at 8 (emphasis added))

28

- [T]he term "sequencing file" of independent claim 1 and the term "playback session sequencing file" of independent claim 14, when interpreted in light of the '178 patent specification and file history, should be interpreted to mean "a file that is received by the player and used by the processor to both control playback of each song in the ordered sequence and respond to control commands." *The claimed sequencing file is received by the player and used by the processor to both control playback of each song in the ordered sequence and respond to control commands.* [12:16-19, 34:17-23] (*Id.* at 5 (emphasis in original))

- During the reexamination for the '178 patent, the patentee explained that prior art "does not disclose that the <u>same</u> 'play list' the Examiner equates with the claimed 'sequencing file' is downloaded, persistently stored and used to playback similarly downloaded and persistently stored audio files in the way claim 1 requires." (*Id.*, ex. 12 at 11 (emphasis in original))

- During the reexamination for the '178 patent, Dr. Almeroth submitted a declaration explaining that the opposing expert's declaration "does not state that the 'import function' in the [prior art] discloses downloading a sequencing file and then using that file for playback by the [prior art system]." (*Id.*, ex. 13 at 7)

- During prosecution, the applicants of the '076 patent stated that "[i]n claims 1-17, as amended, applicants set forth *an audio program player* which stores a collection of individual program segments and which *further receives and stores a file of data which specifies the order in which those program segments are scheduled to be reproduced by the player.*" (D.I. 187, ex. A at 2 (emphasis added); *see also id.* at 3)

- During prosecution, the applicants of the '076 patent stated that "[c]laim 1 makes it clear that the stored 'program segments' are different from the 'file of data' which is <u>received and stored</u> and which establishes a sequence in which the <u>separately claimed program segments</u> are scheduled to be reproduced." (*Id.*, ex. B at 3 (emphasis in original); *see also id.* at 4, 5; *id.*, ex. C at 2, 5, 6, 7; *id.*, ex. D at 14, 16-17, 18-19, 24)

29

At first blush, Google's prosecution history argument does appear to be compelling.  But PA has two good responses to Google's argument.

First, PA asserts that in its prosecution history statements, PA was not intending to generally define any and all "sequencing file[s]."  (D.I. 176 at 5)  Rather, PA's statements above were "characterizing the use of a particular claimed sequencing file *as dictated by explicit limitations of a specific claim*[.]"  (*Id.* (emphasis added))  To that end, PA points out portions of the prosecution history that at times seem to explain what a sequencing file is generally—i.e., a file containing data specifying an ordered sequence of a collection of the downloaded audio program files.  (D.I. 177, ex. 3 at 5; *see also, e.g., id.*, Appendix A at 10 n.1 (during prosecution, patentee explaining that a sequencing file is "a file of data which establishes the sequence in which program segments are scheduled to be reproduced") (emphasis omitted))  And PA is also correct that other portions of the '178 patent's prosecution history do refer to the "claimed" sequencing file or the sequencing file "of independent claim 1" and "independent claim 14" of that patent—with the patentee there explaining that these specific *claimed* sequencing files should be interpreted to mean a file that has the use attributes identified in Google's proposed construction (and that are expressly found in surrounding limitations).  For example, during reexamination proceedings for the '178 patent, the patentee referred to the "sequencing file" of the independent claims and explained that "[t]he *claimed* sequencing file is received by the player and used by the processor to both control playback of each song in the ordered sequencing and respond to control commands."  (D.I. 177, Appendix A at 7)

As explained above, in the claims that contain the sequencing file terms, the surrounding claim language explicitly sets out the use requirements.  And thus the prosecution history

30

**Appx159**

statements highlighted by Google could reasonably be seen as being "directed to the combination

of explicit limitations directed to the sequencing file found in the claims[.]" (D.I. 176 at 6; *see*

*also* Tr. at 51-53, 57, 63)  These statements may well not have been intended to define a

"sequencing file" generally.  The Court agrees with PA that while the prosecution history *could*

be interpreted as Google argues here, one could also reasonably interpret it in line with PA's

explanation.  *See, e.g., Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1332 (Fed. Cir.

2004) (finding no clear or express statement by the patentees defining "rotating" as requiring 360

degrees of rotation because while the relevant statements in the prosecution history could be

"arguably subject to the interpretation [the defendant] gives them, [they can] also be reasonably

understood as applying only to those claims [] that explicitly recite that rotation must be 'through

greater than 360°.' . . . Because the statements in the prosecution history are subject to multiple

reasonable interpretations, they do not constitute a clear and unmistakable departure from the

ordinary meaning of the term 'rotating.'")

     Second, PA points to the IPR proceeding.  During that process, Google submitted that the

sequencing file limitations should be construed to mean "'file of data that identifies the order in

which audio program segments are to be played and that may contain information about the

sequence of events that occur during playback.'"  (D.I. 147, ex. E at 8 (citations omitted))

Google never argued before the PTAB that the proper construction of these terms required the

use limitations that it now seeks to import into its construction.  (D.I. 146 at 6; Tr. at 32, 63)  Yet

here, Google argues that "[b]ased on [the patentee's] definitional statements and arguments

during prosecution and reexamination, Plaintiff has *affirmatively and unequivocally* limited the

claimed 'sequencing file' to the same file that is received from outside the player, stored in a

non-volatile memory ('persistently stored'), and used to control playback and respond to

<div align="center">31</div>

<div align="center">**Appx160**</div>

commands." (D.I. 159 at 8 (emphasis added)) If the patentee's statements in the IPR proceeding were so affirmative and unequivocal on the point at issue (i.e., the incorporation of the use limitations into the "sequencing file" terms), how could Google have advanced a construction for the terms in the IPR that did not include those limitations?

Google defends its differing proposals by noting that during the IPR proceeding, the claim terms were to be interpreted according to their broadest reasonable interpretation ("BRI"), in light of the patent specification in which they appear. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275-79 (Fed. Cir. 2015), *aff'd, Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016).[19] But that fact would not justify Google's shifting positions in the two proceedings.

After all, for a statement to constitute prosecution history disclaimer, it must amount to a *clear and unmistakable* disclaimer. (Tr. at 64; D.I. 176 at 8) This is true in both federal district court proceedings and in IPR proceedings. *See, e.g., Arendi S.A.R.L. v. Google LLC*, 882 F.3d 1132, 1135 (Fed. Cir. 2018) (explaining, in an appeal of the PTAB's decision in an IPR proceeding where the PTAB held that no prosecution disclaimer had occurred, that "a disclaimer must be clear and unmistakable"); *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) (noting, in an appeal from a district court litigation, that "to constitute disclaimer, there must be a clear and unmistakable disclaimer"). The Federal Circuit has explained that "when a prosecution argument is subject to more than one reasonable

---

[19]    Pursuant to a recent rule change, beginning on November 13, 2018, the PTAB began to construe claims (including in IPR proceedings) using the same *Phillips* claim construction standard that is used to construe claims in a civil action in federal district court. *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (to be codified at 37 C.F.R. pt. 42). The PTAB thus utilized the BRI standard during the IPR proceeding relevant to this case, but no longer uses that standard.

interpretation, it cannot rise to the level of a clear and unmistakable disclaimer." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1363 (Fed. Cir. 2017) (internal quotation marks and citation omitted). Therefore, if the patentee made statements regarding the sequencing file limitations during prosecution that amount to *clear and unmistakable* disclaimer—meaning that the *only reasonable interpretation* of such statements is that they served to import the use limitations into the claim terms at issue—then Google could not have advanced the constructions it did for these terms in the IPR proceeding (i.e., constructions that did not include those use limitations). (D.I. 176 at 9; Tr. at 64-65)[20]

This all signals to the Court that the patentee's statements regarding these terms in the prosecution history are subject to more than one reasonable interpretation. And thus, it indicates that those statements were not clear enough to serve as the type of disclaimer Google now suggests.

### 4.     Conclusion

---

[20]     Moreover, when the PTAB construes claims under the BRI standard during an IPR proceeding, it is not as if the prosecution history is irrelevant. Indeed, the Federal Circuit has explained that during an IPR proceeding, when a claim is given its BRI in light of the patent specification, such "specification, together with [the patent's] prosecution history, constitutes intrinsic evidence to which the Board gives priority when it construes claims." *WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323 (Fed. Cir. 2018); *see also Arendi*, 882 F.3d at 1135 (explaining that, in appeal from IPR decision applying the BRI standard, "[i]n construing patent claims, a court should consult the patent's prosecution history so that the court can exclude any interpretation that was disclaimed during prosecution") (internal quotation marks and citation omitted); *cf. Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) (explaining, in an appeal of the PTAB's decision in an *inter partes* reexamination proceeding, "[a]dditionally, the prosecution history, while not literally within the patent document, serves as intrinsic evidence for purposes of claim construction. This remains true in construing claims before the PTO").

In light of the above, the Court recommends that the sequencing file limitations be construed to mean "a file of data that identifies the order in which audio program segments chosen by or for a user are to be played."[21]

**C.    "means responsive" terms**

The "means responsive" terms constitute three means-plus-function limitations in claims 1-3 of the '076 patent, governed by 35 U.S.C. § 112(6). (*See, e.g.*, D.I. 146 at 6; *id.*, Appendix A at Refs. 3, 4, 5) For ease of reference, the Court reproduces these claims below, with the disputed terms highlighted:

> **1.** A player for reproducing selected audio program segments comprising, in combination:
> means for storing a plurality of program segments, each of said program segments having a beginning and an end,
> means for receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be reproduced by said player,
> means for accepting control commands from a user of said player,
> means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command,
> means for detecting a first command indicative of a request to skip forward, and
> *means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence.*

('076 patent, col. 46:13-33 (emphasis added))

---

[21]    Google suggests that PA's reading of what a "sequencing file" refers to would render the term indefinite. (D.I. 186 at 2 n.2; Tr. at 83) Google may raise this argument during summary judgment, but at this time, the issue has not been fully briefed and is not yet ripe for resolution.

> **2.** A player as set forth in claim **1** further comprising means for detecting a second command indicative of a request to skip backward, and
> *means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program.*

(*Id.*, col. 46:34-41 (emphasis added))

> **3.** A player as set forth in claim **2** further comprising *means responsive to the detection of two consecutive ones of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment.*

(*Id.*, col. 46:42-48 (emphasis added))

The parties' competing proposed constructions for the "means responsive" limitations are

set out in the chart below, with the main disputed points noted by bold, underlined language:

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence" (hereinafter, "skip command")<br><br>('076 patent, claim 1) | <u>Function</u>: "in response to a 'Skip' command, discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence."<br><br>The <u>structure</u> corresponding to the claimed function is the following structure and equivalents thereof:<br>A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more | <u>Function</u>:  In response to a ['Skip'/single 'Back'/two consecutive 'Back'/ 'Back'] command[s], discontinuing the [reproduction/translation] of the currently playing program segment and instead continuing the [reproduction/translation] at the beginning of [a program segment which follows said currently playing program in said sequence/said currently playing program/a program segment which precedes the currently playing program segment/the next program segment in said sequence]. |

35

**Appx164**

| | | |
|---|---|---|
| | fully described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:<br><br>1. scanning forward in the **sequence established by the sequencing file** to locate the next Selection_Record of the appropriate LocType;<br><br>or, alternatively,<br><br>1. scanning forward in **a sequencing file** to locate the next Selection_Record of the appropriate LocType;<br><br>2. resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>3. fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.<br><br>**A LocType is an identifier that indicates a characteristic of a selection record, for example, a playable content selection record.** | Structure: A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:<br><br>(1) scanning forward in the **received sequencing file** to locate the next Selection_Record of the appropriate LocType;<br><br>(2) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(3) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.<br><br>**No construction necessary for LocType, or alternatively:**<br>**A LocType is a single byte character and an identifier that indicates a characteristic of a selection record.** |
| "means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program" | The function is "in response to a single 'Back' command, discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program." | Function: In response to a ['Skip'/single 'Back'/two consecutive 'Back'/ 'Back'] command[s], discontinuing the [reproduction/translation] of the currently playing program segment and instead continuing the [reproduction/translation] at the beginning of [a program |

36

| | | |
|---|---|---|
| (hereinafter, "single skip back command")<br><br>('076 patent, claim 2) | The structure corresponding to the claimed function is the following structures and equivalents thereof:<br><br>A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 15, lines 49 to 59. Specifically, this algorithm includes the following steps:<br><br>1. if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment; and<br><br>2. playing the program segment from its beginning.<br><br>**A LocType is an identifier that indicates a characteristic of a selection record, for example, a playable content selection record.** | segment which follows said currently playing program in said sequence/said currently playing program/a program segment which precedes the currently playing program segment/the next program segment in said sequence].<br><br>Structure:  A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 267, 269, and 235 and described at column 15, lines 49 to 59. Specifically, this algorithm includes the following steps:<br><br>(1) if the currently playing program segment has played for a predetermined amount of time **after the start time recorded in a usage log file**, resetting the playback position to the beginning of the program segment; and<br><br>(2) playing the program segment from its beginning.<br><br>**No construction necessary for LocType, or alternatively:**<br>**A LocType is a single byte character and an identifier that indicates a characteristic of a selection record.** |
| "means responsive to the detection of two consecutive ones of said second commands for discontinuing the reproduction of the currently playing program | The function is "in response to two consecutive 'Back' commands, discontinuing the reproduction of the currently playing program segment and instead continuing the | Function:  In response to a ['Skip'/single 'Back'/two consecutive 'Back'/ 'Back'] command[s], discontinuing the [reproduction/translation] of the currently playing |

37

| | | |
|---|---|---|
| segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment" (hereinafter, "double skip back command" ('076 patent, claim 3) | reproduction at the beginning of a program segment which precedes the currently playing program segment." The structure corresponding to the claimed function is the following structures and equivalents thereof: A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269, 235, 261, 262, and 278 and more fully described at column 15, lines 49 to 59 and column 34, line 28 to column 35, line 53. Specifically, this algorithm includes the following steps: 1. in response to a first 'Back' command, if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment and playing the program segment from its beginning; 2. in response to a second 'Back' command, if the currently playing program segment has not yet played for said predetermined amount of time, scanning backward in the sequence established by the sequencing file to locate the previous Selection_Record of the appropriate LocType; or, alternatively: | program segment and instead continuing the [reproduction/translation] at the beginning of [a program segment which follows said currently playing program in said sequence/said currently playing program/a program segment which precedes the currently playing program segment/the next program segment in said sequence]. Structure: A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 267, 269, 235, 261, 262, and 278 and described at column 15, lines 49 to 59 and column 34, line 28 to column 35, line 53. Specifically, this algorithm includes the following steps: (1) in response to a first "Back" command, if the currently playing program segment has played for a predetermined amount of time **after the start time recorded in a usage log file**, resetting the playback position to the beginning of the program segment, and playing the program segment from its beginning; (2) in response to a second "Back" command, if the currently playing program segment **is near its beginning**, scanning backward in the **received** sequencing file to locate the |

| | | |
|---|---|---|
| | 2. in response to a second 'Back' command, if the currently playing program segment has not yet played for said predetermined amount of time, scanning backward in a sequencing file to locate the previous Selection_Record of the appropriate LocType;<br><br>3. resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>4. fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.<br><br>**A LocType is an identifier that indicates a characteristic of a selection record, for example, a playable content selection record.** | previous Selection_Record of the appropriate LocType;<br><br>(3) resetting the CurrentPlay variable to the record number of that Selection_Record; and<br><br>(4) fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.<br><br>**No construction necessary for LocType, or alternatively:**<br>**A LocType is a single byte character and an identifier that indicates a characteristic of a selection record.** |

(D.I. 146, Appendix A at Refs. 3, 4, 5; D.I. 146 at 7; D.I. 186 at 12; Tr. at 124)

## 1.    Skip Command

With respect to the skip command, found in claim 1 of the '076 patent, the function for this means-plus-function term is not in dispute, and is reflected in the chart above. As for the corresponding structure for this term, the parties have two disputes. First, the parties dispute whether the same "received sequencing file" must itself be continuously used for playback control (as Google argues), or whether that received sequencing file can be used to obtain a sequence that is then used to create another sequencing file that is further acted on by the controls (as PA argues). (*See* D.I. 146 at 7; D.I. 159 at 17; Tr. at 90 (Google's counsel

39

explaining that the "main [] dispute" regarding this term is "whether the scanning forward to

locate the next record in response to a user commanding a skip . . . has to be in the *received*

sequencing file") (emphasis added))[22]  Second, the parties dispute whether the structure should

include a definition of the term "LocType[,]" and if so, what that definition should be.  (D.I. 146

at 11-13; D.I. 159 at 21-22)[23]  The Court will take up these disputes in turn.

> ### a.   Must the scanning forward take place in the "received" sequencing file?

At the outset, the Court notes that both parties agree that the corresponding structure for

the skip command includes scanning Selections File 351 in order to skip forward.  (*See* D.I. 176

at 1; D.I. 146, Appendix A at Ref. 3; '076 patent, cols. 34:28-35:48)  However, the parties

disagree as to whether this file was compiled on the player from another downloaded sequencing

file (PA's view) or was received from outside the player (Google's view).  If Selections File 351

was received from outside the player, that supports Google's position that the same sequencing

file is received by the player, stored, and scanned during playback.  But if Selections File 351

was compiled on the player, that supports PA's position that the player does not have to keep

referencing only one particular received sequencing file over and over, but can instead *use* the

received file by accessing it and obtaining/copying its sequence, and then compiling another

sequencing file with the copied sequence.  In conjunction with their respective positions, PA

asserts that the scanning forward step should be construed to require "scanning forward in *a*

sequencing file" or, alternatively, "scanning forward in *the sequence established by the*

---

[22]     The parties also have this dispute with respect to the the double skip back
command, and the Court's resolution here will also apply to that term.

[23]     The parties have this dispute with respect to each of the means responsive
limitations, and the Court's resolution here will also apply to the other two such terms.

*sequencing file*[,]" (D.I. 146 at 7 (emphasis added)), whereas Google asserts that it should be

construed such that the scanning forward step must occur in the same sequencing file that was

"received" by the player, (D.I. 159 at 17).

As described above in connection with the "sequencing file" limitations, the embodiment

described in the specification teaches that a sequencing file with a recommended sequence

(Table 307) is created on the host server and downloaded to the player—and that another

sequencing file containing the final sequence (Sequencing File 351) is created on the player,

using the data of the received sequencing file to control playback.  (*See* D.I. 176 at 2-3)  The

Court will not here repeat the analysis that led it to that conclusion, as that analysis has already

been set out in some detail in the "sequencing file" section.  It is simply worth noting that this

conclusion strengthens PA's position as to the correct outcome regarding this dispute.

The Court also will assess three other arguments made in the parties' briefs with regard to

this "received sequencing file" issue.  The outcome as to each also supports PA's position.

First, PA rightly points out that the claim language "never requires only scanning or

using the 'received sequencing file'" and instead simply refers to using the "sequence" from that

file.  (D.I. 146 at 8; *see also* Tr. at 48-49, 103)  Indeed, claim 1 of the '076 patent recites, *inter*

*alia*, "means for receiving and storing *a file of data establishing a sequence* in which said

program segments are scheduled to be reproduced by said player," "means for continuously

reproducing said program segments in the order *established by said sequence*[,]" and then—in

response to a command to skip forward (the limitation at issue here):  "means responsive to said

first command for discontinuing the reproduction of the currently playing program segment and

instead continuing the reproduction at the beginning of a program segment which follows said

currently playing program *in said sequence*."  ('076 patent, col. 46:13-33 (emphasis added))

41

**Appx170**

Second, Google's argument regarding the import of the prosecution history seems off

base. Google asserts that several of the patentee's statements in the prosecution history mandate

its proposal. (Tr. at 90 (citing Google's Markman Presentation, Slide 22)) But PA retorts that

Google's proposed construction is actually much more narrow than the import of the patentee's

prosecution history statements. PA argues that during the prosecution history, when the patentee

made statements to the effect that the claimed sequencing file is "*used* by the processor to both

control playback of each song in the ordered sequence and respond to control commands[,]"

(D.I. 177, ex. 3 at 5 (emphasis added)), the patentee did not mean that the processor must only

continue to reference the actual received sequencing file, (D.I. 176 at 4; Tr. at 99-101). Rather,

according to PA, "[a] processor can *use* the received sequencing file to control playback and

respond to control commands by referencing the file . . . *to obtain the sequence used for control*

*and playback* but not continue to reference only that file." (*Id.* at 100-01 (emphasis added)) So

under PA's reading, one can "use" the file by accessing it and obtaining its sequence (i.e., a

sequence that will later be scanned), but one does not have to keep referencing only one

particular sequencing file over and over. (*Id.* at 103)

The Court finds PA's position to be reasonable and supported by portions of the file

history. For example, during reexamination of the '178 patent, the patentee explained that:

> The '178 specification describes in detail *how* the exemplary
> preferred embodiment personal audio player implementation *uses*
> the sequencing file's *ordered sequence* of program segment
> identifiers to sequence events which occur during playback and to
> control the playback session and navigation within the playback
> session. Figure 5 shows an example non-limited preferred
> embodiment sequencing file and how the personal audio player
> processor dynamically uses the sequencing file to both control
> playback of each song in the ordered sequence and to change
> selections in response to listener-inputted control commands. For
> example, the '178 specification beginning at 34:14 et seq. describes

42

> how the audio player *uses* the downloaded sequencing file *format*
> and associated player processor to permit the listener to skip
> forward, backward, etc.

(D.I. 177, ex. 3 at 6 (emphasis added); PA's Markman Presentation, Slide 65)  As PA notes, this

explanation allows for the player to use the sequencing file's "ordered sequence" to control the

playback session, but it does not necessarily require the received *file* to always be scanned as part

of that process.  And the citation to column 34 of the '178 patent in the above excerpt also

supports the idea that the player uses the *format* of the downloaded sequencing file—i.e., its

*sequence*—to skip forward.  (Tr. at 102; D.I. 177 at ¶ 42)[24]

Third, PA made persuasive points about Google's positions during the IPR proceeding.

For example, it is undisputed that Google submitted to the PTAB a construction for the term at

issue that did not require scanning forward to happen in the "received" sequencing file.  (D.I.

146 at 9; PA's Markman Presentation, Slide 69; D.I. 177, ex. 1 at 13-14; Tr. at 104)  And it

appears to also be undisputed that in the IPR, Google relied on prior art that did not directly scan

the received sequencing file (a playlist in the prior art) to skip forward, and instead scanned data

structures that were derived from the received sequencing file.  (PA's Markman Presentation,

Slides 70-74; D.I. 146 at 9; Tr. at 104-05)  The PTAB invalidated claims based on this algorithm.

(PA's Markman Presentation, Slide 74; D.I. 147, ex. G at 31-32)  Yet Google's position in this

---

[24]     This reading of the import of the prosecution history statement is in harmony not
only with the claim language, but also with the embodiment described in the specification.  With
respect to playback, the specification explains that "[t]he playback operation itself continues
from the designated playback point in *the selections file (seen at 351 in FIG. 5) which follows a
program sequence initially created by the host server and downloaded* with the program
segments themselves, and then (optionally) modified by the addition, deletion and re-sequencing
of segment identifiers as discussed earlier in connection with step **211** in FIG. 2." ('178 patent,
col. 12:27-33 (emphasis added))  This description aligns with PA's position that the downloaded
sequencing file is used to control playback by providing the sequence for playback, and not
necessarily by being continually scanned itself.  (PA's Markman Presentation, Slide 67)

43

**Appx172**

case is that the prosecution history makes it "clear that the [received] sequencing file does need to be referred to in connection with determining where to skip forward." (Tr. at 90; *see also* Google's Markman Presentation, Slides 22-24) Again, if the patentee's statements during prosecution were really clear and unmistakable and subject to no other reasonable interpretation than that proffered by Google in this case, then Google should have submitted the same construction to the PTAB in the IPR. The fact that it did not causes the Court to question the correctness of its proposal here.

For all of these reasons, the Court is persuaded that PA's construction is appropriate as to this issue. It thus recommends that the structure for the skip command not include Google's "received" sequencing file language.

### b. "LocType"

The term "LocType" is used in the algorithmic structures for the means responsive terms. PA submits that these structures should include a statement defining "LocType," since that term's meaning is not otherwise readily ascertainable. (D.I. 146 at 12; D.I. 176 at 14) To that end, PA explains that "'LocType' is not a term of art in the industry but rather a coined term where the patentee acted as its own lexicographer." (D.I. 146 at 12) According to PA, the patents demonstrate that structurally, LocType is a character identifier (letter or numbers) that identifies the characteristics of a given selection record pertaining to a program segment. (*Id.*; Tr. at 112-13) Further, PA asserts that such identifier should *not* be limited to a single byte character. (PA's Markman Presentation, Slide 95; Tr. at 114) In response, Google does not think that LocType needs to be construed. If the Court does intend to ascribe a definition to the term, Google does not dispute that a LocType "indicates a characteristic of a selection record"; however, Google argues that the term must be described as "a single byte character" because that

is how the term is defined in the patent specification.  (D.I. 186 at 12; Tr. at 123-24; *see also* D.I.

159 at 21-22)

The portion of the patent specification that Google refers to is a good place to start the

Court's analysis.  It is reproduced below:

> To control subject and topic skipping, as well as hyperlink jumps,
> the selections file seen generally at **301** in FIG. **4** preferably takes
> the form of a sequence of records, each having the structure
> defined by the following Pascal record definition:

```
type Selection_Record = record
        LocType: Char;
        Location: Integer;
     end;
```

where LocType is a single byte character having the values and meanings shown in the following

table:

| LocType | Meaning |
| --- | --- |
| "S", "s" | Subject Announcement |
| "T", "t" | Topic Announcement |
| "P", "p" | Programming content segment |
| "Q", "q" | Advertising segment |
| "G", "g" | Glue (announcement) segment |
| "H" | Highlight start offset |
| "E" | Highlight end offset |
| "A" | Anchor start offset |
| "M" | Bookmarked anchor start |
| "B" | Anchor end offset |
| "L" | Linked segment |
| "R" | Rewind to identified location |
| "I" | Image identification |
| "J" | Image display start offset |
| "K" | Image display end offset |
| "C" | Accept comment |
| "V" | Accept value designation |
| "X" | Accept list termination |
| "Y" | Accept "Yes"/ "No" |

45

**Appx174**

('076 patent, cols. 31:63-32:33)

Google's argument seems correct: the patentee did appear to define "LocType" in the specification. And it seems to have done so by noting that a "LocType" is "a single byte character" that is part of the Selection_Record in the selections file, and that it has a particular value. (*See* D.I. 159 at 21-22; D.I. 186 at 12) PA never really persuasively explains why "LocType" should *not* be construed in a manner that mirrors the very definition chosen by the patentee. It complains that Google did not suggest adding in "single byte character" to the construction until it filed its sur-reply brief, thus leaving PA without a "full opportunity to address" the dispute here. (*See* Tr. at 115) But in its responsive brief, Google *did* note that "[e]ven if LocType were required to be construed," PA's construction would confuse the term's meaning because "[t]he specification explains that LocType is 'a single byte character' that is part of the Selection_Record in the selections file, which contains a value indicating one of almost 20 possible types of records." (D.I. 159 at 21-22) PA could have directly responded to this argument in its reply brief, but it did not, instead inaccurately stating that "Defendant's response does not contest the merits of Plaintiff's construction." (D.I. 176 at 14)

In its briefing, PA primarily focused on what occurred in the IPR proceeding. (D.I. 146 at 12-13) In the IPR, Google represented that a LocType indicated a characteristic of a "'playable object[.]'" (*Id.* at 12 (quoting D.I. 147, ex. Z at 48)) In its decision to institute review on, *inter alia*, claim 1 of the '076 patent, the PTAB concluded that a prior art reference ("Chase") taught the steps of the algorithm corresponding to the "means responsive to said first command" described in the patent. (D.I. 147, ex. E at 29-30) In its briefing here, PA seemed to be asserting that something about "Google's representation" to the PTAB, which led the PTAB to find that

46

**Appx175**

Chase invalidated claim 1, suggests that the Court should adopt PA's construction for LocType (and not Google's proposal). (D.I. 146 at 12)

The problem for the Court is that after reading PA's brief, the Court does not understand the argument that PA was making. That is, the Court cannot discern what it is about Google's position in the IPR that was inconsistent with the patentee's definition of LocType in the specification (i.e., that a LocType is a "single byte character").

During the *Markman* hearing, PA's counsel tried to further explain its position. There, counsel focused on a different portion of the IPR record—one it had not referenced in its pre-hearing briefing. During the hearing, PA's counsel argued that in the IPR proceeding, Google advocated that a LocType could be a five byte character (i.e., not simply a single byte character). (PA's Markman Presentation, Slide 98; *see also* Tr. at 114) But PA did not provide a sufficient record to make it clear that Google had in fact taken this position in the IPR. Indeed, PA pointed only to one slide of its *Markman* presentation in support, and that slide was unclear at best. Moreover, as Google's counsel noted, (Tr. at 125), during the IPR proceeding, the claim terms were to be interpreted according to their BRI.[25]

In the end, the Court recommends that the corresponding structures for the means responsive terms reflect that a LocType is a single byte character, as Google has proposed in the

---

[25]    During the *Markman* hearing, PA also for the first time argued that because the term "LocType" is found in the structure for a means-plus-function term, the structural nature of a LocType—i.e, whether it is a single byte character, or a multi-byte character—is not necessary to the recited function and thus should not be included in any construction. (Tr. at 114-15; PA's Markman Presentation, Slide 99) The Court declines to consider this argument since it was not fairly raised by PA prior to the *Markman* hearing. *See, e.g.*, *Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.*, Civil Action No. 17-1086-LPS, 2018 WL 5669168, at *7 n.4 (D. Del. Nov. 1, 2018) (citing cases).

alternative. PA has not explained in a clear and understandable way why the specification's definitional statement in this regard is wrong.

### 2.    Single Skip Back Command and Double Skip Back Command

With respect to both the single skip back command and the double skip back command, found in claims 2 and 3 of the '076 patent, respectively, the functions of these means-plus-function terms are not in dispute, and are reflected in the chart above. The first steps of the corresponding structures for these terms recite that "if the currently playing program segment has played for a predetermined amount of time [then the structure will be] resetting the playback position to the beginning of the program segment." However, the parties dispute whether the "predetermined . . . time" is measured using a "start time recorded in a usage log file" (Google's position). (D.I. 159 at 19; Tr. at 93) The parties have an additional dispute regarding the corresponding structure for the double skip back command—i.e., whether the algorithm must determine whether "the currently playing program is *near its beginning*" (as Google argues), or whether the player just needs to assess whether the currently playing program has played for some predetermined amount of time (as PA argues). (*See* D.I. 159 at 19 (emphasis added); Google's Markman Presentation, Slide 35)

Taking up the latter dispute first, Google asserted in its initial claim construction brief that the specification discloses a single algorithm for determining whether a skip back command should restart the currently playing segment or transition to the beginning of the prior segment (i.e., the double back skip command):

> Note that, after any given segment has played for a predetermined amount of time, the BACK command should reset the playback to [the] beginning of the current segment or topic respectively, allowing the user to start the current segment or topic from the

48

**Appx177**

> beginning *unless the playback point is already near the beginning*,
> in which case the transition is made to the prior segment.

('076 patent, col. 15:49-55 (cited in D.I. 159 at 19) (emphasis added by Google))  According to

Google, this disclosure means that:  (1) in response to a BACK command, if the currently

playing program has played for a predetermined amount of time, playback should be reset to the

beginning of the current program; (2) unless such command comes "near the beginning" of the

current program, in which case playback should be reset to the previous program.  (*See* D.I. 159

at 19-20)

In response, PA explained that this passage simply refers to the time interval from the

beginning of the audio segment to the predetermined amount of time.  (D.I. 176 at 11-12; Tr. at

118-19)  In other words, according to PA, this passage is saying that if the BACK command

occurs during the interval between the beginning of the segment and that predetermined amount

of time, then the player will reset the playback to the prior segment.  (D.I. 176 at 11-12; PA's

Markman Presentation, Slide 106; Tr. at 118-19)  But if the BACK command occurs after the

predetermined amount of time has elapsed, the player will reset at the beginning of the current

segment.  (D.I. 176 at 11-12; PA's Markman Presentation, Slide 106; Tr. at 118-19)

Both positions seem possibly correct.  That said, PA notes that both the Eastern District

of Texas and the PTAB construed the structure corresponding to the double skip back command

without reference to whether the currently playing program segment is near its beginning

(instead, the relevant step in those constructions is identical to PA's proposal here).  (Tr. at 116;

PA's Markman Presentation, Slide 107)  PA's expert also persuasively notes that PA's

interpretation seems to be supported by the language of claims 5 and 6 of the '178 patent,

respectively.  (D.I. 177 at ¶ 63)

**Appx178**

Because Google is the party seeking an additional limitation with respect to the structure, and because PA had the more persuasive arguments, the Court will side with PA. That is, the Court will not require the corresponding algorithm for the double skip back command to have to measure whether the currently playing program "is near its beginning."

The Court next turns to the issue of whether the "predetermined . . . time" is measured using a "start time recorded in a usage log file." Both parties seem to agree that responding to a listener's "skip back" command requires measuring the amount of time that a segment has been playing, in order to determine whether the currently playing segment should be restarted, or whether the prior segment should be restarted. (D.I. 176 at 12; D.I. 186 at 9) According to Google, the specification reveals only one way to measure the "predetermined amount of time" that a song has been playing:

> The system responds *to BACK commands* by resetting the playback point to the desired point in the sequence *and recording the start time*, volume setting and new program segment ID in the *log file as indicated at 267*.

('076 patent, col. 15:55-59 (cited in D.I. 159 at 20) (certain emphasis added by Google); *see also* D.I. 186 at 9-10) Step 267 describes responding to a back command including recording the start time. ('076 patent, col. 15:23-24, 55-59) Therefore, Google asserts that either the structure for these functions uses "the start time recorded in a usage log file" to determine whether a skip back command should restart the current segment or start the prior segment, or there is no structure for this function. (D.I. 186 at 10) PA's proposed structure does not include an algorithm for measuring time.

For its part, PA responds that the invention utilizes usage logging primarily to maintain a record of listener behavior for future recommendations and accounting purposes—and *not* for

performing the claimed functions of the single skip back and double skip back commands. (D.I. 146 at 9; D.I. 176 at 12) And it is true that the patent does refer to usage log data as being utilized for accounting of royalty payment records for amounts due to content providers, ('178 patent, cols. 12:2-8, 28:41-54), and for generating program recommendations, (*id.*, col. 24:46-59). Thus, the big question is whether the specification clearly links usage logging to the single skip back and double skip back commands. *See Medtronic, Inc.*, 248 F.3d at 1311 ("Structure disclosed in the specification is 'corresponding' structure only if the specification [] clearly links or associates that structure to the function recited in the claim.") (citation omitted).

The Court is not persuaded that recording the start time in a usage log file is necessary for measuring whether the segment has played for a predetermined amount of time. The passage that Google relies on describes responding to "BACK commands" by resetting the playback point to the desired point in the sequence *and* recording the start time—these seem to be two separate actions. (PA's Markman Presentation, Slide 85) PA also points out that the specification teaches that with respect to usage logging, "it is unnecessary to record the end time for the prior segment since it is the same value as the start time for the next segment." ('178 patent, col. 13:16-18) Therefore, according to PA, the usage log cannot be used to measure whether you are within the predetermined time, since the end time is not recorded until the next program segment begins. (PA's Markman Presentation, Slide 87; Tr. at 109)[26]

If the specification does not disclose usage logging as the corresponding structure for

---

[26] In its decision affirming the PTAB Final Written Decisions, the Federal Circuit seemed to agree that there is no link between the usage logging and calculating the time played. (PA's Markman Presentation, Slide 87a; Tr. at 109-10 (quoting *Google LLC*, 743 F. App'x at 982)).

**Appx180**

measuring whether the predetermined amount of time has passed, where does this leave things? PA asserts that determining the elapsed time of a program "was common among those skilled in the art" and needs no further elaboration. (D.I. 176 at 12)  It notes that the specification discloses a visual indicator showing the elapsed time of the program. ('178 patent, col. 12:43-58; *see also* D.I. 176 at 12)  And during the *Markman* hearing, PA's counsel asserted that: (1) such indicators were common at the relevant time and were "embedded in the time sequencing information of the CD itself"; and (2) the algorithm does not need to recite further detail on this point, other than simply determining the amount of elapsed time. (Tr. at 110-11, 127)

The law requires a specification to "recite the particular structure that performs the function and to which the means-plus function claim is necessarily limited." *Aristocrat Tech.*, 521 F.3d at 1336.  It seems problematic that the specification does not appear to recite structure for measuring whether the segment is within the predetermined amount of time when a back command is received.  According to Google, in such a circumstance, the "relevant claims are indefinite." (D.I. 186 at 10; *see also* D.I. 202 at 2; Tr. at 95, 123)[27]

The Court is not yet prepared to recommend that the terms be found to be indefinite. Prior to opining on that question, the Court would benefit from additional focused briefing on the extent to which the current structure for these functions is sufficient (including citations to analogous cases and expert testimony, if applicable).  Google thus may wish to re-raise this definiteness argument during the summary judgment stage.

## IV.     CONCLUSION

For the foregoing reasons, the Court recommends that the District Court adopt the

---

[27]     Google does not cite to any expert testimony in support of this statement.

**Appx181**

following constructions:

1.      "file" should be construed to mean "a collection of data that is stored and manipulated as a named unit by a file-management or database system"

2.      the "sequencing file" terms should be construed to mean "a file of data that identifies the order in which audio program segments chosen by or for a user are to be played"

3.      For the term "means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence" the function is "in response to a 'Skip' command, discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence." The corresponding structure for this term is: "A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 15, lines 21 to 25 and column 34, line 28 to column 35, line 48. Specifically, this algorithm includes the following steps:

1.      scanning forward in the sequence established by the sequencing file to locate the next Selection_Record of the appropriate LocType;

2.      resetting the CurrentPlay variable to the record number of that Selection_Record; and

3.      fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.

A LocType is a single byte character and an identifier that indicates a characteristic of a selection record."

53

**Appx182**

4.      For the term "means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program" the function is "in response to a single 'Back' command, discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program." The corresponding structure for this term is: "A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269 and 235 and more fully described at column 15, lines 49 to 59. Specifically, this algorithm includes the following steps:

1.      if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment; and

2.      playing the program segment from its beginning.

A LocType is a single byte character and an identifier that indicates a characteristic of a selection record."

5.      For the term "means responsive to the detection of two consecutive ones of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment" the function is "in response to two consecutive 'Back' commands, discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment." The corresponding structure for this term is: "A general purpose computer programmed to perform the algorithm that is illustrated in the flow chart of Figure 3 at items 269, 235, 261, 262, and 278 and more fully described at column 15, lines 49 to 59 and

54

**Appx183**

column 34, line 28 to column 35, line 53. Specifically, this algorithm includes the following

steps:

    1.    in response to a first 'Back' command, if the currently playing program segment has played for a predetermined amount of time, resetting the playback position to the beginning of the program segment and playing the program segment from its beginning;

    2.    in response to a second 'Back' command, if the currently playing program segment has not yet played for said predetermined amount of time, scanning backward in the sequence established by the sequencing file to locate the previous Selection_Record of the appropriate LocType;

    3.    resetting the CurrentPlay variable to the record number of that Selection_Record; and

    4.    fetching and playing the program segment identified by the ProgramID contained in the new Selection_Record.

A LocType is a single byte character and an identifier that indicates a characteristic of a selection record."

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the

loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874,

878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.

**Appx184**

Dated:  January 16, 2019

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

56

**Appx185**



US006199076B1

(12) **United States Patent**
Logan et al.

(10) Patent No.: **US 6,199,076 B1**
(45) Date of Patent: **Mar. 6, 2001**

(54) **AUDIO PROGRAM PLAYER INCLUDING A DYNAMIC PROGRAM SELECTION CONTROLLER**

(76) Inventors: **James Logan**, 18 Castle Hill Rd., Windham, NH (US) 03087; **Daniel F. Goessling**, 43 Davelin Rd., Wayland, MA (US) 01778; **Charles G. Call**, 4 Pheasant Run, Hingham, MA (US) 02043

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/724,813**

(22) Filed: **Oct. 2, 1996**

(51) Int. Cl.[7] ............................... **G06F 15/00**; G09B 5/04
(52) U.S. Cl. ...................... **707/501**; 434/319; 434/320
(58) Field of Search ..................................... 707/501, 513; 434/10, 308, 318, 319, 320, 185, 156; 704/270, 278; 345/328–335, 356–357

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,153,579  * 10/1992  Fisch et al. ..................... 340/825.22
5,810,600  *  9/1998  Okada .................................. 434/185

* cited by examiner

Primary Examiner—Joseph H. Feild
Assistant Examiner—Alford W. Kindred
(74) Attorney, Agent, or Firm—Charles G. Call

(57) **ABSTRACT**

An audio program and message distribution system in which a host system organizes and transmits program segments to client subscriber locations. The host organizes the program segments by subject matter and creates scheduled programming in accordance with preferences associated with each subscriber. Program segments are associated with descriptive subject matter segments, and the subject matter segments may be used to generate both text and audio cataloging presentations to enable the user to more easily identify and select desirable programming. A playback unit at the subscriber location reproduces the program segments received from the host and includes mechanisms for interactively navigating among the program segments. A usage log is compiled to record the subscriber's use of the provided program materials, to return data to the host for billing, to adaptively modify the subscriber's preferences based on actual usage, and to send subscriber-generated comments and requests to the host for processing. Voice input and control mechanisms included in the player allow the user to perform hands-free navigation of the program materials and to dictate comments and messages which are returned to the host for retransmission to other subscribers. The program segments sent to each subscriber may include advertising materials which the user can selectively play to obtain credits against the subscriber fee. Parallel audio and text transcript files for at least selected programming enable subject matter searching and synchronization of the audio and text files. Speech synthesis may be used to convert transcript files into audio format. Image files may also be transmitted from the server for synchronized playback with the audio programming.

**17 Claims, 7 Drawing Sheets**



LENOVO ET AL. -- EX. 1001 -- Page 1



Fig. 1



Fig. 2

RENOVO ET AL. -- EX. 1001 -- Page 3



Fig. 3



Fig. 4



**Fig. 5**



**Fig. 6**

LENOVO ET AL. -- EX. 1001 -- Page 7



HTML File
. . . <IMG SRC="IMGFILE1.JPG"><EM>Television and motion pictures </EM>offer the viewer a rich combination of sights and sounds which effectively convey a large amount of information to the viewer, and hence require an information delivery system having substantial <EM>bandwidth</EM>. Radio programming requires only a fraction of the bandwidth of a <A HREF="target">full-motion video</A> presentation, and is especially suitable for conveying information expressed in text narrative form. Using suitable audio compression techniques, speech can be transmitted over communications pathways of much more limited bandwidth, <IMG SRC="IMGFILE2.JPG">including telephone dial up connections to the Internet, permitting that facility to be used to provide real-time telephone connections between two computers connected via the Internet,<IMGOFF> and play pre-recorded audio files as they are transferred from an Internet server to a suitably programmed client computer. . . .
470
I ImageID
472
J ImgStart
450
H StartLoc
475
E EndLoc
H StartLoc
476
E EndLoc
A Anchor
478
B EndAnchor
L ProgramID
I ImageID
473
J ImgStart
K ImgOff
474
460
Compressed Audio File
"Television and motion pictures"
"bandwidth"
"full motion video"

Fig. 7

US 6,199,076 B1

1

# AUDIO PROGRAM PLAYER INCLUDING A DYNAMIC PROGRAM SELECTION CONTROLLER

## FIELD OF THE INVENTION

This invention relates to electronic information distribution systems and more particularly to a system for dynamically and interactively selecting and playing particular programs from a program library.

## BACKGROUND OF THE INVENTION

The three dominant commercial systems for providing audio programming to a listeners are broadcast radio systems, cassette tape playback systems and compact disk playback systems.

Broadcast radio uses both the AM and FM frequency bands making a large number of simultaneously broadcast programs available on an essentially random access basis. Unfortunately, since most broadcast stations attempting to appeal to the same general listening audience, much of the programming is duplicative and special interest programs are broadcast on a limited basis. In addition, because there is no convenient way for listeners to be aware of the wide variety of materials scheduled for broadcast, most people listen to only a limited number of stations which dependably broadcast the programming considered to be most acceptable. Even when desired programming is found, it must typically be listened to when it is broadcast; that is, at times chosen by the broadcaster and not the listener.

Tape and compact disk audio players offer the listener the opportunity to purchase specific music selections or albums performed by favorite artists and to replay selections from these purchased recording whenever desired. Pushbutton track selection, as well as improved fidelity, has made the CD player the preferred choice of many, despite the cost and inconvenience of purchasing a library of desired disks. Unfortunately, specialized information programming, unlike music, is largely unavailable on tape or disk, and that media is not capable of adequately conveying rapidly evolving information such as local and world news, weather reports, and rapidly changing trade and business information. Although broadcast radio provides adequate, up to the minute coverage of general news topics, specialized information continues to be largely unavailable on any of these three audio delivery systems, not withstanding the fact that radio, tape and CD players continue to be widely used, particularly in automobiles, for general news and music programming.

More recently, "Internet radio" sources has been introduced which make files of audio program material available for downloading on the World Wide Web using conventional web browsers to locate and request specific files which are then played in real time by special programs, including the popular "Real Audio" program offered by Progressive Networks. Although Internet radio systems make it possible to deliver a richly diverse selection of audio programs to interested listeners on request, including specialized information not offered by conventional broadcast media, the use of a visual web browser to search for and then play individual program selections one at a time makes conventional Internet radio players impractical for routine desktop use, and wholly unsuitable for use by an automobile drive.

It is accordingly an object of the present invention to provide easy access to rich selection of audio programming and to allow the listener to dynamically and interactively locate and select desired programming from the available

2

collection in an easy and intuitive way without the need for a visual display screen and using only simple selection controls.

## SUMMARY OF THE INVENTION

The present invention takes the form of an audio program player which automatically plays a predetermined schedule of audio program segments and which further includes simple controls that allow the listener to perform one or more of the following functions:

to skip the remainder of any segment being played in order to listen to the next program segment;

to skip backward to the beginning of the current segment, and then backward again to the beginning of the prior segment on the schedule, thereby replaying any desired segment or search for a previously played segment in the sequence;

to listen if desired to an audio speech announcement describing each segment before it is played, and to skip the forward or backward to the next or prior announcement, thereby immediately obtaining the information needed to determine whether a given segment is or is not of interest;

to listen if desired to an audio speech announcement describing a subject matter categories within which several program segments are grouped, and to skip from category announcement to category announcement in either the forward or reverse direction, skipping all program segments in categories of insufficient interest;

a. to listen to only predetermined highlight passages in any program segment, thereby more rapidly reviewing the highlights only of a program segment with the ability to commence normal playing at any point where the highlight passage reveals information which the listener desires to hear in more detail;

b. to execute a hyperlink jump to a different, cross-referenced position in the program sequence, or to a program segment not specified in the program sequence, and to provide audible cues to the listener to identify passages which identify the presence of a cross-referencing hyperlink.

According to a further feature of the invention, the audio program player plays program segments in an order determined by a session schedule which identifies an ordered sequence of program segments. The session schedule is preferably created in the first instance by a server subsystem which develops and periodically transmits to the session schedule to the player. According to still another feature of the invention, the player subsystem incorporates means for modifying the session schedule received from the server subsystem by adding or deleting specific programs and by altering the order in which the programs are presented.

As contemplated by the invention, the player subsystem includes a control mechanism responsive to commands received from a listener to dynamically alter the sequence and content of the programming material actually presented. More specifically, the player may advantageously incorporate means for skipping the remaining content of any program being played at any time, or returning to the beginning of a particular subject to replay its content. Each given program segment is preferably preceded by a topic description segment, and the program skipping mechanism is the player is preferably adapted to automatically skip to the next topic description, bypassing the intervening program content, whenever a skip command is receive when a topic

US 6,199,076 B1

3

description is being played. Similarly, related topics (program segments) are sequentially grouped together by subject category, and a subject description program segment advantageously precedes each subject collection. When the user issues a skip command at the time a subject description is playing, the player automatically skips all of the program segments (topics) within the described subject and continues by playing the next subject description. In this way, the listener can rapidly skim through subject categories, one at a time, until a desired subject is reached, and then allow the player to play topic descriptions one at a time until a desired topic (program segment) is reached.

In accordance with still another feature of the invention, means are employed for identifying one or more discrete passages within any program segment as being a "highlight," and the player incorporates means operative when the player is placed in a "play highlights" mode for skipping those portions of the content which are not highlights, thus enabling the listener to review only the key points of a presentation, or to more rapidly locate particular passages on interest within the body of a particular program segment.

According to yet another feature found in the preferred embodiment of the invention, a designated portion of a program segment may be designated as a hyperlink anchor from which, at the request of the user, the player jumps to another portion of the session sequence and begin playing a different sequence of program segments. Means are advantageously employed for generating an audible cue signal to inform the listener that a hyperlink anchor is being played, enabling the listener to request that the link be executed. The hyperlink capability may be used to advantage to implement cross references to related information, or to provide an audible menu of alternative programming which the user may select merely by executing the link when the anchor passage identifies other information of interest to the listener. In the preferred embodiment, a stack mechanism is used to allow hyperlinks to be called in nested fashion, so that a hyperlink may be executed from a linked program segment, with each "return" command from the user causing play to be resumed at the program segment from which the last link was performed.

As contemplated by still another aspect of the invention, the player subsystem includes means for identifying a program segment, or a particular passage within a program segment, as a bookmarked item for ease of reference later. In addition, the player system incorporates means for accepting a dictated annotation from the user which associated with any bookmarked passage. This annotation mechanism may be used to particular advantage when the program segments provided to the subscriber include email or voice mail messages, since the bookmarking may be used to identify specific messages, or portions thereof, which require later attention, and the annotation mechanism provides a convenient mechanism for dictating replies and/or specifying actions to be take in response to particular messages or portions thereof.

These and other objects, features and advantages of the present invention may be more completely understood by considering the following detailed description of a preferred embodiment of the invention. In the course of this description, reference will frequently be made to the attached drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block schematic diagram of an electronic program and advertising distribution system which embodies the invention;

4

FIG. 2 is a flow chart illustrating the principle steps followed in the course of the performing the information distribution functions contemplated by the invention;

FIG. 3 is a flow chart illustrating the principle steps performed during a playback session in the illustrative embodiment;

FIG. 4 is an information structure and data flow diagram illustrating the manner in which programming is selected and accounting functions are performed in the illustrative embodiment of the invention;

FIG. 5 is an information structure diagram illustrating the manner in which the program segments are dynamically selected and played in response to the user's preferences and control decisions;

FIG. 6 is a flow chart which describes a preferred procedure for preparing the program content which is distributed to subscribers in accordance with the invention; and

FIG. 7 is an information structure diagram illustrating the manner in which a narrative text file expressed in hypertext markup language (HTML) may be translated in to the combination of an audio speech file, a text file transcript, and a sequencing file used by the player to create a multimedia presentation.

DESCRIPTION OF THE PREFERRED EMBODIMENT

The illustrative embodiment of the invention shown in FIG. 1 utilizes the Internet to provide communications between a host computer indicated generally at 101 and an audio player device illustrated at 103.

Subscriber Audio Player

The player 103 may be advantageously implemented by a conventional laptop or desktop personal computer including a processor (the client CPU 105), a time of day clock 106, and a data storage system consisting of both high speed RAM storage and a persistent mass storage device, such as a magnetic disk memory, the data storage system being used for storing audio, text and image data at 107 and for storing usage data at 109 which records the nature of the programming reproduced by the player 103. The player 103 further includes a sound card 110 which receives audio input from a microphone input device 111 for accepting voice dictation and commands from a user and which delivers audio output to a speaker 113 in order to supply audio information to the user. The program data stored at 107 may advantageously include compressed audio recordings and/or text (files of characters) which may be converted into audio form by conventional speech synthesis programs executed by the client CPU 105.

The sound card 110 is conventional and preferably complies with the recommendations detailed in the *Hardware Design Guide for Microsoft Windows* 95, by Doug Klopfenstein, Microsoft Press (1994), ISBN 1-55615-642-1. The sound card 110 advantageously supports a 44 kHz, 16-bit, stereo codec providing analog to digital conversion of audio input signals from the microphone 111 as well as digital to analog conversion for programming directed to the speaker 111. The sound card provides external connections and hardware support for Microphone-In, Line-In, Line-Out, and Headphones-Out, with volume controlled by the player software (including volume level logging as discussed later in connection with FIG. 3 of the drawings).

To support multimedia capabilities, the CPU 105 should meet or exceed the capabilities of an Intel 486 DX2-66 computer to provide consistently good playback results and the sound card 110 should include a 16-bit digital-to-analog

LENARZ ET AL. -- EX. 1001 -- Page 10

5

converter for playback and a 16-bit analog-to-digital converter for recording. The sound card **110** should further support 8, 11, 22, and 44 kHz waveforms. A frequency of 44 kHz is used for CD-quality sound and fractions of 44, such as 11 and 22, are often used for compressed waveforms meant to save CPU processing. Support for an 8 kHz frequency should be in order to properly support Windows 95 TrueSpeech™ compression, which is optimized for compression and playback of human speech. Using TrueSpeech compression, programs containing largely voice narrative data can be substantially condensed, and users can record annotations and voice mail responses as discussed later.

In addition, the sound card **110** should be capable of reproducing downloaded MIDI (Musical Instrument Device Interface) commands, enabling the system take a MIDI data stream and produce sound according to the compressed files consisting of digital sheet music instructions. Preferably, the sound card should support at least 16-voice polyphony (the ability to play several sounds at the same time), and polymessage MIDI, an capability included in Windows 95 that allows a sound card to receive and batch-process multiple MIDI messages (such as Note On and Note Off). The sound card **110** should also a microphone port for microphone **111**, a speaker-out port (for one or two (stereo) unpowered speakers **113**, and a headphone-out port.

The personal computer CPU **105** is also preferably connected to a conventional personal computer video display **118** and a standard keyboard **119**, as well as a pointing device (such as a mouse, trackball or touchpad, not shown). The facilities provided by the operating system, such as Windows 95, typically includes multimedia support, as noted above, as well as a standard WINSOCK TCP/IP stack and modem dial up driver software to support a SLIPP/PPP Internet connection, as next discussed.

The player **103** further includes a conventional high speed data modem **115** for receiving (downloading) the program information **107** from the remote server **101** and for transmitting (uploading) program selections and preferences as well as usage data in the file **109** to the server **101**. To effect these file transfers, the modem **115** is connected via conventional dial up telephone SLIP or PPP TCP/IP series data communication link **117** to an Internet service provider **121** which provides access to the Internet. The service provider **121** is in turn connected to the host server **101** via a high speed Internet link seen at **123**.

Host File Server

The host server **101** provides a FTP server interface **125** which provides file transfer protocol services to the player **103**, a CGI interface **127** which performs Common Gateway Interface script program execution in response to requests from the player **103**, and an HTML interface **129** which provides hypertext transport protocol (HTTP) World Wide Web server functions to the connected player **103**. The host server **101** stores and maintains a plurality of data files including a program data library indicated generally at **130** consisting of a collection of compressed audio program segments **131**, announcement ("glue") segments **132**, text program segments **133**, image segments **134**, advertising segments **135** and program catalog information **137**.

The compressed audio segments program segments comprise audio voice and music files which may be compressed using conventional compression mechanisms suited to the data being compressed, such as TrueSpeech compression for voice signals and MIDI files for compressed synthetic music reproducible by the sound card **110** as noted earlier.

Compressed voice programming in the database **131** may advantageously be accompanied by text transcripts (files of

6

characters) stored in the text database **133**. Similarly, images stored in the image database **134** may be used to provide a multimedia presentation which combines images reproduced on the display **118** of player **103** with concurrently presented audio at the speaker **113** and/or displayed text. Program segments which present advertising , illustratively shown as being resident in a separate database **135** in FIG. **1**, may likewise consist of audio, text and/or image segments, as may the program segments which provide announcements between program segments as well as audible and visible menu options which the user may select as described later.

As hereinafter described in connection with FIG. **5**, each voice or text program segment preferably includes a sequencing file which contains the identification of highlighted passages and hypertext anchors within the program content. This sequencing file may further contain references to image files and the start and ending offset locations in the audio presentation when each image display should begin and end. In this way, the image presentation may be synchronized with the audio programming to provide coherent multimedia programming.

As contemplated by the invention, information which is available in text form from news sources, libraries, etc. may be converted to compressed audio form either by human readers or by conventional speech synthesis. If speech synthesis is used, the conversion of text to speech is preferably performed at the client station **103** by the player. In this way, text information alone may be rapidly downloaded from the server **101** since it requires much less data than equivalent compressed audio files, and the downloaded text further provides the user with ready access to a transcript of voice presentations. In other cases, where it is important to capture the quality and authenticity of the original analog speech signals, a text transcript file which collaterally accompanies a compressed voice audio file may be stored in the database **133** from which a transcript may be made available to the user upon request.

The host server **101** further stores web page data **141** which is made available to the player **103** by means of the HTML interface **128**. The host server **101** additionally stores and maintains a user data and usage log database indicated at **143** which stores uploaded usage data received from the store **109** in the player **103** via the Internet pathway **123** and the FTP server interface **125**. The user data **143** further contains additional data describing the preferences, demographic characteristics and program selections unique to each subscriber which is developed largely from user-supplied data obtained when users submit HTML form data via the Internet pathway **123** for processing by the CGI mechanism **127**.

The host server **101** periodically transmits a download compilation file **145** upon receiving a request from the player **103**. The file **145** is placed in a predetermined FTP download file directory and assigned a filename known to the player **103**. At a time determined by player **103** monitoring the time of day clock **106**, a dial up connection is established via the service provider **121** and the Internet to the FTP server **125** and the download compilation **145** is transferred to the program data store **107** in the player **103**. The compilation **145** is previously written to the download directory by a download processing mechanism seen at **151** in the server **101**. Download processing, as described in more detail later, extracts from the library **130** data defining compressed program, advertising, and glue segments, and/or associated text program data, based on selections and preferences made by (or inferred for) the user as specified in the subscriber data and usage log database **143**.

KENNO ET AL. -- EX. 1001 -- Page 11

US 6,199,076 B1

7

The download compilation file 145, though represented as a single file in FIG. 1, preferably takes the form of one or more subscriber and session specific files which contain the identification of separately stored sharable files. By way of example, the recommended order and the identification of the program files making up an individual playback session are stored in a session schedule file (to be described in detail in connection with FIG. 5) which contains program identifiers of the program segments to be played during an upcoming session. The player 103 downloads the session schedule file and then issues download requests for those identified program segment files which are not already available in the player's local storage unit 107.

Usage data in the store 109 maintained by the player 103 is preferably uploaded as a file bearing a predetermined file name indicative of the particular subscriber and upload time and stored in a predetermined FTP upload directory. This upload advantageously occurs at the same time the player 103 establishes a download connection to the FTP server 125 as noted earlier, and occurs prior to the download of the compilation 145. Because the upload data from the store 109 in the player 103 identifies program segments desired by the subscriber, program segments newly requested by the user are appended to the compilation 145. Note that, in typical cases, programming in addition to the specifically requested programming will be included in the download compilation, and the transfer of that programming can begin immediately while the newly uploaded user selections and other information are being processed as indicated at 153 to identify additional information to be included in the download compilation.

As indicated at 161 in FIG. 1, the host server upload processing mechanism 153 also provides a number of reports, as described in more detail later, based upon the record of actual player use by individual subscribers and the community of subscribers as a whole. This report processing is advantageously performed on a periodic basis in connection with financial and accounting functions including subscriber and advertiser billing, content provider royalty payment accounting, and marketing analysis processing.

It should be understood that numerous other information storage, processing and communications schemes may be substituted for the preferred Internet server and PC client player architecture shown in FIG. 1. A dedicated host computer which communicates directly with client stations via dial up telephone facilities may be used, and cellular radio, cable modem and satellite links may be used to provide data communications in lieu of the conventional SLIP/PPP telephone and Internet links shown in FIG. 1. To facilitate use of the system in an automobile, a "player" computer may be linked to the Internet via a local communications server computer via a radio or infrared link when the car is parked at the subscriber's home or office. The Infrared Data Association's (IrDA) wireless infrared (IR) standard provides a highly effective, low-cost communications pathway rapidly becoming a standard feature in all notebook computers and PDAs. The IrDA international standard provides interoperability among widely diverse systems, involves no governmental regulation, are provided at low cost, provide high speed file transfers (e.g., 4 Mbs data rates), are small and can be easily incorporated into portable computers of the type which may be used in a car or on public transportation. Alternatively, the files downloaded from the host may be stored on a replaceable media, such as an optical disk cartridge, which may then be inserted into a portable computer or simplified player for mobile use. A direct link between a mobile client player (such as a laptop

8

PC) may be implemented using the Cellular Digital Packet Data (CDPD) service presently available in major metropolitan areas to provide low-cost access to the Internet using the TCP/IP protocol, and provides the advantage that needed program segments can be downloaded while a session is in progress, eliminating the need for a complete download before the mobile unit is disconnected from its data source.

Upload and Download Sequence—Overview

FIG. 2 illustrates the sequence of major events which are executed in the program dissemination system contemplated by the invention.

As indicated at 203, an interested subscriber invokes programming services by first supplying personal information and initial programming preferences during an account initialization procedure. Preferably, as explained in more detail later, account initialization is accomplished by presenting the subscriber with HTML forms to complete and submit to CGC script programs which execute on the server to post subscriber supplied information into an initial user dataset. Based on the information supplied by the user, the server then compiles one or more files for downloading to the subscriber at step 207 which include programming and advertising segments as well as additional data and utility programs needed by the player 103 to begin operation. The download operation preferably occurs at a time established by the player which establishes a dial up connection via the SLIP/PPP serial connection 117 to the local Internet service provider 121 which provides an Internet connection to the host FTP server 125. The download file or files containing programming and advertising segments as well as subscriber specific data are designate by filenames provided by the requesting client/player 103 and moved from storage unit 145 utilizing the FTP server 125 and the Internet connection into local storage at 107 in the client/player 103. The filenames used to specify the files in the server 125 may conveniently be formed from the program_id value used internally by both the host and the player to identify and differentiate the different program segments used.

The data downloaded includes a recommended program sequence file which provisionally identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data by the download compilation processing mechanism seen at 151 at the server.

Before a playback session begins, as indicated at 211, the subscriber has the opportunity to review and alter the provisional program selections and sequence established as a default by the downloaded information from the server. Utilizing the programming data and a utility program previously supplied by the server, the subscriber may alter the selection and sequence of program materials to be played, including altering the extent to which advertising will be played along with the selected programming.

At the request of the user, the sequence of programming defined by the program sequence file (the selections file illustrated at 351 in FIG. 5) is then reproduced for the listener. As contemplated by the invention, the player 103 includes controls which enable the user to easily move from program segment to program segment, skipping segments in a forward or reverse direction, or to jump to a particular segment, and thus alter the preprogrammed sequence. Nevertheless, when any given program segment concludes, the next segment which is specified as following the given segment will begin playing unless the listener intervenes. Thus, although the segments are stored in randomly addressable locations in the local mass storage unit, they are nonetheless played at step 212 in the sequence established

LENOVO ET AL. -- EX. 1001 -- Page 12

US 6,199,076 B1

9

10

initially by the server and (optionally) modified by the subscriber, with the player providing the ability to dynamically switch to any position in this sequence under the listeners control. As indicated at **213** in FIG. 2, the listener may at any time return to the sequence editing step **211** to manually reorder the playing sequence if desired. As indicated at **215**, a session usage log is recorded during the playback session to identify every segment actually played, the volume and speed at which that segment was played, and the start and end times.

At step **211**, in addition to deleting and reordering items on the program schedule, the user may alter his or her selections and general subject matter preferences to control the manner in which the host assembles program schedules for future sessions. When programs are included in a current schedule which are of particular interest, the subscriber may assign a priority value to the scheduled program and, in that way, inform the host that the user has an interest in receiving more programming in the same subject matter categories in which the identified program is classified. When a program in a serialized sequence is assigned a new or different priority value at step **211**, the host system **101** assigns a corresponding Importance value to the program_segment record for each of the remaining unplayed programs in that serialized sequence. Note that, by expressly approving advertising segments or categories of acceptable advertising in this fashion, the subscriber may be granted a rate reduction since advertisers are generally willing to pay more for advertising directed to customers having a known interest in a given subject.

At the conclusion of a session, subscriber is given the opportunity at **217** to select programming which should be included in the next programming download. To facilitate this selection process, additional programming which fits the subscriber's indicated subject matter preferences, along with additional programming which the server includes as being of particular interest, is identified in a catalog (as periodically supplemented by a download file seen at **308** in FIG. 4) and presented to the user in the form of a proposed program schedule together with a catalog of additional selections which may be substituted or inserted into the proposed schedule. At step **219**, the selections made by the user at **217** as well as the contents of the usage log recorded at **215** are uploaded to the server as a requested file (seen at **301** in FIG. 4). This upload step may occur at the same time the SLIP/PPP dial-up connection is established by the player **103** to accomplish the download, with the upload occurring first by an FTP file transfer from the usage data store **107** to the FTP server **125** followed by the downloading of files requested by the client **103** from the FTP server.

In a addition to the downloaded catalog of available item s which may be viewed by the subscriber from the available downloaded information, the user may re-establish an Internet connection to the HTML web server **129** which presents HTML program selection and search request forms, enabling the subscriber to locate remotely stored programming which may be of particular interest to the subscriber. When such programs are selected in the HTML session, the user's additional preferences and selections may be posted into the user data file **143** and the identification of the needed files may be passed to the client/player **103** for inclusion in the next download request.

Account Initialization

As contemplated by the invention, a subscriber account may be established by any user having a personal computer equipped to provide the capabilities needed to implement the player **103** as described above, together with Internet access

via a service provider **121**. Although a conventional modem dial up connections will perform satisfactorily, the time required for uploading and downloading the necessary files may be substantially reduced using higher speed access, such as an ISDN or cable modem link, when those services are available.

To establish a new account, a prospective subscriber may use a conventional web browser program, such as Mosaic, Netscape Navigator or Microsoft's Internet Explorer, which executes in the client CPU **105** to establish a conventional HTTP request/response dialog with server **101**. The account initialization begins with the transmission of an HTML form from the web page store **141** which is completed by the user at the keyboard (not shown) of the client CPU **105**. The account information is then transmitted to using a HTTP post method directed at a form processing CGI script executed by the server at **127** to place descriptive information about the user in an assigned user data file as seen at **143**. After the account has been established, utility programs and data may be downloaded from the FTP server **125** to the client/player **103**. These utility programs advantageously include programs which perform functions including (a) program decompression, playback and navigation; (b) recording of a usage log file identifying the program and advertising segments played and the start time, ending time, volume level and playing speed for each such segment; and (c) the selection and updating of programming preferences and selections for future downloading.

The data fields supplied by a new subscriber at the initialization step **203** may advantageously include the user's full name and billing address, credit card information or the like for use in subscriber billing; and descriptive data about the subscriber (and others who may share the downloaded material), such as: age, profession, sex, and marital status; the identification of subject matter categories of interest to the subscriber, preferably with assigned weighting factors indicating the level of interest in each category. The subscriber may also indicate general preferences with respect to the including advertising, including an indication of the amount of advertising which is acceptable to defray subscription costs, ranging from fully advertised programming for minimum subscription charges to the complete exclusion of advertising.

In addition, the subscriber may request and be presented with an HTML form which lists available programs in a particular selected subject matter area, with a priority weighting factor pre-assigned to each in accordance with the subscriber's previous specification for that category. The form presented thus reflects the previously entered level of interest weighting factor for each program based on its subject matter category, but permits the subscriber to override the suggested default value on a program by program basis. Similarly, the subscriber is given the opportunity to override the default amount of advertising desired.

Advertising may be associated with particular subject matter categories as well as with particular programs. For example, an airline may wish to advertise generally in connection with programming in the "travel" category whereas a particular resort hotel may wish to advertise only in connection with a particular travelogue program for the region where it is located. Subscribers may wish to hear advertising in connection with the programming in the travel category, but to eliminate commercials from a daily program presenting "today's weather report." The result is clearly advantageous for the advertiser, since advertising is focused more clearly on those having an interest in the subject matter and an expressed willingness to listen to commercial

LENO ET AL. -- EX. 1001 -- Page 13

US 6,199,076 B1

11                                                                          12

messages, while the subscriber is able to receive advertising which may be regarded as useful while eliminating unwanted advertising.

Because personal data describing each subscriber's subject matter interests is available, along with personal data (age, marital status, zip code, etc.), particular advertising segments may be directed to only those subscribers having a likely interest in the goods or services advertised. This targeted advertising need not be presented at any time during the playback for the designated subscriber and need not be timed for presentation with particular programs. For example, a subscriber indicating an interest in travel programming may be supplied with advertising from an airline at any time, and not necessarily concurrent with selected travel programming.

Because a subscriber may have a particular interest in or enjoy some advertising, and may have a particular dislike for other specific advertising, the user may advantageously be presented with a listing of advertising organized by advertiser and subject, providing the subscriber with the opportunity to select additional desired advertising on the list while suppressing others. Since the voluntary acceptance of advertising preferably reduces the programming charge to the subscriber, the utility program which executes on the client CPU **105** to enable program and advertising selection, sequencing and editing preferably provides an advisory indication to the subscriber of the charges or credits to be accrued if the currently programmed sequence is played. This feature enables subscribers to better control the costs of the service by accepting sufficient advertising content to reduce the subscription cost to an acceptable level. Subscribers may also set a player system variable to a value indicating the subscription costs per unit time that the subscriber is willing to accept, and the player **103** can then automatically insert advertising segments between program segments in sufficient quantity to achieve a net charge at the desired level.

Player Operation

The playback operation indicted generally at **212** in FIG. 2 is illustrated in more detail in FIG. 3.

In order to limit access to the downloaded programming materials to the subscriber or persons authorized by the subscriber, the playback utility program executing on the client CPU **105** (FIG. 1) advantageously begins the session by requesting the entry of a password as indicated at **231**. The entry of this or a different password may also be required for access to the utility programs used to modify the subscriber's personal data, future program selections, and current program selections and sequencing. Similarly, information which might be revealed concerning an individual subscriber by the host server **101** is advantageously password protected.

As with all Internet transactions, the actual data transmissions of information other than publicly available programming may also be encrypted. To this end, the client and server ends of the pathway may exchange public keys to enable encrypted transmission using conventional RSA encryption. By placing the decryption capability within the capability of the playback unit which is capable of directing decrypted content only to the system's speakers and display screen, but not to a file, the system insures that the internal usage accounting mechanism cannot be bypassed by reproducing downloaded program segments using other means. In addition, and as a part of this secure accounting arrangement, the host system can be programmed to require the receipt of an uploaded usage log (from which subscriber and advertising charges and content provider payments can

be determined) before releasing additional programming materials for downloading from the FTP server **125**.

As described in more detail later in connection with FIGS. 4 and 5, the sequence of program segments to be presented to the user is formed into a schedule file (seen at **307** in FIG. 4) consisting of a sequence of program segment identification numbers which are used to compile a sequencing file, called the selections file, illustrated at **351** in FIG. 5, which contains more detailed information about the sequence of events which occur during playback. The player obtains information from the selections file which identifies the individual program segments to be fetched from mass storage and played for the user, as well as the segment identification information which is recorded in a usage logging file in the manner illustrated in FIG. 3.

As indicated at **233**, the playback session begins with the presentation of an audio (and/or displayed) menu which allows the user to jump to any program segment within that sequence to start (or resume) playback at **235**, or terminate the session at **236**.

The playback operation itself continues from the designated playback point in the selections file (seen at **351** in FIG. 5) which follows a program sequence initially created by the host server and downloaded with the program segments themselves, and then (optionally) modified by the addition, deletion and re-sequencing of segment identifiers as discussed earlier in connection with step **211** in FIG. 2. Note however that, if the user elects to have advertising segments automatically inserted between program segments to achieve a predetermined cost level, that insertion occurs under the control of the playback mechanism at **235** such that advertising segments not identified in the selections file may be added or advertising segments specified in the selections file may be automatically skipped.

As playing progresses, the current playback position may be advantageously indicated by a variety of means. In the most simple form, the current playback position within the session file of selections (discussed in more detail in connection with FIG. 5) may be indicated by a simple numerical readout indicating the position on a scale of 1–100. In this way, a user listening to the programming in scheduled order is provided with an indication of the duration of programming remaining to be played. In a player implemented by a personal computer provided with a screen display, the current playback position may be advantageously indicated by displaying the program segment topic descriptions in a scrolling listing, with the description of the program currently being displayed being highlighted. The scheduled duration of each program segment may be displayed, along with the elapsed time remaining to be played in the currently playing segment, to enable the user to more easily determine when to skip the remainder of the currently playing segment. When such a concurrent visual display is available, means may also be included to respond to the users selection of a given program on the scrollable listing by means of a mouse or the like, and then automatically continue the play at the beginning of the program segment thus selected.

Each time the playback begins a new programming, advertising or announcement segment, the segment start time is recorded in the usage log file stored at **109** (FIG. 1). Each usage log record contains a program segment identification number (ProgramID) obtained from the selections file as well as a start time and date stamp encoded into a 32 bit date-time value, a volume level setting indicating the volume at which the player was set at that time, and a playing speed value indicating the playing speed or playing being used.

LENNO ET AL. -- EX. 1001 -- Page 14

US 6,199,076 B1

13

14

As indicated at **237** in FIG. **3**, each time a new program segment is started, a new segment handling procedure is executed at **239**. If the user desires to have advertising inserted to defray the costs of the subscription, the current actual cost per unit time is calculated and compared with the desired cost per unit time. If the cost is determined to exceed the desired level, an additional advertising segment is started; otherwise, the next program segment in the program sequence **214** is played. In either case, the segment id of the newly starting segment is recorded in the log file along with the start time for that segment. Note that it is unnecessary to record the end time for the prior segment since it is the same value as the start time for the next segment. When play is concluded, a terminating record indicating the time of turn-off is recorded to enable the duration of the last segment to be calculated.

Recording Volume and Playing Speed Changes

As indicated at **251**, if the user changes the volume level or playback speed by a significant amount, a new record is posted to the usage log at **253**, indicating the continuation of the last program at a new volume level (thus producing two records in sequence having the same program segment ID numbers but having differing start times and volume levels). The user adjusts the volume by means of a software control displayed when the player is active. The user adjusts the control using the mouse or keyboard to adjust the volume. When the volume control experiences a change in level greater than a predetermined deviation, it sends a message to the player routine at **251** to cause the new volume level to be recorded at **253**. New volume settings do not affect the program sequence and the recording of the volume level change takes place transparently to the user. Likewise, when the user changes the playing speed, or switches to highlight mode, the new playing speed setting is recorded (using the PlayingSpeed variable in a Usage Record, to be discussed)

The cost accounting program which calculates subscriber charges and fees to advertisers may thereby treat volume levels below a predetermined threshold level, or playing speeds in excess of a certain level, as being equivalent to skipped programming. In addition, if a subscriber reduces the volume on selected programs or programs in particular subject matter categories, frequently increases the volume for other programs or subject matter categories, or sets the playing speed to play highlights only of other programs, that data can be used to infer preferences and dislikes which can be used to better select desired programming to be included in future download compilations.

User Playback Controls

The player mechanism seen at **103** includes both a keyboard and a microphone for accepting keyed or voice commands respectively which control the playback mechanism. As indicated at **261**, the receipt of a command, which may interrupt the playback of the current selection, and the character of the command is evaluated at **262** to select one of six different types of functions.

The player **103** responds to the first command, "Accept" indicated at **263**, by temporarily suspending the playback in order to accept a spoken "comment" from the user which is recorded as indicated at **264**. After the conclusion of the comment, control is returned to **261** to test for additional commands before playback is resumed at **235**. As described in more detail later, comments dictated by the user are saved and later uploaded to the host system where they exist as program_segments. By allowing the user to dictate and record comments, the system provides a number of useful capabilities, including posting comments and messages to the host (requests for help or additional information), post-

ing comments and messages either privately or publicly to the originator of a program segment being played, thereby enabling private interchanges to occur between users, to enable the interchanges to take place in publicly available threads analogous to the UseNet and Listserv newsgroups employed on the Internet to facilitate public discussions related to predetermined topics. In addition, the ability to accept and upload user-generated comments and information provides a valuable mechanism by which the user can evaluate and comment on the program material being provided by the host. As described later in connection with FIGS. **5** and **7**, the mechanism seen at **263** and **264** for introducing a pause in the session playback while a voice response or comment from the user is recorded can also be employed to produce program generated prompts which request information followed by automatic response recordings, thereby enabling the system to be used to collect data, program evaluations, and other information from the user.

A first command, "Go" indicated at **265**, causes the player to make an immediate shift to a different program segment. For example, the spoken voice command "FIVE" can indicate a request to go to a predetermined numbered program segment while the spoken command "NEWS" could switch to the subject announcement segment for news programs. Alternatively, a mouse click on a screen-displayed menu of items, or a push-button on a hand controller connected by an infrared link to the player computer, could similarly be processed as a command to go to a predetermined program segment associated with that command signal. In such cases, the system records the start of the new segment on the log file (seen at **215** in FIG. **2**) at **267** and switches the current playback position in the program sequence file **214** to the new setting at **269**, and the playback continues at **235**.

In the preferred arrangement, described in more detail in conjunction with FIG. **5** of the drawings, the program being played may contain passages which relate to other program segments in the compilation. These passages may be indicated by direct announcement, such as: "Say 'Go' when any of the following automotive companies are named to obtain additional information: . . . Ford . . . General Motors . . . Chrysler . . . Honda . . . " Alternatively, an audible cue signal, such a distinctive tone or chime, might immediately precede a passage which anchors a link to another program segment. Players equipped with stereo audio output capabilities can make cues distinctive by playing cued segments in one stereo channel, with or without a supplemental cue signal in the other channel. When a cue signal indicates a hyperlink passage, a simple "Go" voice command causes the player to reset to a new location from which playing continues until a "Return" command, seen at **266**, causes the player to return to the original sequence.

As discussed later in connection with FIG. **5**, hyperlinks of this type may be used to identify program segments which are not available in the player **103** because they were not downloaded for inclusion in a scheduled session. In that event, the "Go" handling routine seen at **265** posts a record to the usage log containing the ProgramID of the requested but unavailable segment so that the requested segment can be included in the Requested file **301** seen at **301** in FIG. **4**.

When a communications pathway such as an Internet or cellular phone link is available to connect the player **103** to the server, an immediate request may be sent to the server to download a needed but locally unavailable segment. In that case, the downloading and playing may proceed concurrently by placing the downloaded information into a memory buffer to which the downloaded program segment

MARINO ET AL. -- EX. 1001 -- Page 15

US 6,199,076 B1

15

16

is written as it is concurrently read for reproduction as described U.S. Pat. No. 5,371,551 issued to James Logan and Daniel F. Goessling. To eliminate breaks in the program sequence, the player **103** may advantageously perform a look-ahead operation, sending a file request to the file server via the communication link by pre-scanning the program sequence file **214** to identify program segments to be played which are not in local storage and requesting those segments before they are needed.

Because announcement or "glue" segments are frequently repeated in different program segments, these segments are preferably retained in local storage by the player to avoid the need to be downloaded. The player advantageously processes the usage file at the end of each session and tags each program segment which has been played as being eligible for replacement to make room when necessary for incoming segments. Announcement segments, however, are preferentially retained even though they have been played because of the higher probability they may again be included in upcoming session schedules.

The third command, the SKIP command indicated at **275** in FIG. **3**, causes the player to advance to the beginning of the next program segment in the program sequence, recording the start of the next sequence at **267** and resetting the playback position at **269**. If the program segment has been subdivided (e.g. into paragraphs), the SKIP command causes the player to skip forward to beginning of the next subdivision within that segment. If desired, SKIP commands may be subdivided into two types, a SKIP TOPIC command and a SKIP SUBJECT command. When programming material such as news reports are grouped into topics within subject categories, as described later in connection with FIG. **5**, a SKIP SUBJECT command allows the user to skip over all program segments within that subject and resume playback at the leading description of the next subject. In contrast, the SKIP TOPIC command always advances to the next topic (program segment or program segment subdivision) in the sequence. If desired, the SKIP TOPIC command can produce a jump to the next program segment or subdivision which does not contain advertising, making it unnecessary for the listener to listen to advertising while scanning the program sequence for the next desired program segment.

The BACK command indicated at **278** operates like the SKIP command but in the reverse ("rewind") direction. Similarly, the BACK command may be subdivided into two commands, a BACK SEGMENT and a BACK SUBJECT command, which respectively reset the playback point to the beginning of the prior segment or the beginning of the prior subject description. Note that, after any given segment has played for a predetermined amount of time, the BACK command should reset the playback to be beginning of the current segment or topic respectively, allowing the user to start the current segment or topic from the beginning unless the playback point is already near the beginning, in which case the transition is made to the prior segment. The system responds to BACK commands by resetting the playback point to the desired point in the sequence and recording the start time, volume setting and new program segment ID in the log file as indicated at **267**.

In the preferred form of the invention described in more detail in connection with FIG. **5**, the context sensitive SKIP and BACK commands are used instead of the SKIP TOPIC, SKIP SUBJECT, BACK TOPIC and BACK SUBJECT commands discussed above. In the preferred arrangement, the program materials include subject and topic announcement program segments in addition to the program segments (both programming and advertising). When the user issues a SKIP or BACK command while the player is playing a subject or topic announcement, the player skips the entire subject or topic being announced and moves to the next subject or topic announcement respectively, automatically bypassing the intervening program segments which comprise the skipped subject or topic.

The fifth command, a "MARK" command at **280**, is used to place a "bookmark" into the usage log which identifies a program segment, or a portion of a program segment, which the listener wishes to designate for future use. In its simplest form, the bookmark recording function indicated at **281** may simply record a bookmark and the Program_ID of the current program segment into log file. By bookmarking a program segment, that segment may be recalled by the subscriber and all or part of it saved for later use in local storage, from which it may be reproduced, forwarded as an attachment to an email message, and the like.

More elaborate bookmark functions which may be readily incorporated into the system if desired include the following:

Dictating or keyboarding an annotation at a predetermined position in the bookmarked program segment, the annotation being saved in local storage so that, when the bookmarked program segment is reproduced, it will include the annotation. The bookmarked program segment and the annotation may then be saved as a unit for future reference or forwarded to another person.

Bookmarked program segments, or annotations to bookmarked program segments, may be used in conjunction as an auxiliary audio voice mail and email handling system in which a subscriber's email and voice mail items are organized as topics in the playback session, enabling the subscriber to bookmark particular incoming messages (program segments) for further attention, or to dictate voice mail responses, or responses that can be converted to text form by a human typist or by a voice recognition system. This aspect of the present invention allows the subscriber to review and respond to incoming email and voice mail messages while commuting or traveling to more productively utilize travel time. Voice annotations may be stored in separate files which are uploaded to the host with the usage file and keyed to the program segment passages which they annotate by records in the usage log file.

The sixth command type, the "MENU" command indicated at **283** in FIG. **3** switches the player to a predetermined menu program segment, records the start of a menu mode state in the log file at **285** and places the player in the menu mode at **233**. Using a hands free voice command system, the player may reproduce a menu program segment in which a sequence of options are enunciated on the system's audio output speaker with short pauses between the recited options. By providing the voice command "Go" during or shortly after a desired option, the user may cause the system to branch to that selection. Menu options of this type may be conveniently implemented using the hyperlink capability described later in connection with FIG. **5**. Alternatively, as noted earlier, the menu of options may be displayed on the screen with the desired playback point being selected using the keyboard or a pointing device. In all cases, each transition to a new program segment is recorded into the usage log for later uploading to the server and subsequent processing.

Program Compilation & Billing

FIG. **4** illustrates the principle data processing steps and information structures employed by the preferred embodiment of the invention to compile programming information

App. 201    LIZVO ET AL. -- EX. 1001 -- Page 16

US 6,199,076 B1

17                                                  18

personalized to the preferences of individual subscribers, to perform accounting functions which produce billing charges to subscribers and advertisers, and to determine royalty payments due to content providers.

The program, advertising and announcement segments to be made available to an individual subscriber include those program selections which the subscriber chooses from the supplied catalog of recommended programs, or additional selections chosen during a dial-up dialog with the host, as described above in connection with step **217** seen in FIG. **2**. The selections made by and uploaded from the subscriber take the form of a file (sequence) of 32 bit integers, each integer (ProgramID) designating a particular program segment. This file of integers is placed in a relational database Requested Table seen at **301** in FIG. **4**, with each row (record) in the Requested Table being an identification number which specifies a corresponding record (row) in a database table **303** called the Programs Table. The Requested Table **301** includes not only express requests from the user based on catalog selections but also requests which result from failed hyperlink requests which occur when the listener requested hyperlinked information during the session which was unavailable in local storage at the player. The program segments (which include programs, advertising and announcements) have a plurality of attributes which are described in the data fields of each record (row) in the Program Table **303**. The following Pascal type declarations define the content of each record in the Programs Table **303**:

```
Type
    Classtype = (advertisement, program, announcement);
    Program_Segment = record
        ProgramID: integer; { unique key }
        ProviderID: integer;
        Class: Classtype;
        URL: pchar;
        Created: datetime;
        SubjectDesc: integer;
        TopicDesc: integer;
        GroupID, Episode: integer;
        CommentOn: integer;
        Subjects: array[0..15] of integer;
        Importance: array[0..15] of integer;
        Youngest, Oldest, male, female: byte;
        HouseLow, HouseHigh: byte;
        Duration: integer;
        Plays: integer;
        TotalTime: double;
        PlaysRate, TimeRate: integer;
        Timeliness: integer;
    end;
```

Each Program_Segment record in the Programs Table **303** is identified by a unique key integer value, ProgramID, which is the primary key value upon which the Programs Table **303** is indexed and accessed. The Program_Segment records in the Programs Table **303** are relationally linked using the ProgramID key to other tables including:

the Requested Table **301** discussed above,

a Schedule Table **307** which contains the recommended sequence of program segments for the next playback session,

a New_Catalog Table **308** which contains the identities of new available program selections to be added to the subscriber's catalog of available programming, and

an Advertisements Table **311** containing entries which describe advertising program segments to be brought to the attention of the subscriber.

The relational database system employed by the preferred embodiment of the invention further includes a Subscribers Table **313** which contains information describing each subscriber, a Content_Providers Table **315** containing information about each person or firm which supplies royalty-bearing information for dissemination to subscribers, and an Advertiser Table **317** which contains information about each advertiser that provides advertising program segments to subscribers. Mailing addresses and other information for subscribers, content providers and advertisers is contained in a single Account Table **321** to simplify the data structures needed.

A Usage_Log Table seen at **333** is uploaded from the subscriber, typically at the same time the express program requests in the Requested Table **301** are transferred, and processed at **350** to update the Subscribers Table **313**, the Content Providers Table **315**, the Advertisements Table **311**, the Programs Table **303**, and the Requested Table **301** as described below.

Program Schedule Generation

In accordance with the invention, the host server receives and supplements the user's initial selection of a sequence of desired programs, first by adding the program selections specified in failed hypertext requests as indicated by the Usage_Log Table **333** during usage log processing at **350**, and then by adding advertisements, announcements and additional program segments tailored to the subscriber's known preferences as indicated at **340** in FIG. **4**, thereby producing the recommended Schedule Table **307** which is transferred to the subscriber, along with program segments, during the download transfer. Indeed, if the subscriber provides no selections at all, the host will prepare a Schedule Table **307** containing program segment selected entirely by the host on the subscriber's behalf. The programs, advertising and announcement segments which are added to the Request Table **301** to form the Schedule Table **307** are determined by a matching procedure **342** which may be better understood by first considering the content of the data structures which provide data utilized to make those selections.

The Programs Table **303**, as noted above, contains Program_Segment records which describe the nature of each programming, advertising and announcement segment in the library which is potentially reproducible by the player **103**. As illustrated by the type declaration above, each Program_Segment record specifies the account number (ProviderID) of the advertiser or content provider if any who may be charged or compensated for the actual playing of the program segment by subscribers. The record further contains a Classtype variable Class which indicates whether this segment is an advertisement, a program, a comment or an announcement.

The Class variable may also used to further subclass each program segment; for example, program segments which hold user-recorded comments may be designated as being "public" comments made generally available to all subscribers, "private" comments to be directed solely to the provider of the program_segment commented upon, and "host" comments to be directed to the host system.

The Program_Segment record's URL field specifies the location of the file containing the program segment in the file storage facility indicated at **304** in FIG. **4** (i.e., normally on the FTP server **125** seen in FIG. **1**, but potentially including storage areas on the web server **141** or at any other accessible location on the Internet). In addition, the subscriber may wish to designate for future play a program segment already loaded into the player **103** by virtue of a prior

Appx202    DEWO ET AL. -- EX. 1001 -- Page 17

**19**

download. The subscriber may elect to include an already loaded file because it was not reached in a prior playback session or because the subscriber wishes replay the selection. In that event, the ProgramID of such a selection is nonetheless included in the uploaded selection list (Requested Table **301**), recognizing that at the time of actual download, the player **103** will only request the transfer of those program segments not already present in local storage. The uploaded Requested list **301** should accordingly be understood to be indicative of the requested content of a future planned playback session and not necessarily a listing of programs to be downloaded. The selection of files to download is preferably made by the player which issues FTP download requests from the server by specifying the URLs of the needed files.

The Created field contains a timestamp value specifying the data and time of day the program segment was created. In Created field allows user or host to select program segments by date and permits the listing of segments in chronological order in program catalog listings.

The Program_Segment record further contains a Subject-Desc field and a TopicDesc field, both of which take the form of ProgramID integers which identify other program segment records which contain detailed information on audio announcement and displayable text descriptions of subjects and topics. The descriptive text files for subjects and topics are displayable by the player **103** as part of descriptive catalog entries which enable the user to choose desired segments. Together, the subject and topic program segments provide a hierarchical catalog listing which provides the descriptive information about the associated content segments which enables the subscriber to make informed selections. The text specified by the SubjectDesc and TopicDesc fields may be searched using conventional keyword searching techniques to permit the subscriber to locate and identify particular programming of interest from the locally stored catalog or, in a dial up CGI interaction with the host, to list and select programs from the larger library available on the server.

Serialized Programs

As contemplated by the invention, programming may include serialized sequences of programs. A given program segment may represent an episode in a series which is selected as a group by the subscriber, or a subscriber may select an individual program in a serial sequence and the host may then further installments or related programs within the series to the catalog or session content thereafter sent to the subscriber. The Program_Segment record contains a GroupID field which specifies the series as a whole, and an Episode integer field specifies the position of the given program segment within the serialized sequence. When a serialized sequence is requested, the host may download the entire series in one download for playback at requested intervals, or less than all of the episodes when all are not yet available or when it is desirable to limit the total download content. When a subscriber selects and plays a given program segment, as indicated in the usage log, without having expressly selecting the entire series, the host may then add the next installment to the catalog or the next proposed session. If desired, a hyperlink (to be described) may be placed at the conclusion of each installment which specifies the next installment as the linked program segment. In this way, the listener may request that the next installment be played immediately (if it is available) or included in the next installment (if it is unavailable and the hyperlink fails).

The usage log may be employed to insure that the subscriber has an opportunity to hear episodes that may have

**20**

been skipped. By monitoring the usage log, if an episode included in any given proposed session was not in fact played, the host may include it in the next proposed session as well. Note further that the serialization mechanism which has been described can be used to provide serialized advertisements to a subscriber, insuring that a subscriber does not hear a particular ad twice and further insuring that the advertising is presented to the subscriber in the intended sequence.

In addition, the serialization mechanism may be used to provide sequential presentation relationships between related programs. For example, if a subscriber indicates an interest by selecting and actually playing a program on an evolving topic; for example, a news story about the America's Cup yacht races, further new stories on that topic may be assigned the same Group ID number so that they are automatically routed into the subscriber's catalog or program session if space is available.

Fields Supporting "Comments"

Serialized programs are related to, but should be distinguished from, the parent-child relationships that exist between program segments and the annotations and comments made on those program segments by users. As noted earlier with respect to the Accept command seen at **263**–**264** of FIG. **3**, the player **103** of FIG. **1** permits the user to create an "annotation" or "comment" (typically in the form of a recorded audio message or a keyboarded text message) which is uploaded to the host **101** and stored as a program segment. The CommentOn field of the Program_Segment record contains the Program_ID of the program segment commented on, the Provider_ID field identifies the subscriber generating the comment, the Created field specifies the date and time when the comment was recorded, and the default values of the subject matter fields (discussed next) are copied from the subject matter fields of the program segment being commented on. These field entries provide a mechanism for supporting the comment handling features which are described in more detail below under the heading "Comment Handling."

Program Selection

The Program_Segment record further includes a Subjects field which is an array of 16 integers, each of which may be a non-zero code value indicating a predetermined subject matter categories, allowing each programming segment to be matched against like codes specified as being subjects of interest by the subscriber, as well as codes indicating subjects to which advertised goods and services may relate.

The Program_Segment record also contains an Importance field which is also an array of 16 integers which (at least initially) holds an integer containing the reviewer/editor's assessment of the "importance" of the program segment relative to the subject matter code specified in the corresponding cell in the Subjects array. Thus, if Subjects [7]=12345 and Importance[7]=231, this program segment has been assigned a importance level of 231 with respect to the subject specified by code 12345. Another segment may also be relevant to the same subject, but with a different level of importance to that subject. These fields may be used by the host as a weighting factor used to route programs of greater probable interest to the subscriber. Note also The "importance" value associated with any given program may also be adaptively altered based on the actual use as reflected by the usage logs and by subscribers' catalog selections. By way of example, program segments which are started but frequently skipped while in progress may have their importance value decreased while program which are frequently selected from the catalog and listened to may have their

US 6,199,076 B1

21                                                                22

importance values increased. In this way, the system adaptively learns, for each category or programs, which programs subscribers have found to be of interest and which ones were seldom used. Serialized programs (identified by a common Group ID) may be assigned importance values based on the actual usage of earlier episodes in the same series. Thus, when a series proves to be popular based on repeat selections of its episodes, all episodes (including those not yet issued) may be assigned a higher importance value.

The Youngest and Oldest fields (each storing a byte value 0–255) contains an indication of the age range to which a particular program segment should appeal. Similarly, the byte values Female and Male allow the entry of an estimate of the relative interest of a given program to the different sexes: thus, a program devoted to sports news could be assigned the values Female=60, Male=170 where the value 127 would indicate gender-neutral content. The MaritalStatus field is a single character ("S"=single, "M"=married, "W"=widowed, "D"=divorced).

The fields HouseLow and HouseHigh represents a range of household sizes range that may have a special interest in the program segment. Thus, programming directed to family interests may be directed to subscribers who are married with a household size equal to 3 or more.

The Duration field of the Program_Segment record specifies the duration of the program segment expressed in seconds. The Plays field is an accumulator field which is incremented by incoming Usage_Log records to reflect the total number of times a given program segment has been actually played by all subscribers. Similarly, the TotalTime value represents the total time a given program segment has been actually played by users. Together, these records can be used to determine the advertising fee due from the advertiser, or royalty amount payable to the content provider (the advertiser or content provider being specified the ProviderID field) for the use of this segment.

The Program_Segment record contains two signed integer values, PlaysRate and TimeRate, permitting an advertising charge or royalty payment (Amount) to be calculated as a value calculated by the executable formula:

$$Amount := (Plays*PlaysRate) + (TotalTime*TimeRate)$$

If PlaysRate=0, the amount of the royalty or advertising fee for actual use of the segment can calculated based solely on the actual time duration of the played segment (so that little credit or charge is assigned if the segment is begun but then skipped). Alternatively, if TimesRate=0, the charge can be based solely on the number of times playing the segment was commenced, which may be deemed appropriate when it may be considered the responsibility of the advertiser or the content provider to hold the user's attention once a segment begins. Note that, as usage records are posted to increment the Plays and TotalTime fields in the Program_Segment records, as described later, any program segment which was played for less than a predetermined minimum amount of time may be disregarded, enabling the subscriber to "surf" through selections while listening to minimal information per segment without incurring subscription charges or generating advertising fees or royalty payments.

Program segments are selected for inclusion in the output Schedule Table 307 and/or the NewCatalog Table 308 by comparing the content of the Programs Table 303, the Subscribers Table 313, and the Advertisements Table 311. The fields contained in the Subscribers and Advertisements Tables are set forth in the following Pascal record type declarations:

```
Account = record
    AccountNo: integer; { Unique key }
    Name, Title, CompanyName: pchar;
    Addr1, Addr2, City: pchar;
    State: string[2];
    Zip code, AreaCode, Phone, Fax, Email: pchar;
    end;
Subscriber = record
    AccountNo: integer;
    Birthdate: Date;
    Sex, MaritalStatus: Char;
        HouseholdSize: byte;
    Interests: array[0..15] of integer;
    TopChoices, ChoiceCounts: array[0..15] of integer;
    ChargeLevel: byte;
    DataRate: Integer;
    Capacity: Integer;
    WeekDays: array[0..6] of Compilation;
    end;
Advertisement = record
    ProgramID: integer;
    AccountNo: integer;
    DemographicMatch: function_id;
    DemographicWeight: byte;
    Earliest, Latest: datetime;
    Subscribers: integer;
    Repeats: byte;
    end;
```

The Accounts Table seen at 321 in FIG. 4 is indexed by a key value AccountNo which is unique to each of its Account records. The fields of those records contain name, mailing address, telephone, fax and email information for all subscribers, advertisers and content providers in a single shared file. A person or firm specified by a record in the Accounts Table could simultaneously be a subscriber, advertiser and a content provider, in which case the same AccountNo key value would appear in each of the three tables: Subscribers 313, Content_Providers 315 and Advertisers 317. Prospective or inactive subscribers, content providers and advertisers may also be described by entries in the Accounts Table which are not referred to in any other tables.

Additional information about each active subscriber is contained in the Subscriber record indexed by AccountNo (a key shared with the Accounts Table). The Subscriber record specifies personal information about the subscriber, including birth date (from which age may be determined), sex, marital status, and household size, all of which may be of use in better selecting program material of possible interest which should be brought to the attention of the subscriber.

Each Subscriber record further includes two arrays of integers which indicated the subscriber's subject matter preferences. The Interests array contains 0 to 16 integers each indicating a subject matter category of interest to the subscriber, the integers having the same meaning and being take from the same category listing as the integers placed in the Program_Segment record's Subject array. These integers are placed in the Interests array in response to the subscriber's indication of subject matter preferences when the account is established as indicated at 203 in FIG. 2 or at any time thereafter when the subscriber elects to modify the stated preferences at step 217 in FIG. 2.

A second array of 16 integers called TopChoices is an ordered list of the same subject matter integers; however, in this array the subject matter integers are listed in order of actual playing frequency as indicated by the parallel array of ChoiceCounts integers. For example, the subject matter integer 321 in TopChoices[3] and the count 18 in ChoiceCounts[3] indicates that 18 selections had been played in the category 321 which was the fourth most-

US 6,199,076 B1

23
24

frequently played category. The ChoiceCounts array is modified whenever the usage log indicates that a selection in a particular category has been played by that subscriber. As a consequence, the TopChoices and ChoiceCounts arrays provide an indication of the subscriber's interests as indicated by his or her actual use of the player.

The ChargeLevel field in the Subscriber record indicates the subscriber's willingness to accept the insertion of commercial messages into the programming in order to defray subscription costs. A ChargeLevel value of zero indicates that the subscriber desires to pay the minimum charge and correspondingly is willing to accept sufficient advertising content to achieve that goal. At the other extreme, a ChargeLevel value of 255 indicates that the subscriber wishes to eliminate all commercial messages except those specifically requested.

The DataRate field indicates the rate at which information can be downloaded to the subscriber over the available communications link (typically dependent on the capacity of the modem used by the subscriber). The DataRate field is initially established from information supplied by the subscriber when the account is established (at step **203** in FIG. **2**) but is thereafter altered to reflect actual averaged transmission rates experienced during download operations. Similarly, the Capacity field indicates the available mass storage file space available for program data in the player store (seen at **109** in FIG. **1**). This value is initially supplied by the subscriber during account initialization, automatically reduced whenever the utility programs executing on the processor **105** detect less space available, and increased whenever the subscriber consents to the allocation of more available space when the utility programs detect that space is available and that additional space could be beneficially utilized given the download time available and the subscriber's desired session lengths.

Desired session lengths are contained in seven records each of type Compilation as defined in the following record definition:

```
Compilation = record
    Earliest, Latest: datetime;
    PlayMinutes, Longterm: Integer;
    end;
```

Each Compilation record describes the download requirements for a specific day of the week and contains fields specifying the earliest and latest times of day when download can be begun, with the latest download time being at least a predetermined time in advance of the session start. In this regard, it should be noted that playback and download can occur concurrently, with the Schedule Table being downloaded first, the NewCatalog Table being downloaded second, program segments specified in the Schedule Table which have not previously been downloaded being transferred third (in the order of the expected presentation as stated in the Sequence Table), with program segments selected by the subscriber for future sessions being downloaded last as download time permits. In accordance with the invention, it is desirable to download the equivalent of a full session's programming in addition to the currently scheduled session programs so that, in the event of a temporary communication link or host failure, programming will be nonetheless be available. In installations which utilize download information to a removable media cartridge or a transportable player which is then played back in an automobile or elsewhere, and hence disconnected from the data

link to the host, it will of course be necessary to complete the download prior to the disconnection, meaning that the Latest field in the compilation record should be a time which is in advance of the earliest expected session start time by a duration equal to the maximum expected download time. Because the subscriber may wish to use different download timing on different days of the week, a separate compilation record exists for each day.

The compilation record further specifies the expected duration of the playback session for that day using the variable PlayMinutes. The variable Longterm indicates the maximum duration in which extended play may be required. For example, a commuter who sometimes experiences long traffic delays on Mondays and Fridays may specify that an extra hour of extended programming should be provided for those days. Such extended programming is preferably consists of non-time critical programming which can be stored for future use as needed by the player.

Note that the compilation records noted above are used by the server to optimize the content of the recommended program schedule and not to initiate actual downloads to the player. As contemplated by the invention, the player initiates the actual downloads by sending download requests to the server. Nonetheless, the server can transmit to the client player an indication of optimum times when downloading should be requested. In this way, the load imposed on the server can be spread over time to avoid delays.

Program segments which are of interest to the user and which should be included in either the Schedule Table **307** or the Catalog Table **308** may be automatically identified by the following mechanisms:

the subject matter codes (Interests, TopChoices and ChoiceCounts) for a given subscriber for whom the Schedule Table **307** and Catalog Table **308** are being prepared may be compared with the subject matter contained in the Program_Segment record's Subject for each subject category description and each individual program description. Note that the Program_Segment record for a subject category description may identify related categories. In this way, an indication that a subscriber is interested in a particular category may be used to identify that category, any related category, and any program which specifies that category in its Program_Segment record. A weighting value may be calculated to indicate the extent to which the subscriber's stated interests match a given program or category of programs. Programs to which high weighting values are assigned are placed in the Schedule Table if the usage log data does not indicate the subscriber has already played that program, whereas the remaining programs having a weighting value greater than a predetermined threshold are placed in the Catalog Table **308**. The duration of the programs specified in the Schedule file **307** is governed by the scheduled session lengths, communications throughput, and client storage capacity values contained in the DataRate, Capacity and WeekDays fields of the Subscriber record.

The attributes of the subscriber (birthdate, sex, marital status, and household size) specified in the Subscriber record may be matched against the corresponding descriptions contained in the subject and program Program_Segment records (youngest, oldest, male, female, houselow, househigh) to identify programs and categories of programs likely to be of interest to a subscriber having those attributes. An advertiser-supplied function defining this relationship is specified

US 6,199,076 B1

25                                                            26

by the DemographicMatch function_id field of the Advertiser record, as discussed below.

The host server may advantageously use an optimization technique such as linear programming to complete the segment selection process. The optimizer will take into account the Subscriber's time constraints, cost constraints, and subject preferences. The time constraints used in the optimization are: the playing time available for the current day at the player, the download time available, the percentage of segments usually skipped by the Subscriber. The cost constraints are Subscriber ChargeLevel and the accumulated value of individual advertising segments. The subject preferences are based on the user's expressly stated interests and others interests inferred from the user's playing selections, as noted earlier. Each segment resident in the database at the time of download is evaluated against the constraints and the optimizer thus chooses a set of segments which is best for the subscriber at that time.

The weighting value computed for a segment in the database may also be advantageously varied in accordance with the age of the segment; that is, segments will decline in value as they age with the rate of decline being depend on the Timeliness attribute stored in the Program_Segment record. If the subscriber misses a download for a given day, the timeliness factor will allow the host server to compensate for the lost listening opportunity by adding articles from prior days which are still of interest to the Subscriber.

Targeted Advertising

In order to identify and insert advertising program segments into the Schedule Table **307**, the preferred embodiment of the invention utilizes additional information which describes each advertisement to be placed before subscribers. This information is placed in an Advertisement record having the structure defined earlier and held in the Advertisements Table **311**. The ProgramID field of the Advertisement record identifies a Program_Segment record (described earlier) which describes the content of the advertisement itself. The remainder of the Advertisement record contains additional information used to control the manner in which the identified advertising program segment is selected for insertion into the programming supplied to subscribers.

The AccountNo field of the Advertisement record identifies the entity requesting the advertisement which is typically the same as, but not necessarily the same as, the entity specified in the ProviderID field of the Program_Segment record for advertising segment. The Subjects and Importance arrays in the program segment for the advertising (specified by the ProgramID field) may be matched the subject matter categories used by or created for subscribers to indicate their interest and may be used to produce a numerical value InterestMatch indicative of the extent to which a given advertisement is likely to be suited to the interests of a particular subscriber. The following algorithm, expressed as a function in Pascal, returns an integer value, which may be employed to derive the InterestMatch value indicating the degree to which any program segment matches the interests of a given subscriber:

```
function InterestMatch(SR: subscriber; PSR: program_segment):
integer;
var I: integer;
    InterestCount: integer;
    ChoiceCount: integer;
begin
    InterestCount:=0;
    ChoiceCount:=0;
    for I:=0 to 15 do
        if PSR.subjects[I] > 0 then
            for j:=0 to 15 do
                begin
                    if SR.Interests[j] = PSR.Subjects[I] then
                        inc(InterestCount, PSR.Importance[I]);
                    if SR.TopChoices[j] = PSR.Subjects[I] then
                        inc(ChoiceCounts,(20-j)*PSR.Importance[I]);
                end
            else break;
    return(InterestCount + (ChoiceCounts div 10);
end; { InterestMatch function }
```

The foregoing function identifies all of the Subjects codes specified by the program_segment record for a program segment (including a segment specified the ProgramID value of the Advertisement record for that advertisement) which also match a subject matter code in which the subscriber described by the Subscriber record SR has expressly stated an interest, or has shown an interest base on programs actually played. In each case where a match was found, the Interest_Match value is increased by an amount related to both the weight given to the category in advertising program's Importance array and the level of interest indicated for the subscriber. Note the InterestMatch function described above can be used to generate a numerical indication of the degree to which a given subscriber may have an interest in any program segment, whether that segment contains advertising, entertainment, news, or other content. In the case of advertising program segment however, the Subject and Importance values are assigned by the advertiser in order to define the interests held by target subscriber to whom the advertiser wished to direct the advertisement.

In addition to the InterestMatch value determined above, weight may be given to the subscriber's personal characteristics using a similar weighting function specified th the function_id DemographicMatch which, like interest match, returns a value based on an advertiser specifed relationship based on the subscriber's personal characteristics (age, sex, marital status, size of household, etc.) as previously noted. The value DemographicWeight may be used to specify the relative importance of demographic values derived by the the DemographicMatch function and the value returned by InterestMatch.

All advertisements scheduled for a given subscriber may then be prioritized based on the resulting calculated weight assigned to each advertisement by matching algorithms which compare the characteristics of the subscriber with the makeup of the target audience defined by the fields of the Advertisement record. These advertisements are then preferably inserted into the programming Sequence with the advertisement having the highest weight being scheduled to occur first in the sequence, thereby insuring that the best fitting advertisements are included in the programming and most likely to be played by the subscriber.

Controlling the Quantity of Advertising Delivered

The rate at which advertising is actually inserted by the player is controlled by the ChargeLevel value in the Subscriber record for each subscriber. The ChargeLevel value (a number from 0–255) indicates the rate at which a subscriber

**App. 206**    LYDO ET AL. -- EX. 1001 -- Page 21

US 6,199,076 B1

27

is willing to accept advertisements. An advertisement duration count variable (not shown) maintained by the player **103** accumulates the total duration of actually played advertising while a program duration count variable accumulates the total duration of actually played programming. An integer division of these to duration count values indicates the proportion of time being devoted to advertising. If this proportion falls below a threshold value determined by the value of ChargeLevel, additional advertising is inserted between program segments until the desired proportion is again reached. In this way, advertising skipped by a subscriber will be replaced later by different advertising to yield the proper proportion of programming to advertising, thereby achieving the subscription charge rate requested by the user.

The Schedule **307** downloaded to the player, and the associated programming, announcement and advertising segments sufficient to provide a complete program sequence with adequate advertising to meet the preference of the subscriber, creates total program content longer than the expected playing time indicated by the PlayMinutes variable of the days Compilation record. As a consequence, the player builds a collection of program and advertising segments which can be played in the future and need not be downloaded. Downloading of actual program segments therefore preferably occurs at the request of the player which scans the Schedule for program and advertising segments not already available and issues a request for the needed segments using the URLs contained in the players catalog of Program__Segment records. In addition, as noted earlier, the subscriber has the opportunity to review the local catalog for particular program segments of interest which can be placed in the next day's schedule (and downloaded then at the request of the player if not already resident). The catalog of available items is supplemented by the NewCatalog Table items downloaded from the server as library items are identified whose makeup matches that of the subscriber and should be included, either immediately in the days Schedule Table, or made available by inclusion in the downloaded NewCatalog Table alone.

Accounting Functions

The preferred embodiment of the invention processes the usage log data created during the playback session as described in connection with FIG. **3** to produce a variety of accounting and analysis reports and billing functions.

Each advertising, announcement and program segment played on the player creates a UsageRecord stored as an record in the Usage Log Table having the following content:

```
UsageRecord = record
    Subscriber: integer;
    ProgramID: integer;
    Start: datetime;
    Volume: Integer;
    Playingspeed: Integer;
    end;
```

The Subscriber field contains the AccountNo of the subscriber which used the program segment, and the program segment itself is identified by the ProgramID field. If the value of ProgramID is negative, the record indicates a failed hyperlink attempt and the ProgramID is posted to the Requested Table **301** so that the formerly missing program segment will become a candidate for downloading to the player. In the UsageRecord, the Start field contains the starting time of day (to the nearest second), the Volume field contains a value indicating the level at which the volume

28

was played, and the PlayingSpeed field contains a value indicating the playing speed. A negative playing speed value may be used to indicate that the player was placed in the "play highlights" mode so that only highlight passages were being played.

As noted earlier, each UsageRecord is processed to modify the Subscriber record field TopChoices by first building an ordered list of subject matter categories and the corresponding counts of the number of times each category was played in the session described by the Usage Log Table. These counts are then used to increase the existing Choice Counts for the subject matter codes indicated in the TopChoices array, and the TopChoices and ChoiceCounts arrays are then jointly resorted into order by descending number of plays. To insure that subject matter categories recently used are allowed entry into the list, the lowest five old entries are discarded each time if necessary to make room for the five most frequently played categories in the current usage log which were not already on the list. The TopChoices array accordingly contains an adaptively learned set of subscriber subject matter preferences which is continuously modified automatically without requiring attention from the subscriber.

Subscriber billing is based on the accumulated amount of programming actually played by the subscriber with credit being given for advertising actually presented to the subscriber. To accomplish this, a detailed billing history can be constructed from the usage log which indicates the programs heard, the duration of each, and the cost (or credit) attributable to that program segment. The TimeRate value specified in the Program__Segment record for each item specified in the UsageRecord's ProgramID is multiplied times the segment duration (determined by subtracting the start time of the segment from the start time of the next segment specified in the next UsageRecord). The TimeRate is a signed integer, with negative values being indicative of credits (for advertising) and positive values being indicative of charges for programming. Note that each program segment and advertising segment can have a different rate, allowing the system to accommodate charging rates that reflect different programming costs.

Such costs frequently are affected by the royalty rates charged by content providers as well as the extent to which costs are defrayed by advertisers. In accordance with the invention, each UsageRecord may also be posted into the Content__Providers Table **315** which maintains royalty payment records for amounts due to content providers. As in the case of subscriber billing, the processing of UsageRecords allows the embodiment shown in FIG. **4** to provide detailed information to content providers, identifying the extent each provided program segment was actually performed. Content providers can also be provided with demographic statistics identifying the characteristics of the subscribers who chose to play the content provided, as well as an identification of the extent to which program segments were skipped while in progress, tending to identify programs which were had continuing appeal during the session and those that did not.

Similarly, advertisers can obtain detailed billing records indicating the precise extent to which advertising was actually presented, and paying only for advertising known to have been effectively delivered. In addition, demographic data can be provided to advertisers indicating the makeup of persons who played the advertising, as well as the demographic characteristics of those who did not, in order to better target future advertising.

Finally, the UsageRecords are processed to post use data into the Programs Table, modifying the Plays and TotalTime

VO ET AL. -- EX. 1001 -- Page 22

US 6,199,076 B1

29 30

fields of the Program_Segment records to reflect the extent to which programming materials are actually presented. This information, as well as the demographic statistical information indicating which classes of customers are listening to which classes of programming, is of substantial value in collecting a library of offered programming which best fits the needs of the community of subscribers.

Program Format and Organization

The programs which reside in the program database **303** seen in FIG. 4 are preferably formatted in accordance with a standard structure to facilitate "skimming" the sequence of program segments defined by the selections file **351**, and to make it possible to perform jumps to different predetermined locations in the program sequence.

As previously noted, the program database **303** may include, for a given program segment, both a recorded audio narration and a text transcript or, in the alternative, a text transcript alone which can be converted into a spoken narrative by speech synthesis. While these narratives must be listened to in a linear sequence, it is nonetheless possible to selectively access individual program segments by organizing the overall program compilation into a hierarchical structure in which:

As noted earlier, the program segments which are available in a master library are described in a catalog and associated with descriptors of various kinds, allowing the content of the compilation to be tailored to the preferences of the subscriber, both through express selections made by the subscriber and by selections (or suggestions) made automatically by matching the subscribers known preferences and interests against descriptors which characterize the programs segments, as previously described.

The resulting program compilation is then divided into components each having a beginning, or entry point, to which jumps can be made by the listener by a dynamic selection mechanism which is operative during the listening session.

A given program segment (i.e., an entity described in the program catalog and selected automatically or expressly by the user as being of interest as previously described) is advantageously combined with other related program segments to form a sequence of associated segments here called a "subject," forming a subsection of the overall compilation. A "subject" collection of program segments may (but need not) directly correspond to the named subject matter categories utilized to specify subscriber's preferences as noted earlier. A "subject" collection begins with or is preceded in the scheduled program sequence by a spoken announcement of the subject, giving the user the opportunity to skip immediately to the next subject, thereby skipping all of the program segments comprising that subject.

As a consequence, by the simple expedient of skipping from subject announcement to subject announcement, a user can locate a particular subject of interest. For example, if a given program compilation as defined by the Selections file (having the format illustrated at **351** in FIG. **5**) contains one hour of programming divided into 18 different subjects collections, the user can quickly locate a subject of interest by skipping from subject announcement to subject announcement until a subject of interest is announced, at which time the player is allowed to proceed to the next level in the hierarchy, a "topic" announcement for the first program segment in that subject collection.

Each program segment begins with a "topic" announcement which consists of a brief, summary description of the content of the program segment to follow. Again, at this level, if the user upon hearing the topic announcement elects to skip that program segment, the player automatically advances to the entry point preceding the next topic announcement. In this way, within a given subject, the user can skip from topic to topic to select only the program segments of interest.

Following the topic announcement, if the program segment consists of narrative text, such as a news program, the narrative is presented in a sequence of paragraphs, with the first paragraph providing an overview summary of the content of the program segment (topic) and the succeeding paragraphs providing increasing levels of detail. The narrative is thus presented in a fashion not unlike that followed in news stories written by journalists for print publication, but with more dependable rigor, recognizing that the listener presented with a one-dimensional audio presentation must necessarily depend on the consistent adherence to the subject, topic, summary paragraph, and increasing detail sequence to substitute for the random access provided by two-dimensional presentation of headlined news-print articles.

Finally, within paragraphs, the sentences should be carefully organized with leading topic sentences, again giving the listener a preview of what is coming next in the sequence to enable that material to be skipped if it is not of interest.

By way of example, a program compilation for a given subscriber might illustratively consist of seven subjects: world news, national news, local news, computer trade news, email and voice mail messages, country music, classical music, and the listener may skip from subject announcement to subject announcement to readily locate the beginning of any one of the six subjects. The four "news" subjects each consist of a collection of structured program segments, each of which begins with a subject announcement, again allowing the user to skip from subject to subject, listening to only those which are found to be of interest.

Similarly, the music selections ("topics") within each of the two music subjects, "country music" and "classical music," are preceded with a brief announcement identifying the musical selection which follows, allowing the user to quickly skip from announcement to announcement until a desired selection is found. Because many listeners prefer music without announcements, the subscriber may request that the announcements be suppressed during continuous play and/or that the beginning of each musical segment be played instead of identifying announcements when the musical collection is being "skimmed" to locate the next selection to be played. To simplify the player controls, the subscriber is preferably selects the extent to which narrative music identification announcements are to be played at step **211** seen in FIG. **2**, at the same time the user is given the opportunity to edit the downloaded program sequence.

Play Highlights Mode

To further facilitate rapid skimming, the player may be adapted to support playback in what is here termed the "play highlights" mode. Just as a student often uses a marker to highlight important names and phrases in printed text, key points in the audio narrative may be tagged as highlights such that, when the user places the player in a "play highlights" mode, the player automatically skips from highlighted passage to highlighted passage, greatly increasing

Appx208    LEVO ET AL. -- EX. 1001 -- Page 23

US 6,199,076 B1

31

the speed of presentation, but allowing the user to revert to normally play mode whenever a highlighted passage attracts the users interest for more detail.

Highlighted passages may be advantageously identified by means of a sequence of relative byte locations (integer offsets from the beginning of the program segment) which form part of the selections file 351 and which specify the start and end of each highlighted passage. The player, when placed in the "play highlights" mode, then plays only those passages identified as highlighted portions of the program segment file.

Hyperlink Jumps

In addition, the structured program files may advantageously contain, where appropriate, "hyperlink" passages, which may take the form of announced cross references to other materials, or sentences or phrases which describe related information contained elsewhere in the download compilation but which do not follow immediately in the sequence. In order to alert the listener to the fact that a sentence or passage is a hyperlink to other information which is out of the normal playback sequence, an audible cue may advantageously proceed, accompany, or immediately follow the passage in the normal playback which identifies the character of the hyperlinked material. Using the terminology typically employed to described hypertext, the normal programming sequence includes "anchor" passages which are identified by an audible cue signal of some type and are further associated with a reference to hyperlinked material to which the playback may jump upon the listener's request. Hyperlinked material, like all other programming, is advantageously preceded with a topic description and, if the hyperlinked material is a narrative, it should begin with a summary paragraph, followed by increasing detail.

A hyperlink may be directed to a program segment which is not present in the current selections list. In that case, the Link variable contains a negative number to distinguish it from references to a particular Selection_Record, and is interpreted as the negative of a ProgramID number. If the referenced ProgramID is available in the player's mass storage system, it may be fetched an played and, upon its conclusion, an automatic return is made to the original sequence. If the referenced ProgramID does not refer to a locally stored record, the listener is informed that it is currently unavailable, but will be included in the next download for the next session.

In addition to having means for accepting a user command to execute a jump to the hypertext material, the player also advantageously includes a mechanism (special key or voice command response) which, when activated, causes a "return" to be made to the playing sequence at the point of the original anchor from which the hyperlink was performed. In this way, a listener may listen to as much or as little of the linked information as desired, retaining the ability to return to the original. Just as computer subroutines may be nested by saving the return addresses of a calling instruction in a stack mechanism, a hyperlink may be executed from within a hyperlinked narrative, and so on, with the listener retaining the ability to execute a like sequence of returns to resume the playing sequence at the point of the first hyperlink call.

To control subject and topic skipping, as well as hyperlink jumps, the selections file seen generally at 301 in FIG. 4 preferably takes the form of a sequence of records, each having the structure defined by the following Pascal record definition:

32

```
type Selection_Record = record
        LocType: Char;
        Location: Integer;
    end;
```

where LocType is a single byte character having the values and meanings shown in the following table:

| LocType | Meaning |
| --- | --- |
| "S","s" | Subject Announcement |
| "T","t" | Topic Announcement |
| "P","p" | Programming content segment |
| "Q","q" | Advertising segment |
| "G","g" | Glue (announcement) segment |
| "H" | Highlight start offset |
| "E" | Highlight end offset |
| "A" | Anchor start offset |
| "M" | Bookmarked anchor start |
| "B" | Anchor end offset |
| "L" | Linked segment |
| "R" | Rewind to identified location |
| "I" | Image identification |
| "J" | Image display start |
| "K" | Image display end offset |
| "C" | Accept comment |
| "V" | Accept value designation |
| "X" | Accept list termination |
| "Y" | Accept "Yes"/"No" |

As seen in the table, highlight passages are specified by two Selection_Records, an "H" marking the beginning and an "E" record marking the end of the highlight passage. The Location field in each record contains the byte offset from the beginning of the current program segment whose identity is specified by the last preceding "P" Selection_Record which contains the ProgramID of the program segment in which the highlight passage occurs. "Q" advertising segments and "G" announcements segments behave like regular programming content segments, but are uniquely identified to enable the player to skip over, or skip to, advertising and glue segments when appropriate. In the "play highlights" mode, the player scans the selections file and plays the program segments for each subject and topic announcements but plays only those portions of an identified program segment which are specified as highlight passages or as anchor passages for hyperlinks.

It is desirable to further provide a mechanism for subdividing narrative programming segments into subparts (e.g. paragraphs). Lowercase LocType values "s", "t", "p", "q" and "g" are used to subdivide subjects, topics, programming, advertising and glue segments respectively. The lowercase Loctype records provide the markers needed to implement subdivision skipping, as previously discussed, to enable forward and backward navigation within longer program segments, and further provides passage identifiers which may be used to better synchronize the audio and visual transcript presentation of longer passages.

An "I" Selection_Record contains an integer identification of an image file which is downloaded and stored using a filename found in an image filename table indexed by the image identification number. This indirect access to the image files eliminates the necessity of storing the filenames themselves in the selections file 351. The "I" image file

App. 209    HINDO ET AL. -- EX. 1001 -- PAGE 24

US 6,199,076 B1

33                                                                34

identification records immediately precede a "J" record which specifies the offset location from the start of the compressed audio file where the image display begins. In normal "slide show" presentations, the current image display continues until the position indicated by a subsequent "I"–"J" record at which point the display shifts to the second image. The "K" record type is provided to indicate the position at which the current image display is turned off for those instances when it is desired to suppress the image display entirely.

Each anchor passage for a hyperlink is specified by three selection records: an "A" record indicating the start of the anchor passage, a "B" record indicating the end of the anchor passage, and a "L" record containing the offset location within the selection file to which a jump is made if the user requests a jump to the hyperlinked material.

As discussed in more detail later in connection with FIG. 7 of the drawings, the position and identification of highlighted passages, hypertext links and synchronized images may be conveniently expressed using conventional hypertext markup language to tag the text of the narrative to being presented in the interactive multimedia format contemplated by this aspect of the invention.

The start of bookmarked passages are identified with a special anchor designation, "M," followed by a "B" record to identify the end of the bookmarked passage. If a voice annotation is added, the player places it in its own program segment which is identified with a negative ProgramID in the following "L" record. The presence of the annotation may then be made known to the listener during subsequent playback of the marked passage by means of a distinctive audible cue, and the annotation may then be listened to in the same fashion as any other out of sequence linked material. Note that bookmarked passages and annotations are noted both in the usage log file, as discussed earlier in connection with FIG. 3 at **280** and **281**, but also their presence is also recorded in the Selections file **351** by inserting "M", "B", and (if annotations exist) "L" records, making it possible to immediately replay annotations or return to replay bookmarked passages.

Annotations differ from "comments." Like an annotation, a comment is also stored in its own program segment, but a comment operates as a public or private message generated by the user and communicated publicly or privately to (1) a designated special interest group, (2) the originator of a program segment, which may be the author of earlier comment, (3) the system host, or (4) the person producing the comment to form a note for future reference. While both comments and annotations may be created at the request of the user at any point during a playing program segment using the "Accept" command (see 263–264 in FIG. **3**), the user may be prompted by a pre-recorded request for a comment, or other user input, with the prompting request being placed at any point in a playing program segment, typically after an audio prompt which explains the nature of the information being requested.

Requests for information from the user preferably take one of three forms which are implemented by the records in the schedule file identified by the LocType codes "C", "V", "X" and "Y".

A "C" record causes the player to temporarily pause the playback and record a voice response from the user which may be arbitrarily long and which is uploaded to the server **101** to form a new program segment in the manner to be described under the heading "Comment Handling."

A "Y" record pauses the playback and awaits a "Yes" or "No" response from the user which is then recorded in the usage log. The yes/no response request allows a program provider to obtain response data from subscribers.

When simple "yes"/"no" answers are inadequate, a series of "V" records may be used to identify a set of prompt values from which the user may select, with the end of the list being indicated by a "X" record. The narrative of a program segment might, for example, proceed as follows: "We would like to know which of the following four ice cream flavors is your favorite. Say the word "YES" promptly when your favorite is mentioned. $\underline{V}$ chocolate $\underline{V}$ vanilla $\underline{V}$ pistachio $\underline{V}$ peach $\underline{E}$". In the example, the $\underline{V}$ characters indicate the position of the start of each prompted choice and the $\underline{E}$ character indicates the end. If no affirmative voice response has been accepted by the time in the playback the position indicated by the $\underline{E}$ selection record, the player returns to the positions indicated by first of the series of $\underline{V}$ records to repeat the choices. When a valid response is received, a response value is written into the usage log indicating the ordinal position of the selected response. Given the prompts above, for example, if the user says "YES" after the "chocolate" prompt, the response value 1 is written to the usage log, if the user selects 'vanilla' a 2 is written, and so on.

The Selections File

FIG. **5** shows an illustrative sequence of Selection_ Records making up a selection file indicated generally at **351** which illustrates the manner in which the user may navigate the playback session between playback positions designated by the selection file. At any given moment, the next item of programming to be played is specified by an integer register CurrentPlay seen at **353** which holds the record number of the particular Selection_Record in the selections file **351** to be played next. As shown, CurrentPlay points to a subject Selection_Record identified by the LocType "S" **355** and a Location field **357** which contains the ProgramID of an announcement program segment which describes the subject. If the user issues a skip command during or shortly after the time when subject announcement is played, the player executes a skip to the next subject, which is accomplished by scanning the selection file **351** until the next subject Selection_Record seen at **360** is located, and then performing a jump by inserting the location of Selection_Record **360** into the CurrentPlay register **353**, causing the intervening material to be skipped as indicated by the dashed line **362**.

If, instead, no subject skip is requested, the CurrentPlay register is incremented by one when the subject announcement concludes, causing the "T" Selection_Record **364** to be used to fetch and play the topic announcement specified by the ProgramID in the Location field of record **364**. If a skip is requested during or shortly after the time when topic announcement specified by record **364** is played, the player scans the selection file **355** until the next "S" or "T" Selection_Record is found at **366**, causing the intervening program material to be skipped and the topic announcement specified by record **366** to be played next. If, as illustrated by the Selection_Record **366**, there are no more topics within a particular subject when a topic skip is requested, the player skips the remainder of the last program subject within the current subject collection and plays the next "S" subject announcement. Thus, topic skips take the user quickly to a subject announcement, from which subject skips may be executed until a desired subject is reached. In this way, a desired program segment, no matter where it is located with respect to the current selection, can be readily found.

If the user issues a skip command during the body of a program selection; that is, when neither a subject or a topic announcement is being played, the player advances to the

LEVO ET AL. -- EX. 1001 -- Page 25

US 6,199,076 B1

35

next "S" subject or "T" topic record, skipping the remainder of the program selection. Thus, the user can quickly resume skimming on the subject and topic level at any time.

The user may also issue a "Back" command at any time. Back commands work like Skip commands at the subdivision, subject and topic level. If a Back command is issued when a subject is being played, the player scans backward to the previous subject announcement, which is then played. If the user issues a back command when a topic announcement is being played, the player scans backward to find the previous subject or topic announcement, which is then played. If the player issues a Back command during the playing of a programming segment, the player returns to the beginning of the prior subdivision (if any) or the prior topic announcement for the current program segment, thus enabling the user to easily "replay" a current segment from the beginning if desired. As in the case of forward skip commands (SKIP TOPIC and a SKIP SUBJECT), BACK TOPIC and BACK SUBJECT commands can be made available to the user such that backward navigation from subdivision to subdivision occurs using BACK TOPIC whereas the issuance of a BACK SUBJECT command always returns the playback point to the beginning of the prior subject matter description.

The manner in which a "Back" command is handled as described above is subject on additional variation: The position at which each skip forward command is issued may be advantageously saved so that, upon the issuance of a subsequent Back command, the user may return to the position at which the skip forward position was issued. This allows the user, for example, to skip forward to listen to the nest program announcement, and then use the Back command to return to the point from which the skip forward command was issued. These position indications may be saved as markers in a bi-directional list, allowing the user to skip forward or backward to any position from which a prior jump was made.

When the player is first activated, CurrentPlay is set to 1 to begin play with the first topic announcement specified by the ProgramID **357**. The end of the selections file **351** is marked with an "R" Selection_Record **380** which contains the location value 1. When the player encounters this record, it resets the CurrentPlay register to 1, and the playing sequence begins again. This arrangement creates, in effect, an endless loop, allowing the user to skip forward in circular fashion through the entire program selection to locate desired programming, regardless of where the CurrentPlay register is set. When the player is given a further back command after the beginning of the file is reached, the backward scanning process finds the record **382**, another "R" rewind record which contains the location of the last "S" subject Selection_Record. In this way, the selection file **351** behaves as a bi-directional endless loop.

Hyperlinks are implemented by means of anchor passage identifiers, the "A" and "B" Selection records which respectively identify the anchor passage, and a "L" link identifier which holds the location of a subject, topic or highlight Selection_Record. The "A" and "B" selection records enable the player to add an audio cue (such as a tone, low-level chime, or the like) to the beginning, end, or during any passage in any program selection. Whenever the user issues a "Go" command (seen at **265** in FIG. **3**), the player will execute a hyperlink jump to the location indicated by the last "L" record in the selection file. When the jump is made, the location in the "L" record is inserted into the CurrentPlay register **353** after the previous contents of the CurrentPlay register are saved in (pushed into) a zero-based

36

stack **390** at the stack cell location specified by the contents of a StackPtr register **392**, which is then incremented. Whenever the listener issues a "Return" command, the previously pushed selection file record location is popped from the stack **390** and returned to the CurrentPlay register **353**, and the StackPtr register **392** is decremented. A "Return" command issued when StackPtr=zero (indicating an empty stack) produces no effect.

The hyperlink capability described above may be used to implement a program menu of the type described earlier in connection with FIG. **3**. A menu program segment may be included in the program compilation which includes a series of spoken descriptions of subjects or topics, each description being the anchor portion of a hyperlink to the corresponding subject or topic.

Although hyperlinks to subjects and topics are typical, it should be noted that the arrangement shown in FIG. **5** can be used to link any passage to the beginning or end of any highlighted passage or to the beginning or end of any anchor passage simply by placing the selection file location of that target in the "L" link Selection_Record forming that link.

In its preferred form, the individual program segments are stored in a random access mass storage system permitting program segments to be physically stored in an order unrelated to the actual dynamic sequence in which those segments are played. Forward and backward skimming, highlight playing, and hypertext jumps can accordingly be implemented without any noticeable delay being apparent to the user, unlike the delays which are experienced in forward and rewind operations on a physical tape player, or even the briefer delays experienced upon selecting a different track of a compact disk music album.

As contemplated by the invention, the integration of structured audio announcements and content, as well as cross-referencing and indexing information in the audio program compilation, allows the player to be much more interactive than a simple tape recorder. The user has the ability to browse and skip through the audio program in a very active way, without any requirement to look at a visible display of the program content. The ability to navigate the program using only audio prompts and/or small number of buttons for a user interface make the playback system which utilizes these features of the invention particularly attractive for use by automobile drivers, who can select their program content much more effectively and with less drive distraction than currently possible with a conventional automobile radio, tape or CD player.

Program Production

FIG. **6** shows the method followed to produce program content which is structured in accordance with the invention to facilitate interactive program selection. The first step in program production is to build a structured database of 'articles' which are candidates for inclusion in individual subscriber compilations.

The authoring system seen in FIG. **6** scans a wide range of data sources **401** for potential content as indicated at **403**. Examples of data sources might be news service wire feeds or newsgroups on the Internet. The authoring system subdivides the accessed program data into program segments (topics) and indexes each segment by subject area at **405**. In the case of text data, this indexing may be done automatically by parsing the text into words and building a conventional inverted file word index to the program segments. In the case of audio programming, a text transcript may be prepared using conventional speech recognition mechanisms to for a transcript, and the transcript may then be indexed by the terms used. Alternatively, human indexers

ISRAVO ET AL. -- EX. 1001 -- Page 26

US 6,199,076 B1

37

may produce descriptive words and phrases to characterize the content of a program segment, and these descriptors may be used to index those segments.

After the indexing has been performed at **405**, the authoring system then compares the each program segment's index data at **407** with system wide selection criteria in a system database **409** to provide a "System Filter." The system filtering function identifies those programs which of potential relevance to one or more of the established subject matter categories offered to subscribers. Accordingly, the system filter database **409** may take the form of a set of words (descriptors) of known relevance associated with each of the subject matter categories in the catalog. The comparison function at **407** scans the words in each candidate program segments to form a weighting value indicating the frequency (density) of the occurrence of descriptors for each category. Program segments whose content produces a high weighting value with respect to any category are automatically associated with that category and retained for further processing as indicated at **408**, while program segments producing no weighting values greater than a predetermined minimum may be completely discarded at this stage, as indicated at **411**, since their content does not indicate a sufficient likelihood of being of interest to a sufficient number of subscribers. Marginal program segments may be returned to the source library **401** for possible later use in the event that user preferences change.

Each article which passes the system filter at **408** is processed as shown at **414** in FIG. 6. As noted earlier, and as indicated at **421**, the authoring system next prepares either a transcript for those segments which consist, in their original form, of voice narration. This step may be automated using speech recognition or manually by keyboarding to create the needed transcripts.

As indicated at **425**, when the original material consisted of information in text form, a human reviewer verifies that the program content is in fact relevant to the subject matter categories identified by the automated system filter processing as noted earlier, and adds additional subject matter categories that may have been overlooked by the automated process. As a result of this automated and human-verified classification process, each program segment is associated with one or more subject matter categories which are encoded into a standard form in the Subjects array of the Program_Segment record described earlier in connection with FIG. **4**. These subject codes are further assigned an importance value in the Importance array (which is parallel to the Subjects array) by the human author. Note that the order in which subjects codes are placed in the Subjects array may be used to indicate the relative relevance of the subjects to the program segment; that is, the most relevant subject is identified in Subjects[0], the next most relevant subject is identified in Subjects[1], and so on. Each program is typically placed in the output sequence in accordance with the code at Subject[0], the subject to which the program segment is most relevant.

In addition, the human review may compose a narrative cross referencing description of some or all of the program segments which were secondarily relevant to a given category; that is, program segments which were most relevant to another category but also relevant to the given category. This cross-referencing description may advantageously utilize the hyperlink capability discussed earlier such that, when the user is listening to the description of any related program segment, that related segment may be listened to simply by issuing a Go command to jump to the linked article, and later issuing a Return command to resume the playback at the original.point.

38

The body of the program segment is then organized by the human reviewer at steps **431**, **433**, and **435** seen in FIG. 6 to create an output program segment having the desired structure consisting of:

a topic statement which is packaged in a separate program segment,

a leading summary paragraph,

further content organized into paragraphs of increasing levels of detail, in which all unnecessary detail is excluded (that is, longer topics are digested into shorter, overview topics, with the full version being made available in an alternative, unabridged form which is also made available to the listener),

adding highlight identification to key terms and phrases, and

(1) adding cross-referencing hyperlinks, with added explanatory anchor text if necessary.

When the original program segment is a news article or the like which was made available in text form, the foregoing operations may be most conveniently performed on the text, with the conversion to audio being performed by a human announcer or by speech synthesis after the edited, formatted and tagged text is produced. Thus, as shown at **436**, the human reviewer may compose a new article which has condensed content at **431**, add a topic (title) and summary paragraph previously created at **433**, and then, at **435**, add highlighting and hyperlink tags (which take the form of imbedded flags of the type used in Hypertext Markup Language "HTML" as described later in connection with FIG. **7**) In order to assist the listener in deciding whether to listen to, or skip, a given subject, it is desirable that the topic and subject announcements include a statement of the playing time, particularly for longer program segments. In addition, the playing time is recorded in the Program_Segment record for that segment in the field named "Duration" as noted earlier. A human announcer then reads the structured text, or it is alternatively converted into an audio program segment by speech synthesis, as indicated at **435**.

If desired, the user may request the player to periodically issue a time of day announcement. The user may set a playback preference value indicating a desired time duration between time of day announcements. Each time such an announcement is issued, the last announcement time is recorded. Each time a logical break occurs between program segments, the last announcement time is subtracted from the current time and, if the result exceeds the desired announcement spacing, a new time of day announcement is issued.

In addition, at the user's option, the player may also periodically announce the duration of the unplayed portion of the session, enabling the listener to skip certain programs in order to play others when the actual listening time available is less than the time available to play the entire remaining program.

The player may be programmed to issue timed messages to the listener. For example, a program session may be interrupted to remind the listener to perform some function at a particular time, such as listening to a scheduled radio broadcast. Alternatively, the player may be programmed to play identified segments at a particular time of day, or at a particular time relative to beginning of the session (for example, fifteen minutes after the session begins regardless of what has been played before or where the player is in the sequence). These programmed interruptions are preferably performed as automatic hyperlink, enabling the user to return to the regularly scheduled but interrupted programming simply by issuing a "return" command.

MAO ET AL. -- EX. 1001 -- Page 27

US 6,199,076 B1

**39**

It should be noted that program segments may omit the "original" audio file entirely. Instead, the audio may be generated on the user's player using speech synthesis, with tag to speech conversion of the tagged highlighted materials including an audible cue. The text-to-speech technology might be especially useful for specialized subject areas, such as weather reports, sports scores, or stock market quotes, or other primarily informational articles where the content is significantly more important than the form of speech.

The availability of a collateral text file makes it possible to perform scanning operations to "find" particular words and phrases in the presentation, and perform a jump to that position in the file. Thus, the user may request the player to locate and play the next program selection in the sequence to contain the word "patent" and the player, in response to that request, performs a serial search through the transcript text associated with each program segment until the requested word is found, an a jump then executed to resume play at that location.

Using conventional text indexing techniques, the transcript files of the programs specified on the current program schedule, as well as the transcript files of other locally stored programming, may accessed by means of an inverted file in which each significant word in the playable library is associated with the an indexing record for each occurrence of that word, the record containing program segment identifier for the program segment including the word and the offset(s) within that segment where the word occurs. The availability of that inverted file allows the player to immediately inform the user of the number of time the term occurs to avoid fruitless searches as well as searches which find too much, without actually scanning the transcripts. The availability of the program identifier permits the player to play for the user an announcement of categories and topics along with a recitation of the number of word occurrences within that topic; for example, "The term 'cellular' occurs 7 times in [program segment announcement], 3 times in . . . ".

Alternatively, when a program segment contains a condensation of an original, longer text article, the full transcript may be additionally made available by downloading it to the player where it can be listened to, by placing a hyperlink to the full version in condensed version, or printed for further review by the listener. If desired, this capability may alternatively be realized by placing the full version in a separate program segment, thus allowing the subscriber to select either the condensed or full version from the catalog, or to activate a hyperlink call to the full version if additional detail is desired after listening to the full version.

To encourage consistency, the reviewer/editor may adhere to the format set forth in article templates which describe the form different classes of programs should adhere to. For example, a template might say that a given audio article consist of a time announcement, an summary introduction including the article headline, and the body of the article. Templates may be expressed in a formal grammar which describe the desired program content in a consistent way. In addition, the templates may take the form of pre-written HTML forms where the program topic description is placed in the title and the program segment comment placed in the body portion of the HTML document, which may include tags to identify highlighted passages and hyperlinks as explained below in connection with FIG. **7**.

The invention further supports the construction of serialized groups of program segments in which the sequential episode segments may be downloaded at one time or separately when necessary to conserve space or to handle sequential presentations which evolve in real time. Using

**40**

hyperlinks, the listener may be given the option to continue listening at the next episode of the serial sequence, or to instead allow the player to continue with the next regularly scheduled program segment identified in the selections file, with the next episode being deferred until a later session.

In a similar fashion, complex subjects, such as "books on tape" and instructional materials formed by a sequence of lessons may be readily handled by the invention. The subject/topic hierarchy allows such materials to be presented in the catalog in outline form so that the subscriber can choose all or part of the presentation. The organization of such longer presentations into the structured form contemplated by the invention makes it easy for the listener to locate and replay segments of interest, and the highlight play mode facilitates the rapid review of longer presentations by focusing only the central points presented while allowing more detail to be readily accessed if desired.

When a given program segment contains recorded original audio, such as the newly recorded narration of a human reader or an audio recording of a broadcast radio program, the file of selection records to be associated with that audio recording file is created by a human editor who utilizes suitable audio monitoring and editing equipment to listen to the playback of the audio playback file and identify the byte location within that audio file where highlight and anchor passages as well as response prompts which seek user input begin and end. In addition, for hyperlink selection records, the human editor supplies the identification of the cross-referenced material by specifying the symbolic name of another selection record associated with the same or a different program segment to which control is to be passed if the hyperlink is executed by the user. A crucial step in the production of each segment is the association of byte locations in the audio stream with the records in the selection file. This association may be done by a human technician or by automatic methods.

A technician would use a computer with suitable audio playback capabilities and software to play the audio stream and to simultaneously display the transcript if it is available. The software which plays the audio generates a new record in the segment file which contains the current byte location within an audio file whenever the human editor pressed a key. The significance of a byte location may be indicated by pressing a selected one of a plurality of keys. For example, the technician could generate Subject and Topic records with the correct byte offset simply by pressing the "S" or "T" keys at the right moment while listening to the audio program. The software could automatically generate the synchronizing segment record and prompt the technician to associate byte location thus identified with a corresponding location in the displayed transcript using a mouse or other positional identification means. When no transcript is available, the operator may be prompted to enter a topic or subject description via the keyboard.

The process of associating of audio location with segment records process could be automated by adding additional software to the technicians editing computer. For example, as indicated at **437**, speech recognition technology may be employed to automatically identify when the live speaker changed in an audio stream. The monitoring program thus automatically generates a new record and prompt the technician to associate the record with data in the transcript. Besides speaker changes, the software may advantageously detect laughter, musical interludes, or laughter and use these to automatically generate segment records.

The completed program segment is assembled at **438**, compressed at **440**, and placed in the program library as

Appx213    LEWO ET AL. -- EX. 1001 -- Page 28

US 6,199,076 B1

41

indicated at **442** where it is available for downloading to subscribers. The program segment (topic) thus preferably consists of (a) a compressed audio program segment file, (b) a text transcript file of characters, which is preferably in HTML format or in a word processing format such as the Rich Text Format "RTF" readable by most word processing software, (c) possibly one or more image files for visual presentation with the audio content, (d) a file of Selection_Records for the program segment which identify the subject program segment announcement, the topic program segment announcement, and the program content program segment ("S", "T", "P", "Q," and "G" Selection_Records), as well as the highlighting and hypertext passages and collateral synchronized image files tagged within the body of the programs segment, and finally (e) a Program_Segment record for the segment which identifies all of its component parts and which is placed in the relational Programs Table **303** seen in FIG. **4**. As explained below, the use of HTML to express narrative text facilitates the compilation of these constituent parts of a program segment.

It should be noted that the file of Selection_Records which forms part of the program segment data assembled at **438** may contain cross-referencing links and these links in turn contain location references to cross-referenced program segments or particular passages within other program segments. While a referenced program segment can be identified by the its Program_ID integer, the byte location of a particular passage within that referenced segment is not established until the editing noted above is completed. Consequently, symbolic names are preferably used to initially identify all highlight or anchor text passages, making it possible to use these symbolic names as relocatable addresses, just as symbolic names are used to identify addresses in computer source language which is first compiled and then linked to translate symbolic names into real addresses at run time. In this way, symbolic names used to identify cross-referenced passages may be translated into numerical selection file offset values loaded into the Location field in "L" Selection_Records. As discussed previously, these offset values are either positive values specifying the location within the Selections file of the Selection_Records which identifies the link target, or negative Program_ID values which identify program segments not specified by the current Selections file as being part of the current program session content.

Comment Handling

As previously discussed in connection with FIGS. **3** and **5**, the apparatus contemplated by the invention advantageously includes means for accepting comments, yes/no responses, and value selections from a user during a playback session. As discussed in more detail below under the heading "Defining Audio Programming with HTML," these prompted user input responses are analogous to and can be composed using the <INPUT> tag form elements defined for use in standard hypertext markup language, where the "C" records in the selection file are analogous to <INPUT TYPE="text"> HTML tags, the "Y" selection file records are analogous to <INPUT TYPE="checkbox"> tags, the "V" records are analogous to <INPUT TYPE="radio"> radio button tags. Together these prompt mechanism provide a robust mechanism for prompting the user for and collecting responses of various kinds.

This mechanism for obtaining prompted responses may be advantageously employed to request information from subscribers. For example, prompted requests may be used to obtain program ratings from at least those subscribers who are willing to participate in the program rating process.

42

Using "V" and "E" records, for example, a user may be asked to grade programs by various criteria and the resulting data may then be used alone or in conjunction with other values to produce a figure of merit for programming, whereby programs receiving higher ratings can be assigned a higher priority. In a similar fashion, willing subscribers may be offered the opportunity to volunteer to participate in surveys of various kinds, with the added advantage that personal and preference data already available for each of the participants may be combined with the survey responses is useful ways. For example, the tendency to give a negative responses on a particular topic may be correlated with the age, sex, geographic location, etc. of the respondents. Subscribers who are participate in the surveys may be rewarded by providing reduced subscription rates, free programs, or cash payments.

As discussed previously in connection with FIG. **3** and **263–264**, the embodiment which described also includes the capability of accepting comments from a subscriber at any time during the course of program playback. When such a comment is recorded, it is saved as separate file (or other identifiable data) together with the Program_ID of the program commented upon, the byte location within the playing program file where the comment or annotation is being made, a Class variable indicating the nature of the record, the Class variable being used as the Class variable in the Program_Segment record for the comment or annotation or comment, and the date and time of day when the comment is being created. When the comment is created, the user is then requested to specify, either by voice response or by a keyboard selection, whether the information to be recorded is to be treated as:

An annotation to be appended to the playing program record; or

1. A comment which is treated as an independent message/program segment.

The user further indicates the extent to which such an annotation or comment is to be made available to others. If designated as being public, annotations become available to any other subscriber who subsequently plays the program, at least to the extent that a given subscriber indicates that the playback of annotations is desired. Private annotations are simply stored in the user's local disk storage are (at **107** in FIG. **1**) for future reference whereas public annotations are uploaded to the server where they are saved as separate files keyed to the original by means of the downloaded selections file for those subscribers who desire to hear annotations.

Comments are designated as being public or private messages. Public comments become independently available to all subscribers who have indicated an interest in the subject matter category(s) to which the comment relates. By default, a comment is assumed to relate to the same categories assigned to the program segment which was playing when the comment was produced, but these category codes may be changed by the user during the editing session (seen at **217** in FIG. **2**). In addition to altering the subject matter codes for comments already dictated, the editing capabilities made available to the user at step **217** may advantageously include the ability to delete dictated comments so that they are not uploaded at all, direct comments to specific subscribers or email addresses, and enter new comments on any designated program segment in the current catalog by dictation or keyboarding.

In order to provide an appropriate program description for longer topics, whenever a user records a comment have a duration which exceeds a predetermined elapsed time, the player **103** performing the recording (at **264** in FIG. **3**)

LEVO ET AL. -- EX. 1001 -- Page 29

US 6,199,076 B1

43

produces an audio announcement requesting that the user dictate a brief summary of the comment which is used to form the topic description for the longer program segment. In the catalog listing provided to subscribers who desire access to comments as well as programs in a particular subject matter area, comments are listed in outline form as items which are subordinate to the parent program or comment to which they relate. The Commenton field found in the Program_Segment record for each comment provides the information needed to display the hierarchical tree. The public comment mechanism contemplated by this aspect of the invention provides a useful facility which enables subscribers to exchange information with each other in special interest groups which function much like the UseNet groups on the Internet, but with a conversational ease and informality that audio recording makes possible.

A subscriber can elect the degree to which public comments or annotations are to played back along with programs or topics of specified interest. Comments or annotations can be excluded entirely, a link may be imbedded which may be executed at user request to play the comment or annotation at the point in the file where the comment or annotation was played, or all comments and annotations may be played immediately without first requesting user approval.

Private comments are not posted to the subject matter categories and are made available only to (1) the author of [specified by the Provider_ID of] the program segment being commented upon; (2) the host system, or a host system editor responsible for the subject matter area about which the comment is concerned; or (3) some other destination specified by the user. By sending comments to the author, the user can make a direct but private response to anything contained in a message or program created by that author. Particular advertisers or other content providers may encourage such comments and offer subscriber credits or other incentives to those who are willing to make comments.

The ability to send comments to the responsible host editor provides a direct mechanism by which a subscriber may express satisfaction or dissatisfaction about the programming content provided, suggest other programming which would be of interest, and the like. Moreover, the to-host comment provides a mechanism to assist the editors to identify subscribers who may be inappropriately injecting offensive material to the annoyance of other subscribers. In addition, questions about the operation of the system may be directed to the host, thereby providing help and customer support to subscribers who may need assistance. Finally, the host may provide additional services (fact finding, transaction processing, and the like) which are made available on a fee basis to interested subscribers.

Finally, the ability to direct comments to specific people allows the system to provide voice-mail like functions among subscribers. Using speech recognition, dictated comments may be translated into text messages that could be sent to anyone having an E-mail address or facsimile receiver. Alternatively, the comment could be transmitted as an audio file attachment to an E-mail message (e.g. as a RealAudio file). In addition, like private annotations, the comment may simply be placed on the user's local disk for future reference.

Comments and annotations are preferably stored on the player's local mass storage unit with header information designating a CommentON field (the Program_ID of the program segment commented on), the byte location in the playing program file where the comment was dictated, the Class field specifying the nature of the comment, and the Created date and time stamp. The files containing public and

44

private annotations and comments (other than those designated for the sole use of the subscriber which remain on the local storage unit) are uploaded to the host at the same time the usage log is transferred (see 219, FIG. 2).

Defining Audio Programing with HTML

Narrative text to be presented in the interactive, multimedia format made possible by the present invention may be advantageously expressed in the first instance using essentially conventional hypertext markup language, "HTML". FIG. 7 shows an example of the content of a portion of an illustrative HTML text file indicated generally at 450 used to create an audio file seen at 460 and a selections file indicated at 470.

The HTML file illustrated at 450 uses conventional <IMG> tags to identify image files, conventional emphasizing tags pairs <EM> and </EM> to designate highlighted passages, and conventional <A> and </A> HTML tag pairs to designate the anchor text and link target of a hypertext link. Utilizing conventional HTML to describe the narrative content to be presented in audio form provides several significant advantages, not the least of which are:

conventional HTML composition software may be used to add the image and emphasis tags by means of visual tools which eliminate the need for hand-coding on a character level;

a narrative text version of the audio programming may be viewed and printed, including both the emphasized text and the imbedded images, using most popular web browsers;

existing HTML files may be readily converted into audio multimedia presentations with little or no HTML editing being required;

HTML file may be made available from a server in a form which can be viewed in the normal way by any web browser yet and alternatively presented accordance with the invention in the form of an interactively browsable audio program with synchronized images;

the HTML file may be supplied along with the audio file as a transcript for the audio presentation, and to permit the audio presentation to be indexed and searched; and

the HTML may be automatically converted into the combination of an audio file using conventional speech synthesis techniques to process the narrative text with the HTML tags being used to compile a selections file which enables the player to interactively browse the audio file using highlighted and linked passages, and to synchronize the image presentation with the audio file.

As seen in FIG. 7, the HTML text passage seen at 450 begins with an image tag, <IMG SRC="IMGFILE1.JPG">, which to specify that the display of JPEG image in the file named "IMGFILE1.JPG" should begin at that point. The image tag is translated into a pair of "I" and "J" selection records seen at 472 which respectively contain the ImageID specifying IMGFILE1.JPG and the IMGSTART byte location in the audio file 460 where the display of that image is to begin. This display continues until the next <IMG> tag is encountered specifying the IMGFILE2.JPG image which creates the "I" and "J" selection record pair at 473. The <IMGOFF> is not standard HTML and hence would be ignored by conventional web browsers, but is inserted for recognition by the selections file compiler which responds by inserting the "K" record at 474 which specifies the point at which the current image display should end.

Immediately thereafter, the phrase "Television and motion pictures" is identified as a highlighted passage by the tag pair <EM> and </EM> seen in the text 450. These tags are

US 6,199,076 B1

45

46

translated into the "H" and "E" record pairs at **475** in the selections file **470** which identify the beginning and ending of the phrase in the audio file. As discussed earlier in conjunction with FIG. **5**, the highlight markers in the selections file enable the player to play only the highlighted passages when in the highlight mode. A second "H" and "E" record pair seen at **476** is produced by the HTML text "<EM>bandwidth</EM>".

A conventional HTML hypertext anchor "<A HREF= 'target'>full motion video</A>" is processed to produce the three records "A", "B" and "L" at **478** in the selections file which respectively designate the beginning and ending of the anchor text passage and the location of a linked information. The "HREF='target'" portion of the HTML specifies the target location in conventional HTML and that symbolic address is then translated by the selections file compiler into the location within the selections file of the selections file record which refers to that target or, for targets in program segments which are not part of the currently scheduled programming defined by the selections file, by a negative number representing the negative of the ProgramID number of the target program segment.

The HTML forms mechanism may also be used to incorporate requests for user input at predetermined times during the playback of program segments. As described earlier in connection with FIG. **5**, user inputs may take the form of recorded comments and annotations which are analogous to the <INPUT TYPE="text"> and the <TEXTAREA> tagged requests in an HTML form which similarly request the recipient to supply text data. In addition, the embodiment of the invention which has been described incorporates a mechanism for accepting "YES"/"NO" selections from a user which is analogous the HTML form <INPUT TYPE= "checkbox"> tag. Similarly, the value choice mechanism using "V" selection records provides a radio-button-style mechanism for indicating a user's choice from among several options.

Standard HTML input tags include a Name attribute which can be used as an identifier for the data entered. As HTML is translated into an equivalent audio file, the tags in the written HTML are translated into records in the selections file which contain byte location values specifying when the player should pause the playback and accept the user response. The resulting uploaded usage log file (containing responses to radio and checkbox input tags) contains the response value together with the original byte location value from the selections file which serves the tag identifier. In order to facilitate processing of the responses, the HTML to audio conversion process may advantageously save a table correlating the Name values in the HTML source with the byte location values. In this way, the input tag Name parameter may be used as a symbolic identifier to identify and process response data.

The HTML input tag Value parameter is conventionally used to supply a default response value to be supplied when the user does not supply a different response. Value parameters may accordingly be saved for later use and inserted as output data when the user does not respond to the request for input (as indicated by the absence in the uploaded files of any response data containing the byte location value for the tag not responded to). In the same way, hidden HTML tags may be imbedded in the original HTML and saved during the HTML to audio conversion to indicate the correspondence between particular byte locations in the audio file and symbolic location names identified by the symbolic Name parameter specified in the hidden tag. Such hidden tags may be used, for example, to identify the beginning and end of

particular passages and may be compared with the usage logs to determine the extent to which users exercised their option to skip the remainder of a program during the designated passage.

Conclusion

It is to be understood that the embodiment of the invention which has been described is merely illustrative of one application of the principles of the invention. Numerous modifications may be made to the specific structures and functions used in that embodiment without departing from the true spirit and scope of the invention.

What is claimed is:

1. A player for reproducing selected audio program segments comprising, in combination:

means for storing a plurality of program segments, each of said program segments having a beginning and an end,

means for receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be reproduced by said player,

means for accepting control commands from a user of said player,

means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command,

means for detecting a first command indicative of a request to skip forward, and

means responsive to said first command for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which follows said currently playing program in said sequence.

2. A player as set forth in claim **1** further comprising means for detecting a second command indicative of a request to skip backward, and

means responsive to a single one of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of said currently playing program.

3. A player as set forth in claim **2** further comprising means responsive to the detection of two consecutive ones of said second commands for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment.

4. A player as set forth in claim **1** wherein said sequence established by said data forms an endless circular sequence of program segments.

5. A player as set forth in claim **1** including editing means for modifying said data establishing said sequence.

6. A player as set forth in claim **5** wherein said editing means includes means for reordering the sequence established by said data.

7. A player as set forth in claim **1** wherein said means for reproducing said program segments includes means for varying the rate at which said program segments are reproduced.

8. A player as set forth in claim **7** wherein said means for varying the rate at which said program segments are reproduced includes means for skipping periods of silence between words or other sounds when said program segments are reproduced.

9. A player as set forth in claim **7** wherein said means for varying said rate comprises means for designating portions

LUDWIG ET AL. -- EX. 1001 -- Page 31

US 6,199,076 B1

47

48

of said program segments as highlight passages and means responsive to a request from aid user for reproducing said highlight passages without reproducing at least some portions of said program segments which are adjacent to said highlight passages.

**10.** A player as set forth in claim **1** wherein said means for reproducing said program segments including means for accepting a bookmarking request from said user, means for storing bookmark data indicating the program segment being reproduced at the time said bookmarking request is accepted.

**11.** A player as set forth in claim **1** wherein said program segments include descriptive program segments, each given descriptive segment containing information which when reproduced for the listener describes the content of one or more other program segments which immediate follow said given descriptive segment, and

wherein said player further comprises means responsive to said first command and operative when one of said descriptive segments is currently playing for discontinuing the reproduction of said currently playing descriptive segment and instead continuing the reproduction at the beginning of the next descriptive segment in said sequence.

**12.** A player as set forth in claim **1** wherein said player further comprises:

means for storing data indicative of highlight passages within at least selected ones of said program segments, and

means responsive to a predetermined one of said control commands for reproducing only the highlight passages within said selected program segments.

**13.** A player as set forth in claim **1** wherein said means for accepting control command from a user includes a microphone for accepting voice signals from said user and means for translating said voice signals into said control commands.

**14.** A programmed digital computer for reproducing audio programs, said computer comprising, in combination:

a mass storage device for storing a plurality of digitally recorded audio program segments, each of said segments having a beginning and an end, and further receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be played,

input means for accepting control commands from a user,

output means for producing audible sounds in response to analog audio signals,

processing means for translating said digitally recorded audio program segments into analog audio signals delivered to said output means for reproducing said recorded program segments in a form audible to said user,

processing means responsive to a first one of said control commands for discontinuing the translation of the currently playing program segment and instead continuing the translation at the beginning of the next program segment in said sequence, and

processing means responsive to a second one of said control command for discontinuing the translation of the currently playing program and instead continuing the translation at the beginning of said currently playing program.

**15.** A programmed digital computer for reproducing audio programs as set forth in claim **14** further comprising means responsive to two consecutive ones of said second control commands for discontinuing the translation of the currently playing program and instead continuing the translation at the beginning of a program segment which precedes said currently playing program in said sequence.

**16.** A programmed digital computer for reproducing audio programs as set forth in claim **14** wherein said program segments include descriptive programs segments which describe the content of one or more other program segments which immediately follow said descriptive segment in said sequence and wherein said processing means responsive to said a first one of said control commands continues the translation at the beginning of the next descriptive command when the currently playing program segment is a descriptive segment.

**17.** A programmed digital computer as set forth in claim **16** wherein said input means comprise a microphone for accepting voice commands spoken by said user.

\*  \*  \*  \*  \*

LENO ET AL. -- EX. 1001 -- Page 32

US006199076C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (9429th)

# United States Patent
Logan et al.

(10) **Number:** US 6,199,076 C1
(45) **Certificate Issued:** Nov. 30, 2012

(54) **AUDIO PROGRAM PLAYER INCLUDING A DYNAMIC PROGRAM SELECTION CONTROLLER**

(75) Inventors: **James Logan**, Windham, NH (US);
**Daniel F. Goessling**, Wayland, MA (US); **Charles G. Call**, Hingham, MA (US)

(73) Assignee: **Personal Audio LLC**, Dallas, TX (US)

**Reexamination Request:**
No. 90/011,579, Mar. 17, 2011

**Reexamination Certificate for:**
Patent No.: **6,199,076**
Issued: **Mar. 6, 2001**
Appl. No.: **08/724,813**
Filed: **Oct. 2, 1996**

(51) **Int. Cl.**
*G06F 15/00* (2006.01)
(52) **U.S. Cl.** .......................... **715/203**; 434/319; 434/320
(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,579, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Cameron Saadat

(57) **ABSTRACT**

An audio program and message distribution system in which a host system organizes and transmits program segments to client subscriber locations. The host organizes the program segments by subject matter and creates scheduled programming in accordance with preferences associated with each subscriber. Program segments are associated with descriptive subject matter segments, and the subject matter segments may be used to generate both text and audio cataloging presentations to enable the user to more easily identify and select desirable programming. A playback unit at the subscriber location reproduces the program segments received from the host and includes mechanisms for interactively navigating among the program segments. A usage log is compiled to record the subscriber's use of the provided program materials, to return data to the host for billing, to adaptively modify the subscriber's preferences based on actual usage, and to send subscriber-generated comments and requests to the host for processing. Voice input and control mechanisms included in the player allow the user to perform hands-free navigation of the program materials and to dictate comments and messages which are returned to the host for retransmission to other subscribers. The program segments sent to each subscriber may include advertising materials which the user can selectively play to obtain credits against the subscriber fee. Parallel audio and text transcript files for at least selected programming enable subject matter searching and synchronization of the audio and text files. Speech synthesis may be used to convert transcript files into audio format. Image files may also be transmitted from the server for synchronized playback with the audio programming.



LENOVO ET AL. -- EX. 1001 -- Page 33

US 6,199,076 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-3** and **14-15** is confirmed.

Claims **4-13** and **16-17** were not reexamined.

\* \* \* \* \*

LENOVO ET AL. -- EX. 1001 -- Page 34



US007509178B2

(12) **United States Patent**
Logan et al.

(10) Patent No.: **US 7,509,178 B2**
(45) Date of Patent: **\*Mar. 24, 2009**

(54) **AUDIO PROGRAM DISTRIBUTION AND PLAYBACK SYSTEM**

(75) Inventors: **James D. Logan**, Candia, NH (US); **Daniel F. Goessling**, Wayland, MA (US); **Charles G. Call**, West Yarmouth, MA (US)

(73) Assignee: **James D. Logan and Kerry M. Logan Family Trust**, Monroe, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 633 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/782,546**

(22) Filed: **Feb. 13, 2001**

(65) **Prior Publication Data**

US 2008/0155616 A1    Jun. 26, 2008

**Related U.S. Application Data**

(62) Division of application No. 08/724,813, filed on Oct. 2, 1996, now Pat. No. 6,199,076.

(51) **Int. Cl.**
*G06F 17/00* (2006.01)

(52) **U.S. Cl.** ............................................. **700/94**

(58) **Field of Classification Search** ................. 715/203; 434/319, 32, 185, 156, 169, 318, 321; 700/94; 704/1, 200; 360/15; 709/219; 725/133
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,947,882 A    3/1976 Lightner

5,153,579 A    10/1992 Fisch et al.
5,168,481 A    12/1992 Culbertson et al.
5,406,626 A    4/1995 Ryan
5,428,732 A    6/1995 Hancock et al.
5,454,723 A    10/1995 Horii
5,467,288 A    11/1995 Fasciano et al.
5,475,835 A    12/1995 Hickey
5,481,509 A    1/1996 Knowles
5,486,645 A    1/1996 Suh et al.
5,499,316 A    3/1996 Sudoh et al.
5,510,573 A    4/1996 Cho et al.
5,524,051 A    6/1996 Ryan
5,541,638 A    7/1996 Story
5,557,541 A    9/1996 Schulhof et al.
5,572,442 A    11/1996 Schulhof et al.
5,590,195 A    12/1996 Ryan
5,594,601 A    1/1997 Mimick et al.

(Continued)

OTHER PUBLICATIONS

Moorer, J.A.; Abbott, C.; Nye, P.; Borish, J. & Snell, J.; The Digital Audio Processing Station, Jun. 1996, J. Audio Eng. Soc. vol. 34, No. 6, pp. 545-463, Audio Eng. Soc. U.S.

(Continued)

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Andrew C Flanders
(74) *Attorney, Agent, or Firm*—Charles G. Call

(57) **ABSTRACT**

An audio program and message distribution system in which a host system organizes and transmits program segments to client subscriber locations. A playback unit at the subscriber location reproduces the program segments received from the host and includes mechanisms for interactively navigating among the program segments. Voice input and control mechanisms included in the player allow the user to perform hands-free navigation of the program materials.

29 Claims, 7 Drawing Sheets



**US 7,509,178 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,610,774 A | | 3/1997 | Hayashi et al. |
| 5,616,876 A | | 4/1997 | Clutz |
| 5,619,425 A | | 4/1997 | Funahashi et al. |
| 5,625,608 A | | 4/1997 | Grewe et al. |
| 5,670,730 A | | 9/1997 | Grewe et al. |
| 5,751,806 A | | 5/1998 | Ryan |
| 5,810,600 A | | 9/1998 | Okada |
| 5,815,671 A | | 9/1998 | Morrison |
| 5,841,979 A | | 11/1998 | Schulhof et al. |
| 5,914,941 A | * | 6/1999 | Janky ........................ 370/313 |
| 5,966,440 A | * | 10/1999 | Hair ............................ 705/26 |

## OTHER PUBLICATIONS

Enco America, DADpro Digital Audio Delivery System, Mar. 1996. 7 unnumbered pages, product description, Enco America, Farmington Hills, MI.

Nielsen, J. & Desurvire, H.; Comparative Design Review: An Exercise in Parallel Design, Apr. 24-29, 1993, INTERCHI 93, pp. 414-417, ACM, U.S.A.

* cited by examiner



Fig. 1

Appx222 LENOVO ET AL. -- EX. 1001 -- Page 3



Fig. 2

LENOVO ET AL. -- EX. 1001 -- Page 4



Fig. 3



Fig. 4



**Fig. 5**



**Fig. 6**

Appx227 LENOVO ET AL. -- EX. 1001 -- Page 8



**HTML File**
. . . <IMG SRC="IMGFILE1.JPG"><EM>Television and motion pictures
</EM>offer the viewer a rich combination of sights and sounds which effectively
convey a large amount of information to the viewer, and hence require an
information delivery system having substantial <EM>bandwidth</EM>. Radio
programming requires only a fraction of the bandwidth of a <A
HREF="target">full-motion video</A> presentation, and is especially suitable
for conveying information expressed in text narrative form.  Using suitable audio
compression techniques, speech can be transmitted over communications
pathways of much more limited bandwidth, <IMG
SRC="IMGFILE2.JPG">including telephone dial up connections to the Internet,
permitting that facility to be used to provide real-time telephone connections
between two computers connected via the Internet,<IMGOFF> and play
pre-recorded audio files as they are transferred from an Internet server to a
suitably programmed client computer. . . .

| I | ImageID | 472 |
| J | ImgStart | |
| H | StartLoc | 475 |
| E | EndLoc | |
| H | StartLoc | 476 |
| E | EndLoc | |
| A | Anchor | |
| B | EndAnchor | 478 |
| L | ProgramID | |
| I | ImageID | 473 |
| J | ImgStart | |
| K | ImgOff | 474 |

470

450

**Fig. 7**

460

Compressed Audio File

"Television and motion pictures"  "bandwidth"   "full motion video"

LENOVO ET AL. -- EX. 1001 -- Page 9

<div style="text-align:center">1</div>

# AUDIO PROGRAM DISTRIBUTION AND PLAYBACK SYSTEM

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Division of U.S. patent application Ser. No. 08/724,813 filed on Oct. 2, 1996, now U.S. Pat. No. 6,199,076.

## FIELD OF THE INVENTION

This invention relates to electronic information distribution systems and more particularly to a system for dynamically and interactively selecting and playing particular programs from a program library.

## BACKGROUND OF THE INVENTION

The three dominant commercial systems for providing audio programming to a listeners are broadcast radio systems, cassette tape playback systems and compact disk playback systems.

Broadcast radio uses both the AM and FM frequency bands making a large number of simultaneously broadcast programs available on an essentially random access basis. Unfortunately, since most broadcast stations attempting to appeal to the same general listening audience, much of the programming is duplicative and special interest programs are broadcast on a limited basis. In addition, because there is no convenient way for listeners to be aware of the wide variety of materials scheduled for broadcast, most people listen to only a limited number of stations which dependably broadcast the programming considered to be most acceptable. Even when desired programming is found, it must typically be listened to when it is broadcast; that is, at times chosen by the broadcaster and not the listener.

Tape and compact disk audio players offer the listener the opportunity to purchase specific music selections or albums performed by favorite artists and to replay selections from these purchased recording whenever desired. Pushbutton track selection, as well as improved fidelity, has made the CD player the preferred choice of many, despite the cost and inconvenience of purchasing a library of desired disks. Unfortunately, specialized information programming, unlike music, is largely unavailable on tape or disk, and that media is not capable of adequately conveying rapidly evolving information such as local and world news, weather reports, and rapidly changing trade and business information. Although broadcast radio provides adequate, up to the minute coverage of general news topics, specialized information continues to be largely unavailable on any of these three audio delivery systems, not withstanding the fact that radio, tape and CD players continue to be widely used, particularly in automobiles, for general news and music programming.

More recently, "Internet radio" sources has been introduced which make files of audio program material available for downloading on the World Wide Web using conventional web browsers to locate and request specific files which are then played in real time by special programs, including the popular "Real Audio" program offered by Progressive Networks. Although Internet radio systems make it possible to deliver a richly diverse selection of audio programs to interested listeners on request, including specialized information not offered by conventional broadcast media, the use of a visual web browser to search for and then play individual program selections one at a time makes conventional Internet

<div style="text-align:center">2</div>

radio players impractical for routine desktop use, and wholly unsuitable for use by an automobile drive.

It is accordingly an object of the present invention to provide easy access to rich selection of audio programming and to allow the listener to dynamically and interactively locate and select desired programming from the available collection in an easy and intuitive way without the need for a visual display screen and using only simple selection controls.

## SUMMARY OF THE INVENTION

The present invention takes the form of an audio program player which automatically plays a predetermined schedule of audio program segments and which further includes simple controls that allow the listener to perform one or more of the following functions:

to skip the remainder of any segment being played in order to listen to the next program segment;

to skip backward to the beginning of the current segment, and then backward again to the beginning of the prior segment on the schedule, thereby replaying any desired segment or search for a previously played segment in the sequence;

to listen if desired to an audio speech announcement describing each segment before it is played, and to skip the forward or backward to the next or prior announcement, thereby immediately obtaining the information needed to determine whether a given segment is or is not of interest;

to listen if desired to an audio speech announcement describing a subject matter categories within which several program segments are grouped, and to skip from category announcement to category announcement in either the forward or reverse direction, skipping all program segments in categories of insufficient interest;

a. to listen to only predetermined highlight passages in any program segment, thereby more rapidly reviewing the highlights only of a program segment with the ability to commence normal playing at any point where the highlight passage reveals information which the listener desires to hear in more detail;

b. to execute a hyperlink jump to a different, cross-referenced position in the program sequence, or to a program segment not specified in the program sequence, and to provide audible cues to the listener to identify passages which identify the presence of a cross-referencing hyperlink.

According to a further feature of the invention, the audio program player plays program segments in an order determined by a session schedule which identifies an ordered sequence of program segments. The session schedule is preferably created in the first instance by a server subsystem which develops and periodically transmits to the session schedule top the player. According to still another feature of the invention, the player subsystem incorporates means for modifying the session schedule received from the server subsystem by adding or deleting specific programs and by altering the order in which the programs are presented.

As contemplated by the invention, the player subsystem includes a control mechanism responsive to commands received from a listener to dynamically alter the sequence and content of the programming material actually presented. More specifically, the player may advantageously incorporate means for skipping the remaining content of any program being played at any time, or returning to the beginning of a particular subject to replay its content. Each given program segment is preferably preceded by a topic description seg-

 LENOVO ET AL. -- EX. 1001 -- Page 10

US 7,509,178 B2

3

ment, and the program skipping mechanism is the player is preferably adapted to automatically skip to the next topic description, bypassing the intervening program content, whenever a skip command is receive when a topic description is being played. Similarly, related topics (program segments) are sequentially grouped together by subject category, and a subject description program segment advantageously precedes each subject collection. When the user issues a skip command at the time a subject description is playing, the player automatically skips all of the program segments (topics) within the described subject and continues by playing the next subject description. In this way, the listener can rapidly skim through subject categories, one at a time, until a desired subject is reached, and then allow the player to play topic descriptions one at a time until a desired topic (program segment) is reached.

In accordance with still another feature of the invention, means are employed for identifying one or more discrete passages within any program segment as being a "highlight," and the player incorporates means operative when the player is placed in a "play highlights" mode for skipping those portions of the content which are not highlights, thus enabling the listener to review only the key points of a presentation, or to more rapidly locate particular passages on interest within the body of a particular program segment.

According to yet another feature found in the preferred embodiment of the invention, a designated portion of a program segment may be designated as a hyperlink anchor from which, at the request of the user, the player jumps to another portion of the session sequence and begin playing a different sequence of program segments. Means are advantageously employed for generating an audible cue signal to inform the listener that a hyperlink anchor is being played, enabling the listener to request that the link be executed. The hyperlink capability may be used to advantage to implement cross references to related information, or to provide an audible menu of alternative programming which the user may select merely by executing the link when the anchor passage identifies other information of interest to the listener. In the preferred embodiment, a stack mechanism is used to allow hyperlinks to be called in nested fashion, so that a hyperlink may be executed from a linked program segment, with each "return" command from the user causing play to be resumed at the program segment from which the last link was performed.

As contemplated by still another aspect of the invention, the player subsystem includes means for identifying a program segment, or a particular passage within a program segment, as a bookmarked item for ease of reference later. In addition, the player system incorporates means for accepting a dictated annotation from the user which associated with any bookmarked passage. This annotation mechanism may be used to particular advantage when the program segments provided to the subscriber include email or voice mail messages, since the bookmarking may be used to identify specific messages, or portions thereof, which require later attention, and the annotation mechanism provides a convenient mechanism for dictating replies and/or specifying actions to be take in response to particular messages or portions thereof.

These and other objects, features and advantages of the present invention may be more completely understood by considering the following detailed description of a preferred

4

embodiment of the invention. In the course of this description, reference will frequently be made to the attached drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block schematic diagram of an electronic program and advertising distribution system which embodies the invention;

FIG. 2 is a flow chart illustrating the principle steps followed in the course of the performing the information distribution functions contemplated by the invention;

FIG. 3 is a flow chart illustrating the principle steps performed during a playback session in the illustrative embodiment;

FIG. 4 is an information structure and data flow diagram illustrating the manner in which programming is selected and accounting functions are performed in the illustrative embodiment of the invention;

FIG. 5 is an information structure diagram illustrating the manner in which the program segments are dynamically selected and played in response to the user's preferences and control decisions;

FIG. 6 is a flow chart which describes a preferred procedure for preparing the program content which is distributed to subscribers in accordance with the invention; and

FIG. 7 is an information structure diagram illustrating the manner in which a narrative text file expressed in hypertext markup language (HTML) may be translated in to the combination of an audio speech file, a text file transcript, and a sequencing file used by the player to create a multimedia presentation.

DESCRIPTION OF THE PREFERRED
EMBODIMENT

The illustrative embodiment of the invention shown in FIG. 1 utilizes the Internet to provide communications between a host computer indicated generally at 101 and an audio player device illustrated at 103.

Subscriber Audio Player

The player 103 may be advantageously implemented by a conventional laptop or desktop personal computer including a processor (the client CPU 105), a time of day clock 106, and a data storage system consisting of both high speed RAM storage and a persistent mass storage device, such as a magnetic disk memory, the data storage system being used for storing audio, text and image data at 107 and for storing usage data at 109 which records the nature of the programming reproduced by the player 103. The player 103 further includes a sound card 110 which receives audio input from a microphone input device 111 for accepting voice dictation and commands from a user and which delivers audio output to a speaker 113 in order to supply audio information to the user. The program data stored at 107 may advantageously include compressed audio recordings and/or text (files of characters) which may be converted into audio form by conventional speech synthesis programs executed by the client CPU 105.

The sound card 110 is conventional and preferably complies with the recommendations detailed in the *Hardware Design Guide for Microsoft Windows* 95, by Doug Klopfenstein, Microsoft Press (1994), ISBN 1-55615-642-1. The sound card 110 advantageously supports a 44 kHz, 16-bit, stereo codec providing analog to digital conversion of audio input signals from the microphone 111 as well as digital to analog conversion for programming directed to the speaker

LENOVO ET AL. -- EX. 1001 -- Page 11

US 7,509,178 B2

5

**111**. The sound card provides external connections and hardware support for Microphone-In, Line-In, Line-Out, and Headphones-Out, with volume controlled by the player software (including volume level logging as discussed later in connection with FIG. **3** of the drawings).

To support multimedia capabilities, the CPU **105** should meet or exceed the capabilities of an Intel 486 DX2-66 computer to provide consistently good playback results and the sound card **110** should include a 16-bit digital-to-analog converter for playback and a 16-bit analog-to-digital converter for recording. The sound card **110** should further support 8, 11, 22, and 44 kHz waveforms. A frequency of 44 kHz is used for CD-quality sound and fractions of 44, such as 11 and 22, are often used for compressed waveforms meant to save CPU processing. Support for an 8 kHz frequency should be in order to properly support Windows 95 TrueSpeech™ compression, which is optimized for compression and playback of human speech. Using TrueSpeech compression, programs containing largely voice narrative data can be substantially condensed, and users can record annotations and voice input responses as discussed later.

In addition, the sound card **110** should be capable of reproducing downloaded MIDI (Musical Instrument Device Interface) commands, enabling the system take a MIDI data stream and produce sound according to the compressed files consisting of digital sheet music instructions. Preferably, the sound card should support at least 16-voice polyphony (the ability to play several sounds at the same time), and polymessage MIDI, an capability included in Windows 95 that allows a sound card to receive and batch-process multiple MIDI messages (such as Note On and Note Off). The sound card **110** should also a microphone port for microphone **111**, a speaker-out port (for one or two (stereo) unpowered speakers **113**, and a headphone-out port.

The personal computer CPU **105** is also preferably connected to a conventional personal computer video display **118** and a standard keyboard **119**, as well as a pointing device (such as a mouse, trackball or touchpad, not shown). The facilities provided by the operating system, such as Windows 95, typically includes multimedia support, as noted above, as well as a standard WINSOCK TCP/IP stack and modem dial up driver software to support a SLIPP/PPP Internet connection, as next discussed.

The player **103** further includes a conventional high speed data modem **115** for receiving (downloading) the program information **107** from the remote server **101** and for transmitting (uploading) program selections and preferences as well as usage data in the file **109** to the server **101**. To effect these file transfers, the modem **115** is connected via conventional dial up telephone SLIP or PPP TCP/IP series data communication link **117** to an Internet service provider **121** which provides access to the Internet. The service provider **121** is in turn connected to the host server **101** via a high speed Internet link seen at **123**.

Host File Server

The host server **101** provides a FTP server interface **125** which provides file transfer protocol services to the player **103**, a CGI interface **127** which performs Common Gateway Interface script program execution in response to requests from the player **103**, and an HTML interface **129** which provides hypertext transport protocol (HTTP) World Wide Web server functions to the connected player **103**. The host server **101** stores and maintains a plurality of data files including a program data library indicated generally at **130** consisting of a collection of compressed audio program segments **131**, announcement ("glue") segments **132**, text program segments **133**, image segments **134**, advertising segments **135** and program catalog information **137**.

The compressed audio segments program segments comprise audio voice and music files which may be compressed using conventional compression mechanisms suited to the data being compressed, such as TrueSpeech compression for voice signals and MIDI files for compressed synthetic music reproducible by the sound card **110** as noted earlier.

Compressed voice programming in the database **131** may advantageously be accompanied by text transcripts (files of characters) stored in the text database **133**. Similarly, images stored in the image database **134** may be used to provide a multimedia presentation which combines images reproduced on the display **118** of player **103** with concurrently presented audio at the speaker **113** and/or displayed text. Program segments which present advertising, illustratively shown as being resident in a separate database **135** in FIG. **1**, may likewise consist of audio, text and/or image segments, as may the program segments which provide announcements between program segments as well as audible and visible menu options which the user may select as described later.

As hereinafter described in connection with FIG. **5**, each voice or text program segment preferably includes a sequencing file which contains the identification of highlighted passages and hypertext anchors within the program content. This sequencing file may further contain references to image files and the start and ending offset locations in the audio presentation when each image display should begin and end. In this way, the image presentation may be synchronized with the audio programming to provide coherent multimedia programming.

As contemplated by the invention, information which is available in text form from news sources, libraries, etc. may be converted to compressed audio form either by human readers or by conventional speech synthesis. If speech synthesis is used, the conversion of text to speech is preferably performed at the client station **103** by the player. In this way, text information alone may be rapidly downloaded from the server **101** since it requires much less data than equivalent compressed audio files, and the downloaded text further provides the user with ready access to a transcript of voice presentations. In other cases, where it is important to capture the quality and authenticity of the original analog speech signals, a text transcript file which collaterally accompanies a compressed voice audio file may be stored in the database **133** from which a transcript may be made available to the user upon request.

The host server **101** further stores web page data **141** which is made available to the player **103** by means of the HTML interface **128**. The host server **101** additionally stores and maintains a user data and usage log database indicated at **143** which stores uploaded usage data received from the store **109** in the player **103** via the Internet pathway **123** and the FTP server interface **125**. The user data **143** further contains additional data describing the preferences, demographic characteristics and program selections unique to each subscriber which is developed largely from user-supplied data obtained when users submit HTML form data via the Internet pathway **123** for processing by the CGI mechanism **127**.

The host server **101** periodically transmits a download compilation file **145** upon receiving a request from the player **103**. The file **145** is placed in a predetermined FTP download file directory and assigned a filename known to the player **103**. At a time determined by player **103** monitoring the time of day clock **106**, a dial up connection is established via the service provider **121** and the Internet to the FTP server **125** and the download compilation **145** is transferred to the pro-

LENOVO ET AL. -- EX. 1001 -- Page 12

US 7,509,178 B2

7

gram data store **107** in the player **103**. The compilation **145** is previously written to the download directory by a download processing mechanism seen at **151** in the server **101**. Download processing, as described in more detail later, extracts from the library **130** data defining compressed program, advertising, and glue segments, and/or associated text program data, based on selections and preferences made by (or inferred for) the user as specified in the subscriber data and usage log database **143**.

The download compilation file **145**, though represented as a single file in FIG. **1**, preferably takes the form of one or more subscriber and session specific files which contain the identification of separately stored sharable files. By way of example, the recommended order and the identification of the program files making up an individual playback session are stored in a session schedule file (to be described in detail in connection with FIG. **5**) which contains program identifiers of the program segments to be played during an upcoming session. The player **103** downloads the session schedule file and then issues download requests for those identified program segment files which are not already available in the player's local storage unit **107**.

Usage data in the store **109** maintained by the player **103** is preferably uploaded as a file bearing a predetermined file name indicative of the particular subscriber and upload time and stored in a predetermined FTP upload directory. This upload advantageously occurs at the same time the player **103** establishes a download connection to the FTP server **125** as noted earlier, and occurs prior to the download of the compilation **145**. Because the upload data from the store **109** in the player **103** identifies program segments desired by the subscriber, program segments newly requested by the user are appended to the compilation **145**. Note that, in typical cases, programming in addition to the specifically requested programming will be included in the download compilation, and the transfer of that programming can begin immediately while the newly uploaded user selections and other information are being processed as indicated at **153** to identify additional information to be included in the download compilation.

As indicated at **161** in FIG. **1**, the host server upload processing mechanism **153** also provides a number of reports, as described in more detail later, based upon the record of actual player use by individual subscribers and the community of subscribers as a whole. This report processing is advantageously performed on a periodic basis in connection with financial and accounting functions including subscriber and advertiser billing, content provider royalty payment accounting, and marketing analysis processing.

It should be understood that numerous other information storage, processing and communications schemes may be substituted for the preferred Internet server and PC client player architecture shown in FIG. **1**. A dedicated host computer which communicates directly with client stations via dial up telephone facilities may be used, and cellular radio, cable modem and satellite links may be used to provide data communications in lieu of the conventional SLIP/PPP telephone and Internet links shown in FIG. **1**. To facilitate use of the system in an automobile, a "player" computer may be linked to the Internet via a local communications server computer via a radio or infrared link when the car is parked at the subscriber's home or office. The Infrared Data Association's (IrDA) wireless infrared (IR) standard provides a highly effective, low-cost communications pathway rapidly becoming a standard feature in all notebook computers and PDAs. The IrDA international standard provides interoperability among widely diverse systems, involves no governmental

8

regulation, are provided at low cost, provide high speed file transfers (e.g., 4 Mbs data rates), are small and can be easily incorporated into portable computers of the type which may be used in a car or on public transportation. Alternatively, the files downloaded from the host may be stored on a replaceable media, such as an optical disk cartridge, which may then be inserted into a portable computer or simplified player for mobile use. A direct link between a mobile client player (such as a laptop PC) may be implemented using the Cellular Digital Packet Data (CDPD) service presently available in major metropolitan areas to provide low-cost access to the Internet using the TCP/IP protocol, and provides the advantage that needed program segments can be downloaded while a session is in progress, eliminating the need for a complete download before the mobile unit is disconnected from its data source.

Upload and Download Sequence—Overview

FIG. **2** illustrates the sequence of major events which are executed the program dissemination system contemplated by the invention.

As indicated at **203**, an interested subscriber invokes programming services by first supplying personal information and initial programming preferences during an account initialization procedure. Preferably, as explained in more detail later, account initialization is accomplished by presenting the subscriber with HTML forms to complete and submit to CGC script programs which execute on the server to post subscriber supplied information into an initial user dataset. Based on the information supplied by the user, the server then compiles one or more files for downloading to the subscriber at step **207** which include programming and advertising segments as well as additional data and utility programs needed by the player **103** to begin operation. The download operation preferably occurs at a time established by the player which establishes a dial up connection via the SLIP/PPP serial connection **117** to the local Internet service provider **121** which provides an Internet connection to the host FTP server **125**. The download file or files containing programming and advertising segments as well as subscriber specific data are designate by filenames provided by the requesting client/player **103** and moved from storage unit **145** utilizing the FTP server **125** and the Internet connection into local storage at **107** in the client/player **103**. The filenames used to specify the files in the server **125** may conveniently be formed from the program_id value used internally by both the host and the player to identify and differentiate the different program segments used.

The data downloaded includes a recommended program sequence file which provisionally identifies the order in which downloaded program segments are to be played, with the initial selection and sequence being established based on user preference data by the download compilation processing mechanism seen at **151** at the server.

Before a playback session begins, as indicated at **211**, the subscriber has the opportunity to review and alter the provisional program selections and sequence established as a default by the downloaded information from the server. Utilizing the programming data and a utility program previously supplied by the server, the subscriber may alter the selection and sequence of program materials to be played, including altering the extent to which advertising will be played along with the selected programming.

At the request of the user, the sequence of programming defined by the program sequence file (the selections file illustrated at **351** in FIG. **5**) is then reproduced for the listener. As contemplated by the invention, the player **103** includes controls which enable the user to easily move from program

LENOVO ET AL. -- EX. 1001 -- Page 13

US 7,509,178 B2

9          10

segment to program segment, skipping segments in a forward or reverse direction, or to jump to a particular segment, and thus alter the preprogrammed sequence. Nevertheless, when any given program segment concludes, the next segment which is specified as following the given segment will begin playing unless the listener intervenes. Thus, although the segments are stored in randomly addressable locations in the local mass storage unit, they are nonetheless played at step **212** in the sequence established initially by the server and (optionally) modified by the subscriber, with the player providing the ability to dynamically switch to any position in this sequence under the listeners control. As indicated at **213** in FIG. **2**, the listener may at any time return to the sequence editing step **211** to manually reorder the playing sequence if desired. As indicated at **215**, a session usage log is recorded during the playback session to identify every segment actually played, the volume and speed at which that segment was played, and the start and end times.

At step **211**, in addition to deleting and reordering items on the program schedule, the user may alter his or her selections and general subject matter preferences to control the manner in which the host assembles program schedules for future sessions. When programs are included in a current schedule which are of particular interest, the subscriber may assign a priority value to the scheduled program and, in that way, inform the host that the user has an interest in receiving more programming in the same subject matter categories in which the identified program is classified. When a program in a serialized sequence is assigned a new or different priority value at step **211**, the host system **101** assigns a corresponding Importance value to the program_segment record for each of the remaining unplayed programs in that serialized sequence. Note that, by expressly approving advertising segments or categories of acceptable advertising in this fashion, the subscriber may be granted a rate reduction since advertisers are generally willing to pay more for advertising directed to customers having a known interest in a given subject.

At the conclusion of a session, subscriber is given the opportunity at **217** to select programming which should be included in the next programming download. To facilitate this selection process, additional programming which fits the subscriber's indicated subject matter preferences, along with additional programming which the server includes as being of particular interest, is identified in a catalog (as periodically supplemented by a download file seen at **308** in FIG. **4**) and presented to the user in the form of a proposed program schedule together with a catalog of additional selections which may be substituted or inserted into the proposed schedule. At step **219**, the selections made by the user at **217** as well as the contents of the usage log recorded at **215** are uploaded to the server as a requested file (seen at **301** in FIG. **4**). This upload step may occur at the same time the SLIP/PPP dial-up connection is established by the player **103** to accomplish the download, with the upload occurring first by an FTP file transfer from the usage data store **107** to the FTP server **125** followed by the downloading of files requested by the client **103** from the FTP server.

In addition to the downloaded catalog of available items which may be viewed by the subscriber from the available downloaded information, the user may re-establish an Internet connection to the HTML web server **129** which presents HTML program selection and search request forms, enabling the subscriber to locate remotely stored programming which may be of particular interest to the subscriber. When such programs are selected in the HTML session, the user's additional preferences and selections may be posted into the user

data file **143** and the identification of the needed files may be passed to the client/player **103** for inclusion in the next download request.

Account Initialization

As contemplated by the invention, a subscriber account may be established by any user having a personal computer equipped to provide the capabilities needed to implement the player **103** as described above, together with Internet access via a service provider **121**. Although a conventional modem dial up connections will perform satisfactorily, the time required for uploading and downloading the necessary files may be substantially reduced using higher speed access, such as an ISDN or cable modem link, when those services are available.

To establish a new account, a prospective subscriber may use a conventional web browser program, such as Mosaic, Netscape Navigator or Microsoft's Internet Explorer, which executes in the client CPU **105** to establish a conventional HTTP request/response dialog with server **101**. The account initialization begins with the transmission of an HTML form from the web page store **141** which is completed by the user at the keyboard (not shown) of the client CPU **105**. The account information is then transmitted to using a HTTP post method directed at a form processing CGI script executed by the server at **127** to place descriptive information about the user in an assigned user data file as seen at **143**. After the account has been established, utility programs and data may be downloaded from the FTP server **125** to the client/player **103**. These utility programs advantageously include programs which perform functions including (a) program decompression, playback and navigation; (b) recording of a usage log file identifying the program and advertising segments played and the start time, ending time, volume level and playing speed for each such segment; and (c) the selection and updating of programming preferences and selections for future downloading.

The data fields supplied by a new subscriber at the initialization step **203** may advantageously include the user's full name and billing address, credit card information or the like for use in subscriber billing; and descriptive data about the subscriber (and others who may share the downloaded material), such as: age, profession, sex, and marital status; the identification of subject matter categories of interest to the subscriber, preferably with assigned weighting factors indicating the level of interest in each category. The subscriber may also indicate general preferences with respect to the including advertising, including an indication of the amount of advertising which is acceptable to defray subscription costs, ranging from fully advertised programming for minimum subscription charges to the complete exclusion of advertising.

In addition, the subscriber may request and be presented with an HTML form which lists available programs in a particular selected subject matter area, with a priority weighting factor pre-assigned to each in accordance with the subscriber's previous specification for that category. The form presented thus reflects the previously entered level of interest weighting factor for each program based on its subject matter category, but permits the subscriber to override the suggested default value on a program by program basis. Similarly, the subscriber is given the opportunity to override the default amount of advertising desired.

Advertising may be associated with particular subject matter categories as well as with particular programs. For example, an airline may wish to advertise generally in connection with programming in the "travel" category whereas a

LENOVO ET AL. -- EX. 1001 -- Page 14

US 7,509,178 B2

11 12

particular resort hotel may wish to advertise only in connection with a particular travelogue program for the region where it is located. Subscribers may wish to hear advertising in connection with the programming in the travel category, but to eliminate commercials from a daily program presenting "today's weather report." The result is clearly advantageous for the advertiser, since advertising is focused more clearly on those having an interest in the subject matter and an expressed willingness to listen to commercial messages, while the subscriber is able to receive advertising which may be regarded as useful while eliminating unwanted advertising.

Because personal data describing each subscriber's subject matter interests is available, along with personal data (age, marital status, zip code, etc.), particular advertising segments may be directed to only those subscribers having a likely interest in the goods or services advertised. This targeted advertising need not be presented at any time during the playback for the designated subscriber and need not be timed for presentation with particular programs. For example, a subscriber indicating an interest in travel programming may be supplied with advertising from an airline at any time, and not necessarily concurrent with selected travel programming.

Because a subscriber may have a particular interest in or enjoy some advertising, and may have a particular dislike for other specific advertising, the user may advantageously be presented with a listing of advertising organized by advertiser and subject, providing the subscriber with the opportunity to select additional desired advertising on the list while suppressing others. Since the voluntary acceptance of advertising preferably reduces the programming charge to the subscriber, the utility program which executes on the client CPU **105** to enable program and advertising selection, sequencing and editing preferably provides an advisory indication to the subscriber of the charges or credits to be accrued if the currently programmed sequence is played. This feature enables subscribers to better control the costs of the service by accepting sufficient advertising content to reduce the subscription cost to an acceptable level. Subscribers may also set a player system variable to a value indicating the subscription costs per unit time that the subscriber is willing to accept, and the player **103** can then automatically insert advertising segments between program segments in sufficient quantity to achieve a net charge at the desired level.

Player Operation

The playback operation indicted generally at **212** in FIG. **2** is illustrated in more detail in FIG. **3**.

In order to limit access to the downloaded programming materials to the subscriber or persons authorized by the subscriber, the playback utility program executing on the client CPU **105** (FIG. **1**) advantageously begins the session by requesting the entry of a password as indicated at **231**. The entry of this or a different password may also be required for access to the utility programs used to modify the subscriber's personal data, future program selections, and current program selections and sequencing. Similarly, information which might be revealed concerning an individual subscriber by the host server **101** is advantageously password protected.

As with all Internet transactions, the actual data transmissions of information other than publicly available programming may also be encrypted. To this end, the client and server ends of the pathway may exchange public keys to enable encrypted transmission using conventional RSA encryption. By placing the decryption capability within the capability of the playback unit which is capable of directing decrypted content only to the system's speakers and display screen, but not to a file, the system insures that the internal usage accounting mechanism cannot be bypassed by reproducing downloaded program segments using other means. In addition, and as a part of this secure accounting arrangement, the host system can be programmed to require the receipt of an uploaded usage log (from which subscriber and advertising charges and content provider payments can be determined) before releasing additional programming materials for downloading from the FTP server **125**.

As described in more detail later in connection with FIGS. **4** and **5**, the sequence of program segments to be presented to the user is formed into a schedule file (seen at **307** in FIG. **4**) consisting of a sequence of program segment identification numbers which are used to compile a sequencing file, called the selections file, illustrated at **351** in FIG. **5**, which contains more detailed information about the sequence of events which occur during playback. The player obtains information from the selections file which identifies the individual program segments to be fetched from mass storage and played for the user, as well as the segment identification information which is recorded in a usage logging file in the manner illustrated in FIG. **3**.

As indicated at **233**, the playback session begins with the presentation of an audio (and/or displayed) menu which allows the user to jump to any program segment within that sequence to start (or resume) playback at **235**, or terminate the session at **236**.

The playback operation itself continues from the designated playback point in the selections file (seen at **351** in FIG. **5**) which follows a program sequence initially created by the host server and downloaded with the program segments themselves, and then (optionally) modified by the addition, deletion and re-sequencing of segment identifiers as discussed earlier in connection with step **211** in FIG. **2**. Note however that, if the user elects to have advertising segments automatically inserted between program segments to achieve a predetermined cost level, that insertion occurs under the control of the playback mechanism at **235** such that advertising segments not identified in the selections file may be added or advertising segments specified in the selections file may be automatically skipped.

As playing progresses, the current playback position may be advantageously indicated by a variety of means. In the most simple form, the current playback position within the session file of selections (discussed in more detail in connection with FIG. **5**) may be indicated by a simple numerical readout indicating the position on a scale of 1-100. In this way, a user listening to the programming in scheduled order is provided with an indication of the duration of programming remaining to be played. In a player implemented by a personal computer provided with a screen display, the current playback position may be advantageously indicated by displaying the program segment topic descriptions in a scrolling listing, with the description of the program currently being displayed being highlighted. The scheduled duration of each program segment may be displayed, along with the elapsed time remaining to be played in the currently playing segment, to enable the user to more easily determine when to skip the remainder of the currently playing segment. When such a concurrent visual display is available, means may also be included to respond to the users selection of a given program on the scrollable listing by means of a mouse or the like, and then automatically continue the play at the beginning of the program segment thus selected.

Each time the playback begins a new programming, advertising or announcement segment, the segment start time is recorded in the usage log file stored at **109** (FIG. **1**). Each usage log record contains a program segment identification

LENOVO ET AL. -- EX. 1001 -- Page 15

US 7,509,178 B2

13

number (ProgramID) obtained from the selections file as well as a start time and date stamp encoded into a 32 bit date-time value, a volume level setting indicating the volume at which the player was set at that time, and a playing speed value indicating the playing speed or playing being used.

As indicated at **237** in FIG. **3**, each time a new program segment is started, a new segment handling procedure is executed at **239**. If the user desires to have advertising inserted to defray the costs of the subscription, the current actual cost per unit time is calculated and compared with the desired cost per unit time. If the cost is determined to exceed the desired level, an additional advertising segment is started; otherwise, the next program segment in the program sequence **214** is played. In either case, the segment id of the newly starting segment is recorded in the log file along with the start time for that segment. Note that it is unnecessary to record the end time for the prior segment since it is the same value as the start time for the next segment. When play is concluded, a terminating record indicating the time of turnoff is recorded to enable the duration of the last segment to be calculated.

Recording Volume and Playing Speed Changes

As indicated at **251**, if the user changes the volume level or playback speed by a significant amount, a new record is posted to the usage log at **253**, indicating the continuation of the last program at a new volume level (thus producing two records in sequence having the same program segment ID numbers but having differing start times and volume levels). The user adjusts the volume by means of a software control displayed when the player is active. The user adjusts the control using the mouse or keyboard to adjust the volume. When the volume control experiences a change in level greater than a predetermined deviation, it sends a message to the player routine at **251** to cause the new volume level to be recorded at **253**. New volume settings do not affect the program sequence and the recording of the volume level change takes place transparently to the user. Likewise, when the user changes the playing speed, or switches to highlight mode, the new playing speed setting is recorded (using the Playing-Speed variable in a Usage Record, to be discussed)

The cost accounting program which calculates subscriber charges and fees to advertisers may thereby treat volume levels below a predetermined threshold level, or playing speeds in excess of a certain level, as being equivalent to skipped programming. In addition, if a subscriber reduces the volume on selected programs or programs in particular subject matter categories, frequently increases the volume for other programs or subject matter categories, or sets the playing speed to play highlights only of other programs, that data can be used to infer preferences and dislikes which can be used to better select desired programming to be included in future download compilations.

User Playback Controls

The player mechanism seen at **103** includes both a keyboard and a microphone for accepting keyed or voice commands respectively which control the playback mechanism. As indicated at **261**, the receipt of a command, which may interrupt the playback of the current selection, and the character of the command is evaluated at **262** to select one of six different types of functions.

The player **103** responds to the first command, "Accept" indicated at **263**, by temporarily suspending the playback in order to accept a spoken "comment" from the user which is recorded as indicated at **264**. After the conclusion of the comment, control is returned to **261** to test for additional commands before playback is resumed at **235**. As described

14

in more detail later, comments dictated by the user are saved and later uploaded to the host system where they exist as program_segments. By allowing the user to dictate and record comments, the system provides a number of useful capabilities, including posting comments and messages to the host (requests for help or additional information), posting comments and messages either privately or publicly to the originator of a program segment being played, thereby enabling private interchanges to occur between users, to enable the interchanges to take place in publicly available threads analogous to the UseNet and Listserv newsgroups employed on the Internet to facilitate public discussions related to predetermined topics. In addition, the ability to accept and upload user-generated comments and information provides a valuable mechanism by which the user can evaluate and comment on the program material being provided by the host. As described later in connection with FIGS. **5** and **7**, the mechanism seen at **263** and **264** for introducing a pause in the session playback while a voice response or comment from the user is recorded can also be employed to produce program generated prompts which request information followed by automatic response recordings, thereby enabling the system to be used to collect data, program evaluations, and other information from the user.**

A first command, "Go" indicated at **265**, causes the player to make an immediate shift to a different program segment. For example, the spoken voice command "FIVE" can indicate a request to go to a predetermined numbered program segment while the spoken command "NEWS" could switch to the subject announcement segment for news programs. Alternatively, a mouse click on a screen-displayed menu of items, or a push-button on a hand controller connected by an infrared link to the player computer, could similarly be processed as a command to go to a predetermined program segment associated with that command signal. In such cases, the system records the start of the new segment on the log file (seen at **215** in FIG. **2**) at **267** and switches the current playback position in the program sequence file **214** to the new setting at **269**, and the playback continues at **235**.

In the preferred arrangement, described in more detail in conjunction with FIG. **5** of the drawings, the program being played may contain passages which relate to other program segments in the compilation. These passages may be indicated by direct announcement, such as: "Say 'Go' when any of the following automotive companies are named to obtain additional information: . . . Ford . . . General Motors . . . Chrysler . . . Honda . . . " Alternatively, an audible cue signal, such a distinctive tone or chime, might immediately precede a passage which anchors a link to another program segment. Players equipped with stereo audio output capabilities can make cues distinctive by playing cued announcements in one stereo channel, with or without a supplemental cue signal in the other channel. When a cue signal indicates a hyperlink passage, a simple "Go" voice command causes the player to reset to a new location from which playing continues until a "Return" command, seen at **266**, causes the player to return to the original sequence.

As discussed later in connection with FIG. **5**, hyperlinks of this type may be used to identify program segments which are not available in the player **103** because they were not downloaded for inclusion in a scheduled session. In that event, the "Go" handling routine seen at **265** posts a record to the usage log containing the ProgramID of the requested but unavailable segment so that the requested segment can be included in the Requested file **301** seen at **301** in FIG. **4**.

When a communications pathway such as an Internet or cellular phone link is available to connect the player **103** to the

 LENOVO ET AL. -- EX. 1001 -- Page 16

US 7,509,178 B2

**15**

server, an immediate request may be sent to the server to download a needed but locally unavailable segment. In that case, the downloading and playing may proceed concurrently by placing the downloaded information into a memory buffer to which the downloaded program segment is written as it is concurrently read for reproduction as described U.S. Pat. No. 5,371,551 issued to James Logan and Daniel F. Goessling. To eliminate breaks in the program sequence, the player **103** may advantageously perform a look-ahead operation, sending a file request to the file server via the communication link by pre-scanning the program sequence file **214** to identify program segments to be played which are not in local storage and requesting those segments before they are needed.

Because announcement or "glue" segments are frequently repeated in different program segments, these segments are preferably retained in local storage by the player to avoid the need to be downloaded. The player advantageously processes the usage file at the end of each session and tags each program segment which has been played as being eligible for replacement to make room when necessary for incoming segments. Announcement segments, however, are preferentially retained even though they have been played because of the higher probability they may again be included in upcoming session schedules.

The third command, the SKIP command indicated at **275** in FIG. **3**, causes the player to advance to the beginning of the next program segment in the program sequence, recording the start of the next sequence at **267** and resetting the playback position at **269**. If the program segment has been subdivided (e.g. into paragraphs), the SKIP command causes the player to skip forward to beginning of the next subdivision within that segment. If desired, SKIP commands may be subdivided into two types, a SKIP TOPIC command and a SKIP SUBJECT command. When programming material such as news reports are grouped into topics within subject categories, as described later in connection with FIG. **5**, a SKIP SUBJECT command allows the user to skip over all program segments within that subject and resume playback at the leading description of the next subject. In contrast, the SKIP TOPIC command only advances to the next topic (program segment or program segment subdivision) in the sequence. If desired, the SKIP TOPIC command can produce a jump to the next program segment or subdivision which does not contain advertising, making it unnecessary for the listener to listen to advertising while scanning the program sequence for the next desired program segment.

The BACK command indicated at **278** operates like the SKIP command but in the reverse ("rewind") direction. Similarly, the BACK command may be subdivided into two commands, a BACK SEGMENT and a BACK SUBJECT command, which respectively reset the playback point to the beginning of the prior segment or the beginning of the prior subject description. Note that, after any given segment has played for a predetermined amount of time, the BACK command should reset the playback to be beginning of the current segment or topic respectively, allowing the user to start the current segment or topic from the beginning unless the playback point is already near the beginning, in which case the transition is made to the prior segment. The system responds to BACK commands by resetting the playback point to the desired point in the sequence and recording the start time, volume setting and new program segment ID in the log file as indicated at **267**.

In the preferred form of the invention described in more detail in connection with FIG. **5**, the context sensitive SKIP and BACK commands are used instead of the SKIP TOPIC, SKIP SUBJECT, BACK TOPIC and BACK SUBJECT com-

**16**

mands discussed above. In the preferred arrangement, the program materials include subject and topic announcement program segments in addition to the program segments (both programming and advertising). When the user issues a SKIP or BACK command while the player is playing a subject or topic announcement, the player skips the entire subject or topic being announced and moves to the next subject or topic announcement respectively, automatically bypassing the intervening program segments which comprise the skipped subject or topic.

The fifth command, a "MARK" command at **280**, is used to place a "bookmark" into the usage log which identifies a program segment, or a portion of a program segment, which the listener wishes to designate for future use. In its simplest form, the bookmark recording function indicated at **281** may simply record a bookmark and the Program_ID of the current program segment into log file. By bookmarking a program segment, that segment may be recalled by the subscriber and all or part of it saved for later use in local storage, from which it may be reproduced, forwarded as an attachment to an email message, and the like.

More elaborate bookmark functions which may be readily incorporated into the system if desired include the following:

Dictating or keyboarding an annotation at a predetermined position in the bookmarked program segment, the annotation being saved in local storage so that, when the bookmarked program segment is reproduced, it will include the annotation. The bookmarked program segment and the annotation may then be saved as a unit for future reference or forwarded to another person.

Bookmarked program segments, or annotations to bookmarked program segments, may be used in conjunction as an auxiliary audio voice mail and email handling system in which a subscriber's email and voice mail items are organized as topics in the playback session, enabling the subscriber to bookmark particular incoming messages (program segments) for further attention, or to dictate voice mail responses, or responses that can be converted to text form by a human typist or by a voice recognition system. This aspect of the present invention allows the subscriber to review and respond to incoming email and voice mail messages while commuting or traveling to more productively utilize travel time. Voice annotations may be stored in separate files which are uploaded to the host with the usage file and keyed to the program segment passages which they annotate by records in the usage log file.

The sixth command type, the "MENU" command indicated at **283** in FIG. **3** switches the player to a predetermined menu program segment, records the start of a menu mode state in the log file at **285** and places the player in the menu mode at **233**. Using a hands free voice command system, the player may reproduce a menu program segment in which a sequence of options are enunciated on the system's audio output speaker with short pauses between the recited options. By providing the voice command "Go" during or shortly after a desired option, the user may cause the system to branch to that selection. Menu options of this type may be conveniently implemented using the hyperlink capability described later in connection with FIG. **5**. Alternatively, as noted earlier, the menu of options may be displayed on the screen with the desired playback point being selected using the keyboard or a pointing device. In all cases, each transition to a new program segment is recorded into the usage log for later uploading to the server and subsequent processing.

 LENOVO ET AL. -- EX. 1001 -- Page 17

US 7,509,178 B2

**17**

Program Compilation & Billing

FIG. **4** illustrates the principle data processing steps and information data structures employed by the preferred embodiment of the invention to compile programming information personalized to the preferences of individual subscribers, to perform accounting functions which produce billing charges to subscribers and advertisers, and to determine royalty payments due to content providers.

The program, advertising and announcement segments to be made available to an individual subscriber include those program selections which the subscriber chooses from the supplied catalog of recommended programs, or additional selections chosen during a dial-up dialog with the host, as described above in connection with step **217** seen in FIG. **2**. The selections made by and uploaded from the subscriber take the form of a file (sequence) of 32 bit integers, each integer (ProgramID) designating a particular program segment. This file of integers is placed in a relational database Requested Table seen at **301** in FIG. **4**, with each row (record) in the Requested Table being an identification number which specifies a corresponding record (row) in a database table **303** called the Programs Table. The Requested Table **301** includes not only express requests from the user based on catalog selections but also requests which result from failed hyperlink requests which occur when the listener requested hyperlinked information during the session which was unavailable in local storage at the player. The program segments (which include programs, advertising and announcements) have a plurality of attributes which are described in the data fields of each record (row) in the Program Table **303**. The following Pascal type declarations define the content of each record in the Programs Table **303**:

```
Type
    Classtype = (advertisement, program, announcement);
    Program_Segment = record
        ProgramID: integer; { unique key }
        ProviderID: integer;
        Class: Classtype;
        URL: pchar;
        Created: datetime;
        SubjectDesc: integer;
        TopicDesc: integer;
        GroupID, Episode: integer;
        CommentOn: integer;
        Subjects: array[0..15] of integer;
        Importance: array[0..15] of integer;
        Youngest, Oldest, male, female: byte;
        HouseLow, HouseHigh: byte;
        Duration: integer;
        Plays: integer;
        TotalTime: double;
        PlaysRate, TimeRate: integer;
        Timeliness: integer;
    end;
```

Each Program_Segment record in the Programs Table **303** is identified by a unique key integer value, ProgramID, which is the primary key value upon which the Programs Table **303** is indexed and accessed. The Program_Segment records in the Programs Table **303** are relationally linked using the ProgramID key to other tables including:

the Requested Table **301** discussed above,

a Schedule Table **307** which contains the recommended sequence of program segments for the next playback session,

a New_Catalog Table **308** which contains the identities of new available program selections to be added to the subscriber's catalog of available programming, and

**18**

an Advertisements Table **311** containing entries which describe advertising program segments to be brought to the attention of the subscriber.

The relational database system employed by the preferred embodiment of the invention further includes a Subscribers Table **313** which contains information describing each subscriber, a Content_Providers Table **315** containing information about each person or firm which supplies royalty-bearing information for dissemination to subscribers, and an Advertiser Table **317** which contains information about each advertiser that provides advertising program segments to subscribers. Mailing addresses and other information for subscribers, content providers and advertisers is contained in a single Account Table **321** to simplify the data structures needed.

A Usage_Log Table seen at **333** is uploaded from the subscriber, typically at the same time the express program requests in the Requested Table **301** are transferred, and processed at **350** to update the Subscribers Table **313**, the Content Providers Table **315**, the Advertisements Table **311**, the Programs Table **303**, and the Requested Table **301** as described below.

Program Schedule Generation

In accordance with the invention, the host server receives and supplements the user's initial selection of a sequence of desired programs, first by adding the program selections specified in failed hypertext requests as indicated by the Usage_Log Table **333** during usage log processing at **350**, and then by adding advertisements, announcements and additional program segments tailored to the subscriber's known preferences as indicated at **340** in FIG. **4**, thereby producing the recommended Schedule Table **307** which is transferred to the subscriber, along with program segments, during the download transfer. Indeed, if the subscriber provides no selections at all, the host will prepare a Schedule Table **307** containing program segment selected entirely by the host on the subscriber's behalf. The programs, advertising and announcement segments which are added to the Request Table **301** to form the Schedule Table **307** are determined by a matching procedure **342** which may be better understood by first considering the content of the data structures which provide data utilized to make those selections.

The Programs Table **303**, as noted above, contains Program_Segment records which describe the nature of each programming, advertising and announcement segment in the library which is potentially reproducible by the player **103**. As illustrated by the type declaration above, each Program_Segment record specifies the account number (ProviderID) of the advertiser or content provider if any who may be charged or compensated for the actual playing of the program segment by subscribers. The record further contains a Classtype variable Class which indicates whether this segment is an advertisement, a program, a comment or an announcement.

The Class variable may also used to further subclass each program segment; for example, program segments which hold user-recorded comments may be designated as being "public" comments made generally available to all subscribers, "private" comments to be directed solely to the provider of the program_segment commented upon, and "host" comments to be directed to the host system.

The Program_Segment record's URL field specifies the location of the file containing the program segment in the file storage facility indicated at **304** in FIG. **4** (i.e., normally on the FTP server **125** seen in FIG. **1**, but potentially including storage areas on the web server **141** or at any other accessible location on the Internet). In addition, the subscriber may wish to designate for future play a program segment already loaded

LENOVO ET AL. -- EX. 1001 -- Page 18

US 7,509,178 B2

19                                                    20

into the player **103** by virtue of a prior download. The subscriber may elect to include an already loaded file because it was not reached in a prior playback session or because the subscriber wishes replay the selection. In that event, the ProgramID of such a selection is nonetheless included in the uploaded selection list (Requested Table **301**), recognizing that at the time of actual download, the player **103** will only request the transfer of those program segments not already present in local storage. The uploaded Requested list **301** should accordingly be understood to be indicative of the requested content of a future planned playback session and not necessarily a listing of programs to be downloaded. The selection of files to download is preferably made by the player which issues FTP download requests from the server by specifying the URLs of the needed files.

The Created field contains a timestamp value specifying the data and time of day the program segment was created. In Created field allows user or host to select program segments by date and permits the listing of segments in chronological order in program catalog listings.

The Program_Segment record further contains a Subject-Desc field and a TopicDesc field, both of which take the form of ProgramID integers which identify other program segment records which contain detailed information on audio announcement and displayable text descriptions of subjects and topics. The descriptive text files for subjects and topics are displayable by the player **103** as part of descriptive catalog entries which enable the user to choose desired segments. Together, the subject and topic program segments provide a hierarchical catalog listing which provides the descriptive information about the associated content segments which enables the subscriber to make informed selections. The text specified by the SubjectDesc and TopicDesc fields may be searched using conventional keyword searching techniques to permit the subscriber to locate and identify particular programming of interest from the locally stored catalog or, in a dial up CGI interaction with the host, to list and select programs from the larger library available on the server.

Serialized Programs

As contemplated by the invention, programming may include serialized sequences of programs. A given program segment may represent an episode in a series which is selected as a group by the subscriber, or a subscriber may select an individual program in a serial sequence and the host may then further installments or related programs within the series to the catalog or session content thereafter sent to the subscriber. The Program_Segment record contains a GroupID field which specifies the series as a whole, and an Episode integer field specifies the position of the given program segment within the serialized sequence. When a serialized sequence is requested, the host may download the entire series in one download for playback at requested intervals, or less than all of the episodes when all are not yet available or when it is desirable to limit the total download content. When a subscriber selects and plays a given program segment, as indicated in the usage log, without having expressly selecting the entire series, the host may then add the next installment to the catalog or the next proposed session. If desired, a hyperlink (to be described) may be placed at the conclusion of each installment which specifies the next installment as the linked program segment. In this way, the listener may request that the next installment be played immediately (if it is available) or included in the next installment (if it is unavailable and the hyperlink fails).

The usage log may be employed to insure that the subscriber has an opportunity to hear episodes that may have been skipped. By monitoring the usage log, if an episode included in any given proposed session was not in fact played, the host may include it in the next proposed session as well. Note further that the serialization mechanism which has been described can be used to provide serialized advertisements to a subscriber, insuring that a subscriber does not hear a particular ad twice and further insuring that the advertising is presented to the subscriber in the intended sequence.

In addition, the serialization mechanism may be used to provide sequential presentation relationships between related programs. For example, if a subscriber indicates an interest by selecting and actually playing a program on an evolving topic; for example, a news story about the America's Cup yacht races, further new stories on that topic may be assigned the same Group ID number so that they are automatically routed into the subscriber's catalog or program session if space is available.

Fields Supporting "Comments"

Serialized programs are related to, but should be distinguished from, the parent-child relationships that exist between program segments and the annotations and comments made on those program segments by users. As noted earlier with respect to the Accept command seen at **263-264** of FIG. **3**, the player **103** of FIG. **1** permits the user to create an "annotation" or "comment" (typically in the form of a recorded audio message or a keyboarded text message) which is uploaded to the host **101** and stored as a program segment. The CommentOn field of the Program_Segment record contains the Program_ID of the program segment commented on, the Provider_ID field identifies the subscriber generating the comment, the Created field specifies the date and time when the comment was recorded, and the default values of the subject matter fields (discussed next) are copied from the subject matter fields of the program segment being commented on. These field entries provide a mechanism for supporting the comment handling features which are described in more detail below under the heading "Comment Handling."

Program Selection

The Program_Segment record further includes a Subjects field which is an array of 16 integers, each of which may be a non-zero code value indicating a predetermined subject matter categories, allowing each programming segment to be matched against like codes specified as being subjects of interest by the subscriber, as well as codes indicating subjects to which advertised goods and services may relate.

The Program_Segment record also contains an Importance field which is also an array of 16 integers which (at least initially) holds an integer containing the reviewer/editor's assessment of the "importance" of the program segment relative to the subject matter code specified in the corresponding cell in the Subjects array. Thus, if Subjects[7]=12345 and Importance[7]=231, this program segment has been assigned a importance level of 231 with respect to the subject specified by code 12345. Another segment may also be relevant to the same subject, but with a different level of importance to that subject. These fields may be used by the host as a weighting factor used to route programs of greater probable interest to the subscriber. Note also The "importance" value associated with any given program may also be adaptively altered based on the actual use as reflected by the usage logs and by subscribers' catalog selections. By way of example, program segments which are started but frequently skipped while in progress may have their importance value decreased while program which are frequently selected from the catalog and listened to may have their importance values increased. In this way, the system adaptively learns, for each category or pro-

 LENOVO ET AL. -- EX. 1001 -- Page 19

grams, which programs subscribers have found to be interest and which ones were seldom used. Serialized programs (identified by a common Group ID) may be assigned importance values based on the actual usage of earlier episodes in the same series. Thus, when a series proves to be popular based on repeat selections of its episodes, all episodes (including those not yet issued) may be assigned a higher importance value.

The Youngest and Oldest fields (each storing a byte value 0-255) contains an indication of the age range to which a particular program segment should appeal. Similarly, the byte values Female and Male allow the entry of an estimate of the relative interest of a given program to the different sexes: thus, a program devoted to sports news could be assigned the values Female=60, Male=170 where the value **127** would indicate gender-neutral content. The MaritalStatus field is a single character ("S"=single, "M"=married, "W"=widowed, "D"=divorced).

The fields HouseLow and HouseHigh represents a range of household sizes range that may have a special interest in the program segment. Thus, programming directed to family interests may be directed to subscribers who are married with a household size equal to 3 or more.

The Duration field of the Program_Segment record specifies the duration of the program segment expressed in seconds. The Plays field is an accumulator field which is incremented by incoming Usage_Log records to reflect the total number of times a given program segment has been actually played by all subscribers. Similarly, the TotalTime value represents the total time a given program segment has been actually played by users. Together, these records can be used to determine the advertising fee due from the advertiser, or royalty amount payable to the content provider (the advertiser or content provider being specified the ProviderID field) for the use of this segment.

The Program_Segment record contains two signed integer values, PlaysRate and TimeRate, permitting an advertising charge or royalty payment (Amount) to be calculated as a value calculated by the executable formula:

$$\text{Amount}:=(\text{Plays}*\text{PlaysRate})+(\text{TotalTime}*\text{TimeRate})$$

If PlaysRate=0, the amount of the royalty or advertising fee for actual use of the segment can calculated based solely on the actual time duration of the played segment (so that little credit or charge is assigned if the segment is begun but then skipped). Alternatively, if TimesRate=0, the charge can be based solely on the number of times playing the segment was commenced, which may be deemed appropriate when it may be considered the responsibility of the advertiser or the content provider to hold the user's attention once a segment begins. Note that, as usage records are posted to increment the Plays and TotalTime fields in the Program_Segment records, as described later, any program segment which was played for less that a predetermined minimum amount of time may be disregarded, enabling the subscriber to "surf" through selections while listening to minimal information per segment without incurring subscription charges or generating advertising fees or royalty payments.

Program segments are selected for inclusion in the output Schedule Table **307** and/or the NewCatalog Table **308** by comparing the content of the Programs Table **303**, the Subscribers Table **313**, and the Advertisements Table **311**. The fields contained in the Subscribers and Advertisements Tables are set forth in the following Pascal record type declarations:

```
Account = record
    AccountNo: integer; { Unique key }
    Name, Title, CompanyName: pchar;
    Addr1, Addr2, City: pchar;
    State: string[2];
    Zip code, AreaCode, Phone, Fax, Email: pchar;
    end;
Subscriber = record
    AccountNo: integer;
    Birthdate: Date;
    Sex, MaritalStatus: Char;
    Interests: array[0..15] of integer;
    TopChoices, ChoiceCounts: array[0..15] of integer;
    ChargeLevel: byte;
    DataRate: Integer;
    Capacity: Integer;
    WeekDays: array[0..6] of Compilation;
    end;
Advertisement = record
    ProgramID: integer;
    AccountNo: integer;
    DemographicMatch: function__id;
    DemographicWeight: byte;
    Earliest, Latest: datetime;
    Subscribers: integer;
    Repeats: byte;
    end;
```

The Accounts Table seen at **321** in FIG. **4** is indexed by a key value AccountNo which is unique to each of its Account records. The fields of those records contain name, mailing address, telephone, fax and email information for all subscribers, advertisers and content providers in a single shared file. A person or firm specified by a record in the Accounts Table could simultaneously be a subscriber, advertiser and a content provider, in which case the same AccountNo key value would appear in each of the three tables: Subscribers **313**, Content_Providers **315** and Advertisers **317**. Prospective or inactive subscribers, content providers and advertisers may also be described by entries in the Accounts Table which are not referred to in any other tables.

Additional information about each active subscriber is contained in the Subscriber record indexed by AccountNo (a key shared with the Accounts Table). The Subscriber record specifies personal information about the subscriber, including birth date (from which age may be determined), sex, marital status, and household size, all of which may be of use in better selecting program material of possible interest which should be brought to the attention of the subscriber.

Each Subscriber record further includes two arrays of integers which indicated the subscriber's subject matter preferences. The Interests array contains 0 to 16 integers each indicating a subject matter category of interest to the subscriber, the integers having the same meaning and being take from the same category listing as the integers placed in the Program_Segment record's Subject array. These integers are placed in the Interests array in response to the subscriber's indication of subject matter preferences when the account is established as indicated at **203** in FIG. **2** or at any time thereafter when the subscriber elects to modify the stated preferences at step **217** in FIG. **2**.

A second array of 16 integers called TopChoices is an ordered list of the same subject matter integers; however, in this array the subject matter integers are listed in order of actual playing frequency as indicated by the parallel array of ChoiceCounts integers. For example, the subject matter integer 321 in TopChoices[3] and the count **18** in ChoiceCounts [3] indicates that 18 selections had been played in the cat-

 LENOVO ET AL. -- EX. 1001 -- Page 20

US 7,509,178 B2

**23**

egory **321** which was the fourth most-frequently played category. The ChoiceCounts array is modified whenever the usage log indicates that a selection in a particular category has been played by that subscriber. As a consequence, the TopChoices and ChoiceCounts arrays provide an indication of the subscriber's interests as indicated by his or her actual use of the player.

The ChargeLevel field in the Subscriber record indicates the subscriber's willingness to accept the insertion of commercial messages into the programming in order to defray subscription costs. A ChargeLevel value of zero indicates that the subscriber desires to pay the minimum charge and correspondingly is willing to accept sufficient advertising content to achieve that goal. At the other extreme, a ChargeLevel value of 255 indicates that the subscriber wishes to eliminate all commercial messages except those specifically requested.

The DataRate field indicates the rate at which information can be downloaded to the subscriber over the available communications link (typically dependent on the capacity of the modem used by the subscriber). The DataRate field is initially established from information supplied by the subscriber when the account is established (at step **203** in FIG. **2**) but is thereafter altered to reflect actual averaged transmission rates experienced during download operations. Similarly, the Capacity field indicates the available mass storage file space available for program data in the player store (seen at **109** in FIG. **1**). This value is initially supplied by the subscriber during account initialization, automatically reduced whenever the utility programs executing on the processor **105** detect less space available, and increased whenever the subscriber consents to the allocation of more available space when the utility programs detect that space is available and that additional space could be beneficially utilized given the download time available and the subscriber's desired session lengths.

Desired session lengths are contained in seven records each of type Compilation as defined in the following record definition:

```
Compilation = record
    Earliest, Latest: datetime;
    PlayMinutes, Longterm: Integer;
    end;
```

Each Compilation record describes the download requirements for a specific day of the week and contains fields specifying the earliest and latest times of day when download can be begun, with the latest download time being at least a predetermined time in advance of the session start. In this regard, it should be noted that playback and download can occur concurrently, with the Schedule Table being downloaded first, the NewCatalog Table being downloaded second, program segments specified in the Schedule Table which have not previously been downloaded being transferred third (in the order of the expected presentation as stated in the Sequence Table), with program segments selected by the subscriber for future sessions being downloaded last as download time permits. In accordance with the invention, it is desirable to download the equivalent of a full session's programming in addition to the currently scheduled session programs so that, in the event of a temporary communication link or host failure, programming will be nonetheless be available. In installations which utilize download information to a removable media cartridge or a transportable player which is then played back in an automobile or elsewhere, and hence

**24**

disconnected from the data link to the host, it will of course be necessary to complete the download prior to the disconnection, meaning that the Latest field in the compilation record should be a time which is in advance of the earliest expected session start time by a duration equal to the maximum expected download time. Because the subscriber may wish to use different download timing on different days of the week, a separate compilation record exists for each day.

The compilation record further specifies the expected duration of the playback session for that day using the variable PlayMinutes. The variable Longterm indicates the maximum duration in which extended play may be required. For example, a commuter who sometimes experiences long traffic delays on Mondays and Fridays may specify that an extra hour of extended programming should be provided for those days. Such extended programming is preferably consists of non-time critical programming which can be stored for future use as needed by the player.

Note that the compilation records noted above are used by the server to optimize the content of the recommended program schedule and not to initiate actual downloads to the player. As contemplated by the invention, the player initiates the actual downloads by sending download requests to the server. Nonetheless, the server can transmit to the client player an indication of optimum times when downloading should be requested. In this way, the load imposed on the server can be spread over time to avoid delays.

Program segments which are of interest to the user and which should be included in either the Schedule Table **307** or the Catalog Table **308** may be automatically identified by the following mechanisms:

the subject matter codes (Interests, TopChoices and ChoiceCounts) for a given subscriber for whom the Schedule Table **307** and Catalog Table **308** are being prepared may be compared with the subject matter contained in the Program_Segment record's Subject for each subject category description and each individual program description. Note that the Program_Segment record for a subject category description may identify related categories. In this way, an indication that a subscriber is interested in a particular category may be used to identify that category, any related category, and any program which specifies that category in its Program_Segment record. A weighting value may be calculated to indicate the extent to which the subscriber's stated interests match a given program or category of programs. Programs to which high weighting values are assigned are placed in the Schedule Table if the usage log data does not indicate the subscriber has already played that program, whereas the remaining programs having a weighting value greater than a predetermined threshold are placed in the Catalog Table **308**. The duration of the programs specified in the Schedule file **307** is governed by the scheduled session lengths, communications throughput, and client storage capacity values contained in the DataRate, Capacity and WeekDays fields of the Subscriber record.

The attributes of the subscriber (birthdate, sex, marital status, and household size) specified in the Subscriber record may be matched against the corresponding descriptions contained in the subject and program Program_Segment records (youngest, oldest, male, female, houselow, househigh) to identify programs and categories of programs likely to be of interest to a subscriber having those attributes. An advertiser-supplied function

LENOVO ET AL. -- EX. 1001 -- Page 21

US 7,509,178 B2

25

defining this relationship is specified by the Demograph-icMatch function_id field of the Advertiser record, as discussed below.

The host server may advantageously use an optimization technique such as linear programming to complete the segment selection process. The optimizer will take into account the Subscriber's time constraints, cost constraints, and subject preferences. The time constraints used in the optimization are: the playing time available for the current day at the player, the download time available, the percentage of segments usually skipped by the Subscriber. The cost constraints are Subscriber ChargeLevel and the accumulated value of individual advertising segments. The subject preferences are based on the user's expressly stated interests and others interests inferred from the user's playing selections, as noted earlier. Each segment resident in the database at the time of download is evaluated against the constraints and the optimizer thus chooses a set of segments which is best for the subscriber at that time.

The weighting value computed for a segment in the database may also be advantageously varied in accordance with the age of the segment; that is, segments will decline in value as they age with the rate of decline being depend on the Timeliness attribute stored in the Program_Segment record. If the subscriber misses a download for a given day, the timeliness factor will allow the host server to compensate for the lost listening opportunity by adding articles from prior days which are still of interest to the Subscriber.

Targeted Advertising

In order to identify and insert advertising program segments into the Schedule Table **307**, the preferred embodiment of the invention utilizes additional information which describes each advertisement to be placed before subscribers. This information is placed in an Advertisement record having the structure defined earlier and held in the Advertisements Table **311**. The ProgramID field of the Advertisement record identifies a Program_Segment record (described earlier) which describes the content of the advertisement itself. The remainder of the Advertisement record contains additional information used to control the manner in which the identified advertising program segment is selected for insertion into the programming supplied to subscribers.

The AccountNo field of the Advertisement record identifies the entity requesting the advertisement which is typically the same as, but not necessarily the same as, the entity specified in the ProviderID field of the Program_Segment record for advertising segment. The Subjects and Importance arrays in the program segment for the advertising (specified by the ProgramID field) may be matched the subject matter categories used by or created for subscribers to indicate their interest and may be used to produce a numerical value InterestMatch indicative of the extent to which a given advertisement is likely to be suited to the interests of a particular subscriber. The following algorithm, expressed as a function in Pascal, returns an integer value, which may be employed to derive the InterestMatch value indicating the degree to which any program segment matches the interests of a given subscriber:

```
function InterestMatch(SR: subscriber; PSR: program_segment):
    integer;
var I: integer;
        InterestCount: integer;
```

26

-continued

```
        ChoiceCount: integer;
begin
    InterestCount:=0;
    ChoiceCount:=0;
    for I:=0 to 15 do
        if PSR.subjects[I] > 0 then
            for j:=0 to 15 do
                begin
                    if SR.Interests[j] = PSR.Subjects[I] then
                        inc(InterestCount, PSR.Importance[I]);
                    if SR.TopChoices[j] = PSR.Subjects[I] then
                        inc(ChoiceCounts, (20−j)*PSR.Importance[I]);
                end
            else break;
            return(InterestCount + (ChoiceCounts div 10));
end; { InterestMatch function }
```

The foregoing function identifies all of the Subjects codes specified by the program_segment record for a program segment (including a segment specified the ProgramID value of the Advertisement record for that advertisement) which also match a subject matter code in which the subscriber described by the Subscriber record SR has expressly stated an interest, or has shown an interest base on programs actually played. In each case where a match was found, the Interest_Match value is increased by an amount related to both the weight given to the category in advertising program's Importance array and the level of interest indicated for the subject. Note the InterestMatch function described above can be used to generate a numerical indication of the degree to which a given subscriber may have an interest in any program segment, whether that segment contains advertising, entertainment, news, or other content. In the case of advertising program segment however, the Subject and Importance values are assigned by the advertiser in order to define the interests held by target subscriber to whom the advertiser wished to direct the advertisement.

In addition to the InterestMatch value determined above, weight may be given to the subscriber's personal characteristics using a similar weighting function specified th the function_id DemographicMatch which, like interest match, returns a value based on an advertiser specified relationship based on the subscriber's personal characteristics (age, sex, marital status, size of household, etc.) as previously noted. The value DemographicWeight may be used to specify the relative importance of demographic values derived by the DemographicMatch function and the value returned by InterestMatch.

All advertisements scheduled for a given subscriber may then be prioritized based on the resulting calculated weight assigned to each advertisement by matching algorithms which compare the characteristics of the subscriber with the makeup of the target audience defined by the fields of the Advertisement record. These advertisements are then preferably inserted into the programming Sequence with the advertisement having the highest weight being scheduled to occur first in the sequence, thereby insuring that the best fitting advertisements are included in the programming and most likely to be played by the subscriber.

Controlling the Quantity of Advertising Delivered

The rate at which advertising is actually inserted by the player is controlled by the ChargeLevel value in the Subscriber record for each subscriber. The ChargeLevel value (a number from 0-255) indicates the rate at which a subscriber is willing to accept advertisements. An advertisement duration count variable (not shown) maintained by the player **103**

Appx244

US 7,509,178 B2

27

28

accumulates the total duration of actually played advertising while a program duration count variable accumulates the total duration of actually played programming. An integer division of these to duration count values indicates the proportion of time being devoted to advertising. If this proportion falls below a threshold value determined by the value of ChargeLevel, additional advertising is inserted between program segments until the desired proportion is again reached. In this way, advertising skipped by a subscriber will be replaced later by different advertising to yield the proper proportion of programming to advertising, thereby achieving the subscription charge rate requested by the user.

The Schedule 307 downloaded to the player, and the associated programming, announcement and advertising segments sufficient to provide a complete program sequence with adequate advertising to meet the preference of the subscriber, creates total program content longer than the expected playing time indicated by the PlayMinutes variable of the days Compilation record. As a consequence, the player builds a collection of program and advertising segments which can be played in the future and need not be downloaded. Downloading of actual program segments therefore preferably occurs at the request of the player which scans the Schedule for program and advertising segments not already available and issues a request for the needed segments using the URLs contained in the players catalog of Program_Segment records. In addition, as noted earlier, the subscriber has the opportunity to review the local catalog for particular program segments of interest which can be placed in the next day's schedule (and downloaded then at the request of the player if not already resident). The catalog of available items is supplemented by the NewCatalog Table items downloaded from the server as library items are identified whose makeup matches that of the subscriber and should be available, either immediately in the days Schedule Table, or made available by inclusion in the downloaded NewCatalog Table alone.

Accounting Functions

The preferred embodiment of the invention processes the usage log data created during the playback session as described in connection with FIG. 3 to produce a variety of accounting and analysis reports and billing functions.

Each advertising, announcement and program segment played on the player creates a UsageRecord stored as an record in the Usage Log Table having the following content:

```
UsageRecord = record
    Subscriber: integer;
    ProgramID: integer;
    Start: datetime;
    Volume: Integer;
    PlayingSpeed: Integer;
    end;
```

The Subscriber field contains the AccountNo of the subscriber which used the program segment, and the program segment itself is identified by the ProgramID field. If the value of ProgramID is negative, the record indicates a failed hyperlink attempt and the ProgramID is posted to the Requested Table 301 so that the formerly missing program segment will become a candidate for downloading to the player. In the UsageRecord, the Start field contains the starting time of day (to the nearest second), the Volume field contains a value indicating the level at which the volume was played, and the PlayingSpeed field contains a value indicating the playing speed. A negative playing speed value may be

used to indicate that the player was placed in the "play highlights" mode so that only highlight passages were being played.

As noted earlier, each UsageRecord is processed to modify the Subscriber record field TopChoices by first building an ordered list of subject matter categories and the corresponding counts of the number of times each category was played in the session described by the Usage Log Table. These counts are then used to increase the existing Choice Counts for the subject matter codes indicated in the TopChoices array, and the TopChoices and ChoiceCounts arrays are then jointly resorted into order by descending number of plays. To insure that subject matter categories recently used are allowed entry into the list, the lowest five old entries are discarded each time if necessary to make room for the five most frequently played categories in the current usage log which were not already on the list. The TopChoices array accordingly contains an adaptively learned set of subscriber subject matter preferences which is continuously modified automatically without requiring attention from the subscriber.

Subscriber billing is based on the accumulated amount of programming actually played by the subscriber with credit being given for advertising actually presented to the subscriber. To accomplish this, a detailed billing history can be constructed from the usage log which indicates the programs heard, the duration of each, and the cost (or credit) attributable to that program segment. The TimeRate value specified in the Program_Segment record for each item specified in the UsageRecord's ProgramID is multiplied times the segment duration (determined by subtracting the start time of the segment from the start time of the next segment specified in the next UsageRecord). The TimeRate is a signed integer, with negative values being indicative of credits (for advertising) and positive values being indicative of charges for programming. Note that each program segment and advertising segment can have a different rate, allowing the system to accommodate charging rates that reflect different programming costs.

Such costs frequently are affected by the royalty rates charged by content providers as well as the extent to which costs are defrayed by advertisers. In accordance with the invention, each UsageRecord may also be posted into the Content_Providers Table 315 which maintains royalty payment records for amounts due to content providers. As in the case of subscriber billing, the processing of UsageRecords allows the embodiment shown in FIG. 4 to provide detailed information to content providers, identifying the extent each provided program segment was actually performed. Content providers can also be provided with demographic statistics identifying the characteristics of the subscribers who chose to play the content provided, as well as an identification of the extent to which program segments were skipped while in progress, tending to identify programs which were had continuing appeal during the session and those that did not.

Similarly, advertisers can obtain detailed billing records indicating the precise extent to which advertising was actually presented, and paying only for advertising known to have been effectively delivered. In addition, demographic data can be provided to advertisers indicating the makeup of persons who played the advertising, as well as the demographic characteristics of those who did not, in order to better target future advertising.

Finally, the UsageRecords are processed to post use data into the Programs Table, modifying the Plays and TotalTime fields of the Program_Segment record to reflect the extent to which programming materials are actually presented. This information, as well as the demographic statistical informa-

Appx242

US 7,509,178 B2

**29**

tion indicating which classes of customers are listening to which classes of programming, is of substantial value in collecting a library of offered programming which best fits the needs of the community of subscribers.

Program Format and Organization

The programs which reside in the program database **303** seen in FIG. **4** are preferably formatted in accordance with a standard structure to facilitate "skimming" the sequence of program segments defined by the selections file **351**, and to make it possible to perform jumps to different predetermined locations in the program sequence.

As previously noted, the program database **303** may include, for a given program segment, both a recorded audio narration and a text transcript or, in the alternative, a text transcript alone which can be converted into a spoken narrative by speech synthesis. While these narratives must be listened to in a linear sequence, it is nonetheless possible to selectively access individual program segments by organizing the overall program compilation into a hierarchical structure in which:

As noted earlier, the program segments which are available in a master library are described in a catalog and associated with descriptors of various kinds, allowing the content of the compilation to be tailored to the preferences of the subscriber, both through express selections made by the subscriber and by selections (or suggestions) made automatically by matching the subscribers known preferences and interests against descriptors which characterize the programs segments, as previously described.

The resulting program compilation is then divided into components each having a beginning, or entry point, to which jumps can be made by the listener by a dynamic selection mechanism which is operative during the listening session.

A given program segment (i.e., an entity described in the program catalog and selected automatically or expressly by the user as being of interest as previously described) is advantageously combined with other related program segments to form a sequence of associated segments here called a "subject," forming a subsection of the overall compilation. A "subject" collection of program segments may (but need not) directly correspond to the named subject matter categories utilized to specify subscriber's preferences as noted earlier. A "subject" collection begins with or is preceded in the scheduled program sequence by a spoken announcement of the subject, giving the user the opportunity to skip immediately to the next subject, thereby skipping all of the program segments comprising that subject.

As a consequence, by the simple expedient of skipping from subject announcement to subject announcement, a user can locate a particular subject of interest. For example, if a given program compilation as defined by the Selections file (having the format illustrated at **351** in FIG. **5**) contains one hour of programming divided into 8 different subjects collections, the user can quickly locate a subject of interest by skipping from subject announcement to subject announcement until a subject of interest is announced, at which time the player is allowed to proceed to the next level in the hierarchy, a "topic" announcement for the first program segment in that subject collection.

Each program segment begins with a "topic" announcement which consists of a brief, summary description of

**30**

the content of the program segment to follow. Again, at this level, if the user upon hearing the topic announcement elects to skip that program segment, the player automatically advances to the entry point preceding the next topic announcement. In this way, within a given subject, the user can skip from topic to topic to select only the program segments of interest.

Following the topic announcement, if the program segment consists of narrative text, such as a news program, the narrative is presented in a sequence of paragraphs, with the first paragraph providing an overview summary of the content of the program segment (topic) and the succeeding paragraphs providing increasing levels of detail. The narrative is thus presented in a fashion not unlike that followed in news stories written by journalists for print publication, but with more dependable rigor, recognizing that the listener presented with a one-dimensional audio presentation must necessarily depend on the constant adherence to the subject, topic, summary paragraph, and increasing detail sequence to substitute for the random access provided by two-dimensional presentation of headlined newsprint articles.

Finally, within paragraphs, the sentences should be carefully organized with leading topic sentences, again giving the listener a preview of what is coming next in the sequence to enable that material to be skipped if it is not of interest.

By way of example, a program compilation for a given subscriber might illustratively consist of seven subjects: world news, national news, local news, computer trade news, email and voice mail messages, country music, classical music, and the listener may skip from subject announcement to subject announcement to readily locate the beginning of any one of the six subjects. The four "news" subjects each consist of a collection of structured program segments, each of which begins with a subject announcement, again allowing the user to skip from subject to subject, listening to only those which are found to be of interest.

Similarly, the music selections ("topics") within each of the two music subjects, "country music" and "classical music," are preceded with a brief announcement identifying the musical selection which follows, allowing the user to quickly skip from announcement to announcement until a desired selection is found. Because many listeners prefer music without announcements, the subscriber may request that the announcements be suppressed during continuous play and/or that the beginning of each musical segment be played instead of identifying announcements when the musical collection is being "skimmed" to locate the next selection to be played. To simplify the player controls, the subscriber is preferably selects the extent to which narrative music identification announcements are to be played at step **211** seen in FIG. **2**, at the same time the user is given the opportunity to edit the downloaded program sequence.

Play Highlights Mode

To further facilitate rapid skimming, the player may be adapted to support playback in what is here termed the "play highlights" mode. Just as a student often uses a marker to highlight important names and phrases in printed text, key points in the audio narrative may be tagged as highlights such that, when the user places the player in a "play highlights" mode, the player automatically skips from highlighted passage to highlighted passage, greatly increasing the speed of presentation, but allowing the user to revert to normally play mode whenever a highlighted passage attracts the users interest for more detail.

LENOVO ET AL. -- EX. 1001 -- Page 24

US 7,509,178 B2

31                                                                    32

Highlighted passages may be advantageously identified by means of a sequence of relative byte locations (integer offsets from the beginning of the program segment) which form part of the selections file **351** and which specify the start and end of each highlighted passage. The player, when placed in the "play highlights" mode, then plays only those passages identified as highlighted portions of the program segment file.

Hyperlink Jumps

In addition, the structured program files may advantageously contain, where appropriate, "hyperlink" passages, which may take the form of announced cross references to other materials, or sentences or phrases which describe related information contained elsewhere in the download compilation but which do not follow immediately in the sequence. In order to alert the listener to the fact that a sentence or passage is a hyperlink to other information which is out of the normal playback sequence, an audible cue may advantageously proceed, accompany, or immediately follow the passage in the normal playback which identifies the character of the hyperlinked material. Using the terminology typically employed to described hypertext, the normal programming sequence includes "anchor" passages which are identified by an audible cue signal of some type and are further associated with a reference to hyperlinked material to which the playback may jump upon the listener's request. Hyperlinked material, like all other programming, is advantageously preceded with a topic description and, if the hyperlinked material is a narrative, it should begin with a summary paragraph, followed by increasing detail.

A hyperlink may be directed to a program segment which is not present in the current selections list. In that case, the Link variable contains a negative number to distinguish it from references to a particular Selection_Record, and is interpreted as the negative of a ProgramID number. If the referenced ProgramID is available in the player's mass storage system, it may be fetched an played and, upon its conclusion, an automatic return is made to the original sequence. If the referenced ProgramID does not refer to a locally stored record, the listener is informed that it is currently unavailable, but will be included in the next download for the next session.

In addition to having means for accepting a user command to execute a jump to the hypertext material, the player also advantageously includes a mechanism (special key or voice command response) which, when activated, causes a "return" to be made to the playing sequence at the point of the original anchor from which the hyperlink was performed. In this way, a listener may listen to as much or as little of the linked information as desired, retaining the ability to return to the original. Just as computer subroutines may be nested by saving the return addresses of a calling instruction in a stack mechanism, a hyperlink may be executed from within a hyperlinked narrative, and so on, with the listener retaining the ability to execute a like sequence of returns to resume the playing sequence at the point of the first hyperlink call.

To control subject and topic skipping, as well as hyperlink jumps, the selections file seen generally at **301** in FIG. **4** preferably takes the form of a sequence of records, each having the structure defined by the following Pascal record definition:

```
type Selection_Record = record
    LocType: Char;
    Location: Integer;
    end;
```

where LocType is a single byte character having the values and meanings shown in the following table:

| LocType | Meaning |
|---------|---------|
| "S", "s" | Subject Announcement |
| "T", "t" | Topic Announcement |
| "P", "p" | Programming content segment |
| "Q", "q" | Advertising segment |
| "G", "g" | Glue (announcement) segment |
| "H" | Highlight start offset |
| "E" | Highlight end offset |
| "A" | Anchor start offset |
| "M" | Bookmarked anchor start |
| "B" | Anchor end offset |
| "L" | Linked segment |
| "R" | Rewind to identified location |
| "I" | Image identification |
| "J" | Image display start offset |
| "K" | Image display end offset |
| "C" | Accept comment |
| "V" | Accept value designation |
| "X" | Accept list termination |
| "Y" | Accept "Yes"/"No" |

As seen in the table, highlight passages are specified by two Selection_Records, an "H" marking the beginning and an "E" record marking the end of the highlight passage. The Location field in each record contains the byte offset from the beginning of the current program segment whose identity is specified by the last preceding "P" Selection_Record which contains the ProgramID of the program segment in which the highlight passage occurs. "Q" advertising segments and "G" announcements segments behave like regular programming content segments, but are uniquely identified to enable the player to skip over, or skip to, advertising and glue segments when appropriate. In the "play highlights" mode, the player scans the selections file and plays the program segments for each subject and topic announcements but plays only those portions of an identified program segment which are specified as highlight passages or as anchor passages for hyperlinks.

It is desirable to further provide a mechanism for subdividing narrative programming segments into subparts (e.g. paragraphs). Lowercase LocType values "s", "t", "p", "q" and "g" are used to subdivide subjects, topics, programming, advertising and glue segments respectively. The lowercase Loctype records provide the markers needed to implement subdivision skipping, as previously discussed, to enable forward and backward navigation within longer program segments, and further provides passage identifiers which may be used to better synchronize the audio and visual transcript presentation of longer passages.

An "I" Selection_Record contains an integer identification of an image file which is downloaded and stored using a filename found in an image filename table indexed by the image identification number. This indirect access to the image files eliminates the necessity of storing the filenames themselves in the selections file **351**. The "I" image file identification records immediately precede a "J" record which specifies the offset location from the start of the compressed audio file where the image display begins. In normal "slide show" presentations, the current image display continues until the position indicated by a subsequent "I"-"J" record at which point the display shifts to the second image. The "K" record type is provided to indicate the position at which the current

LENOVO ET AL. -- EX. 1001 -- Page 25

US 7,509,178 B2

33

image display is turned off for those instances when it is desired to suppress the image display entirely.

Each anchor passage for a hyperlink is specified by three selection records: an "A" record indicating the start of the anchor passage, an "B" record indicating the end of the anchor passage, and a "L" record containing the offset location within the selection file to which a jump is made if the user requests a jump to the hyperlinked material.

As discussed in more detail later in connection with FIG. 7 of the drawings, the position and identification of highlighted passages, hypertext links and synchronized images may be conveniently expressed using conventional hypertext markup language to tag the text of the narrative to being presented in the interactive multimedia format contemplated by this aspect of the invention.

The start of bookmarked passages are identified with a special anchor designation, "M," followed by a "B" record to identify the end of the bookmarked passage. If a voice annotation is added, the player places it in its own program segment which is identified with a negative ProgramID in the following "L" record. The presence of the annotation may then be made known to the listener during subsequent playback of the marked passage by means of a distinctive audible cue, and the annotation may then be listened to in the same fashion as any other out of sequence linked material. Note that bookmarked passages and annotations are noted both in the usage log file, as discussed earlier in connection with FIG. 3 at 280 and 281, but also their presence is also recorded in the Selections file 351 by inserting "M", "B", and (if annotations exist) "L" records, making it possible to immediately replay annotations or return to replay bookmarked passages.

Annotations differ from "comments." Like an annotation, a comment is also stored in its own program segment, but a comment operates as a public or private message generated by the user and communicated publicly or privately to (1) a designated special interest group, (2) the originator of a program segment, which may be the author of earlier comment, (3) the system host, or (4) the person producing the comment to form a note for future reference. While both comments and annotations may be created at the request of the user at any point during a playing program segment using the "Accept" command (see 263-264 in FIG. 3), the user may be prompted by a pre-recorded request for a comment, or other user input, with the prompting request being placed at any point in a playing program segment, typically after an audio prompt which explains the nature of the information being requested.

Requests for information from the user preferably take one of three forms which are implemented by the records in the schedule file identified by the LocType codes "C", "V", "X" and

A "C" record causes the player to temporarily pause the playback and record a voice response from the user which may be arbitrarily long and which is uploaded to the server 101 to form a new program segment in the manner to be described under the heading "Comment Handling."

A "Y" record pauses the playback and awaits a "Yes" or "No" response from the user which is then recorded in the usage log. The yes/no response request allows a program provider to obtain response data from subscribers.

When simple "yes"/"no" answers are inadequate, a series of "V" records may be used to identify a set of prompt values from which the user may select, with the end of the list being indicated by a "X" record. The narrative of a program segment might, for example, proceed as follows: "We would like to know which of the following four ice cream flavors is your favorite. Say the word "YES" promptly when your favorite is mentioned. $\underline{V}$ chocolate $\underline{V}$ vanilla $\underline{V}$ pistachio $\underline{V}$ peach $\underline{E}$". In

34

the example, the $\underline{V}$ characters indicate the position of the start of each prompted choice and the $\underline{E}$ character indicates the end. If no affirmative voice response has been accepted by the time in the playback the position indicated by the E selection record, the player returns to the positions indicated by first of the series of V records to repeat the choices. When a valid response is received, a response value is written into the usage log indicating the ordinal position of the selected response. Given the prompts above, for example, if the user says "YES" after the "chocolate" prompt, the response value 1 is written to the usage log, if the user selects 'vanilla' a 2 is written, and so on.

The Selections File

FIG. 5 shows an illustrative sequence of Selection_ Records making up a selection file indicated generally at 351 which illustrates the manner in which the user may navigate the playback session between playback positions designated by the selection file. At any given moment, the next item of programming to be played is specified by an integer register CurrentPlay seen at 353 which holds the record number of the particular Selection_Record in the selections file 351 to be played next. As shown, CurrentPlay points to a subject Selection_Record identified by the LocType "S" 355 and a Location field 357 which contains the ProgramID of an announcement program segment which describes the subject. If the user issues a skip command during or shortly after the time when subject announcement is played, the player executes a skip to the next subject, which is accomplished by scanning the selection file 351 until the next subject Selection_Record seen at 360 is located, and then performing a jump by inserting the location of Selection_Record 360 into the CurrentPlay register 353, causing the intervening material to be skipped as indicated by the dashed line 362.

If, instead, no subject skip is requested, the CurrentPlay register is incremented by one when the subject announcement concludes, causing the "T" Selection_Record 364 to be used to fetch and play the topic announcement specified by the ProgramID in the Location field of record 364. If a skip is requested during or shortly after the time when topic announcement specified by record 364 is played, the player scans the selection file 355 until the next "S" or "T" Selection_Record is found at 366, causing the intervening program material to be skipped and the topic announcement specified by record 366 to be played next. If, as illustrated by the Selection_Record 366, there are no more topics within a particular subject when a topic skip is requested, the player skips the remainder of the last program subject within the current subject collection and plays the next "S" subject announcement. Thus, topic skips take the user quickly to a subject announcement, from which subject skips may be executed until a desired subject is reached. In this way, a desired program segment, no matter where it is located with respect to the current selection, can be readily found.

If the user issues a skip command during the body of a program selection; that is, when neither a subject or a topic announcement is being played, the player advances to the next "S" subject or "T" topic record, skipping the remainder of the program selection. Thus, the user can quickly resume skimming on the subject and topic level at any time.

The user may also issue a "Back" command at any time. Back commands work like Skip commands at the subdivision, subject and topic level. If a Back command is issued when a subject is being played, the player scans backward to the previous subject announcement, which is then played. If the user issues a back command when a topic announcement is being played, the player scans backward to find the previ-

LENOVO ET AL. -- EX. 1001 -- Page 26

US 7,509,178 B2

35                                                    36

ous subject or topic announcement, which is then played. If the player issues a Back command during the playing of a programming segment, the player returns to the beginning of the prior subdivision (if any) or the prior topic announcement for the current program segment, thus enabling the user to easily "replay" a current segment from the beginning if desired. As in the case of forward skip commands (SKIP TOPIC and a SKIP SUBJECT), BACK TOPIC and BACK SUBJECT commands can be made available to the user such that backward navigation from subdivision to subdivision occurs using BACK TOPIC whereas the issuance of a BACK SUBJECT command always returns the playback point to the beginning of the prior subject matter description.

The manner in which a "Back" command is handled as described above is subject on additional variation: The position at which each skip forward command is issued may be advantageously saved so that, upon the issuance of a subsequent Back command, the user may return to the position at which the skip forward position was issued. This allows the user, for example, to skip forward to listen to the nest program announcement, and then use the Back command to return to the point from which the skip forward command was issued. These position indications may be saved as markers in a bi-directional list, allowing the user to skip forward or backward to any position from which a prior jump was made.

When the player is first activated, CurrentPlay is set to 1 to begin play with the first topic announcement specified by the ProgramID **357**. The end of the selections file **351** is marked with an "R" Selection_Record **380** which contains the location value 1. When the player encounters this record, it resets the CurrentPlay register to 1, and the playing sequence begins again. This arrangement creates, in effect, an endless loop, allowing the user to skip forward in circular fashion through the entire program selection to locate desired programming, regardless of where the CurrentPlay register is set. When the player is given a further back command after the beginning of the file is reached, the backward scanning process finds the record **382**, another "R" rewind record which contains the location of the last "S" subject Selection_Record. In this way, the selection file **351** behaves as a bi-directional selection.

Hyperlinks are implemented by means of anchor passage identifiers, the "A" and "B" Selection records which respectively identify the anchor passage, and a "L" link identifier which holds the location of a subject, topic or highlight Selection_Record. The "A" and "B" selection records enable the player to add an audio cue (such as a tone, low-level chime, or the like) to the beginning, end, or during any passage in any program selection. Whenever the user issues a "Go" command (seen at **265** in FIG. **3**), the player will execute a hyperlink jump to the location indicated by the last "L" record in the selection file. When the jump is made, the location in the "L" record is inserted into the CurrentPlay register **353** after the previous contents of the CurrentPlay register are saved in (pushed into) a zero-based stack **390** at the stack cell location specified by the contents of a StackPtr register **392**, which is then incremented. Whenever the listener issues a "Return" command, the previously pushed selection file record location is popped from the stack **390** and returned to the CurrentPlay register **353**, and the StackPtr register **392** is decremented. A "Return" command issued when StackPtr=zero (indicating an empty stack) produces no effect.

The hyperlink capability described above may be used to implement a program menu of the type described earlier in connection with FIG. **3**. A menu program segment may be included in the program compilation which includes a series

of spoken descriptions of subjects or topics, each description being the anchor portion of a hyperlink to the corresponding subject or topic.

Although hyperlinks to subjects and topics are typical, it should be noted that the arrangement shown in FIG. **5** can be used to link any passage to the beginning or end of any highlighted passage or to the beginning or end of any anchor passage simply by placing the selection file location of that target in the "L" link Selection_Record forming that link.

In its preferred form, the individual program segments are stored in a random access mass storage system permitting program segments to be physically stored in an order unrelated to the actual dynamic sequence in which those segments are played. Forward and backward skimming, highlight playing, and hypertext jumps can accordingly be implemented without any noticeable delay being apparent to the user, unlike the delays which are experienced in forward and rewind operations on a physical tape player, or even the briefer delays experienced upon selecting a different track of a compact disk music album.

As contemplated by the invention, the integration of structured audio announcements and content, as will as cross-referencing and indexing information in the audio program compilation, allows the player to be much more interactive than a simple tape recorder. The user has the ability to browse and skip through the audio program in a very active way, without any requirement to look at a visible display of the program content. The ability to navigate the program using only audio prompts and/or small number of buttons for a user interface make the playback system which utilizes these features of the invention particularly attractive for use by automobile drivers, who can select their program content much more effectively and with less drive distraction than currently possible with a conventional automobile radio, tape or CD player.

Program Production

FIG. **6** shows the method followed to produce program content which is structured in accordance with the invention to facilitate interactive program selection. The first step in program production is to build a structured database of 'articles' which are candidates for inclusion in individual subscriber compilations.

The authoring system seen in FIG. **6** scans a wide range of data sources **401** for potential content as indicated at **403**. Examples of data sources might be news service wire feeds or newsgroups on the Internet. The authoring system subdivides the accessed program data into program segments (topics) and indexes each segment by subject area at **405**. In the case of text data, this indexing may be done automatically by parsing the text into words and building a conventional inverted file word index to the program segments. In the case of audio programming, a text transcript may be prepared using conventional speech recognition mechanisms to for a transcript, and the transcript may then be indexed by the terms used. Alternatively, human indexers may produce descriptive words and phrases to characterize the content of a program segment, and these descriptors may be used to index those segments.

After the indexing has been performed at **405**, the authoring system then compares the each program segment's index data at **407** with system wide selection criteria in a system database **409** to provide a "System Filter." The system filtering function identifies those programs which of potential relevance to one or more of the established subject matter categories offered to subscribers. Accordingly, the system filter database **409** may take the form of a set of words (de-

LENOVO ET AL. -- EX. 1001 -- Page 27

US 7,509,178 B2

37

scriptors) of known relevance associated with each of the subject matter categories in the catalog. The comparison function at **407** scans the words in each candidate program segments to form a weighting value indicating the frequency (density) of the occurrence of descriptors for each category. Program segments whose content produces a high weighting value with respect to any category are automatically associated with that category and retained for further processing as indicated at **408**, while program segments producing no weighting values greater than a predetermined minimum may be completely discarded at this stage, as indicated at **411**, since their content does not indicate a sufficient likelihood of being of interest to a sufficient number of subscribers. Marginal program segments may be returned to the source library **401** for possible later use in the event that user preferences change.

Each article which passes the system filter at **408** is processed as shown at **414** in FIG. 6. As noted earlier, and as indicated at **421**, the authoring system next prepares either a transcript for those segments which consist, in their original form, of voice narration. This step may be automated using speech recognition or manually by keyboarding to create the needed transcripts.

As indicated at **425**, when the original material consisted of information in text form, a human reviewer verifies that the program content is in fact relevant to the subject matter categories identified by the automated system filter processing as noted earlier, and adds additional subject matter categories that may have been overlooked by the automated process. As a result of this automated and human-verified classification process, each program segment is associated with one or more subject matter categories which are encoded into a standard form in the Subjects array of the Program_Segment record described earlier in connection with FIG. 4. These subject codes are further assigned an importance value in the Importance array (which is parallel to the Subjects array) by the human author. Note that the order in which subjects codes are placed in the Subjects array may be used to indicate the relative relevance of the subjects to the program segment; that is, the most relevant subject is identified in Subjects[0], the next most relevant subject is identified in Subjects[1], and so on. Each program is typically placed in the output sequence in accordance with the code at Subject[0], the subject to which the program segment is most relevant.

In addition, the human review may compose a narrative cross referencing description of some or all of the program segments which were secondarily relevant to a given category; that is, program segments which were most relevant to another category but also relevant to the given category. This cross-referencing description may advantageously utilize the hyperlink capability discussed earlier such that, when the user is listening to the description of any related program segment, that related segment may be listened to simply by issuing a Go command to jump to the linked article, and later issuing a Return command to resume the playback at the original point.

The body of the program segment is then organized by the human reviewer at steps **431**, **433**, and **435** seen in FIG. 6 to create an output program segment having the desired structure consisting of:

    a topic statement which is packaged in a separate program segment,

    a leading summary paragraph,

    further content organized into paragraphs of increasing levels of detail, in which all unnecessary detail is excluded (that is, longer topics are digested into shorter, overview topics, with the full version being made avail-

38

    able in an alternative, unabridged form which is also made available to the listener),

adding highlight identification to key terms and phrases, and

(1) adding cross-referencing hyperlinks, with added explanatory anchor text if necessary.

When the original program segment is a news article or the like which was made available in text form, the foregoing operations may be most conveniently performed on the text, with the conversion to audio being performed by a human announcer or by speech synthesis after the edited, formatted and tagged text is produced. Thus, as shown at **436**, the human reviewer may compose a new article which has condensed content at **431**, add a topic (title) and summary paragraph previously created at **433**, and then, at **435**, add highlighting and hyperlink tags (which take the form of imbedded flags of the type used in Hypertext Markup Language "HTML" as described later in connection with FIG. 7). In order to assist the listener in deciding whether to listen to, or skip, a given subject, it is desirable that the topic and subject announcements include a statement of the playing time, particularly for longer program segments. In addition, the playing time is recorded in the Program_Segment record for that segment in the field named "Duration" as noted earlier. A human announcer then reads the structured text, or it is alternatively converted into an audio program segment by speech synthesis, as indicated at **435**.

If desired, the user may request the player to periodically issue a time of day announcement. The user may set a playback preference value indicating a desired time duration between time of day announcements. Each time such an announcement is issued, the last announcement time is recorded. Each time a logical break occurs between program segments, the last announcement time is subtracted from the current time and, if the result exceeds the desired announcement spacing, a new time of day announcement is issued.

In addition, at the user's option, the player may also periodically announce the duration of the unplayed portion of the session, enabling the listener to skip certain programs in order to play others when the actual listening time available is less than the time available to play the entire remaining program.

The player may be programmed to issue timed messages to the listener. For example, a program session may interrupted to remind the listener to perform some function at a particular time, such as listening to a scheduled radio broadcast. Alternatively, the player may be programmed to play identified segments at a particular time of day, or at a particular time relative to beginning of the session (for example, fifteen minutes after the session begins regardless of what has been played before or where the player is in the sequence). These programmed interruptions are preferably performed as automatic hyperlink, enabling the user to return to the regularly scheduled but interrupted programming simply be issuing a "return" command.

It should be noted that program segments may omit the "original" audio file entirely. Instead, the audio may be generated on the user's player using speech synthesis, with tag to speech conversion of the tagged highlighted materials including an audible cue. The text-to-speech technology might be especially useful for specialized subject areas, such as weather reports, sports scores, or stock market quotes, or other primarily informational articles where the content is significantly more important than the form of speech.

The availability of a collateral text file makes it possible to perform scanning operations to "find" particular words and phrases in the presentation, and perform a jump to that position in the file. Thus, the user may request the player to locate

LENOVO ET AL. -- EX. 1001 -- Page 28

US 7,509,178 B2

**39**

and play the next program selection in the sequence to contain the word "patent" and the player, in response to that request, performs a serial search through the transcript text associated with each program segment until the requested word is found, an a jump then executed to resume play at that location.

Using conventional text indexing techniques, the transcript files of the programs specified on the current program schedule, as well as the transcript files of other locally stored programming, may accessed by means of an inverted file in which each significant word in the playable library is associated with the an indexing record for each occurrence of that word, the record containing program segment identifier for the program segment including the word and the offset(s) within that segment where the word occurs. The availability of that inverted file allows the player to immediately inform the user of the number of time the term occurs to avoid fruitless searches as well as searches which find too much, without actually scanning the transcripts. The availability of the program identifier permits the player to play for the user an announcement of categories and topics along with a recitation of the number of word occurrences within that topic; for example, "The term 'cellular' occurs 7 times in [program segment announcement], 3 times in . . . ".

Alternatively, when a program segment contains a condensation of an original, longer text article, the full transcript may be additionally made available by downloading it to the player where it can be listened to, by placing a hyperlink to the full version in condensed version, or printed for further review by the listener. If desired, this capability may alternatively be realized by placing the full version in a separate program segment, thus allowing the subscriber to select either the condensed or full version from the catalog, or to activate a hyperlink call to the full version if additional detail is desired after listening to the full version.

To encourage consistency, the reviewer/editor may adhere to the format set forth in article templates which describe the form different classes of programs should adhere to. For example, a template might say that a given audio article consist of a time announcement, an summary introduction including the article headline, and the body of the article. Templates may be expressed in a formal grammar which describe the desired program content in a consistent way. In addition, the templates may take the form of pre-written HTML forms where the program topic description is placed in the title and the program segment comment placed in the body portion of the HTML document, which may include tags to identify highlighted passages and hyperlinks as explained below in connection with FIG. **7**.

The invention further supports the construction of serialized groups of program segments in which the sequential episode segments may be downloaded at one time or separately when necessary to conserve space or to handle sequential presentations which evolve in real time. Using hyperlinks, the listener may be given the option to continue listening at the next episode of the serial sequence, or to instead allow the player to continue with the next regularly scheduled program segment identified in the selections file, with the next episode being deferred until a later session.

In a similar fashion, complex subjects, such as "books on tape" and instructional materials formed by a sequence of lessons may be readily handled by the invention. The subject/ topic hierarchy allows such materials to be presented in the catalog in outline form so that the subscriber can choose all or part of the presentation. The organization of such longer presentations into the structured form contemplated by the invention makes it easy for the listener to locate and replay segments of interest, and the highlight play mode facilitates

**40**

the rapid review of longer presentations by focusing only the central points presented while allowing more detail to be readily accessed if desired.

When a given program segment contains recorded original audio, such the newly recorded narration of a human reader or an audio recording of a broadcast radio program, the file of selection records to be associated with that audio recording file is created by a human editor who utilizes suitable audio monitoring and editing equipment to listen to the playback of the audio playback file and identify the byte location within that audio file where highlight and anchor passages as well as response prompts which seek user input begin and end. In addition, for hyperlink selection records, the human editor supplies the identification of the cross-referenced material by specifying the symbolic name of another selection record associated with the same or a different program segment to which control is to be passed if the hyperlink is executed by the user. A crucial step in the production of each segment is the association of byte locations in the audio stream with the records in the selection file. This association may be done by a human technician or by automatic methods.

A technician would use a computer with suitable audio playback capabilities and software to play the audio stream and to simultaneously display the transcript if it is available. The software which plays the audio generates a new record in the segment file which contains the current byte location within an audio file whenever the human editor pressed a key. The significance of a byte location may be indicated by pressing a selected one of a plurality of keys. For example, the technician could generate Subject and Topic records with the correct byte offset simply by pressing the "S" or "T" keys at the right moment while listening to the audio program. The software could automatically generate the synchronizing segment record and prompt the technician to associate byte location thus identified with a corresponding location in the displayed transcript using a mouse or other positional identification means. When no transcript is available, the operator may be prompted to enter a topic or subject description via the keyboard.

The process of associating of audio location with segment records process could be automated by adding additional software to the technicians editing computer. For example, as indicated at **437**, speech recognition technology may be employed to automatically identify when the live speaker changed in an audio stream. The monitoring program thus automatically generates a new record and prompt the technician to associate the record with data in the transcript. Besides speaker changes, the software may advantageously detect laughter, musical interludes, or laughter and use these to automatically generate segment records.

The completed program segment is assembled at **438**, compressed at **440**, and placed in the program library as indicated at **442** where it is available for downloading to subscribers. The program segment (topic) thus preferably consists of (a) a compressed audio program segment file, (b) a text transcript file of characters, which is preferably in HTML format or in a word processing format such as the Rich Text Format "RTF" readable by most word processing software, (c) possibly one or more image files for visual presentation with the audio content, (d) a file of Selection_Records for the program segment which identify the subject program segment announcement, the topic program segment announcement, and the program content program segment ("S", "T", "P", "Q," and "G" Selection_Records), as well as the highlighting and hypertext passages and collateral synchronized image files tagged within the body of the programs segment, and finally (e) a Program_Segment record for the segment which iden-

Appx248    LENOVO ET AL. -- EX. 1001 -- Page 29

US 7,509,178 B2

41

tifies all of its component parts and which is placed in the relational Programs Table **303** seen in FIG. **4**. As explained below, the use of HTML to express narrative text facilitates the compilation of these constituent parts of a program segment.

It should be noted that the file of Selection_Records which forms part of the program segment data assembled at **438** may contain cross-referencing links and these links in turn contain location references to cross-referenced program segments or particular passages within other program segments. While a referenced program segment can be identified by the its Program_ID integer, the byte location of a particular passage within that referenced segment is not established until the editing noted above is completed. Consequently, symbolic names are preferably used to initially identify all highlight or anchor text passages, making it possible to use these symbolic names as relocatable addresses, just as symbolic names are used to identify addresses in computer source language which is first compiled and then linked to translate symbolic names into real addresses at run time. In this way, symbolic names used to identify cross-referenced passages may be translated into numerical selection file offset values loaded into the Location field in "L" Selection_Records. As discussed previously, these offset values are either positive values specifying the location within the Selections file of the Selection Records which identifies the link target, or negative Program_ID values which identify program segments not specified by the current Selections file as being part of the current program session content.

Comment Handling

As previously discussed in connection with FIGS. **3** and **5**, the apparatus contemplated by the invention advantageously includes means for accepting comments, yes/no responses, and value selections from a user during a playback session. As discussed in more detail below under the heading "Defining Audio Programming with HTML," these prompted user input responses are analogous to and can be composed using the <INPUT> tag form elements defined for use in standard hypertext markup language, where the "C" records in the selection file are analogous to <INPUT TYPE="text"> HTML tags, the "Y" selection file records are analogous to <INPUT TYPE="checkbox"> tags, the "V" records are analogous to <INPUT TYPE="radio"> radio button tags. Together these prompt mechanism provide a robust mechanism for prompting the user for and collecting responses of various kinds.

This mechanism for obtaining prompted responses may be advantageously employed to request information from subscribers. For example, prompted requests may be used to obtain program ratings from at least those subscribers who are willing to participate in the program rating process. Using "V" and "E" records, for example, a user may be asked to grade programs by various criteria and the resulting data may then be used alone or in conjunction with other values to produce a figure of merit for programming, whereby programs receiving higher ratings can be assigned a higher priority. In a similar fashion, willing subscribers may be offered the opportunity to volunteer to participate in surveys of various kinds, with the added advantage that personal and preference data already available for each of the participants may be combined with the survey responses is useful ways. For example, the tendency to give a negative responses on a particular topic may be correlated with the age, sex, geographic location, etc. of the respondents. Subscribers who are participate in the surveys may be rewarded by providing reduced subscription rates, free programs, or cash payments.

42

As discussed previously in connection with FIG. **3** and **263-264**, the embodiment which described also includes the capability of accepting comments from a subscriber at any time during the course of program playback. When such a comment is recorded, it is saved as separate file (or other identifiable data) together with the Program_ID of the program commented upon, the byte location within the playing program file where the comment or annotation is being made, a Class variable indicating the nature of the record, the Class variable being used as the Class variable in the Program_Segment record for the comment or annotation or comment, and the date and time of day when the comment is being created. When the comment is created, the user is then requested to specify, either by voice response or by a keyboard selection, whether the information to be recorded is to be treated as:

An annotation to be appended to the playing program record; or

1. A comment which is treated as an independent message/ program segment.

The user further indicates the extent to which such an annotation or comment is to be made available to others. If designated as being public, annotations become available to any other subscriber who subsequently plays the program, at least to the extent that a given subscriber indicates that the playback of annotations is desired. Private annotations are simply stored in the user's local disk storage are (at **107** in FIG. **1**) for future reference whereas public annotations are uploaded to the server where they are saved as separate files keyed to the original by means of the downloaded selections file for those subscribers who desire to hear annotations.

Comments are designated as being public or private messages. Public comments become independently available to all subscribers who have indicated an interest in the subject matter category(s) to which the comment relates. By default, a comment is assumed to relate to the same categories assigned to the program segment which was playing when the comment was produced, but these category codes may be changed by the user during the editing session (seen at **217** in FIG. **2**). In addition to altering the subject matter codes for comments already dictated, the editing capabilities made available to the user at step **217** may advantageously include the ability to delete dictated comments so that they are not uploaded at all, direct comments to specific subscribers or email addresses, and enter new comments on any designated program segment in the current catalog by dictation or keyboarding.

In order to provide an appropriate program description for longer topics, whenever a user records a comment have a duration which exceeds a predetermined elapsed time, the player **103** performing the recording (at **264** in FIG. **3**) produces an audio announcement requesting that the user dictate a brief summary of the comment which is used to form the topic description for the longer program segment. In the catalog listing provided to subscribers who desire access to comments as well as programs in a particular subject matter area, comments are listed in outline form as items which are subordinate to the parent program or comment to which they relate. The CommentOn field found in the Program_Segment record for each comment provides the information needed to display the hierarchical tree. The public comment mechanism contemplated by this aspect of the invention provides a useful facility which enables subscribers to exchange information with each other in special interest groups which function much like the UseNet groups on the Internet, but with a conversational ease and informality that audio recording makes possible.

LENOVO ET AL. -- EX. 1001 -- Page 30

US 7,509,178 B2

43

A subscriber can elect the degree to which public comments or annotations are to be played back along with programs or topics of specified interest. Comments or annotations can be excluded entirely, a link may be imbedded which may be executed at user request to play the comment or annotation at the point in the file where the comment or annotation was played, or all comments and annotations may be played immediately without first requesting user approval.

Private comments are not posted to the subject matter categories and are made available only to (1) the author of [specified by the Provider_ID of] the program segment being commented upon; (2) the host system, or a host system editor responsible for the subject matter area about which the comment is concerned; or (3) some other destination specified by the user. By sending comments to the author, the user can make a direct but private response to anything contained in a message or program created by that author. Particular advertisers or other content providers may encourage such comments and offer subscriber credits or other incentives to those who are willing to make comments.

The ability to send comments to the responsible host editor provides a direct mechanism by which a subscriber may express satisfaction or dissatisfaction about the programming content provided, suggest other programming which would be of interest, and the like. Moreover, the to-host comment provides a mechanism to assist the editors to identify subscribers who may be inappropriately injecting offensive material to the annoyance of other subscribers. In addition, questions about the operation of the system may be directed to the host, thereby providing help and customer support to subscribers who may need assistance. Finally, the host may provide additional services (fact finding, transaction processing, and the like) which are made available on a fee basis to interested subscribers.

Finally, the ability to direct comments to specific people allows the system to provide voice-mail like functions among subscribers. Using speech recognition, dictated comments may be translated into text messages that could be sent to anyone having an E-mail address or facsimile receiver. Alternatively, the comment could be transmitted as an audio file attachment to an E-mail message (e.g. as a RealAudio file). In addition, like private annotations, the comment may simply be placed on the user's local disk for future reference.

Comments and annotations are preferably stored on the player's local mass storage unit with header information designating a CommentON field (the Program_ID of the program segment commented on), the byte location in the playing program file where the comment was dictated, the Class field specifying the nature of the comment, and the Created date and time stamp. The files containing public and private annotations and comments (other than those designated for the sole use of the subscriber which remain on the local storage unit) are uploaded to the host at the same time the usage log is transferred (see 219, FIG. 2).

Defining Audio Programming with HTML

Narrative text to be presented in the interactive, multimedia format made possible by the present invention may be advantageously expressed in the first instance using essentially conventional hypertext markup language, "HTML". FIG. 7 shows an example of the content of a portion of an illustrative HTML text file indicated generally at 450 used to create an audio file seen at 460 and a selections file indicated at 470.

The HTML file illustrated at 450 uses conventional <IMG> tags to identify image files, conventional emphasizing tag pairs <EM> and </EM> to designate highlighted passages, and conventional <A> and </A> HTML tag pairs to designate

44

the anchor text and link target of a hypertext link. Utilizing conventional HTML to describe the narrative content to be presented in audio form provides several significant advantages, not the least of which are:

conventional HTML composition software may be used to add the image and emphasis tags by means of visual tools which eliminate the need for hand-coding on a character level;

a narrative text version of the audio programming may be viewed and printed, including both the emphasized text and the imbedded images, using most popular web browsers;

existing HTML files may be readily converted into audio multimedia presentations with little or no HTML editing being required;

HTML file may be made available from a server in a form which can be viewed in the normal way by any web browser yet and alternatively presented accordance with the invention in the form of an interactively browsable audio program with synchronized images;

the HTML file may be supplied along with the audio file as a transcript for the audio presentation, and to permit the audio presentation to be indexed and searched; and

the HTML may be automatically converted into the combination of an audio file using conventional speech synthesis techniques to process the narrative text with the HTML tags being used to compile a selections file which enables the player to interactively browse the audio file using highlighted and linked passages, and to synchronize the image presentation with the audio file.

As seen in FIG. 7, the HTML text passage seen at 450 begins with an image tag, <IMG SRC="IMGFILE1.JPG">, which to specify that the display of JPEG image in the file named "IMGFILE1.JPG" should begin at that point. The image tag is translated into a pair of "I" and "J" selection records seen at 472 which respectively contain the ImageID specifying IMGFILE1.JPG and the IMGSTART byte location in the audio file 460 where the display of that image is to begin. This display continues until the next <IMG> tag is encountered specifying the IMGFILE2.JPG image which creates the "I" and "J" selection record pair at 473. The <IMGOFF> is not standard HTML and hence would be ignored by conventional web browsers, but is inserted for recognition by the selections file compiler which responds by inserting the "K" record at 474 which specifies the point at which the current image display should end.

Immediately thereafter, the phrase "Television and motion pictures" is identified as a highlighted passage by the tag pair <EM> and </EM> seen in the text 450. These tags are translated into the "H" and "E" record pairs at 475 in the selections file 470 which identify the beginning and ending of the phrase in the audio file. As discussed earlier in conjunction with FIG. 5, the highlight markers in the selections file enable the player to play only the highlighted passages when in the highlight mode. A second "H" and "E" record pair seen at 476 is produced by the HTML text "<EM> bandwidth</EM>".

A conventional HTML hypertext anchor "<A HREF='target'> full motion video</A>" is processed to produce the three records "A", "B" and "L" at 478 in the selections file which respectively designate the beginning and ending of the anchor text passage and the location of a linked information. The "HREF='target' " portion of the HTML specifies the target location in conventional HTML and that symbolic address is then translated by the selections file compiler into the location within the selections file of the selections file record which refers to that target or, for targets in program segments which are not part of the currently sched-

 LENOVO ET AL. -- EX. 1001 -- Page 31

US 7,509,178 B2

45

uled programming defined by the selections file, by a negative number representing the negative of the ProgramID number of the target program segment.

The HTML forms mechanism may also be used to incorporate requests for user input at predetermined times during the playback of program segments. As described earlier in connection with FIG. **5**, user inputs may take the form of recorded comments and annotations which are analogous to the <INPUT TYPE="text"> and the <TEXTAREA> tagged requests in an HTML form which similarly request the recipient to supply text data. In addition, the embodiment of the invention which has been described incorporates a mechanism for accepting "YES"/"NO" selections from a user which is analogous the HTML form <INPUT TYPE="checkbox"> tag. Similarly, the value choice mechanism using "V" selection records provides a radio-button-style mechanism for indicating a user's choice from among several options.

Standard HTML input tags include a Name attribute which can be used as an identifier for the data entered. As HTML is translated into an equivalent audio file, the tags in the written HTML are translated into records in the selections file which contain byte location values specifying when the player should pause the playback and accept the user response. The resulting uploaded usage log file (containing responses to radio and checkbox input tags) contains the response value together with the original byte location value from the selections file which serves the tag identifier. In order to facilitate processing of the responses, the HTML to audio conversion process may advantageously save a table correlating the Name values in the HTML source with the byte location values. In this way, the input tag Name parameter may be used as a symbolic identifier to identify and process response data.

The HTML input tag Value parameter is conventionally used to supply a default response value to be supplied when the user does not supply a different response. Value parameters may accordingly be saved for later use and inserted as output data when the user does not respond to the request for input (as indicated by the absence in the uploaded files of any response data containing the byte location value for the tag not responded to). In the same way, hidden HTML tags may be imbedded in the original HTML and saved during the HTML to audio conversion to indicate the correspondence between particular byte locations in the audio file and symbolic location names identified by the symbolic Name parameter specified in the hidden tag. Such hidden tags may be used, for example, to identify the beginning and end of particular passages and may be compared with the usage logs to determine the extent to which users exercised their option to skip the remainder of a program during the designated passage.

## CONCLUSION

It is to be understood that the embodiment of the invention which has been described is merely illustrative of one application of the principles of the invention. Numerous modifications may be made to the specific structures and functions used in that embodiment without departing from the true spirit and scope of the invention.

What is claimed is:

**1**. An audio program player comprising:

a communications port for establishing a data communications link for downloading a plurality of separate digital compressed audio program files and a separate sequencing file from one or more server computers,

a digital memory unit coupled to said communications port for persistently storing said separate digital compressed audio program files and said separate sequencing file,

46

said sequencing file containing data specifying an ordered sequence of a collection of said separate digital compressed audio program files,

an audio output unit including at least one speaker or headset for reproducing said audio program files in audible form perceptible to a listener,

one or more manual controls for accepting commands from said listener, and

a processor for continuously delivering a succession of said audio program files in said collection to said audio output unit in said ordered sequence specified by said sequencing file in the absence of a program selection command from said listener, and for discontinuing the reproduction of the currently playing audio program file and instead continuing the reproduction at the beginning of a listener-selected one of said audio program files in said collection in response to a program selection command from said listener.

**2**. The audio program player as set forth in claim **1** further comprising a display screen for displaying a scrollable listing describing each of said separate digital compressed audio program files in said collection displayed in said ordered sequence specified by said sequencing file wherein said listener-selected audio program file is chosen by said listener by employing one or more of said manual controls to accept a program selection command from said listener to select one of said audio program files described on said scrollable listing for immediate reproduction by said audio output unit.

**3**. The audio program player as set forth in claim **2** wherein said display screen provides a visible indication of said currently playing audio program file in the collection of programs specified by said sequencing file and described on said scrollable listing.

**4**. The audio program player as set forth in claim **3** wherein said processor responds to a skip forward program selection command accepted from said listener by discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of that audio program file which follows said currently audio program file in said ordered sequence specified by said sequencing file.

**5**. The audio program player as set forth in claim **4** wherein said processor responds to a skip backward program selection command accepted from said listener at a time when said currently playing audio program file has played for at least a predetermined amount of time by discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of said currently playing audio program file.

**6**. The audio program player as set forth in claim **5** wherein said processor responds to a skip backward program selection command accepted from said listener at a time when said currently playing audio program file has not yet played for said predetermined amount of time for discontinuing the reproduction of the currently playing program segment and instead continuing the reproduction at the beginning of a program segment which precedes the currently playing program segment in said ordered sequence specified by said sequencing file.

**7**. The audio program player as set forth in claim **6** wherein said processor responds to a skip forward program selection command when playing the last audio program file in said ordered sequence specified by said sequencing file by continuing reproduction at the beginning of the first audio program file in said sequence, and responds to a skip backward program selection command accepted at a time when said first audio program file is playing but said first audio program

LENOVO ET AL. -- EX. 1001 -- Page 32

US 7,509,178 B2

47

file has not yet played for said predetermined amount of time by continuing reproduction at the beginning of the last audio program in said sequence whereby the reproduction of the audio program files specified by said sequencing file can be skipped from beginning to beginning in both the forward or backward direction in a bidirectional endless loop.

**8.** The audio program player as set forth in claim **7** wherein each of said separate digital compressed audio program files stored in said digital memory unit is designated by a unique program identifier, wherein said sequencing file specifies the program identifier of each of the audio program files in said collection, and wherein said digital memory unit further stores program description data comprising a plurality of program description records stored separately from said audio program files each of which:

    (a) describes a given one of said separate digital compressed audio program files stored in said digital memory unit,

    (b) contains or is designated by the unique program identifier designating said given one of said audio program files,

    (c) specifies text displayable on said display screen describing said given one of said separate digital compressed audio program files, and

    (d) specifies the storage location of said given one of said separate digital compressed audio program files.

**9.** The audio program player as set forth in claim **1** wherein each audio program file in said collection specified by said sequencing file is selected in accordance with program preference data or program selections accepted from said listener to define a playback session that is personalized to the preferences of said listener.

**10.** The audio program player as set forth in claim **9** wherein at least some of said separate digital compressed audio program files downloaded from said one or more server computers are selected by or on behalf of said listener from a catalog listing of recommended audio program files available from said one or more server computers wherein the audio program files specified in said catalog listing of recommended audio program files are selected in accordance with program preference data or program selections previously accepted from said listener.

**11.** The audio program player as set forth in claim **10** wherein at least some of said separate digital compressed audio program files downloaded from said one or more server computers are specified by requests transmitted by said listener to said one or more server computers via said communication link.

**12.** The audio program player as set forth in claim **11** wherein said one or more manual controls include a keyboard for accepting account information from said listener that is transmitted via said communications link to said one or more server computers to establish a subscription account for said listener, said account information including a unique identification of said listener, a password supplied by and known to said listener, and credit card information for use in billing charges to said listener, and wherein at least some of said separate digital compressed audio program files downloaded from said one or more server computers and specified by said requests transmitted by said listener are purchased by said listener and charged to said subscription account.

**13.** The audio program player as set forth in claim **9** wherein at least some of said separate digital compressed audio program files downloaded from said server computer are selected by said server computer based on data describing the preferences of or past requests submitted by said listener.

48

**14.** An audio program player for automatically playing a collection of audio program files selected by a listener, said player comprising, in combination:

    a memory unit for storing:

      (a) a plurality of audio program files,

      (b) program description data including displayable text describing each of said audio program files, and

      (c) at least one separately stored playback session sequencing file which specifies an ordered sequence of a collection of said plurality of audio program files,

    a communications port for downloading at least some of said audio program files and said playback session sequencing file from said one or more server computers, at least some of said audio program files downloaded from said one or more server computers being selected by said listener from a library of audio program files available from said one or more server computers, and said audio program files in said collection specified by said playback session sequencing file being selected by or on behalf of said listener to produce a personalized playback session,

    one or more controls for accepting input commands from said listener,

    a display screen for presenting a visual menu listing to said listener containing displayable text describing some or all of the audio program files in said collection specified by said sequencing file,

    an audio playback unit for automatically and continuously reproducing said audio program files in said collection in the ordered sequence specified by said playback session sequencing file in the absence of a control command from said listener, and

    a processor for executing one or more utility programs to perform control functions in response to said input commands from a user, said functions including:

      (a) in response to a first one of said input commands designating a selected audio program file described on said visual menu listing for causing said audio playback unit to discontinue the reproduction of the currently playing audio program file in said ordered sequence and to instead continue the reproduction at the beginning of said selected audio program file,

      (b) in response to a second one of said control commands for discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of that audio program file which follows said currently playing audio program file in said ordered sequence specified by said playback session sequencing file,

      (c) in response to a third one of said control commands accepted from said listener at a time when said currently playing audio program file has played for at least a predetermined amount of time by discontinuing the reproduction of said currently playing audio program file and instead continuing the reproduction at the beginning of said currently playing audio program file, and

      (d) in response to said third one of said control commands accepted from said listener at a time when said currently playing audio program file has not yet played for said predetermined amount of time for discontinuing the reproduction of the currently playing program file and instead continuing the reproduction at the beginning of that audio program file which precedes the currently playing program segment in said ordered sequence specified by said playback session sequencing file.

LENOVO ET AL. -- EX. 1001 -- Page 33

US 7,509,178 B2

49

50

**15**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **14** wherein said display screen visually indicates the currently playing audio program file as playing progresses.

**16**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **15** wherein said memory unit further stores image data files and wherein said processor displays selected ones of said image data files on said display screen concurrently with the reproduction of specified ones of said audio program files in the ordered sequence specified by said playback session sequencing file.

**17**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **16** wherein said control functions performed by said processor by executing said utility programs further include displaying the time remaining to be played in the audio program file currently being reproduced by a client player in the ordered sequence specified by said playback session sequencing file.

**18**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **16** wherein said one or more of the audio program files in said collection specified by said playback session scheduling file are selected based on preference data indicating subject matter categories of interest to said listener determined by past program selections accepted from said listener.

**19**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **18** at least some of said audio program files downloaded from said one or more server computers are purchased by said listener.

**20**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **19** wherein said one or more controls include a keyboard for accepting account information from said listener that is transmitted via said communications port to said one or more server computers to establish a subscription account for said listener, said account information including a unique identification for said listener, a password, and credit card information for use in billing charges to said listener, and wherein at least some of said program files downloaded from said one or more server computers are purchased by said listener and charged to said subscription account.

**21**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **20** wherein said audio program files purchased by said listener are downloaded to said player in encrypted form and wherein said processor decrypts said audio program files purchased by said listener prior to their reproduction by said audio playback unit.

**22**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **18** wherein at least some of said utility programs are downloaded via said communications port from said one or more server computers and stored in said memory unit for execution by said processor.

**23**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **22** wherein at least some of said audio program files available from said one or more server computers are organized into subject matter categories and wherein said player transmits a request to said one or more server computers for a catalog listing of programs available in a specified one or more of said categories, said player displays said catalog listing on said display screen, and said player thereafter transmits a request for and receives one or more audio program files specified in said catalog listing of programs for future playback.

**24**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **22** wherein said control functions performed by said processor by executing said utility programs further include adding, deleting or reordering one or more of the audio program files in said collection specified by said playback session sequencing file.

**25**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **18** wherein some of said audio program files represent episodes in a series of related episodes which are requested as a group by said listener and are thereafter automatically downloaded to said player as said episodes become available for download from said one or more server computers.

**26**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **18** wherein the duration of the scheduled playback session specified by the said playback session sequencing file is determined in part by preferences data accepted from said listener.

**27**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **14** wherein specific ones of said audio program files are selected by said listener by downloading and reviewing one or more HTML program selection forms from said one or more server computers via the Internet, selecting said specific ones of said audio program files from audio program files described by said selection forms, and downloading said specific ones of said audio program files from said one or more server computers.

**28**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **14** wherein each of said audio program files stored in said memory unit is designated by a unique program identifier and wherein said playback session sequencing file specifies the program identifier of each of the audio program files in said collection.

**29**. The audio program player for automatically playing a collection of audio program files selected by a listener as set forth in claim **28** wherein said program description data comprises a plurality of program description records each of which:

(a) describes a given one of said audio program files stored in said memory unit,

(b) contains or is designated by the unique program identifier designating said given one of said audio program files,

(c) specifies said displayable text describing said given one of said audio program files, and

(d) specifies the storage location of said given one of said audio program files.

\* \* \* \* \*

Appx258 LENOVO ET AL. -- EX. 1001 -- Page 34

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 2nd day of February, 2024, I caused this

Corrected Non-Confidential Brief of Appellant to be filed electronically with the

Clerk of the Court using the CM/ECF System, which will send notice of such filing

to all counsel or record as registered CM/ECF users.


/s/ Steven M. Hanle
*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*13,987*] words.

[     ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>February 2, 2024            </u>            <u>/s/ Steven M. Hanle            </u>
                                                                           *Counsel for Appellant*